# Exhibit 3

2012 WL 6693116 (Mich.Cir.Ct.) (Expert Deposition)
Circuit Court of Michigan.
Wayne County

Kathleen SCHUTT and Donald Schutt, Next Friends and Legal Guardians of Tyler Schutt, a minor and legally
incapacitated person, Plaintiffs,

v.

NEW OAKLAND CHILD - ADOLESCENT & FAMILY CENTER, an assumed name of Ismail B. Sendi, M.D.,
P.C., a Domestic Professional Service Corporation, and Ismail B. Sendi, M.D., Jointly and Severally, Defendants.

No. 10011189.
February 3, 2012.

Case No. 10-011190-NM

**The Deposition of Gerald Shiener, M.D.**

**Case Type:** Medical Malpractice-Facility >> Clinic/Center/Group
**Case Type:** Medical Malpractice-Physicians & Health Professionals >>Pediatrician
**Case Type:** Medical Malpractice-Procedures & Treatment >> Therapy Negligence
**Case Type:** Medical Malpractice-Procedures & Treatment >> Failure to Diagnose/Treat
**Case Type:** Medical Malpractice-Physicians & Health Professionals >>Psychiatrist
**Jurisdiction:** Wayne County, Michigan
**Name of Expert:** Gerald A. Shiener, M.D.
**Area of Expertise:** Health Care-Physicians & Health Professionals >>Psychiatrist

**Representing:** Plaintiff

Appearances.

Helen K. Joyner Fieger, Fieger, Kenny & Giroux, P.C.
19390 West Ten Mile Road
Southfield, Michigan 48075
(248) 355-5555
Appearing on behalf of the Plaintiffs.
John J. Ramar

Ramar & Paradiso, P.C.
2151 Livernois
Suite 300
Troy, Michigan 48083
(313) 965-4524
Appearing on behalf of the Defendants.

Hon. Michael F. Sapala.

Taken at 251 East Merrill Street, Suite 230,

Birmingham, Michigan,

Commencing at 1:21 p.m.,

Friday, February 3, 2012,

Before Deborah A. Culver, CER-3001.

## TABLE OF CONTENTS

WITNESS ... PAGE

GERALD SHIENER, M.D.

EXAMINATION

BY MR. RAMAR: ... 4

EXAMINATION

BY MS. JOYNER: ... 86

## EXHIBITS

EXHIBIT ... PAGE

(Exhibit attached to transcript.)

DEPOSITION EXHIBIT 1 y(3)27 P4

GERALD SHIENER, M.D., was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

MARKED FOR IDENTIFICATION DEPOSITION EXHIBIT 1 1:21p.m.

MR. RAMAR: Dr. Shiener, my name is John Ramar, I represent the Defendants in this Schutt matter which you have been identified as a proposed expert witness and have signed an affidavit of meritorious claim.

## EXAMINATION

BY MR. RAMAR:

Q. I've had marked as Exhibit 1 a copy of your Curriculum Vitae. Is it a current and up to date summary of your professional affiliations, accolades and achievements?

A. It is.

Q. Doctor, are you board certified in child psychiatry?

A. No, I'm not.

Q. Okay. You understand that Dr. Sendi is board certified in child psychiatry?

A. I do.

Q. You understand that when he was treating Tyler Schutt, that he was treating Tyler Schutt in his capacity as a board certified child psychiatrist?

A. I'm not sure that I understand the question. I can't imagine what other capacity in which he would be acting.

Q. Sure. What's the date on this one. 2009.

Doctor in 2008-2009, did you devote a majority of your professional time to the active practice of child psychiatry?

A. Not the active practice of child psychiatry.

Q. Okay.

A. The active practice of psychiatry.

Q. Now, you are board certified in adult psychiatry?

A. I am.

Q. And you have CAQ's?

A. I do.

Q. In what areas?

A. Addiction, forensic, geriatric psychiatry and what they call psychosomatic medicine.

Q. And in the calendar year 2008-2009, was a majority of your professional time, and by majority I'm referring in excess of 50% --

A. I think I get that

Q. Okay. Well, only because it's - well, apparently the Court of Appeals didn't get it until they decided the Keifer versus Markley decision, but that's neither here nor there.

A. Well, they're lawyers.

Q. I know.

In any event, in the calendar year 2008-2009, did you spend or devote a majority of your professional time to the active practice of adult psychiatry?

A. Well, I spent the majority of my time in the active practice of psychiatry. I don't want to give you the idea that I limit my practice to adults.

I would say of the time that I spend practicing clinical psychiatry, the majority of my patient load was adult, would have consisted of adults.

Q. Okay. You have certificate of added qualifications in geriatric psychiatry?

A. I do.

Q. As well as addictive --

A. Addiction psychiatry.

Q. And forensic?

A. Yes.

Q. In 2008-2009, what percentage of your professional time was devoted to forensic psychiatry, approximately?

A. I never really calculated it, but I'd say it was a small percentage of my practice.

Q. About ten percent; right?

A. I may have estimated it at ten percent in another proceeding.

Q. Okay.

A. Since you're reaching for papers, I assume --

Q. I'm reaching for depositions.

A. You have some documentation?

Q. Yes, I do.

A. It may have been about ten percent.

Q. And the reason I say that is because in the Henrietta case in 2006, you gave an estimate of approximately ten percent. Excuse me. Williams?

A. I have to take your word for it.

Q. Okay.

A. The name doesn't ring a bell. And 2006 was a long time ago.

Q. And in 200 - well, let me ask you this.

Has your practice changed as far as the active practice of psychiatry as far as percentage devotion in last five years?

A. Well, to the extent that certain areas of my practice wax and wane, some weeks or some months I may do more of one thing or another. But no, basically I've been doing the same thing for many years.

Q. And as we sit here today, can you testify within a reasonable degree of medical certainty whether or not for the last five years more than 50% of your professional time has been devoted to the active practice of adult psychiatry?

A. Well, with the understanding and the caveats that I gave you the last time you asked me a similar question, I would say yes, most of my time working has been involved in the clinical practice and/or teaching, there's a significant overlap there, and most of my patients are adults.

Q. Okay. As far as an educational background, 1969, Cass Tech; right?

A. '67.

Q. '67, I'm sorry.

'67 through what, '71, Wayne State?

A. That's right.

Q. And then '71 through '75, Michigan State. And you had a degree in medicine?

A. Yes.

Q. Allopathic?

A. Yes, allopathic. I went to the M.D. school. I got my degree in 1975.

Q. And then you did a residency?

A. I did.

Q. And was that with the DMC -- or excuse me - Sinai Grace - excuse me. Sinai?

A. Sinai Hospital in Detroit. As we go back down memory lane.

Q. Exactly.

And you are currently affiliated with the DMC?

A. I am.

Q. In the Department of psychiatry?

A. They call it Psychiatry and Behavioral Neurosciences, but yes.

Q. Who is the chair of that department?

A. That's interesting because it just changed. I think his name is -- his name is David Rosenberg.

Q. Do you know Dr. Rosenberg?

A. Not well, but I know him.

Q. Do you know what he's boarded in?

A. A lot of things probably.

Q. Okay. Were you aware that he's an expert in this case?

A. No.

Q. I see you have a box of materials in front of you?

A. I do.

Q. Is that the sum and substance of the various documents and materials which you have been sent in this case?

A. There's about ten inches of paper. It's not the sum and substance; this is the bulk of what I've been sent, the entire bulk.

Q. And you have a DVD. Is that the day-in-the-life of Tyler Schutt?

A. I have two, two copies.

Q. You know what, I forgot. I have a check for you for $1000.

A. Thank you.

Q. And just speaking of the $1000, what is your fee for deposition?

A. For the time involved in giving a deposition, $1000 for the first 90 minutes and then $450 an hour thereafter.

Q. And your fee for reviewing medical/legal matters?

A. If it's an hourly fee, it's $450 an hour.

Q. If you testify at trial, what is your fee for trial testimony?

A. Trial testimony is not for sale, but the time involved in giving testimony, between $2500 and $3500 for a half day. $5000 to $6000 for a full day.

Q. And looking at this bulk material that you have in front of you, approximately how many hours did you devote to this case?

A. I would say between six and eight hours.

And just let me warn you that I have two copies of many materials here.

Q. Okay. And I presume the focal area of your review were the psychiatric-based records in this case?

A. That's right.

Q. And they consist of the St. John psychiatric records which predate the ER presentation to St. Mary's and the partial hospitalization therapy at New Oakland?

You know what I'm talking about?

A. Yeah. Those are the psychiatric records that I've had.

Q. As well as the pediatric office records, and I think that's where the problem was first noted?

A. From Dr. AJ.

Q. Yes. And as a matter of fact, Dr. AJ started this patient on psychiatric medication?

A. I think so.

I'll spread it out so I can reach this stuff.

Q. Okay. Do you know what medication he gave him?

A. I don't remember offhand.

Q. I think I probably have mine quicker.

Looking at the 1-15-09 office visit.

A. Do you have a Bates number?

Q. Mine aren't Bates stamped.

A. Mine aren't either.

Q. Let me see.

Do you know, my eyes are bad, I can't read this.

A. I have my glasses.

Q. It's right here. It's too small for me.

A. Yes.

Q. What med? Do you see it? It's stamped right here.

A. That's tiny.

Q. I know.

A. Fluoxetine, Prozac.

Q. Okay.

A. 20 milligram capsules, number 30.

Q. Is Prozac considered and antidepressant?

A. It is.

Q. And next to that you see that it said black box warning?

A. Yes.

Q. The black box warning is apparently there have been some studies which suggest that there is an increase in suicidal ideations in the first 30 days of using this type of medication?

A. Well, I don't think -- well, with this type of medication, yeah, not with Prozac exclusively.

But it was thought to be first described with Prozac in 1.986, but a literature review showed that it was described with Disopromine even prior retrospective.

So there's some evidence that antidepressants do increase suicidal risk and suicidal thinking in the early stages of treatment.

Q. And the black box warning, is that only for use in adolescent patients?

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

A. I believe the black box warning is more specifically for adolescents.

Q. And that was research which was initially done in Brittain, Great Brittain, if you know?

A. Well, the initial studies about suicidality were in the United States. The British studies spoke about the adolescent population.

But again, I think we use more antidepressant medications for adolescents in the United States than they do in Great Brittain.

Q. And is Prozac considered an appropriate medication for an adolescent psychiatric patient?

A. Well, that's a very, very general question. And what I would say is if an adolescent psychiatric patient is properly evaluated, and an antidepressant medication is indicated, Prozac would be one of the appropriate choices.

Q. And you reviewed these pediatric records; correct?

A. Yes.

Q. Did you come to any conclusion whether or not the scripting of Prozac at this time was appropriate?

A. I didn't find it to be inappropriate.

Q. So flipping that over, did you find it to be appropriate?

A. That calls for a more lengthy discussion, and that's more the issue of what the treatment of choice for adolescent depression would be, and whether psychotherapy would be more indicated, and whether referral for counseling as an adjunct.

Every case is different. My understanding from my review of this matter indicates that this family had a very good and close relationship with this doctor, so in this instance I don't think it was inappropriate for him to do so.

If you want me to say that it was appropriate, I could say yes, but I think I want to be careful and I don't want to give anyone the idea that that's all you need to do or that would be appropriate in any instance.

I think there are special circumstances here because of the regard that this family had for that doctor.

Q. Substance-induced mood disorder?

A. Yes.

Q. What is that?

A. Well, that's a diagnostic category that psychiatrists use to describe people who have depressive symptoms, but the depressive symptoms are not due to a native depressive illness or a functional depressive illness, but it's due to the ingestion of certain substances.

And there are lots of substances, therapeutic medications as well as drugs of abuse that can alter moods.

Q. And what are the necessary criteria pursuant to the DSM-IV TR in order to make a diagnosis of SIMD?

A. I don't know that I could quote that from memory. But I think that the Diagnostic and Statistical Manual, which is only a guideline that doctors use to communicate with each other, has to be used by trained professionals with clinical judgement.

But it basically says if someone manifests depressive symptoms and the symptoms are due to the use of a substance that's

capable of affecting mood, and the kinds of substances vary, but again, drugs of abuse, therapeutic drugs, corticosteroids, alcohol, tranquilizers, pain medicines, all kind of things, even drugs like Accutane, acne preparations, all those drugs.

Q. Did Tyler have substance-induced mood disorder, in your opinion?

A. That was my conclusion based on reviewing all this information, he was using drugs of abuse.

Q. And what drugs and/or substances was he using which would allow you to arrive at that diagnosis?

A. Well, there were reports that he was using marijuana, huffing paints. And so those would be primary offenders.

Q. What about alcohol?

A. I believe there's reference to alcohol too.

Q. As far as the history as contained in New Oakland records, I think it's in the biophysical profile?

A. I think biopsychosocial.

Q. Yeah.

When was the first time that he volunteers use of the alcohol?

A. Let me take a look here. So let's see. That's the follow up transmission summary.

Initial treatment plan, is that what we're talking about?

Here we are.

We have a substance abuse, and it says age first used. So you have alcohol, age first used, 13. Sedatives, 14. Took three of mom's Ambien a month ago. Inhalants. Client admits to huffing hair spray four times.

Marijuana, age 12. Client admits to using frequently. Date last used, January of 2009.

Q. Now, as far as a diagnosis of substance-induced mood disorder, does the use of the substance have to be concurrent with the mood disorder? In other words, do they go hand in hand as far as the mood disorder must be induced by the substance use?

A. Well, let me try to answer your question as best as I understand it.

Q. Sure.

A. Does the mood disorder have to be due to the substance abuse. I think that's implied in the diagnosis.

Q. Yeah.

A. The other part of your question, the other clause that was just kind of dangling there, you said something about concurrence.

And first of all, I want to be careful when answering this because I don't want to endorse the idea that the DSM is some of sort of book of statutes and those requirements are absolute.

And so I would say no, that the substance abuse does not have to be concurrent, and there is no absolute criteria for temporal association.

Q. Okay.

A. Someone who -- someone can use a drug of abuse over a period of several days or weeks, that can set off a depressive syndrome that may last for weeks or months.

Q. So as far as the alcohol -- and assuming that this information is accurate.

A. Okay.

Q. It says alcohol, first used age 13, last used summer of '08.

Here's my question. Do you believe that there is a causal connection between the use of alcohol and the diagnosis of substance-induced mood disorder?

A. Well, for purposes of this question, which I would assume is hypothetical, and if I'm to assume the accuracy of that history, I'm only to act as a conduit for what's written on paper, then I would say that that would be somewhat less likely.

But again, I just want to be careful in answering that because of the multiple caveats in thinking that way.

Q. What are those caveats?

A. Well, substance abuse history, especially on an intake, especially when dealing with adolescents, ha; limited reliability, and there are inferences that clinicians make beyond just the manifest of what patients tell us.

Q. And based upon your review of any other aspect of these records, did you come to a conclusion that the substance or the chemical use history as documented by, I think, Alicia Kalinski, was inaccurate?

A. Well, I think that some of the collateral history talked about an onset of use, and use with his sister, and onsets that were more recent. So there may be other competing versions of this. But I wouldn't say that this is --

What I would say is this history can't be taken literally.

Q. Okay.

A. I think it would be dangerous to do so.

Q. When he was admitted - and I'm going to come back to this --

Now, according to the St. Mary's ER record, and just to put it in perspective, St. Mary's was the facility that his mom took him to after she discovered, I guess, a razor blade in his room, and he had volunteered, I believe, some suicidal ideations.

My question is this. Based on the toxicology results, were there any illicit substances that were noted to be in his body at that time?

A. This is also very small print, so please bear with me. No.

Q. Okay. Now, according to the behavioral medicine triage note - and I'll tell you what, I'll give you mine.

A. Is that the St. Mary's?

Q. Yes.

What it says is patient admits to smoking marijuana at least once a week for the last year.

Do you remember seeing that?

A. Yes.

Q. If he's smoking marijuana for the last year -- is THC considered the metabolite for marijuana?

A. One of them.

Q. Okay. Do you know how long it would be in the system if one smokes it?

A. In an adult male, smoking on a weekly basis, you would expect to find detectable levels of cannabinoid for a couple of weeks.

But adolescents metabolize those medications differently. And for whatever purpose, the detection threshold for cannabinoids is considered to be higher, it's higher than other drugs of abuse.

Q. So the fact that the toxicology is negative for marijuana metabolites, THC, can you offer an opinion as to, in this case, why that would be, if the history was smoking once a week?

A. Well, first of all, the tests done in the emergency room are tests that are available rapidly. They're done -- I believe those were urine tests, and they're only screening tests; their accuracy is somewhat limited and their sensitivity is somewhat limited.

And again, with cannabinoids, the cut-off points are higher, you need a higher level to give you a positive result.

Q. Talking about specificity and sensitivity for the moment, because you mentioned it as far as the sensitivity for a urine toxicology, do you know what the sensitivity of a urine toxicology test is?

A. Sensitive, you mean for --

Q. For --

A. Well, I think they talk about detection levels of 100 nanograms per milliliter for other drugs of abuse, and I think it's about 300 nanograms per milliliter for cannabinoids.

And again, for those kind of screenings, it's been my experiences that the specificity for some drugs of abuse is limited.

Now, there isn't really a specificity issue with cannabinoids. But with something like Cocaine, certain decongestants will cross-react with Cocaine, so if you see a positive, and we're that concerned, we would follow it up with a more specific serum test.

Q. Now, you said specificity. I believe you said initially sensitivity; right?

A. Right, sensitivity, and I gave you the sensitivity numbers as I understand them.

Q. Now, is there an inverse relationship between the sensitivity of a specific test, and conversely the specificity of that test?

A. Well, not really. Specificity means if you're testing for Substance A, will the test only react to Substance A. There might be things that are like Substance A that will set off the test. Again, as I said, when we talk about Cocaine, some decongestants or antiarrythmic drugs may set off a screen: So that's really how sensitive a test is. And then -- excuse me, how specific the test is.

And sensitivity just tells you how much needs to be there for you to see it.

Q. And far as the - are you familiar with the term positive predictive value?

A. That's a statistical term.

Q. Are you familiar with it?

A. Yeah.

Q. Are you familiar with the term as relates to the positive predictive value of a urine toxicology test in diagnosing the presence or absence of THC?

A. I've read discussions on that.

Q. But you don't know - sitting here offhand, you don't know what it is?

A. I don't think I could give you -- I don't think I could give you a textbook definition here. But it really is just a measure of how useful the test is.

And to be useful, there are a number of measures that you have to consider in terms of cost, speed of availability, specificity and sensitivity. So it's an index of utility measures.

Q. Okay. Is suicide predictable?

A. Well, that's a complex question. And we -- risk of suicide can be assessed.. And when the risk is assessed, actions can be taken to reduce the risk. Human behavior can be predictable within limits, but it's not absolutely predictable.

Q. Are there any objective tests in psychiatry which can determine a patient's risk for suicide?

A. Well, when you say objective tests --

Q. Let me define objective test for you.

If I were to go to the emergency room with a history of falling off a ladder and complaining of arm pain, there are objective tests which can be done which could determine within 99% accuracy whether or not I have a fracture injury.

A. Really? You think--

Q. Oh, yeah.

A. You think that that's 99%?

Q. Oh, yes.

A. Just because some orthopedic surgeon told you that?

Q. No, just because imaging studies can confirm that.

A. I don't know that imagining studies are that accurate, but I think I get a sense of what you mean.

Q. You can do flat films, x-rays, you can do MRI's, et cetera.

A. There are all kinds of imaging studies.

Q. Okay. Are there any objective tests in psychiatry which would allow you to determine whether or not a patient is suicidal?

A. Well, again, that's a difficult question to ask. We don't have anything like the x-ray, we don't have anything where we can take a picture of someone's brain and see some anatomic variant or some functional variant to say that this means the patient's at risk for suicide.

But there are means of assessing suicidal risk that are evidence-based and that can give psychiatrists directions as to what sort of interventions would be required to reduce risk.

Q. Is suicide preventable?

A. It is.

Q. Always?

A. Well, always. Even your imaging studies are only 99% effective, so I don't think I would say always.

Q. Do you know what the sensitivity of determining whether or not a patient is suicidal, using your armament of tests, be they risk assessment, be they the various, what do they call them, like the Hamilton and whatever you use?

A. Well, wait. Some of those that you're talking about are not specifically oriented towards suicide, they're only oriented towards assessing depression, which is one factor in assessing suicide risk.

And what I will tell you is this. That it's a state of our art to make a suicide assessment, and a suicide assessment is not an absolute prediction of what someone is going to do. But it's a way to give a doctor a guideline as to how to intervene in certain cases, and the more those risk assessments are applied and the more stringently they're applied, and the more instruments or the more dimensions that you use, the greater your accuracy, the greater your predictability becomes.

Again, it doesn't approach the accuracy or predictability of what you described an imaging study to be. And I've heard statistical discussions that can -- reductionists discussions that can reduce this to an absurdity, that talk how much money you have to spend to screen and to treat to prevent a given number of suicides that would seem to suggest that it's not cost effective.

But nonetheless, clinical standards of care indicate that risk assessment can be made and that action be taken to reduce risk. And if those things are applied, they are considered to be effective based on evidence that we have.

So I can't give you a number and I can't give the -- I can't describe the reductionist statistical discussion, that would make it seem futile, but the standard of care is that it's not futile.

Q. What's a suicidal ideation?

A. Well, suicidal ideation is a fancy doctor's way of saying that someone is thinking about suicide.

Q. Do all patients with suicidal ideations need to be admitted on an inpatient basis?

A. Well, I want to be careful in answering that because I don't think there's any one symptom that necessarily suggests one particular clinical action. So I'd say no, not everyone who thinks about suicide and talks about suicide necessarily needs hospitalization.

Q. What's a suicidal plan?

A. Well, someone who has not only thought about suicide, but has thought about it to the extent that they -- they thought about exactly how they would go about doing it.

Q. Do all patients who have suicidal ideations and a plan need to be admitted on an inpatient basis?

A. Because we're dealing with human beings, these things are multidimensional, and you use the term all.

But I would say more than in your previous example.

Q. Obviously it depends on the ability to carry out the plan? For example, by illustration and not limitation, if someone says I'm feeling suicidal and I have a plan of what I'm going to do is I'm going to take a rocket ship to the moon, there's no air up there, so I will suffocate, the plan really isn't realistic, is it?

A. Well, that would raise another issue if someone's thinking is that distorted and someone's thinking is that naive, they may have another problem.

Q. Psychosis?

A. That would suggest something like that, their relationship to reality would be impaired. That's why I said it's multidimensional. That would trigger another route to indicate an aggressive intervention.

Q. Do you believe that Tyler Schutt should have been admitted on February 19, 2009?

A. When he was admitted to the Oakland facility?

Q. Yes.

A. I believe inpatient care was indicated.

Q. Based on what?

A. Based on his behavior, his use of drugs, his irritability, fighting with the hockey coach, his disappointment in his father, his thoughts of suicide, his family history of substance abuse, his family history of suicide.

Q. Anything else?

A. His age. His mother's difficulty in controlling his behavior.

Q. When you saying control his behavior, are you talking about the substance abuse?

A. Well, the substance abuse, the irritability.

Q. When you're talking about suicide, you're talking about the mother's brother?

A. Yes.

Q. Committed suicided at what, 19, thereabouts?

A. Yes.

Q. Anything else?

A. Not that I can think of right now.

I mean that would be enough. I could pore over the medical records and talk about issues of his demeanor. But I think the big points are that this is a teenager who had shown that he could accept discipline in a structured athletic activity, and shown that he could perform in school, his performance deteriorates. His behavior gets irritable and out of character. He begins at

least reporting the use of drugs and alcohol. And he has the context of a father who's got a substance abuse history, a maternal uncle who has a mood disorder history, or at least died by suicide. So all those things are cause for alarm.

Q. The father's history apparently was use of marijuana?

A. That's right. And I believe alcohol perhaps.

Q. And the fact that based on his history Tyler had been using these drugs before these changes occurred - and when I say changes, I'm talking about the fighting with his hockey coach, the fact that his school work had deteriorated, the fact -- those things; correct? That's what you're talking about as far as there had been a change in his behavior?

A. There had been that. Plus there's a history of using drugs. And even though he gave a date of onset, again, I don't think that we just act as a passive conduit for what some other therapist writes on paper for what the patient says to us, and I think that we don't want to be so naive as to jump to the conclusion that the moment he said he first used alcohol, that he began to use it compulsively, or that when he said his alcohol use was circumscribed to a period of a few months, that he didn't have any alcohol after that, because doctors understand that substance abuse histories are often distorted by patients, sometimes intentionally and sometimes even unintentionally.

Q. So if a patient is going to distort their substance abuse history, can the doctor rely on anything they say?

A. Well, it's not a question of whether they can rely on it or not, it's a question of how much weight they use, especially when talking to a 14-year-old, and correlating collateral history.

Q. Was Tyler a suicide risk on February 19th?

A. I think the suicide risk existed on February 19.

Q. Was he a suicide risk before February 19?

A. I think so.

Q. When, in your opinion, did he first become a suicide risk?

A. Well, I don't think I could give you a date. I think that adolescents carry statistical risk for suicide and I think it increases with each of the factors that I gave you. And I can't tell you the date that it became critical, but certainly when the behavior that led them to consult Dr. AJ and talk about depression, Dr. AJ did a depression evaluation and recommended a treatment, I believe that -- and when he discussed the black box warnings for fluoxetine, a suicide risk existed. Whether it was critical or not I can't say because there's not enough data there. Suicide risk existed and I would say it continued to build.

Q. And by that continue to build, is it your opinion that Tyler Schutt was at risk for suicide - strike that, let me ask it this way.

Is it your opinion that the risk of suicide that Tyler Schutt had was higher on March 5th than it was on February 19th?

And just to put it in perspective, March 5th was the Thursday that he was transitioned back to school, the next day being Friday, with the plan being he's going to come back on the following Monday to see how he did.

A. Well, I want to be careful in answering that question too because I don't want to give you the idea that the risk only changed in one direction or only changed in one direction at a time.

I think that the risk existed. Whether it was greater or not, I would say perhaps it was greater when he was discharged or when he transitioned than it was when he was spending several hours a day at the program. But the risk existed, it was ongoing. I think the key factor here is that it wasn't really addressed.

Q. Was the risk higher when he was not in therapy?

A. Well, clearly if someone is sitting across a desk or across a room from a therapist, at that moment their risk of acting at that moment is less.

Q. Okay.

A. But people do act out while they're in programs. But again, the risk is somewhat less when they're eye to eye with a therapist than they are when they're alone in the day room.

Q. Okay.

A. Than they are when they're in the bathroom than they are when they're in the parking lot.

Q. But the reason I asked that is because you said that the risk of suicide increased when he was transitioned back to school?

A. Well, because the structure was decreased.

Q. Okay.

A. And what I mean is there was less eyes-on contact by; mental health professional.

Q. And so the transition back to school that Friday increased the potential for suicide?

A. No, what increased the potential for suicidal was taking him into a program without making a proper diagnosis and without reducing the risk by addressing the core problem.

Q. But did this transition back to school on Friday, and when the structure was decreased, did that also increase his risk to suicide?

A. Again, that's a complex question. I want to be careful when answering it because in any setting where he has less eye-to-eye contact with a mental health professional, his risk of acting on suicidal thoughts or expressing suicidal intent and acting on it would have increased.

Q. Okay.

A. But I think that that's an artificial -- or that artifical construct or distorting -- a distorted way of looking at it. But so you can say he's at the day program for six hours a day and then he walks out the door and waits for his mother to pick him up, his risk increases when he walks out the door.

Q. And you know where I was going, because the day program is Monday through Friday, he's home on the weekend in an unstructured environment for Saturday and Sunday; right?

A. Well, that's right.

Q. So based on your opinion, there was a higher risk for suicidality on the weekend when he was not in this structured environment; right?

A. Again, by applying that criteria, which I think is an artificial construct, I don't see that that's really the central issue, but you could say that.

Q. I could or could not?

A. You could.

Q. Okay.

A. I don't know what the utility of it would be, it wouldn't be exactly right, but it just wouldn't be wrong either.

Q. And this artificial construct would also be transitioning him back to school then; right?

A. I think I answered that a couple times.

Q. And that would be yes?

A. Well, we can start reading from the record.

Q. That's fine.

Is it your opinion, and I apologize if I asked this, but I'll ask it just one last time. Is it your opinion that Tyler Schutt should have been admitted to an inpatient program instead of the partial hospitalization program that he was admitted to on the 19th of February?

A. Yes, I think inpatient care was indicated.

Q. The failure to admit him on an inpatient basis, in your opinion, was that a violation of the standard of care?

A. On the 19th after he was assessed, I believe it was a violation of the standard of care to assess and get the information that was received in the initial assessment and continue with day treatment, yes, I think that was a violation of the standard of care.

Q. And why do you believe that Tyler required inpatient admission as opposed to the partial hospitalization therapy which was rendered?

A. Well, again, I don't think that this is -- I don't think that this really is the central issue here, but I think that suicide risk existed and I think the day treatment program didn't really effectively and rationally and within the standard of care take action to reduce the risk of suicide.

Q. And from your perspective, what information suggested that there was a risk for suicide during the partial hospitalization program?

A. I think when they obtained the history that there was a change in behavior, there was substance abuse, that there was a family history of addiction in the patient's father, a family history of suicide in the maternal uncle, those things that I discussed, including those things that I discussed earlier when you took those notes.

Q. Okay. But regardless of the therapy which would be rendered, there would always be a history of suicide in the family; right?

A. We call that a static risk factor. Static risk factors are factors that can't be changed with therapy, but when added to dynamic risk factors, increase risk significantly.

So if you have a teenager who has a dynamic risk factor without a static risk factor, you don't -- you're not compelled to act as aggressively as if you had both.

Q. And just so I understand your definition, static risk factors are those which cannot be changed or altered by therapy, medication, et cetera? And by, again, illustration and not limitation, a static risk factor would be a history of suicide in the family?

A. Yes.

Q. A history of drug or alcohol abuse in the family?

A. Any history.

Q. Any history?

A. History can't be changed.

Q. Okay.

A. Gender can't be changed.

Q. Well --

A. Well, okay. Practically.

Q. And in your opinion, irritability can be addressed and changed?

A. Yeah, behavior can be changed, any behavior has the potential to be changed. We're not always effective at doing so.

Q. Is age, is that a dynamic or static risk factor?

A. Well, for the purpose of initiating a treatment plan, the age issue would be that if you have a preteen or a teenager -- suicide risk, I think, increases to age 20 and then it flattens out. And so if you have someone who is like 14 or 15, you would treat them differently than someone who is 20 or 22. So age would be a static risk factor even though it does change. You're not going to keep anyone in a confined setting until they get old enough. They do that in prison, we don't do that in psychiatry.

Q. So there is an increased risk factor in suicide for the adolescent between, what, is it puberty through age 20?

A. Yeah, it tends to increase. And the issue is like 13 and 14 year olds, 15 year olds, maybe even some 16 year olds, don't really have a fully developed concept of death as permanent, and so they may be more likely: to make a suicide attempt or to complete suicide because they're developmentally incapable of appreciating the concept; they know they'll be dead but they don't really get that they'll be dead forever. Part of them still thinks like a small child where in cartoons you can see a character killed or maimed and he can then be resurrected in the next frame or the next scene without contradiction.

Q. Similar to like invincibility?

A. That's another -- grandiosity or invincibility is another adolescent thought mode or trait.

Q. Now, after age 21 or 22, when does the risk factor for suicide again increase?

A. Starting sometime in the fifties.

Q. And does gender play into that increased wrist?

A. Well, in looking at gender and risk factors, it's kind of confounding because statistically women attempt more than men, men complete more than women. But women suffer depressive illness at a slightly but significantly increased rate, so you're not going to make a treatment decision solely based on gender. Your difference in how you approach men or women is not going to be very different.

Maybe if you have a 55-year-old man who's lost his job and his wife left him, he's facing both financial and personal problems, and he starts drinking, you might be a little bit more aggressive than you would with a woman in similar

circumstance. But that's not really a significant factor.

Q. Does the method of suicide tell you anything from a psychiatric standpoint?

A. Well --

Q. You know what I mean?

A. Yeah, I do. And my research on that and my review of the literature, that was an interest of mine, says this: Someone shoots themself in the heart, they might speak to the fact of a romantic disappointment, so that might tell something about their motivation.

If someone suffers from chronic pain, they may shoot themselves in the offending part, if they have chronic arm pain or chronic abdominal pain, they may do something like that.

If someone makes a suicide gesture, something that's very naive, a woman taking an overdose of vitamins or birth control pills, versus a 17-year-old kid who finds his father's gun and shoots himself in the face and doesn't kill himself, those are significant differences. So that's one factor that's considered.

The problem with young adults or adolescents is that they really aren't -- they really don't think like adults, their capacity to appreciate consequences is limited, even though they may act like adults. So sometimes they do things because they don't know how serious they are.

There's also a group of impulsive adults, and I think the demographic is manipulative suicides. Some young women who say to their boyfriends if you leave me, I'll kill myself, they tend to choose methods in their attempt that are out of proportion to their intent to die. There are some very emotionally unstable wives of police officers who argue with their husband and at the end of the argument will take their husband's weapon and shoot themselves. So those are the parameters and methods.

Q. Speaking of the police department, are you still the psychiatrist for the Detroit Police Department?

A. Yes, I am.

Q. And Detroit Fire?

A. Yes, Detroit Fire as well.

Q. And you do assessments, for example, by illustration, after guns have been used by the police officer, be it a shooting --

A. I do psych evals for officers who are involved in firearm incidents or other near calls like that

Q. Getting back to this case, are all depressed patients suicidal?

A. No, not necessarily.

Q. Depression is considered the larger subset and in that large subset is a smaller subset of patients who are depressed who are suicidal potentially?

A. Depression is not the subset, that's the set.

Q. That's the set, you're right.

A. And there are subsets of patients because there are a number of different kinds of depression, and not all -- I would say not all depressed patients are suicidal.

Q. In this case, what type of depression do you believe Tyler Schutt had on February 19th?

A. I think he had a substance-induced mood disorder. I think his mood symptoms were due to the multiple substances that he was using.

Q. Those multiple substances as indicated were the huffing?

A. Huffing.

Q. Now, according to the record, it says he attempted huffing four times. You said you saw that, didn't you?

A. Yes.

Q. Do you just take that with a grain of salt, because as you said, substance abuse patients tend to, the old proverbial, I only had two beers?

A. Well, they underestimate in some situations, they overestimate in others. But so I think that you have to treat that as one piece of information, but you have to validate it with what you know about how adolescents at the age of 14 think, how substance abusers think, and with collateral history.

Q. Now, how long do you believe inpatient admission -- strike that.

How long do you believe Tyler should have been admitted on an inpatient basis in this case?

A. Well, I don't think you can predict. I think you would have to look at his response to the interventions. And if the interventions were appropriate, I think the time would have been shorter. If the interventions were inadequate, the time would be more prolonged.

Q. And as his attending psychiatrist, what things would you be looking for in order to justify discharge from an inpatient admission?

A. Well, as his attending psychiatrist, by initiating an appropriate plan of management, I would have a plan of treatment that would, A, address his substance abuse, and B, focus on his feelings of abandonment by his father, C, his feelings of self-hatred, if he hated his father for using drugs or smoking marijuana and he found himself doing the same thing, at some level he would be disappointed or angry with himself and I would address that.

I would look for more ability to verbalize and work through uncomfortable feelings rather than act them out. So in other words, if I talked to him about some of those things and he got mad and threw things and stormed out of the session, I would say that that would mean that he needed more work to do. But if he was able to sit and talk and cry and experience sadness, that would be better and that would mean he was making progress.

I would look for his ability to participate in substance abuse groups and at least generate some basic understanding of some of the principles of 12-step recovery.

I would look at his behavior and his ability to get along with other patients on the unit.

I would look at staff assessments. If he was described as being more open, more appropriate, more expressive of feelings.

And I would work with his mother to try and establish a safe environment in the home where if I thought risk existed in the early stages of transition, he could be monitored and I would give very specific directions about monitoring.

So when all those things were accomplished, I would be more comfortable sending him home.

Q. As far as the therapy designed to address the SIMD, substance-induced mood disorder, what therapy that you've

delineated for us, would do that, other than the first one, the criteria which said that the treatment would include addressing his substance abuse problem? Any of these other therapies, are they designed to address that issue?

A. Well, sure. Being able to verbalize feelings is another thing that would reduce the likelihood that he would abuse a substance when he felt uncomfortable. So if he had the skills to verbalize them, then the motivation to use substances would be diminished.

And transition to an outpatient program, or anything less than hospital care. Of course, hospital confinement would limit his access to drugs or abuse and would force abstinence. And then once discharged, regular urine drug screens would be necessary to ensure continued abstinence.

Q. Do you believe that the failure to do routine or periodic drug screens in this case was a breach of accepted standards of care?

A. I do.

Q. And do you believe that urine or blood or both should have been done in this case?

A. Well, I think urine drug screens are, looking at what's cost-effective, urine drug screens are generally adequate.

Q. Had urine drug screens been done in this case, do you have an opinion within a reasonable degree of psychiatric probability, what they would have revealed? In other words, would they have been positive, negative, you tell me?

A. Well, if I could predict that, then I wouldn't have to do the test.

Q. Well, yeah. I mean if you could predict that, I was going to ask you what the Power numbers were going to be tomorrow night. ]

A. Right.

MS. JOYNER: Let me just put a foundational objection. Do you mean without any of the psychotherapy or measures that Dr. Shiener is advancing or --

MR. RAMAR: No, no. I just want to know --

MS. JOYNER: Or just in a vacuum?

BY MR. RAMAR:

Q. Had he dropped urine, would it have been positive?

A. I would hope that it would be negative, but I wouldn't be surprised if it was positive.

I would use it, whether it was positive or negative, as an indicator for treatment. And for him knowing that he was going to have to drop every other day, that would have been, A, may have been enough to prevent him from using, and to let him know that we were listening to him when he was telling us that he was using, and B, that would have been another way for him to tell us if he thought the treatment were inadequate, because if he thought the treatment were inadequate, he would go out and smoke some weed, he would go out and do something else knowing that he would test positive and knowing what the consequences were going to be.

Q. I just want to know, Doctor, that in the event this case goes to trial, if you're going to testify that, okay, in addition, they should have done urine drug toxicology screen, and had they done it, they would have been positive? That's the only thing I want to know. If you can't say one way or the other, that's fine.

A. I don't think I'm prepared to say.

Q. That's fine.

A. I don't think I'm prepared to predict what they would have been.

Q. That's fine.

A. Again, if I could have predicted that, then I could just say we don't need to, we can just look him in the eye.

Q. Okay. Other than a diagnosis of substance-induced mood disorder, was there any other psychiatric diagnoses that Tyler had which were not diagnosed in this case?

A. Substance abuse.

Q. Is substance abuse separate and distinct from substance-induced mood disorder?

A. Well, in order to have a substance-induced mood disorder, you have to be abusing substances. Well, not necessarily abusing, sometimes doctors put patients on corticosteroids and they have problems and they have a substance-induced mood disorder.

But in this case, it's a separate diagnosis because he's using drugs of abuse, he's using them not in a pharmacologic manner.

Q. So in addition to the SIMD, another diagnosis which should have been made in this case was substance abuse?

A. Or substance dependence. But I think substance abuse would have been more appropriate.

Q. Other than SIMD and substance abuse, any other psychiatric diagnoses that you believe were present in this case?

A. I can't think of any.

Q. Other than the failure to make the appropriate diagnoses, SIMD and substance use or abuse, the failure to admit on an inpatient basis and the failure to perform periodic urine drug screens, do you have any other opinions which amount to breaches from accepted standards of psychiatric care that involve this case?

A. I have some concerns about the use of medications.

Q. Okay.

A. The use of antidepressant medications in substance abuse mood disorders and the combination of other drugs, and using combinations of drugs that antagonize one another and using psychostimulants and antipsychotics in patients without the diagnosis of psychosis, I believe in this case --

Q. Well, let's talk about that.

What medications do you believe should not have been prescribed in this case?

A. I saw no indication for the drug Adderall. I saw no diagnosis of attention deficit disorder or no suggestion of the indications for the drug Adderall given that some of the behaviors that might be interpreted as arising from attention deficit hyperactivity disorder were more likely due to a mood disorder and substance abuse.

I saw no indication for the use of the drug Risperdal. Risperdal is an antipsychotic, I saw no description of psychotic symptoms.

Q. What about Celexa?

A. Well, Celexa is a drug that's used to treat depression, but it's not used to treat substance-induced mood disorder.

Abstinence is the treatment of choice for substance-induced mood disorder. So I don't see an indication for that drug either.

Q. So was the prescription of that drug also a violation from accepted standards of care?

A. Perhaps to a lesser degree, but I would think so.

Q. And Deseryl?

A. Deseryl is a drug that is used as an antidepressant, that is what was designed as an antidepressant. However, it's used for an off-label indication of sedation, and it's quite commonly used. So I would say that that would be less of an issue here. It's used in some therapeutic doses just as a sedative to aid sleeplessness.

Q. But my question is this; even though you have less of a problem with that, is it still, using Deseryl, is it still, regardless of whether it's an off-label, I'll get the other off-label issues in a minute, but the question is as* it relates to Deseryl, is that prescribed medication in this case, was that a violation from accepted standards of care?

A. As much as I would disagree with its use, I would say it's just so broadly and widely used in this manner, that I don't think I can say that it's a violation of the standard of care, because it's such a common practice.

Q. Is drug interaction and synergistic effect, are those separate terms?

A. Yes.

Q. As far as drug interaction, was there any contraindications to prescribe, other than the fact that you believe that they were not indicated, were there any drug interactions which also was inappropriate in this case in prescribing, for example, Adderall and Risperdal?

A. Well, that's also not an uncommon practice. But, that being said, Adderall acts on the dopamine system and acts as an agonist or a potentiator, and Risperdal acts on the dopamine system and acts as an antagonist So I don't believe it's rational psychopharmacology to prescribe a drug and its antagonist in the same patient. I don't think there's any rationale for it.

Q. So it's like a push/pull?

A. No, it's like driving a car and stepping on the gas and the brakes at the same time.

Q. Like my ex-wife used to do?

A. Well, if she did, you'd have to buy new brakes, new clutch.

Q. What about the interaction between Adderall and Celexa?

A. I don't think there's any absolute contraindication for that. But drugs like Celexa do tend to be dopamine-depleting and Adderall is dopamine-perpetuating or potentiating.

Q. What about Risperdal and Celexa?

A. Well, they both act on the serotonin system, so there might be some -- it's a common practice, but you have to take caution for synergistic activity, that is, they make each other work more aggressively and they can cause toxicity in the serotonin system.

Q. Are they SSRI's?

A. Celexa is an SSRI and Risperdal is an atypical neuroleptic and it antagonizes the serotonin of the 5HT2 receptor, which is a different receptor. So that interaction is poorly understood.

I don't think there's any rationale for using those drugs in combination in that way.

Q. 5HTP, that helps sleep; right?

A. 5HT2.

Q. Two, okay.

A. SHT2 -- 5HT is for serotonin. And there are several receptor groups of serotonin. 5HT2 is involved in the reward system. 5HT1A where the SSRI's work is involved in mood anxiety system, as best we understand.

Q. Were there any medications which you believe should have been prescribed in this case which were not?

A. No. It would have been my recommendation to treat substance-induced mood disorder, a period of abstinence would be indicated before a patient can be accurately and adequately assessed for the need for medication.

Q. Okay. Would a drug, for example, like Antabuse have been indicated in this case?

A. Not in the hospital, but perhaps as part of an outpatient treatment program.

Q. Other than the - do you believe that had Dr. Sendi prescribed Deseryl in and of itself, without any of these other medications, that first of all, he should have added additional meds other than that?

A. No. What I said was abstinence is important. And use Deseryl -- I think that if you're treating a child or an adult for substance abuse, the message and the thrust of treatment is that you can't rely on substances to change the way you feel. And I think it's confusing, especially for a child, to say then take this because you're not sleeping. I think that sends a bad message.

I'm not prepared to say that that's a violation of the standard of care. I would say that it was unwise and would have been unwise in this instance.

Q. When you say you can't rely on substances to change the way you feel, is that only for substance-induced mood disorder, because isn't that why they prescribe antidepressants all the time?

A. Well, that's a different illness.

Q. Okay.

A. That's a different illness.

Q. Okay. I just wanted --

A. Patients who suffer from that illness don't need the message that you can't rely on substances to change your mood.

When we tell someone they can't use alcohol or marijuana or tranquilizers or stimulants or paint thinner or bath salts or whatever they're using to change the way they feel to block out uncomfortable feelings, in the same breath we can't say well, take this pill because it will make you feel better and I'm giving it to you. That's a very confusing message and we try to avoid that if at all possible:

Q. His GAF, I think was 25 or 30, something like that?

A. At Oakland?

Q. At Oakland, yeah.

A. Yes.

Q. Do you use the adult GAF or the adolescent GAF? And my next question is do you know which one was used in this case?

A. Okay. The first question, I use them both.

Q. Okay.

A. Not exclusive. I use the adult in adult patients, or in some very young adult patients who are dealing with adult issues.

We see under class 16, 17 year old young women who are raising children, living on their own and holding a job, and it would be inappropriate to apply an adolescent GAF. So we use it where it's appropriate.

And I don't know for sure, but I would assume in an adolescent facility run by child psychiatrists that adolescent standards were used.

Q. And is there a cut-off GAF from your perspective that mandates inpatient admission? In other words, if the GAF score is below this range, then that mandates the patient be admitted to an inpatient psychiatric facility, or GAF is just guidelines in order to assist the clinician in determining what is happening, what to do?

A. Given that the road to Hell is paved with good intentions, and these guidelines were developed just for that, to be guidelines for experienced clinicians, they're often misapplied in different situations.

So for example, insurance companies might take the position that we're not going to pay for a hospital admission for anyone who's GAF is assessed at over 50, and some are going to take the position that we're not going to pay for outpatient psychotherapy for anyone who's GAF is over 70, but I think that's a gross misuse of that diagnostic system.

So I don't think there's any absolute. If you think someone's impulse control is so poor or their reality test was so poor, their self-control is so poor or their mood is so low or so desperate that they can't control themselves, then you have to confine them within the four walls of a hospital.

Q. Now, let's look at Dr. Sendi's initial assessment. Do you have that?

A. Yes, that's in New Oakland.

Q. Yeah. It's towards the back if yours is arranged like mine. It's the one that's typed because his handwriting is deplorable, Just like any physicians, in most parts.

A. I have a typed psychological assessment here.

Q. Okay. Now, go to the last page, and I want to talk about his GAF and Axis I and Axis II, et cetera.

Do you see it?

A. Last page?

Q. Yeah.

A. Yeah, I have these numbers from seven, eight, nine, ten eleven.

Q. Page five at the top. That's not it. That's the psychological test.

A. That's the intake.

Q. Here's what I'm talking about, this right here. It's the GAF.

A. Okay. 2-19, yeah.

Q. And as far as Axis - this is a GAF, correct, Global Assessment Functioning Scale?

A. Yes.

Q. Axis I tells us what Dr. Sendi's psychiatric diagnosis is?

A. It does.

Q. Now, it's your opinion that Axis I should have contained substance-induced mood disorder and substance use/substance abuse?

A. Substance abuse.

Q. Okay. His Axis I has major depressive disorder with moderate to severe family conflict.

A. Yes.

Q. Is that considered, from your standpoint, an incorrect diagnosis?

A. Well, I think given that, and again, these aren't absolute, and diagnoses are made with clinical judgment, but given the history of substance abuse and family history of substance abuse, I think this would have been an incorrect or inappropriate diagnosis. And I think that there's an exclusion criteria for major depressive disorder that says that the patient is not using any drug that could adversely affect mood or something to that effect.

Q. Axis II, it says mild CPSM with low motivation. What is CPSM?

A. I'd have to think about that for a minute.

Q. What's Axis II?

A. Axis II is personality disorders or disorders of temperament. And those disorders are - and we also diagnose developmental disability, learning disabilities, and I think we don't make personality disorder diagnoses in 14-year-olds, we certainly don't make them after one session because it's hard when a child or an adult is suffering from an acute psychiatric illness, it's very difficult to determine what is state and what is trait.

Axis I is a state diagnosis, you know, like someone has a fever. And Axis II would be a trait diagnosis, someone's got obesity or they have scoliosis or they have short stature, something like that.

Axis III is physical conditions, diagnosis healthy. Psychosocial stressors are multiple.

Q. Is that accurate, as far as multiple?

A. Well --

Q. Okay.

A. I mean you could always find a whole list of stressors.

Q. Let me do it this way. Had you filled out this GAF, do you know - Axis I would have been SIMD and substance abuse; correct?

A. That's right.

Q. Anything else?

A. No.

Q. And Axis II would have been what?

A. I would have deferred that.

Q. That's fine.

A. You have to get to know this child.

Q. Axis III would have been healthy?

A. There don't seem to be any pertinent physical conditions.

Q. And Axis IV?

A. Psychosocial stressors, I think I would specify moderate to severe family conflict, I would specify estranged relationship from father, which I think is the primary stressor.

Q. And the severity, severe; agree, disagree?

A. I would say that that's severe. His reaction is certainly severe.

Q. And his GAF of 35 to 40, is that ballpark or would you have assessed it lower, higher, you tell me?

A. Well, the GAF is in deciles, so it would be 31 to 40 would be about the same. So if you say someone is 31 to 40, then they might fluctuate. I would say he's closer to 30 and decile below because his functioning is impaired, he's thinking about suicide. He was a disciplined young man who played hockey for a long time with some talent, gets into a fight with his coach, which is out of character, he's arguing with his mother, and he's using drugs of abuse. So I would say that that's greater impairment than 35 to 40.

Q. Now, looking at Dr. Sendi's initial assessments, you know, we've talked about the diagnosis. But is there any other aspects of initial assessment which you believe are wrong?

A. You mean this whole document?

Q. Yeah.

A. Let's take a look at it.

At this time, let's go back to page one. So he talks to the mother who he considers to be reliable.

Q. Okay.

A. And he estimates that the child would be in his program for seven to ten days. Seen in the ER for suicidal ideation. Denies any plan, but feels hopeless, withdrawn, isolative, mood irritability, failing classes, suspensions, disruptive behavior. And then the symptoms of concern are danger to self, others and property, need for continuous skilled observation, need for therapeutic milieu. Plan, intensive chemotherapy.

And then the present illness, again, he reiterates suicidal ideation, deny plan, becoming easily frustrated.

Misuse or abuse of drugs, alcohol or other substances.

Present. The client has used alcohol in the past along with taking three of his mother's Ambien and smoking marijuana.

He neglects the huffing paint.

Q. Was it paint or was it something else?

A. Paint sticks out in my mind.

Q. Does it matter what he's huffing?

A. Pharmacologically it might because there are different volatiles. The fact is that he's huffing and that all those chemicals are dangerous. And the real issue is they're so readily available. You can, I'm sure in a day hospital, you can find someplace, the bathroom or the janitor's closet, you can find something to huff. So those things are readily available.

Three of his mother's Ambien, smoking marijuana. Early evening insomnia. Insomnia is another suicidal risk factor.

Sexual difficulty is not applicable.

He has a mild impairment. Becomes selective, transient, difficult, but able to function. And I think the irritability and the frustration problems might suggest something more severe.

He has average involvement in social activities. But the real issue here is that there's a deterioration in that he was getting along well, actively involved in sports, and that participation deteriorated. School attendance, student but failing.

Impulsivity, moderate, unable to postpone. But when Dr. Sendi says he's easily frustrated, I don't know if that, or the severe definite problem is an issue.

Violence and aggression, no information. But again, he got into an argument. At least he's argumentative.

Failing all classes last quarter.

Q. Okay.

A. Undesirable activities, involvement with the law. Well, there's no legal -- apparently there's no legal history, but there's certainly undesirable activities. If this just speaks to the police records, then that would be accurate.

Degree of impairment, severe. So I don't disagree with that.

Rarely sees his father and has a lot of anger about him. Maternal uncle committed suicide a age 20. Uncle, aunt, recovering alcoholics.

Doesn't speak to the father's substance abuse.

Q. Okay.

A. Denies allergies. Periods aren't an issue.

Asthma and pyloric stenosis, I don't take any issue with that.

Quiet, hostile and disheveled. He's noted to be not quiet. He's not hostile and he's not disheveled. He's neat.

Suicide, yes. Ideas, contract for safety.

It's been my experience, and I think we have evidence to show that contracts for safety are not particularly reassuring for the clinician and aren't an acceptable, reasonable or effective means of reducing suicide risk.

Q. On an inpatient, outpatient or both, basis?

A. My understanding in my review of literature suggests that it's not effective in any setting.

Q. When you see in these various psychiatric records, contracts for safety, basically that is worthless?

A. Well, if you think that someone is thinking about ending their life, never seeing their loved ones, never doing anything that they enjoy, never seeing their -- never being able to eat their favorite food, never being able to resume their favorite hobby, and they're that desperate, and then they promise someone they've met within the last 15 or 20 minutes in a psychiatric assessment that they're not going to do anything, I think it's absurd to consider that.

Q. But what you just described, was that Tyler Schutt on the 19th?

A. If he was thinking about suicide, those would be the consequences of committing suicide.

And again, I think that a 14-year-old might not really be able to appreciate all those consequences. So making that kind of commitment, making that kind of promise is like getting caught fighting with your sibling and looking at your father and saying I promise I'll never do it again.

Q. Okay.

A. You may mean it, but it's an unrealistic promise.

That's the same in this instance. And again, I think that evidence shows that those kinds of commitments are unrealistic and not effective in reducing or assessing the risk.

Q. Let me just -- I just want to explore this a little.

Because you see that statement in a lot of psychiatric records, contracts for safety.

You've seen that before?

A. Yes, I have.

Q. And as far as from your perspective, when a patient says yes, I have suicidal ideas, but I can agree that if I have -- if they increase or if I develop a plan, I'll come to you, that's really the contract for safety that is between the clinician and the patient; right?

A. That's what the clinician is asking the patient.

Q. In that type of situation, that contract for safety from your standpoint is really worthless?

A. I think I answered that.

Q. Okay.

A. I said that -- and I gave a lengthy answer.

Q. But you qualified it. And I just want to say that generally, generally contracting for safety, do you still believe on a general basis, contracting for safety is worthless, or just based on what you said as far as taking that various criteria under those circumstances, it's worthless?

A. I don't want to say it's worthless because of this, and I'll tell you why.

If a patient disagrees and says no, I can't do that, that's his way of telling you that he needs more help than you're offering. So it does have some utility to discuss it was offered.

But to say that it has some worth in reducing suicide risk, I would say it is virtually worthless.

Q. Okay. Let's go back to this thing. I think we ended up --

A. I think that's the last thing we discussed.

Q. Okay.

A. Going on to moderate definite experience of fear, objective signs. So there's anxiety, there's hyperactivity, and a hypomania or agitation.

And those are actually more acute predictors of suicide, that kind of restlessness or anxiety.

Q. Okay.

A. Speech is normal. Quantity is abnormal, the patient is hyperverbal, or monosyllabic.

Organization is normal. Use of words is normal. Mood is depression, mild to moderate. Feelings of worthlessness and hopelessness.

I think when a patient is thinking of suicide, and alienating people who are trying to help him, he's being hostile to the doctor or he's fighting with his coach, I would say that that would be more severe.

Q. Was he being hostile to Dr. Sendi?

A. No, he wasn't.

Q. Okay.

A. No psychophysiologic disorders, no conversion disorders.

Mild thinking disturbance with ruminations. I wouldn't disagree with that.

No cognitive impairment.

Insight towards illness, usually accepts having a problem of some sort, but ambiguous about relating to self, although accepts responsibility intellectually.

I don't have a basis to dispute that.

Supportive family, yes.

Stable work environment, student. But his academic performance is deteriorating.

Average intelligence.

Summation, no interest in therapy, yes.

So those also all seem to be accurate with the caveats that I've given.

Q. Okay. Now, as far as had you been the attending psychiatrist, other than what you've explained for us, is there anything else you would have added, deleted, supplemented, modified, redacted?

A. I can't think of anything else other than the things we've discussed.

Q. Now, we've discussed the opinions up to this point which amount to breaches from accepted standards of care. And just by summation and topic, we discussed the initial diagnosis of SIMD and substance abuse; we've discussed the fact that the patient should have been admitted on an inpatient basis as opposed to a partial hospitalization program; we've discussed the medications that you believe were inappropriate in this case the Adderall, the Risperdal, and the Deseryl?

And what did I leave out? What did I forget?

A. And urine drug screen.

Q. Urine drug screen, that's correct.

A. Psychotherapy.

Q. Let's talk about psychotherapy. I don't think we talked about psychotherapy.

A. I think we did. You asked me what measures I would use to gauge improvement, and I would say an ability to provide -- to be able to verbalize uncomfortable affects rather than act them out.

Q. Now, psychotherapy, is that one-to-one or does that include group, et cetera?

A. It can be group. Groups in therapeutic and inpatient settings can be either therapeutic or they can border on activity. They are therapeutic community conferences that are either psychoeducational or activities rather than therapies per se, but there can be group therapy.

But for this young man, individual therapy, group therapy, and participation in 12-step programs of recovery.

Q. And the 12-step program of recovery, is that the same thing as like you see in AA?

A. AA or NA, or Alateen or something.

Q. And the psychotherapy, is there different subjects that are discussed, or the psychotherapy should have focussed on substance-induced mood disorder and substance abuse?

A. Well, I think what I said was that in children with this kind of problem, when they feel uncomfortable, they either act out and do something to discharge their discomfort, or use a drug of abuse to block out those feelings. And psychotherapy provides an alternative avenue for dealing with uncomfortable feeling, verbalizing them and working them through.

The hope is that that reduces the motivation to use drugs or alcohol.

Q. Okay. Other than those four things we discussed, the last one being the psychotherapy - I think there were four; right?

A. I think there were five.

Q. Five.

A. Because there were four and then I added urine drug screening, and we talked about psychotherapy as well,

Q. Okay.

A. So other than the four things plus the two things that I added, plus the other things I discussed earlier in the deposition, I can't think of anything else.

Q. Let's go to Tyler's suicide attempt, okay.

What do you believe was the precipitating factor or factors of that suicide attempt?

A. Well, I don't know that I would describe it as precipitating factors.

I think that the factors that led to him being depressed were inadequately addressed.

Q. Okay.

A. And some of them were not addressed at all, and his condition proceeded in its natural deteriorating progressive course.

But being home and resuming the behaviors that led to his hospitalization I think were the issues that led up to the suicide attempt.

Q. And the behavior was he was caught on Friday afternoon after coming home from school smoking dope by his grandfather?

A. Yes.

Q. Any other factors that he resumed upon returning to school?

A. No. Again, I think that that was just a progression of his illness that was untreated. And had it been treated, I don't think he would have done what he did.

Q. And what are Morning Glory seeds?

A. They're the seeds of the Morning Glory flower.

Q. Do they have any hallucinogenic effects, if you know?

A. Purportedly. I remember hearing about that when I was in high school and college.

Q. In the '60s. You were part of the '60s.

A. Yes. And I remember reading about them and I remember in organic chemistry we would boil compounds like that to extract certain chemicals as part of experiments and some of those got activity on nervous tissue.

Q. When Tyler came home from a visit with his father, he comes home and the bedroom door is off the hinges, and apparently his mom had gone through his stuff and found some more of his stash, marijuana, and took away his computer and

took away the marijuana.

Do you believe that those factors contributed to his suicide attempt?

A. Well, if you're asking whether his mother punishing him made him kill himself, look --

Q. He didn't kill himself.

A. Excuse me, attempt to kill himself. Look, suicide is a hostile act, it involves a great deal of anger. And there's always an element of that

I've evaluated more than tens of thousands of people who have made suicide attempts and part of the assessment is if you had died, who would have found you and what do you think that would be like. And suicide can often be framed as a hostile gesture towards the survivors. I don't think it's conscious and I wouldn't say that that's what caused it. I would say that this young man was crying out for help and his behavior was disruptive, and he had feelings and he didn't know how to deal with them or how to address them, especially feelings about his father and his father's conduct and his father's relationship to him. And I think that those were all determinates of his suicide attempt.

And I think that would be fallacious to say that his mother punished him and he went off and killed himself.

Q. Okay. Why did he attempt suicide on Sunday, March 8th, as opposed to the weekend prior to that, the weekend prior to that, or the weekend prior to that when he first started therapy on February 19th?

A. I don't know that there's necessarily an answer to that, but certainly being cut loose, if you would, from a more controlled environment had something to do with it.

Certainly being exposed to his father without an opportunity to -- or without preparation or without counseling after that, because his relationship with his father was quite conflicted and was identified as a source of stress.

So that may suggest why at that moment and not some other moment but --

Q. Have you read his father's deposition?

A. I have it. I read it a while ago.

Q. His father said that -- you just said that being exposed to his father without proper therapy. According to his father, his father visited him on a frequent basis. If that's the case, he wasn't exposed to his father on an abrupt or sudden basis, was he?

A. I wouldn't say it was abrupt or sudden, but he certainly had strong feelings about his father, his father's conduct, and the nature of his father's relationship to him.

And I would just ask you, how do you think the kid feels about having his father walk away from the family and not see him as often as he would have liked. And how do you think a kid feels when he goes to a hockey game and all the parents are there and his dad is not.

Q. Okay.

A. And how do you think he feels about spending that time with his father and just playing video games with him and being exposed to his father's lifestyle. I mean I think all those things are issues that need to be explored in therapy.

And I think he was exposed to his father. 5 This is different than his father visiting him or visiting him in the day program or coming to the house. This is him spending a weekend with his father away from his mother.

Q. Okay.

A. And that relationship was disappointing to him.

Q. Based on your understanding and review of these records, was the weekend of the 6th the first weekend that Tyler had spent with his father since starting the partial hospitalization program at New Oakland?

A. It may not have been.

Q. Okay.

A. It may not have been. But again, look, short of having a conversation with this young man and interviewing him and trying to -- which is no longer available to us -- there's no way to accurately determine why then and why at that moment.

But we can look at things, and I think the biggest thing that I can point to is this young man suffered from a disease, the disease was not accurately diagnosed, measures were not taken to address the disease, and the disease followed its normal progression.

Q. You said he may not have visited his father between -- before the March 6th weekend. But here's my question. Do you know absolutely whether or not he did or he didn't?

A. No, I don't think I said he may not have. I said he may have. I don't remember specifically which weekends he spent with his dad. This wasn't the first weekend he spent. But a number of things came to together in that he was, for lack of a better term, cut loose or his participation in the program was somewhat decreased, he was exposed to school, so there was less structure. And I don't believe that he was adequately prepared. I don't believe that he was adequately prepared to spend time with his father.

Q. Let me ask you this, the note says, client's mother comes into session with client. Mom reports client is less irritable and is talking with her more often.

Is that a good thing or a bad thing?

A. I think that's a good thing.

Q. Client will attend school tomorrow and return to F to F, Face-to-Face, which is a partial hospitalization program, on 3-9. Client verbalizes that he feels ready to go to school and feels less depressed.

Good thing or bad thing?

A. Well, that depends. It has to be explored and has to be compared with other aspects of behavior and other aspects of progress.

Now, if a kid is put in a partial hospitalization program and the thing that's bothering him the most isn't addressed, and he's saying whew, I got to come here and I didn't really have to go on the line and talk to these people about why I was using alcohol or why I was smoking marijuana, why I took my mother's pills, and I beat one, and he says I feel better now, I'm getting out, but that might not mean he's feeling better.

So I wouldn't necessarily take that as a sign of progress and I would caution any therapist who would simply act as a passive conduit for what a patient tells them.

Q. Is that what you believe Tyler was thinking during this hospitalization, whew, he skirted the issue as far as drug use and abuse?

A. Absent an opportunity to talk to him about it, I don't think we can -- I don't think we can reconstruct what he was thinking. But I think that looking back on what happened, that statement lacks -- it doesn't resonate with the truth, it lacks

accuracy, and I think that for me to say that it was a good thing would mean that I would just be saying what he said.

Q. Okay.

A. I think that the doctor's job in this instance or the therapist's job in this instance is to analyze and try to understand what the patient is telling us.

Q. It says shares his project from group with therapist and mom. It shows the quote, old, close quote, me and the quote, new me.

What does that tell you, if anything?

A. It tells you that he sees a disconnect between his behavior beforehand and the behavior that he's trying to manifest in that session, and there's no connection, that's the old me and that's not me anymore.

It's very typical in people who abuse drugs, and people who abuse drugs say I can stop whenever I want and I'll never do that again.

And again, they may, on some level, mean that, but it just lacks reliability.

Q. Okay.

A. Because of the nature of the illness.

Q. And during the group session on the 5th it also says client participated well, he was asked to verbalize how he was going to make positive changes in his life. Client was encouraged and supportive.

Does that add anything to it?

A. I think that's the therapist's assessment.

Q. Okay.

A. But she's already barking up the wrong tree.

Q. Okay. I want to go the - here's one with the -

And you've looked at all these records?

A. Yes. And we can read every positive thing that any therapist ever said about him in those records, but my opinion remains the same. They were barking up the wrong tree and their analysis to me seems quite superficial.

Q. Well, I'll just do the last one, and then what I want to do is go through all the negative stuff from your opinion which supports the facts that this kid was never getting any better. Okay. But here's --

A. I think that's a distortion of what I've said here today.

Q. Okay. But you can modify any way you want.

A. Thank you, I know I can.

Q. I know. And you know it because what you've done this more than I have.

A. So I can do it without your permission too.

Q. Sure you can.. Doesn't matter to me.

On the 4th, this is a session with Kalinski. Client brings his list of healthy coping skills to session. Client has identified ways to stay away from drugs and stay motivated upon his return to school. Therapist offers support and feedback.

Did you read Therapist Kalinski's deposition yet? It just happened last week.

MS. JOYNER: We don't have the transcript.

MR. RAMAR: Okay.

BY MR. RAMAR:

Q. But the fact that she's discussing with him drug use, first of all, the fact that she's discussing drug use, is that a good thing or a bad thing?

A. Depends on how she's discussing it.

Q. Okay.

A. From what I gather from this program, there really doesn't seem to be any documented reason in depth effort to address this boy's drug use and to identify it as his primary problem.

Q. Okay.

A. And so, you know, is it a good thing or a bad thing, it's not necessarily a bad thing. It's just way, way, way, way not good enough. So not good enough that I consider it to be a deviation of the standard of care.

Q. Assuming hypothetically that the diagnosis which Dr. Sendi made in Axis I was correct, would the therapy which was rendered from that point forward also be appropriate?

A. I think that's the problem, I think they made the wrong diagnosis, they were treating him for the wrong condition, and the validation of diagnosis is the response to treatment.

Q. Assuming hypothetically, and I recognize that you disagree with the diagnosis and you believe that the diagnosis should have been SIMD and SA, substance abuse, but assuming hypothetically a diagnosis of -- Where's Axis I -- major depressive disorder with moderate to severe family conflict, assuming that to be correct, would the therapy which followed that diagnosis be appropriate?

A. I think I answered that. What I said was that a diagnosis implies a course of therapy. So if that therapy -- if that was the diagnosis, then counseling, group therapy, individual therapy, participation in the day treatment program, the use of, I believe, Celexa, the antidepressant medicine, would have been appropriate.

There's still no indication for the use of the Adderall. There's still no indication for the use of Risperdal. There are no psychotic symptoms, there's no history -- there's no indication of bipolar disorder, there's no indication of attention deficit disorder as a separate diagnosis, or hyperactivity disorder, so I would take issue with that.

And if the issue was severe family distress, although there were sessions with the mother, inclusion of the father in treatment sessions or family therapy would have been more indicated as well.

But this treatment was not inappropriate for a depressive disorder of the type of major depression with the exception of the medication usages.

Q. Getting the father into therapy for the kid, it's dependent on whether or not he wants to participate right?

I mean keep in mind by what you said, dad's not even going to his hockey games. If he's not going to his hockey games, you think he's going to go to his therapy?

A. I don't know what the correlation would be. I think a hockey game is a lot different than addressing a suicidal child in a therapeutic setting.

I don't see an indication that they attempted to involve the father in any way. I may have missed it, but I don't recall seeing it.

And whether he wanted to -- if he wanted to, if there was some effort undertaken to try to press him into treatment, and then if he didn't, to help the child accept the fact that his father had limitations that the child couldn't overcome, to help him see that it wasn't his own shortcoming, to rethink his decision to internalize, which he would have made as a small child, and it would be a direction of therapy.

Q. And attempting to get the father in to participate in therapy would be, for example, calling his house or cell and leaving telephone numbers, hey, this is, for example, hypothetically, Therapist Kalinski, I'm at New Oakland, I'm treating Tyler, your son, and we'd like to talk to you and arrange something so you can come in and talk.

That's what you're talking about; right?

A. Or having Tyler discuss it with his dad and then counseling Tyler as well.

Q. Have we now discussed all of the opinions which you have in this case which amount to breaches from accepted standards of care as they relate to Dr. Sendi?

A. I think so.

Q. Do you have any other opinions which amount to breaches from accepted standards of psychiatric care that involve any other of the various ancillary personnel participating in his care?

And by definition, I will tell you what I mean by ancillary personnel. I'm talking about therapists, I'm talking about the individuals who ran the group therapy, I'm talking about if there were mental health techs, any of those individuals.

But my question globally is other than Dr. Sendi, do you have any other opinions criticizing the care rendered at New Oakland?

A. Well, only to the extent that -- let me put it this way. I don't think I have any issues with any of the mental health technicians.

As for the people who ran the groups, I would say that the groups seem to be more oriented towards an activity than a therapy, they seemed to be more psychoeducational, this is what drug use does to you, can you think of things that someone can do to address, to help them resist using drugs or say no.

I don't see that they were necessarily therapeutic, they were more psychoeducational.

And I don't see anything in the therapist's notes to indicate that she gave any thought, consideration or took any effort to address the problems that I identified as substance-induced mood disorder and substance abuse, but rather she made the same error that Dr. Sendi made in considering this to be some form of depressive illness, and ignoring the point of the patient's condition.

Q. So in that regard, was Therapist Kalinski also negligent?

A. I would consider that given that she's a therapist and her failure to identify the source of this patient's difficulties.

Q. Other than Dr. Sendi and Therapist Kalinski, do you have any other opinions regarding negligent acts or omissions on the part of anyone else from New Oakland?

A. I can't think of any.

Q. The last thing I want to do is just want to delineate for the record the materials which you have been sent in this case.

And you can do it or --

A. There's a letter here, and I think the letter is cumulative and inclusive. So let's see.

A copy of the Complaint, Kathleen Schutt's deposition, day-in-the-life video, some photographs, New Oakland child records, Mott Children's records, U of M Hospital, St. Mary's Hospital, Brentwood Pediatrics, Garden City Hospital, Care Mark Pharmacy, Emerson Middle School, Westland Fire Department, Westland Police Department.

Q. The date of that is what?

A. The date of this is January 9, 2012.

Q. But that's not the time you reviewed --

A. No, no.

Q. I got you. Because you signed an affidavit way before that. That's fine.

A. What I have is I had two sets, two charts that were incomplete, and then Mr. Fieger's office was kind enough to send me another complete set.

MR. RAMAR: Okay. I have other questions, but I have to use the restroom, so I'm done.

MS. JOYNER: I have a couple too.

(Off the record at 3:09 p.m.)

(On the record at 3:10 p.m.)


**EXAMINATION**

BY MS. JOYNER:

Q. Doctor, I just have a couple of questions.

Are there any certifications or sub-certifications specifically dealing with child psychology as opposed to adult psychology or psychiatry?

A. There's a board -- you mean psychiatry.

There is a board certification in child psychiatry, yes.

Q. Do you treat children in your practice?

A. I treat children and adolescents.

Q. And you teach as well?

A. I do.

Q. And in your teachings, do you teach on issues of child psychology?

A. Psychiatry?

Q. Or psychiatry. I'm sorry.

A. I don't teach in the child psychiatry program, but in the program in which I teach, we do see children and adolescents at the hospital, and I'm involved in teaching about those cases as well as teaching adult cases.

Q. I should correct that, when I said psychology in my questions, I mean psychiatry.

A. Yes.

Q. And when you treat children, have you involved yourself in children who had similar diagnoses to the diagnoses that you have opined in this case that Tyler had?--

A. I have.

Q. And do you feel that you're qualified in this case to serve as an expert in psychiatry on these issues that are involved in this case with Tyler?

A. I do.

Q. Okay. Can you just summarize the basis for that?

A. Part of my training, which was not a board requirement at the time, my program had us work in a child or adolescent facility for six months. I left a month early to go do another rotation overseas, but I worked at the Lafayette Clinic on the adolescent psychiatry ward from January to the end of May of 1977.

I gained experience in treating adolescents.

Since that time, I've had experience in counseling adolescents and counseling parents of adolescents and dealing with issues of mood disorders and substance abuse.

MS. JOYNER: Okay. Thank you, Doctor. I have no further questions.

MR. RAMAR: No questions.

(The deposition was concluded at 3:12 p.m. Signature of the witness was not requested by counsel for the respective parties hereto.)

**End of Document**   © 2018 Thomson Reuters. No claim to original U.S. Government Works.