# Exhibit 4

2007 WL 7687480 (Mich.Cir.Ct.) (Expert Deposition)
Circuit Court of Michigan.
Wayne County

Adriana LEE, as Personal Representative of the Estate of Rufus Young, Jr., Plaintiffs,
v.
DETROIT MEDICAL CENTER, Children's Hospital, Dr. Ahm Mahbobul Huq, Dr. Jayshree Rao, Dr. Vince Troung Life Span Clinical Services, Kristin Ryeson-Dzahristos, Defendants.

No. 04-438626 NO.
February 13, 2007.

**(Deposition of Gerald Shiener, M.D.)**

**Case Type:** Family & Domestic Relations >> Other Family & Domestic Relations
**Case Type:** Medical Malpractice-Facility >> Clinic/Center/Group
**Case Type:** Medical Malpractice-Facility >> Hospital
**Case Type:** Vicarious Liability >> N/A
**Case Type:** Wrongful Death >> Minor
**Jurisdiction:** Wayne County, Michigan
**Name of Expert:** Gerald Shiener, M.D.
**Area of Expertise:** Health Care-Physicians & Health Professionals >> Clinical Counselor
**Area of Expertise:** Health Care-Physicians & Health Professionals >>Psychologist
**Area of Expertise:** Health Care-Physicians & Health Professionals >>Psychiatrist

**Representing:** Plaintiff

Appearances.

Lloyd Johnson (P43046)
Fieger, Fieger, Kenney and Johnson, P.C.
19390 West Ten Mile Road
Southfield, Michigan 48075.

Appearing on behalf of the Plaintiff.
James M. Hicks (P42699)
Law Offices of Paula J. Martin
27555 Executive Drive, Suite 360
Farmington Hills, Michigan 48331-3543.

Appearing on behalf of Defendants Life Span and Kristin Ryeson -Dzahristos.
Jennifer Engelhardt (P64993)
Cox, Hodgman & Giarmarco
Tenth Floor Columbia Center
101 West Big Beaver Road
Troy, Michigan 48084-5280.

Appearing on behalf of Defendant Dr. Vince Troung.
Daniel R. Corbet (P37306)
Tanoury, Corbet, Shaw, Nauts

645 Griswold, Suite 2800
Detroit, Michigan 48226.

Appearing on behalf of Defendants Children's Hospital, Detroit Medical Center, Dr. Huq & Dr. Rao.

Hon. Warfield Moore.

The Deposition of GERALD SHIENER, M.D., Taken at 251 Merrill Street, Birmingham, Michigan, Commencing at 6:00 p.m., Tuesday, February 13, 2007, Before Bonnie J. Murphy, CSR-2300.

Birmingham, Michigan

February 13, 2007

About 6:00 p.m.

GERALD SHIENER, M.D., having first been duly sworn, was examined and testified on his oath as follows:

MR. HICKS: Let the record reflect this is the deposition of Dr. Gerald Shiener being taken pursuant to Notice.

**EXAMINATION BY MR. HICKS:**

Q. Doctor, can you state your name for the record?

A. Gerald Shiener.

Q. Doctor, you've been kind enough to provide me a Curriculum Vitae, I'm guessing since this came off your printer right now that it's up-to-date?

A. It's pretty current.

Q. Okay.

A. Before we proceed we discussed fees briefly and I see that you sent me a notice and I know that we scheduled this proceeding some time ago. My fees for the time involved in giving deposition testimony are as follows: $900 for the first ninety minutes and $350 an hour thereafter. And since you weren't able to bring payment in advance as I usually require, I'd just like you to place on the record your concurrence to me that my fees will be paid in a timely manner and there won be any difficulty in collecting them or collecting overtime.

Q. Absolutely. Do you have a Tax I. D. number that you know?

A. Ida 38-2283215.

Q. 38-2283215?

A. Yes. Who gets the bill?

Q. You give me the bill and the check is issued out of my office. I can actually sign checks so that will help.

A. And you're Tenth Floor Columbia Center?

MS. ENGELHARDT: James Hicks, Esquire.

BY MR. HICKS:

Q. The bills, the bills that I get through the professional practice are the only ones that get paid.

A. That's also on the record.

Q. You're a psychologist, and your degree is from where?

A. Wayne State University.

Q. Doctor, does your practice include counseling minors?

A. It does.

Q. What age -- I guess, in your practice do you counsel children in the four or five year old range?

A. I evaluate them in conjunction with treatment of parents, I will sometimes counsel children that young, it's not, that's not a substantial part of my practice but it's part of what I do.

Q. Do you in your practice have you ever evaluated children that have been at least suspected of abuse?

A. I have.

Q. Have you ever been a court appointed evaluator for an abuse case?

A. I think I reported an abuse case to the courts and I have given opinions, I can't recall if I've ever been appointed by the court. I have been in child custody issues, sometimes abuse has been alleged but.

Q. When you reported abuse cases would those be patients that you're seeing?

A. Yes.

Q. Can you give us a ball park figure of how often you've had to do that if it's possible?

A. I can't.

Q. Would it be more or less than ten?

A. I wouldn't want to guess but it's something that comes up from time to time. Let me, by way of explanation, I was the director of emergency psychiatry at Sinai Hospital of Detroit for the first four years of my practice. I was the director of emergency psychiatry at Mount Carmel Mercy Hospital which was the receiving trauma Center for Northwest Detroit. During that time I've done regular work with the emergency room, work not as a chief of consultation psychiatry at Sinai, sol would see emergency room admits, sometimes children, sometimes adults, who were irritable or who were acting in the manner that led me to conclude that their children were at risk. So I would negotiate Protective Services referrals or notify the court as part of SCAN, the acronym for Suspected Child Abuse and Neglect.

Q. Have you given testimony in a case by either way of deposition? I guess let's start with that. First by way of deposition in a case in which abuse has been alleged?

A. I think so.

Q. Any civil cases?

A. Yes, I think so.

Q. How about in the actual courtroom setting, the trial setting, have you ever given testimony?

A You know, I can't remember if I have or not, I can't remember specific instances.

Q. When were you retained in this case?

A. Gee, I don't know.

Q. Do you have any documents in your file that would refresh when you were retained?

A. It looks like I have some stuff that was sent on January 5, 2007 but I think that there were, that's the earliest correspondence but I think I must have seen, I had some of these documents or I've seen this material prior to that

Q. Can I just look and see what letter you're referring to?

A. Sure.

Q. It looks like there's a letter dated January 5, 2007 to you from Mr. Johnson's office enclosing the Complaint, records from Wayne County Medical Examiner, records from Starfish Family Service, preliminary examination testimony, records from Grand River Medical Center and records from the Department of FIA?

A. Yes.

Q. Do you have any information in your file to indicate that you were given any other materials before this time?

A. I don't. That's the only correspondence and that may in fact have been the earliest contact I thought 1 received something late last year but I don't recall.

Q. These six items that I just read off that were referenced in this enclosure letter to you, did you receive any documents other man those to review?

A. Tell me what you've got.

Q. Sure. There's a Complaint.

A. Let's find that.

Q. Records from Wayne County Medical Examiner.

A. Okay.

Q. Records from Starfish Family Services?

A. Yes.

Q. Preliminary examination testimony?

A. Yes.

Q. Records from Grand River Medical Center?

A. Okay.

Q. And records from Department of FIA which is Family Independence Agency?

A. I have, I guess that would encompass everything. I have CPS records, that's really FIA

Q. All right. You can have this back. Can you give me some idea how many times you've been retained by the Fieger law firm --

A. No.

Q. -- that called for expert testimony?

A. I haven't counted.

Q. Would you say it's more than twenty?

A. I haven't counted. I really wouldn't be in a position to say. I mean it could be, I have done work for Mr. Fieger and his colleagues from time to time.

Q. So it could be more than twenty times? What percentage of your practice is devoted to counseling patients versus offering expert opinions?

A. I don't want to endorse those are the only two things I do.

Q. Let me rephrase it then. What percentage of your practice pertains to offering expert opinions or being retained as an expert?

A. I really haven't calculated that and it varies from month to month and week to week. I'll go for several weeks in a row without encountering a forensic matter and some weeks I may encounter several matters. What I can tell you is that more than 75 percent of the time that I'm working, I'm teaching doctors and medical students, counseling patients or doing administrative work at the hospital and in some weeks it might be more than 90 percent, I think there might be the odd week where it's less than 75 percent. But most of the time I'm working, I'm taking care of sick people or teaching doctors or doing administrative work at the hospital.

Q. And when you've told me that your fees are $900 per ninety minutes for testifying in deposition and then $300 for each hour after that?

A. No, it's $350 an hour in the time involved.

Q. I thought it was 900 for ninety minutes?

A The first ninety minutes.

Q. And then 350 each?

A. $350 an hour thereafter.

Q. How does that compare what you charge in your office for counseling patients?

A. It depends on -- I have a sliding scale. There are some patients I see for free and then I have some patients that may pay me thousands of dollars per visit.

Q. You don't charge by the hour?

A. By the visit.

Q. How long are your visits?

A. Typically forty-five minutes, sometimes longer.

Q. What do you charge for a forty-five minute visit?

A. Depends. Some people get it for free and some people they pay thousands of dollars for that experience.

Q. You charge some people thousands of dollars for a forty-five minute visit?

A. That's right.

Q. Have you ever been retained by Mr. Fieger's firm or any attorneys employed by Mr. Fieger's firm to provide expert opinions or testimony in a case involving child abuse?

A. I think so.

Q. Have you done so in the last year?

A. Oh, I don't remember.

Q. Do you know if you've given any deposition testimony in any of those cases?

A. I don't remember.

Q. Have you ever testified in a Federal Court case?

A. I have.

Q. Have you had to put together information regarding your testifying as an expert in other cases as a consequence of that?

A. I have.

Q. Pardon?

A. I have.

MR. CORBET: What's that called?

MS. ENGELHARDT: That's a Rule 26 report

MR. CORBET: We have learned as a general rule when she trumps us.

MR. HICKS: We concede defeat.

THE WITNESS: You're lucky to have her.

MR HICKS: We know that.

BY MR. HICKS:

Q. If we request that information do you have it readily available?

A. No. I prepare it on request and I don't retain the information because it changes from time to time I do it so infrequently.

Q. So you don't have that information retained?

A. No.

Q. Do you also provide, you mentioned teaching medical students, do you also teach social workers?

A. I do social work students, sometimes social workers, yes.

Q. Have you also, setting aside any students in social work that you may be instructing, have you ever instructed social workers that were employed by the State of Michigan?

A. Yes.

Q. In what kind of setting would you do that?

A. I have been asked to give educational programs that were shown to social workers, many of the social workers in attendance were State of Michigan employees.

Q. And I'm not sure if your Curriculum Vitae has it but have you ever been -- when would you have most recently given any type of seminar or instructions in a setting in which social workers, whether they're private social workers or employed by the State of Michigan would have been in attendance?

A. I gave something for an organization, Wayne County Social Workers, sometime within the last three or four years, I can't recall the specific date and I only listed you know some highlights of my presentations. I give fifteen, twenty presentations a year, I just highlight two or three to come to the land of thing I discuss in the public educational forum.

Q. In the last year or two, when you would have given a presentation or instructions in a setting that would have included social workers, for example, from Wayne County, where would that have been specifically?

A. The last one I recall was at either Rackham Auditorium or at the Art Institute or one of the auditoriums in the Art Institute, one of those venues east of Wayne's campus.

Q. Would you have --

A. No, not the public library, Art Institute.

Q. Who would have asked you to be a speaker?

A. I think it was -l can't remember the name, it was Wayne County Social Workers Society or the equivalent of the or the Wayne County Medical Society for Social Workers.

Q. Were you asked to give a specific topic of discussion or just did you cover a lot of different areas?

A. I don't recall the topic, it may have had something to do with depressive illness or suicide.

Q. Did it have anything to do with looking for signs of suspected abuse?

A. Yes. When you talk about depression in a social. work setting, you're talking about depressed children who are often depressed because they're in an abusive situation, you're talking about depressed mothers who are at great risk for harming their children.

Q. Would you have put together materials that would have been handed out?

A. Probably.

Q. Have you ever published any or put together any written materials that were handed out for purpose of instructions dealing specifically with the topic of looking for suspected abuse and when and when not to report it?

A. I don't think that I - I know that I haven't published anything on that specific issue and I don't recall, I haven't reviewed recently any hand-outs or reference materials dealing with that issue specifically.

Q. When you've, in the past when you have provided any type of instructions to social workers regarding the topic of abuse would that include specifically when someone should report it, that is what criteria or anything of that nature?

A. I'm sure that that was addressed.

Q. Specifically I mean when you should report?

A. You mean was there a list of the A, B, CorD?

Q. Under what circumstance you should or should not report it, in other words to give them some idea of okay, in this particular circumstance you should and in this particular circumstance you might not have to, anything that concrete?

A. I don't know if there was anything that concrete or specific in dealing with a topic like suspected child abuse or neglect or the threshold of reporting. The threshold should be artificially lower rather than higher and the errors should be errors of commission and overreacting rather than omissions and under reacting. And you know and the theory here is - we're getting ahead of ourselves -- is that reporting is not, reporting a suspicion only triggers an investigation, it doesn't trigger an accusation.

Q. So what you've just told me is that something that you would have either put in writing or told people in one of your presentations?

A. Yes. The concept of index of suspicion and how to act on index of suspicion.

Q. All right. In this case it doesn't reflect in your letter but in this case what were you requested to offer an opinion on by Mr. Johnson's office?

A. Well, there were a couple of things that I understood Mr. Johnson understood to be of interest to me in terms of opinions I might generate. One is in reviewing the records of treatment for this little boy who died at the hands of foster parents, were there, was there anything in the records that suggested the risk that he was facing suggested abuse to which he was subject. And then the other thing I believe Mr. Johnson wanted to discuss with me or was interested in me expressing an opinion regarding would be the effects of living in an abusive situation for a child between the third and fourth year of life.

Q. Were you given and we already discussed all the records or at least we just listed the records that you were provided, one of the set of records that was mentioned in that letter was the records from FIA?

A. Yes.

Q. What records did you get from FIA, could you show those to me?

A. (Witness complies).

Q. Do you recall when you looked through these records whether or not you had records that pre-dated Rufus Young's presence in the Hall foster home, in other words in the records from when he was in the foster home prior to the Hall's foster home and then also in the biological parents home?

A. I'm not sure, I'm not sure if those experiences were only referenced or if I had contemporary records.

Q. Okay. Were you specifically being asked to offer an opinion as to whether or not Kristin Ryeson who was employed by Starfish Family Services should have reported Rufus Young's matter to Protective Services?

A. I think that was one of the issues I was going to be asked to discuss.

Q. Were you also asked to express an opinion as to whether the social workers employed by the State of Michigan, in particular Jennifer Reno and Barbara Friedel should have also reported Rufus' case to Protective Services?

A. I believe that was another one of the of the issues I was asked to discuss.

Q. Let's start with the State of Michigan social workers, Jennifer Reno and Barbara Friedel. Are you going to offer an opinion in this case that they should have reported Rufus Young?

A. Could I have my materials?

Q. I'm sorry, here. Did you form an opinion after reviewing the records as to whether the State of j Michigan social workers, in particular Jennifer Reno and Barbara Friedel should have reported Rufus' matter to Protective Services before his death?

A. Please give me a moment.

Q. That's okay.

A. To the extent the social workers for the State of Michigan had some responsibility for inspecting the placement and reviewing the case and to the extent that they saw or should have seen the child's deteriorating condition they did bear some responsibilities for reporting or at least triggering an investigation as to the nature of the care this child was receiving and that could have been discharged by either initiating Protective Services referral or conducting a more thorough investigation on their own.

Q. By the way it doesn't look like you reviewed deposition transcripts of any witnesses in this case?

A. I have not received deposition transcripts.

Q. Did you even receive any summaries of what any of the witnesses testified to?

A. This is what I received.

Q. Is there a point in time based on your review of what you did receive, is there a certain point in time that in your opinion the State of Michigan social workers, Ms. Friedel and Ms. Reno, should have filed a Protective Services request?

A. I don't know if I can point to a day and say that they were warranted, there was no reason for them to act on one day and on the next day there was a reason but you know my understanding is that this child was accused of failing to thrive, or was labeled as a failure to thrive and was losing weight and his physical condition was deteriorating and with each day it became more obvious. And the day it closed the threshold, I don't know if the documentation is specific enough for me to point to a calendar and say that was the day that you know it became egregious and it was just human error before that.

Q. Can you give me any time frame at all as far as when?

A. Even though I said I couldn't you want me to do it a little bit?

Q. Well, obviously I'm guessing you're going to offer an opinion at some time before Rufus Young died someone should have made a Protective Services request?

A. Yes.

Q. Was it a week before, was it two weeks before, a month before, five months before, six months before?

A. Let me review the highlighted and tabbed materials and tell you the date I would consider. Well, certainly by the end of January there was, January of 2003, there are indications in some of the clinical documentation that there's a failure to thrive, now that's suggested in some of the early records and that persistent failure to thrive and the lack of medical input even though it's discussed in the records for at least six weeks before that should raise some suspicions that the foster mother is not complying with the recommendations or complying with her statement that she's going to seek medical attention to explain the child's failure to thrive and child's failure to thrive and failure to gain weight and keep it up would indicate a degree of neglect and that should warrant further investigation.

Q. Now, you've been looking through the records of which agency?

A. The agency is Starfish Family Services because they really did describe the child's condition and the mother's response.

Q. My question was though first of all do you understand that Miss Reno and Miss Friedel were social workers for the State of Michigan?

A. For the State of Michigan I understand and they had some responsibility for overseeing the placement in the foster home, not for doing the therapy but for evaluating the appropriateness of the placement and the success of the placement. The therapy records reflect the ongoing failure to thrive and the nutritional issues and they start, they start becoming a matter of concern in December and I would imagine that -- it's not my imagination but it would be my understanding a state social worker would be responsible for monitoring the care that the child received at the placement and the success of the placement and the child is not thriving in the placement, that would indicate that either that something is not happening that would be in the realm of neglect or that there is something that is subtracting from the child's health and development which would be in the form of abuse.

Q. So, are you telling me that then as to January of '03 at that time the state social workers, Miss Friedel and Miss Reno, should have reported this to Protective Services or inquired further or which is it?

A. Well, what I'm saying is that by January it becomes obvious the need for investigation to the appropriateness of placement and there were obvious evidences of concern for the child's safety and well-being.

Q. Should they or should they not have at that point in time reported Rufus Young's matter to Protective Services?

A. Well, let me put it this way, they should have acted on that finding.

Q. Acted in what respect?

A. Well, reporting it to Protective Services would be one of the things they could do, conducting an investigation, monitoring whether the parents were following the plan in doing - the foster parents were following the plan in doing what they were supposed to do or said they were going to do would be one thing, there should have been an intervention and the intervention would have ultimately been a Protective Services referral or investigation or removal of the child from the setting.

Q. Do you understand that the social workers employed by the State of Michigan, Miss Friedel and Miss Reno, have the authority to remove Rufus Young from the foster home at any time if they felt that they needed to do that to protect him?

A. I understand that, I understand that but that's only one of the things they could have done.

Q. You understand that but what I'm trying to find out here is what your opinion is going to be with respect to when there actually should have been a specific report to Protective Services?

A. And the times that you've asked me that I told you I couldn't point to a day. In reviewing that portion of the

documentation certainly seems that by January the need is obvious and starting in December the need, the need for some intervention should have been evident.

Q. When you say some intervention what exactly are you talking about?

A. As I said, a review of the appropriateness of the placement, the success of the placement and that would be the foster parents ability to meet the child's needs, to act on the recommendations that they receive from the therapist, the pediatrician to follow through on those things and if that action was thought to be lacking something had to be done. And the only reason I'm taking this approach to it, I'm not saying there's a knee jerk reaction that on December 15th the child had a bump on his head, they should have yanked him from placement, called Protective Services and thrown the foster parents in jail, there are a series of actions that can be taken before that.

Q. Okay.

A. And you know that the things that I described might be more of a last resort.

Q. All right. Just to clarify then you do not have, you're saying as of January of 2003 there should have been some type of intervention, you're not necessarily saying that it should have been a formal report to Protective Services but there should have been some type of additional further something more than what was being done by the social workers for the State of Michigan?

A. That's sort of what I said but I think the distinction other than your paraphrasing was that by that time it had become obvious.

Q. Okay. And is there a point in time where in reviewing the records that you reviewed that in your opinion Rufus Young should have been taken from the foster home?

A. Well, once again retrospectively we can say at the earliest signs of distress but what I would say is that an investigation should have been undertaken. What I can say further is had an investigation been undertaken, if somebody had really looked what was going on, inspected the site and asked the right questions and looked at the answers and looked at the evidence, the conclusion would be that the child would have been removed upon inspection. So when if the inspection, the investigation took place, I would say that would have been the obvious findings or that would have been the obvious recommendation as a result of the investigation.

Q. That's your opinion, it would have been had all those things been done it would have been the obvious conclusion someone would have reached?

A. Yes, that's right.

Q. Did you review any pictures of the foster parents home?

A. You know, I don't recall if I did. I think there may have been some pictures in here, some copies of pictures.

Q. Were you aware of whether the social workers employed by the State of Michigan visited the foster parents home?

A. I understood that they had made a visit at some point, I don't recall exactly when.

Q. All right. Were you aware that the social workers employed by the State of Michigan, Miss Reno, accompanied the foster mother on some of her doctor's appointments?

A. I believe I read that.

Q. You did not think that that was -- you've got this State of Michigan social worker attending some of the doctor's appointments, were you also aware she was following up with the foster mom to see if some of the appointments had been

kept and what medical testing needed to be done and things of that nature?

MR. JOHNSON: Before you answer, let me voice an objection as to the form of the question. If you're posing this as a hypothetical, it's incomplete. If you're not posing it as a hypothetical, it mischaracterizes the evidence of record as to the term follow-up.

MR. HICKS: I'll withdraw the question.

THE WITNESS: I'm not sure that I would --

BY MR. HICKS:

Q. Well withdraw the question and rephrase it. In your review of the records did you see in any instances where the social worker, Miss Reno, accompanied the foster mom on any doctor's appointments?

A. I believe I read something to the effect that she was present at one of the appointments.

Q. Did you actually review the State of Michigan social worker's log of contacts, date of contacts, who they talked to, what was said, things of that nature?

A. I saw some accounting of that in the FIA records.

Q. When you saw some recounting, can you show me specifically if you reviewed, if you have in your packet there any logs from the State of Michigan social workers to show what contacts they made, with whom and what was discussed?

A. You mean like this case narrative where it's, you know, it's described as to what actions were taken, I don't know if these would qualify as a log.

Q. But there are some written ones and some typewritten ones?

A. What I said was I think there was something -- where did it go - --

Q. There's something that seems to be transcribed?

A. I did review that.

Q. Did you review anything regarding the State of Michigan social workers contacts with the foster mom indicating whether they followed up with her to see that she was getting any testing done or doctor's appointments made, things of that nature?

A. I recall some documentation that alluded to their attempting to encourage her to do what she told the therapist that she would do and some discussions as to why some things had been done and some things hadn't been done.

Q. Whose responsibility is it in your opinion in this case that to make sure that the foster mom followed up with doctors and specialists and other medical providers to make sure Rufus got the proper medical treatment that he needed?

MR. JOHNSON: Before he answers let me voice an objection as to relevance. Go ahead.

THE WITNESS: To the extent that calls for a legal opinion.

BY MR. HICKS:

Q. It's not.

A. Because you did qualify it in my opinion. Now, in terms of the legal chain of command I'm not really in a position to

comment but my understanding would be that if the State of Michigan licenses a foster care home, licenses a woman to take care of foster children and they have social workers assigned to the case, the social workers monitor the child's progress in the borne and the foster parents' ability to meet the child's needs within the foster care setting and the state would monitor that through their agent which would be the social workers.

Q. If someone came to you for counseling for an example in Rufus' case -- well, let me ask you this question before I get to that question: What's your understanding of why the foster mom and Rufus came to Starfish Family Services, for what purpose?

A. To Starfish Family Services?

Q. Yes?

A. For family counseling.

Q. Okay.

A. And the goals are delineated in the plan of service and the psychiatric intake, the target behaviors that were to be addressed, there were supposedly progress towards those, towards the goal of irradicating those behaviors and modifying those behaviors documented in the records. I said supposedly because progress was somewhat lacking.

Q. You're not going to offer an opinion in this case that Starfish Family Services and the social workers there that provided counsel to the family, that they had a responsibility to make sure that Miss Hall followed up on Rufus' medical treatment, you're not going to offer an opinion on that conclusion, are you?

A. Well --

Q. Yes or no?

A. Well --

MR. JOHNSON: Before he answers now which question do you want him to answer, the penultimate one or the last one?

MR. HICKS: Okay, let me rephrase it.

BY MR. HICKS:

Q. Is it not your opinion that Starfish Family Services had a duty to make sure that Miss Hall followed up on whatever medical treatment Rufus Young needed?

MR. JOHNSON: Before he answers let me voice an objection to the form of the question. You are now calling for a legal conclusion because you introduced the concept of duty.

MR. HICKS: Okay.

THE WITNESS: You want to ask it again or do you want me to answer?

BY MR. HICKS:

Q. Go ahead and answer.

A. I'm not sure if I can endorse the use of the phrase make sure the family's compliance with recommendations and the family's ability to meet the welfare of the child are part of treatment program, part of the plan of service that the social worker giving family therapy had generated and identified and to the extent that their duty is a legal concept, I can't comment

But certainly if the parents, the foster parents are not meeting the child's needs, there is some obligation on behalf of the social worker to act and to intervene.

Q. Which social worker are we talking about?

A. You're talking about Starfish Family Services therapists, the therapist here.

Q. Act and intervene in what manner?

A. To identify the neglect, to explore it and see that it is addressed and that can be done in a number of ways, the last resort would be initiating a Protective Services referral.

Q. You told us what the last resort is, what are some other ways?

A. I think in general explore what's happening, why, what's happening and as a mental health professional to make an assessment as to whether the reasoning is adequate. So if someone, say if me kid comes in and he's bleeding, you say put on a band-aid. And he comes in the next week and there's no band-aid and you ask the mom why not and she says I don't have any money, I can't afford a band-aid. You have to identify if that is plausible with the understanding that me foster child is getting a certain allowance for care, a child with Medicare can go to the emergency room or physician's office and get a dressing, so that would not be plausible. So it would lead the social worker to assess a little more assertively or proactively to instruct the mother to call the doctor, make an appointment with the doctor in our presence. If that doesn't take place, again, small steps leading up to the ultimate last resort of a Protective Services referral.

Q. Do you recall when you reviewed the records that you saw here Ms. Ryeson attempted to do what you stated which was to contact the doctor's office to see that Rufus, an appointment was made for Rufus and things of that nature?

A. I recall her encouraging the family to do so. I don't know if I recall a specific phone call but I recall an explaining of facts or explanation of information. Unless you would like to direct me to a page in that record?

Q. Sure.

A. Are you talking about Bates number B34, February 11, 2003, strongly encouraged that client receive immediate medical attention. Foster mother was asked to call the therapist with the medical results.

Q. Just a second. Why don't we start with the first one. Did you see anything prior to January of '03 in reference to the Starfish records, did you see anything prior to January of '03 where there was any I guess necessity for Rufus to have medical attention or have any medical testing? Well, let me help you out here, January 28th?

A. Are you talking about like in December when they discussed the medicine issues or the child's tremors, things like that?

Q. Let's start with'that. Which record are you referring to?

A. December 9, 2002 there's a discussion of the child's sleep and appetite, there's discussion of the child's tremors, there's a recognition of foster parents difficulty regarding managing the client's behavior, there's some mention of prescription and recommendation for the use of a new medicine, discontinuing the use of the medicine Trazodone.

Q. Did you review the psychiatrist's initial evaluation that was done in September?

A. Yes.

Q. Is there anything in there you disagree with?

A. No. The psychiatrist recommends the use of Trazodone and I would think that using medication in a child this young might be unwise but it's not outside the standard of care, advising behavioral modification to correct and follow what the

therapist recommends for therapy, a recommendation there be follow-up with the physician to follow if there's any medical problems. It's very general but a reasonable recommendation so I don't disagree with any of it.

Q. In the history of complaints in the initial psychiatrist's evaluation on September 19th of 2002 the psychiatrist notes that Rufus has been with the foster parents since April and I'm paraphrasing this, do you see which one I'm referring to?

A. Yes, history of complaints and this is Bates number B100.

Q. Right. Rufus has been with the foster parents since April of this year, I have noticed that he has difficulty with his temper, behavior and being aggressive towards his sister and other kids at times, making inappropriate remarks and touching people inappropriately while touching himself inappropriately, is bed wetting daily, soiling in his pants sometimes daily, sometimes on and off, he does not sleep well, he's is wandering all night and gets frustrated and cranky easily. He takes off his clothes in public. He at times does not seem to know what is appropriate behavior and what is not appropriate behavior. He eats out of garbage cans. The kids were visiting with biological parents on and off which is not going well so they're on hold right now. Under background information states foster parents did not seem to know the details of birth, history of milestones, but he was born addicted to cocaine and to possible fetal alcohol syndrome. His mother was on drugs and alcohol during pregnancy. Under personal history states the kids were removed from biological parents for severe abuse and neglect and were placed in a foster home for about a month prior to coming to this foster home. Was it inappropriate or somehow incorrect for the social worker, Kristin Ryeson, to rely on this information of the psychiatrist's initial assessment in her assessment of Rufus' condition when he came into her counseling and his ongoing condition while she's counseling him?

A. Well, given what you read was history I don't know that she needed to rely on that because that was history that she could have obtained in her assessment and that she would have obtained in her assessment.

MR. CORBET: What was the date of that?

MR. HICKS: September 19th of 2002.

MR. CORBET: Thank you, sorry.

BY MR. HICKS:

Q. And as a matter of fact, I believe her intake was done on September 10th. Was there anything different in her intake than in the psychiatrist's intake?

A. She speaks of a history of the child having fascination with fires and in addition has a history from the foster mother not by her observation that the child would appear to be in a daze and stare off into space, sometimes picking and digging at his skin which is addressed in the psychiatric evaluation.

Q. He would sometimes dig and pick at his skin because he has eczema?

A. That doesn't say this, often to the point that it bleeds.

Q. Do you know why he was doing it?

A. I think the pediatric records reflect either dry skin or eczema and that diagnosis was made by a pediatrician, I don't recall seeing a dermatologist's confirmation of that diagnosis, although this record is I talking about a history of abuse and neglect and abuse of drugs and alcohol during pregnancy. And the mother doesn't say the source of that collateral history because no one really knows, everyone just heard and this is third or fourth hand information and there's no description that the child actually had a habitus of fetal alcohol syndrome which is quite specifically defined. So even though a psychiatrist alludes to that, the psychiatrist doesn't describe the facial stigmata or any of the other habitus that are suggestive of that specific diagnosis.

Q. Let me turn your attention to the report you referred to previously of December 9th of '02, what in that report in your

opinion does suggest that there should have been some medical follow-up?

A. I'm not sure, December 9th of '02, you're losing me. I don't know, this is December 10th. Are you talking about Bates 99?

Q. Bates B49?

A. B49, oh, December 9th, I'm sorry, this is September, December 9th, okay, going back to this.

Q. That's the one you referred to? By the way you said the word tremor, where in that December 9, 2002 report is the reference to specifically the word tremor?

A. The word tremor isn't used. The foster mother states client is anxious throughout the day and sometimes shakes, even while at the dinner table. And then the issue of medical attention is where the social worker discusses the changes in medication which are undertaken at the direction of a physician.

Q. That medication would be prescribed or one medication would be discontinued or prescribed by the psychiatrist that did the initial intake who authored the December 10, 2002 report?

A. It doesn't say which doctor made the prescription, it just says doctor's recommendations regarding new script.

Q. He wasn't getting any psychotropic medication from anybody else?

A. I just don't know whether it was the same child psychiatrist or a different doctor.

Q. Okay. When was the next time that there was -- well, okay, let's stick with the December 9, '02 report Other than the medication discussions is there anything in this report that suggests that somehow Rufus should be sent out to a doctor or go to a hospital for any type of medical treatment?

A. The issue of the shakes even while at the dinner table.

Q. He sometimes shakes even while at the dinner table, is there any mention of any shaking or tremor in the next session of December 17th of 2002?

A. No, I don't see the term shaking or tremors in this.

Q. In fact, the clinical status of December 17th of 2002, it states among other things that his mood, affect is improving, he's more expressive but mostly quiets easily, is there anything in this evaluation of December 17th, 2002 that suggests his condition is getting worse?

A. It doesn't address the tremor, it doesn't say whether it's getting better or worse.

Q. It doesn't reference it at all?

A. Which is curious. When there's a troubling behavior or a troubling symptom, it's mentioned in a note, the follow-up note should mention whether the behavior is improved or deteriorated. There's also no mention as to the patient's response to medication, although medication was addressed in the earlier session and the patient's responses to a change in medication should be addressed or described.

Q. Do you have any information other than this report dated December --

A. 17th.

Q. -- 17th to suggest that he is or is not having any shaking on December 17th of 2002?

A. There's no progress described regarding that symptom. That symptom is identified as something that is troubling, that's something that I described as being a matter of concern and it should have been a matter of concern and then it's not addressed, there's no follow-up to it.

Q. My question is do you have any information whatsoever that indicates he was experiencing shaking or tremors on December 17th of 2002 but they weren't noted, any evidence or any information whatsoever?

MR. JOHNSON: Before he answers let me voice an objection to the form of the question or in this case questions. You have to let him answer a question before you shoot out another one. It's almost impossible for me to write down the questions, let alone for the doctor to be able to answer them cogently. So if you want to decide which one of the last questions - and I use the pleural form - you want him to answer, I'll let him answer one of them but only one at a time.

BY MR. HICKS:

Q. Okay.

A. To the best I understand your question is there anything, any evidence that it was or wasn't there, I don't really understand what you're asking me.

Q. Okay, I'll rephrase it.

A Please.

Q. On December 9th of '02 the therapist took some history from the mother which states that Rufus was anxious throughout the day and sometimes shakes even while at the dinner table. Is there anything in this report that suggests that the social worker actually observed Rufus shake or having tremors at that session?

A. She doesn't comment on its presence or absence, she makes no comment.

Q. Based on your review of the therapist's notes there, how would it suggest to you that this information came to the therapist, by way of observation or by way of history from the mother?

A. That's a report from the mother.

Q. Okay. Now turning to December 17th of '02?

A There isn't any description of the behavior's presence or absence at any time, any comment on the patient's motor activity is conspicuously absent.

Q. Turning to December 17th of '02, is there any reference in that report and I think you already answered my question regarding whether the mother gave a history, again talking about the shaking or whether the therapist observed any shaking, yes or no?

A. Yes. Did I already say that or which one question do you want?

Q. Would you agree with me in the December 9th, '02 report there's no reference or any history from the mother about the shaking continuing or any reference by the social worker of observing that in that session?

A. There's no history of, there's no notation of anything from the mother other than that she was late in bringing the children to the session and the issue of shaking that was raised in the prior session but not described in the prior session is not even addressed in this session.

Q. This January 7 of '03, can you turn to that one, Number B44?

A. Yes.

Q. Is there any reference in there from the mother that she reports any continued shaking or any reference by the social worker that she observed any shaking in this session?

A. There's absolutely no reference to any information obtained from the mother in this session, there's no description of the child's demeanor nor the presence or absence of any tremor, that's again conspicuously and curiously absent.

Q. Now, January 14th of '03 there was a cancellation, do you have clients that cancel appointments, doctor?

A. I do.

Q. January 21st of 03, is there anything in that session making reference to a history from the mother about shaking or where the social worker makes any observations of shaking in the office by Rufus?

A. No mention of shaking at all.

Q. Okay. January 28th, let's turn to the next session which I believe was February 4 of '03, number B36 -- scratch that, that was a cancellation, B34 which is a February 11th of '03?

A. You're correct, a cancellation, February 4th.

Q. Yes.

A. And you're skipping a cancellation of --

Q. Right

A. The prior cancellation of January 28th and moving onto--17

Q. February 11th of '03?

A. February 11th of '03.

Q. Okay. Are you there?

A. Lam.

Q. All right. Now, in this report under clinical status it says fully oriented, mood sullen and appeared sad and anxious. Motor activity - hands shaking and voice trembling. Appearance - weight loss, bump on forehead?

A. That's right.

Q. Have you reviewed the rest of the report?

A. I have.

Q. Okay. The therapist was given an explanation by the mother as to how Rufus got the bump on the forehead, do you see that or recall that?

A. Foster mother stated he sustained the bump from quotes "running into a wall" end quotes.

Q. And the therapist also probed the client about the bump on his head and the client also stated I got it from hitting a wall

when I was running too fast. She asked him about the trembling hands. Do you need to take another chance to look?

A. Oh, no.

Q. Was there anything in this session that was inappropriately handled by the therapist?

A. Well, when you say inappropriately handled, I'm not sure what you mean.

Q. Let me be more specific.

A Let me finish.

Q. I'll rephrase the question. At this point in time should she have contacted Protective Services for the bump on the head?

A. That would be one of the things she could have done, as I said as a last resort and I'll give the same answer each time you ask me that kind of question.

Q. My only question was should she have contacted Protective Services at this point, yes or no?

A. Well, that's not a yes or no question, it depends on if she would have investigated, it would depend on the findings of the investigation, the response she received from the inquiry and her conclusions. She should have done something, she should have taken a closer look at it, there were a lot of things she could have done and depending on what she saw calling Protective Services might have been the result.

Q. Tell me what other things she should have done at this session?

A. I think I did.

Q. You said take a closer look at what?

A. Well, what I mean when I say take a closer look would be conduct a more in depth interview of the child, inspect the child's wounds and address his shaking, interview the child outside the presence of the mother, interview the mother outside the presence of the child, interview the other children and express some concern about not only for me bump on the head but the shaking, the weight loss, which are shaping up to a more obvious picture of failure of the placement, of failure of the caregiver, an increasing risk to the child. And if the results of that inquiry were not plausible and were not cooperation from the participants, then intervention, a home inspection, or a further investigation by another agency like Family Independence Agency or Protective Services would have been indicated.

Q. You mention whether or not further inquiry should have been made of the child not in the mother's presence, do you know that the therapist when she interviewed the child about how he got the bump on the forehead, whether or not that was in the mother's presence?

A. It doesn't say the child was interviewed alone and the mother was interviewed.

Q. You don't know whether the child was interviewed outside the mother's presence or not?

A. It says client could not identify why he was shaking and foster mother stated he has been doing that lately, that would imply she was present.

Q. It says while playing therapist probed client about the bump on his head, does that indicate the mother was present?

A. When the therapist inquired about the bump on the client's forehead, and it indicates the foster mother stated, that would imply she was present.

Q. I'm talking about the statement after that where the social worker says while playing therapist probed client about the bump on the head, do you know whether the foster mother was present or not?

A. There's no intervening statement that the foster mother was dismissed so the reasonable inference is that the mother remained present. Do I know? I wasn't there so I can't know.

Q. You did not review Miss Ryeson's deposition to see what she had to state?

A. What she had to state is not as important or compelling as to what's in the records.

Q. What's in the record states while playing, it doesn't indicate in that statement whether the foster mother was present or not, would you agree with me, yes or no?

A. No, I wouldn't. What I would say there's no intervening statement that the mother was dismissed so the reasonable inference would be that she remained present and asking for me to comment on that isolated statement from this record would give a disingenuous answer to this because it doesn't say she was there, doesn't say she wasn't. The fact that the two questions that she asked were answered by the child and then followed by a response from the mother would indicate the mother was present.

Q. If the social worker testified in deposition that when the client was, when the client was playing which was a routine as far as these visits were concerned and was just in her presence and the foster mother wasn't there and that's when she made this inquiry, do you have any evidence to contradict that?

A. Yes, this record doesn't reflect that.

Q. This record does not suggest that?

A. The record suggests there's no indication that the mother was dismissed, the foster mother was dismissed. The record is more suggestive of the foster mother being present while the child was interviewed.

Q. A bump on the forehead in and of itself is not reason to call Protective Services, would you agree with that?

A. It may or may not in and of itself, it would depend on the presence of other factors like weight loss.

Q. If a child comes in with a bump on their head with nothing but a bump on their head and the child and the mother says, you know, he bumped it, he was running too fast and hit the wall, that exclusive of anything else is not reason enough to call?

A. If I'm just to consider that and to not consider anything else but just consider those two statements, there probably is not enough to initiate a Protective Services referral unless there were other factors that would raise the level of concern.

Q. Okay. The next visit was?

A. February 13th.

Q. Well, actually before we get to that, the December 11th visit the therapist strongly encouraged the foster mother to receive or the client to receive immediate medical attention, do you see that?

A. December 11th?

Q. Yes, the one we were just talking about.

A. December 11th?

MR. JOHNSON: You mean February 11.

BY MR. HICKS:

Q. I'm sorry, February 11th.

A. That was my recollection, that we were talking about the February 11 th note. Now, what was your question?

Q. The note about, let's see, under the focus of session, the second to last sentence?

A. Therapist strongly encouraged that client receive immediate medical attention at the time.

Q. Let's go before that. Therapist instructed foster mother to take client to emergency room following his appointment this evening to further assess the shaking. Foster mother inquired about taking client to his doctor in the morning. Therapist strongly encouraged client receive immediate medical attention. Foster mother was asked to call therapist with the medical results. That was appropriate, don't you think?

A. Her concern?

Q. Well, her instructions to have Miss Hall take Rufus to get immediate medical attention?

A. To an emergency room, yes, she considered it to be a medical emergency.

Q. The therapist couldn't do anything more at that point other than do what she did or call Protective Services?

A. No.

Q. No?

A. That's not true.

Q. What else could she have done with respect to getting medical attention?

A. She could have told the foster mother to do so, she could have called the foster mother and said did you do that.

Q. Let's talk about this visit before you get on the next thing. At this session when she gave the instruction to the foster mother to go get emergency room care, go get immediate attention, there's nothing more that she could have done at this session other than what she did or for the therapist to contact Protective Services?

A. No, that's not true.

Q. What else?

A. She could have called 911 if she thought the child needed emergency medical attention, she could have done that, I'm so concerned I'm going to call 911 and have the child taken to the emergency room.

Q. That's what you would have done?

A. I would have talked to the mother.

Q. Would you have done that, called 911?

MR. JOHNSON: Let me voice an objection as to relevance. What he would do in this situation is irrelevant.

BY MR. HICKS:

Q. Okay.

A. If I had to, if I had to and if nothing else worked, my strong encouragement and follow-up wasn't sufficient and the mother insisted on taking the child home and if I couldn't reach the family doctor to apprise him of the concerns and to have him call me the next day to make sure that the mother arrived, I would have called 911.

Q. At this session on February 11th of 2003 based on what you reviewed in the records which is my understanding all you reviewed, you haven't reviewed the deposition transcript, would you have called 911?

A. I would have done the things that I described, calling 911 would have been one of the things to which I would have had to resort had the other earlier interventions not been effective or adequate.

Q. Okay. But we're at a session on February 11, 2003, you've read this report?

A. I have.

Q. And she's gotten to the point in this session where she's made a recommendation of what the mother should do?

A. That's right.

Q. She has to wait until after the mother leaves the office to see that she takes him to get the medical attention?

A. That she takes him?

Q. Or that she --

A. She being the foster mother?

Q. Right?

A. No, no, that's not, no, that's not okay, that's not it, that's not it. If mat's your question to me my answer is no.

Q. I want to know, maybe it's my fault in the way I'm asking the question.

A. I'm trying to make myself clear.

Q. So that on the December 11th, '03 session the social worker, we have got a bump on the forehead, his hands were shaking, she's got an explanation from the mother that the child is -- well, she said that the child, you know, that she should take him to the emergency room?

A. To the extent that you say you know, I'm not sure what I'm supposed to know. If you're going to ask the question, ask it succinctly and specifically. Tell me what your question is.

Q. Did the therapist instruct the mother to take him to the emergency room following the appointment?

A. No. She said I'm going to take him to the doctor tomorrow and the therapist said no, he needs immediate medical attention.

Q. So I guess and maybe that's where I'm missing the point here, you're saying that because the mother said I'm going to take him to the doctor in the morning, that that wasn't sufficient?

A. She said he needed immediate medical attention, the child needed immediate medical attention.

Q. You're telling me then based on this record from December 11th, '03 that in your opinion that therapist should have called 911?

MR. JOHNSON: Before he answers let me voice an objection and I believe you did it by mistake, you keep saying December 11th.

MR. HICKS: Okay.

MR. JOHNSON: The date is February 11th.

BY MR.HICKS:

Q. All right. February 11th, I'm sorry go ahead.

A. I don't know what else I can do to help you because I've tried to make myself clear. I think there are a number of things that can be done including making clear to the mother what the child's needs are, trying to extract from the mother a commitment to act on your recommendations, if the mother is uncooperative then discussing your obligation to the child and telling the mother if you don't do this then this is what I'm going to do as an alternative. And depending on what the child's condition was because the social worker saw the child at that point now and as a medical doctor I might be in a better position to make a determination as to the acuity of the child's needs, so an alternative that 221 might be able to negotiate with the mother to take die child to the pediatrician tomorrow, tell me his name, I'll call him, I will talk to him, make him aware of what my concerns are or to take him to the emergency room. And then I would verify that the mother kept the appointment and then if she didn't then I would call 911 or I would call Protective Services or if the mother was uncooperative and I couldn't reach the pediatrician and she couldn't assure me, give me the doctor's name or we couldn't make those arrangements and I couldn't get that assurance or I felt the needs were acute, then I would tell the mother I will have to call 911 if you don't take the child to the emergency room, I will call 911 and have the emergency medical service take the child to the emergency room. So that would be the manner in which I would proceed. And the only reason Tm not going to say yes, I would have called Protective Services, yes, I would have called 911 because there are some other things that you could do to make that unnecessary but as a last resort if that was necessary, that's what you do.

Q. Okay. So the social worker's request that the foster mother follow-up with her after taking the child to get medical attention and call her with the results, that would be one of the things that you were talking about in terms of following up, making sure it was getting done. If it wasn't getting done then you're going to call Protective Services or 911?

A. That's sort of what I said. What I said was more in the context of communicating directly with the primary care physician or pediatrician, apprising him of my concerns and discussing the concerns and getting his input as to whether the need for medical care was imminent or could be deferred to the following morning. And coupled with that would be a mechanism to at least assure that there was at least compliance with the recommendations and if there was not, either the pediatrician or I would be responsible for calling 911 and sending them out to the family home or calling Protective Services.

Q. Okay. B33, it's the February 12, '03 note?

MR. JOHNSON: Not December.

MR. HICKS: I got it right. I keep looking at the 12th, I want to say December, maybe it's the snow outside, I'm thinking of Christmas.

BY MR. HICKS:

Q. Are you with me?

A. Not on that last bit of reasoning.

Q. Maybe I'll hire you, you can figure out what my problem is.

A. If you can afford me.

Q. I can't afford you, doctor.

A. I don't know whether you- but I'm looking at the same piece of paper you're looking at.

Q. Oh, all right It says therapist contacted Dr. Pennington's office to follow-up with client's appointment with the doctor, the receptionist states that the client had not yet been seen and was not scheduled for an appointment, the therapist contacted foster mother regarding therapist's recommendation to have client seen by the doctor, there was no answer so i message was left to call therapist at Life Span. Was that appropriate of the therapist?

A. Well --

Q. Yes or no, to make the call to see if she made the appointment?

A. It wasn't enough, it was inadequate.

Q. Okay. Let's tum-to -- I'm sorry, February 13th of '03, now, when she again speaks with the office manager at the same doctor's office, Dr. Pennington's office, talked about you know a release of the records and what was needed for that and then the next entry on the same day is at 2:15 and the therapist called and left a message for the FIA social worker and then at 4:00 o'clock she spoke with Mrs. Hall again regarding the medical status of the client per Miss Hall, she called client's pediatrician and informed him of the client's shaking, Miss Halls states the pediatrician told her to monitor Rufus and take him to Childrens ER if there are any changes in his condition. Miss Hall further indicates that client's shaking is not -- well, I think it's a typo - states has profound but I think she meant as profound as it was on 2/11 and he's eating normal and doesn't have a fever, was this inadequate again?

A. I believe so.

Q. Okay. And Miss Ryeson should have done what at that point, what else?

A. Well, my concerns are --

MR. JOHNSON: Before he answers let me voice an objection as to the form of the question. When you say she should have done what at that point, it's very vague, we don't know what date you're talking about, whether ifs, whether it's the inadequacy on February 12th or the additional inadequacy of February 13th and we don't know who the who is assuming it's Miss Ryeson.

MR. HICKS: I'll rephrase the question.

BY MR. HICKS:

Q. On December 13th of '03--21

A. You mean February.

Q. February 10th of '03 we have looked at what Ms. Ryeson noted on that day, you said you would have done more?

A. But I didn't say that about the 13th. You haven't let me talk about the 13th.

Q. With respect to the 13th, at that point in time, let's start with the first question, should she have contacted Protective Services on the 13th, yes or no?

A. I don't want to answer that question yes or no.

Q. Why can't you?

A. Because it's complex. She missed an opportunity on the 11th and my concern is that she was so concerned that the child needed immediate attention on the 11th then she doesn't act on that on the 12th, she takes inadequate action, by the 13th mere's a child who's 48 hours after her determination that he needs immediate medical attention and had to go to an emergency room and she's arguing with an office manager over whether a release of information is adequate and then she calls the mother who she suspects of neglect or abuse and who she knows does not follow recommendations and the mother says the shaking is not as bad, the doctor said keep an eye on him and the last statement he's earing normal, doesn't have a fever, she made the statement on prior sessions he's eating normal and losing weight, that's not possible, the child couldn't be eating normal and not thriving and losing weight She missed two opportunities over a course of the 48 hours to initiate emergency treatment which she feels is necessary, is she simply acting as a passive conduit for what a mother suspected of neglect or abuse tells her, that's inadequate, she should he have called Protective Services, she could have done any number of things, ask for the mother's conversation with the pediatrician, verify the conversation with the pediatrician in a more timely way, encourage the mother to once again seek emergency medical attention, told the mother of the alternative of her sending a 911 ambulance to the child's house to obtain emergency medical attention, if all that was inadequate to notify Protective Services of her concerns so further investigation can be undertaken.

Q. So you can't answer the question yes or no when she should call Protective Services, you can't answer the question yes or no?

A. I think I already explained that.

Q. You explained a lot.

A. I explained why, I won't say that as first response, if nothing else worked then she could have done that, that would have been the last resort.

Q. Based on what was in the records that we just read and reviewed you can't answer the question yes or no, whether she should have called Protective Services, is that a fair statement?

A. Well, the judge will decide what's fair.

Q. I'm just asking.

A. No, I'm not going to answer the question yes or no because the answer would be misleading, the answer.

Q. And your answer, you reference back to February 11th of '03, you can't answer that on that date yes or no whether she should have called Protective Services either?

A. I think I've explained that and just asking it over and over again isn't going to change my answer.

Q. You can't answer yes or no, it would be misleading? Just say yes or no, is that it in a nutshell?

A I don't know about a nutshell but it's not a question I can't answer yes or no because it would be misleading.

Q. You did mention, you said if the child is eating normally there's no way they can lose weight, do you really agree with that statement?

A. I can concoct a scenario if the child had normal intake and had malabsorption or fulminant diarrhea, then the child might not be absorbing nutrients but the question was raised about the child's intake and the response was the child is eating normally. In the context of an uncooperative mother, a child with the bump on the head and tremor and when I say uncooperative mother, a mother who gets a recommendation from a professional that the child seek immediate medical attention and doesn't take him, she says she's going to take him to the doctor the next day and then when they phone they

find she didn't take him to the doctor the next day, she only called the doctor, I would say that's alarming.

Q. February 18th of 2003, B29?

A. B29?

Q. Do you see that report?

A. I do.

Q. Rufus is at the appointment?

A. Client, therapist, client's foster parents?

Q. Right?

A. Yes.

Q. Is there any reference to Rufus shaking at that appointment?

A. Therapist met with foster parents to follow-up about medical exam with regard to shaking and weight loss.

Q. Is there any reference in this report about either the mother saying that Rufus is continuing to shake or that the therapist makes an observation?

A. That's not addressed at all.

Q. Is there anything in this report to suggest that the therapist should have called 911 for any medical attention?

A. There is nothing about the parents, foster parents compliance with treatment for the child's condition that's addressed in this session. My concern would only be that a more aggressive review and intervention should have taken place, calling 911 would only be indicated if none of the measures that I discussed earlier were effective.

Q. Is there anything in the February 18th,'03 report that's required in your assessment as a medical doctor that 911 should be called to the location to treat this child medically, to give him emergency medical services at this location or within an hour or two, is there anything in this report to suggest a medical emergency?

A. There's no description that would give the indication of the child's status by way of improvement from his prior condition or deterioration from his prior condition, there's nothing in this record that reports any progress or indication for a change of opinion that this social worker assessed this child to be in need of medical services on an emergent basis, she doesn't say they're any better, doesn't say the parents are any more cooperative, doesn't say they're any worse, they do nothing to address it. As to whether a 911 was indicated based on this session, I would only answer the way I answered every time you put it today, that the alarming condition that the child manifested would have called for an exploration, inquiry and some sort of intervention that could be taken, calling 911 or involving Protective Services would have been some of the more latter indications or some of the more last resorts.

Q. Doctor, why can't you look at that record from February 18th of '03 and tell me based on the information that's contained there, not the information that's not contained there but the information that's contained there whether or not the information in here reflects a medical emergency? You can tell me that.

MR. JOHNSON: Before he answers let me voice an objection to the form of the question, it's compound and it's argumentative.

THE WITNESS: Well, the best I answer I can give you to that, I don't want to give any jury or any finder of fact an

indication in any way that I think this record in any way suggests that things are better or things or okay or that this child didn't need more attention than he got. And just by saying whether there's nothing in the record that says she called, had to call 911 that day, that may be literally true but because of the conspicuous absence of any charting or information or basis for conclusion that says the child is any better or any worse doesn't mean that the need for more attention didn't exist.

BY MR. HICKS:

Q. Doctor, I'm not taking issue with your --

A. I don't want to answer it any other way.

Q. I'm not taking issue with your opinion that maybe medical or certainly medical attention needed to be given to this child, I'm just asking you a simple question about on this particular office visit based on the information that you reviewed in this report of February 18th of '03, whether or not the information contained in here suggests to you that there was a medical emergency which required an immediate call to 911 or an immediate visit to the emergency room?

A. I can only answer that succinctly by giving a qualification that there's so little information in this note and that there is some important things that are absent and because of their absence there wouldn't seem to be anything in this note that says 911 should be called immediately or that the child needed to be in an emergency room that day, only the fact that those things weren't addressed and the concerns weren't addressed and nothing to indicate any improvement, none of that stuff went away just because it's not mentioned here; If we were to take it in total isolation out of context, what happened on the prior visit and what*s documented on die prior interactions, it might suggest there's no reason to doing anything more aggressive but I think that's artificial.

Q. February 25th of 2003, B27? By the way did you review any records from Children's Hospital?

A. There were some pediatric records from Children's in the FIA records.

Q. Do you know what medical visits, treatments Rufus had after February 11th?

A. No, not without finding them, if you want me to do that, I'll do that.

Q. That's okay, if you don't --

A. Yes, I don't recall the date.

Q. -- if you don't recall, that's fine. February 25th of '03, B27 is, without you going through this whole exchange again, I gather if I ask you whether or not he was in need of any emergency medical attention on this day your answer would be the same as the previous answer regarding the previous visit or is it different now with respect to this visit of February 25th of '03?

A. I would basically say the same thing.

Q. You'd say the same thing, okay. His status of fully oriented, mood improving, smiling, laughing; interacting with family, motor activity, minor shaking, all the -- I think that's a typo - he's calm, focused on activity, still not enough information in this report to say, you know, I don't know if I'd call 911 or not?

A. Was that a statement or a question?

Q. I guess it is kind of a statement, would you disagree with that?

A. This is devoid of information that would suggest any acuity but again I can't speak of this record and ignore what happened over the last few sessions and remember the fact that what happened over the last few sessions and the concerns that were present, not only the child's condition but of the mother's unwillingness to cooperate. So although there's nothing

here that says you should call 911 immediately based on these few paragraphs, if you look at the context it might be more of a matter of concern.

Q. Again, with the question it's a yes or no answer. If you can't answer it yes or no, all you need to do is say I can't answer that yes or no. With respect to the February 25th, '03 visit should the social worker have called Protective Services, yes or no?

A. Given that she should have called them in the days prior, every day that she didn't call them would be an error but if I'm asked again to the extent that I said she should have done a number of things and Protective Services would have been the last resort, so given that I thought some intervention would have been indicated in the days prior, to the fact that she didn't do that on this day, I don't mean to frustrate you.

Q. It's very interesting hearing you talk and I'm not frustrated at all, perhaps I missed something. On what day should the social worker at Life Span have contacted Protective Services?

A. You want me to give you the whole answer again?

Q. No, just give the day?

A. I think about forty-five minutes ago I said I don't think I can point to a particular day and I said every other time you asked me that question. There were a number of things that should have been done and that calling Protective Services would have been a last resort.

Q. Well, doctor I asked you with respect to the February 25th, '03 visit whether she should have called Protective Services on that day and you said she should have called Protective Services long before, that's what I'm trying to find out, when you say long before that or in so many words what day before that are you talking about, on what day?

A. I think I said when you asked me that question just about every time you asked there were a number of things that she should have had happen, if they weren't successful then calling Protective Services would have been a last resort and I don't --

Q. Let's take that. You said as far as back as I think January that she should have done something further and as a last resort called Protective Services and men we went to the next visit, I said should she have called Protective Services that day and you said you couldn't answer that yes or no because there were certain things you would have done to inquire further and more intervention. Next visit you said the same thing and the same thing, now we're on the March 4, '03 visit or the February 28th or 25th of '03 visit, I'm asking you should she have called Protective Services that day and you say well, she should have called them a long time ago, I'm trying to find out, you're telling me that on several dates that there were things that she should have done and if not followed up on then Protective Services should have been called. We have now gone through successive appointments, after that I'm trying to find out at which point in time are you going to pull the trigger on calling Protective Services and can you give me a date, yes or no?

MR. JOHNSON: Before he answers let me voice an objection to the form of the question. I don't even know if that constitutes a question or colloquy.

THE WITNESS: I thought colloquy, I was going to say soliloquy when I answered.

MR. JOHNSON: It may have been mellifluous in some respects but it was not a soliloquy.

MR. HICKS: Is that your objection?

MR. JOHNSON: Yes.

MR. HICKS: Can I get a dictionary?

MR. JOHNSON: I'll give you one later.

THE WITNESS: Let me answer by saying if I held a gun on someone and I shouted stop, I wouldn't pull the trigger unless they continued to threaten. When you said when would you pull the trigger, only when I felt my life was in danger, when would you call Protective Services or 911, when everything else didn't work. She didn't do any of those things and they might have worked.

BY MR. HICKS:

Q. At some point in --

A. And if they didn't, that's when she should have done that.

Q. Now, there are certain things she could do and if they don't happen then you take the last resort of calling the Protective Services, have we reached the last resort yet?

A. None of the earlier interventions were attempted.

Q. Okay. So they weren't attempted, should Protective Services then be called if they weren't attempted?

A. They have to - those other things have to be attempted first.

Q. What happened if --

A. The child died,

Q. I'm asking you at what point in time would you reach the conclusion here that the things that you're suggesting should have been done as far as intervention weren't done and that the ultimate last resorts weren't done and Protective Services should have been called, can you pinpoint that to me?

A. That question doesn't make any sense to me. I don't understand it because there are some things that should have been done. Protective Services would be the last resort. Those other things having not, not having been done, I can't pinpoint a day when Protective Services should have been called because there were things you had to do first.

Q. I got you.

A. If you got me why do you keep asking?

Q. I got what you just said, I'm satisfied with that answer. March 18 of '03 -- I'm sorry, I apologize, I went too fast.

A. March 24 - that's a cancellation.

Q. March 11th of '03, B25?

A. Okay.

Q. Therapist spoke with Jennifer Reno regarding client's weight loss and shaking behavior, per Miss Reno client is receiving a series of medical tests to determine a medical cause to his weight loss and shaking. Miss Reno indicated that Tara Hall, client's foster mother, had taken client on February 23 of '03 for a neurological developmental assessment, so far the doctor reports failure to thrive and fetal alcohol syndrome. There were some other things mentioned in this report about some discussion about Miss Reno stating that she has consulted with a nutritionist about client's weight loss and some other things in here, is there anything else that at this point in time on March 11th of '03 that the social worker at Life Span should have done?

A. To the extent that some of the descriptions are unlikely or seem inadequate, to the extent that the social worker knew that the mother was less than cooperative as evidenced by her declining to take the child for immediate medical attention, her assuring the social worker that she would take the child to the physician on the next day and not doing so but only stating to the social worker that she had spoken to the physician and implying that the physician had said that she should only monitor the child. The social worker should have taken steps to verify the veracity of the mother's feedback and if there were any questions about the veracity of the mother's feedback, the mother's statement, she should have discussed with the mother her need to intervene more aggressively that is always found in more monitored circumstances, discussions with the doctor at the time that the examination had.taken place or a Protective Services referral as an ultimate last resort.

Q. Rufus Young came into Life Span Services for behavioral issues, correct?

A. That's right.

Q. Not for --

A. Well, for family issues.

Q. Well, for behavioral issues within the family but the bottom line is he came in for behavioral issues, correct?

A. I guess you could describe it that way, it was his behavior that was alarming and the interventions at Life Span Climes was to give the foster parents some means to handle the behavior and have it occur less frequently.

Q. The social worker that was assigned by the State of Michigan and her supervisor were responsible for the overall care of Rufus, were they not?

A. When you say the overall care, they are to make sure he got the medical attention, make sure he was in the right foster care home, make sure he wasn't harmed. In terms of the state inspection of the placement and determination of the placement and monitoring the progression of the placement, yes, that was the responsibility of those people but I don't want to imply that relieved anybody else that came into contact with this little boy, that they weren't responsible for his well-being or didn't have some obligation to act on his behalf.

Q. Do you have any understanding as to whether or not the social workers for the State of Michigan are still defendants in this case?

A. I don't know.

Q. So as of March 11th of '03 based on the information that's in here exchanged between the social workers at clinical services and the State of Michigan social workers, Miss Reno, are you suggesting that Miss Ryeson should have done something, essentially gone around Miss Reno and requested additional things of the foster mother or gone on to some of the additional steps like to Protective Services or something of that nature?

A. Well, something of that nature but I want to be careful in answering that. When you imply she should have gone around Miss Reno, she had some information and clinical experience that was alarming, the cavalier attitude towards her recommendation that the child get emergency medical care, that the mother was not reliable in her report of her intention to take the child for direct medical attention, on the following day not doing so and then calling on the following day or at least maintaining on the following day that she had telephone contact with the doctor and the doctor didn't have an opportunity to see the child with his own eyes, only heard the foster mother's report. So one of the things that this social worker could have done was shared that information.

Q. Which social worker?

A. The social worker at Life Span could have shared that information with the social workers for the state but there's no evidence she had done so. And that's just to address your phrasing the question that she could have gone around Miss Ryeson -- excuse me, Miss Reno as if Miss Reno were an obstruction and there's no indication she was.

Q. All your assumptions of what you gather in this case are based on the records that you reviewed?

A. I don't know that they're assumptions, they're my understanding of what's documented in the medical records and my reviewing of the medical records in a longitudinal way rather than taking it one sentence at a time, to see where the failure is addressed, the failure is evident but when you look at the deteriorating condition and in this instance the social worker, that is Lifespan's social worker's failure to act on information she had concerns that she voiced.

Q. What specific information in any of these reports that you've read from Life Span do you believe was not shared with the State of Michigan social workers?

A. There's no documentation in this note that the Life Span's social worker communicated to the State of Michigan social workers that the mother was uncooperative, that the mother ignored her recommendations that the child receive emergency care, I said that already.

Q. When you say the mother was uncooperative, what did the mother other than that emergency room visit, not taking Rufus right away to the emergency room instead of calling the pediatrician?

A. Well, that's it, she didn't go. She said she would go to the pediatrician and she didn't. She called and she represented that the child was eating normally, she represented what the pediatrician said which would seem to be quite cavalier given the concerns that were expressed.

Q. Do you know what the pediatrician told her was • not -- do you know that she lied about what the pediatrician told her?

A. I don't know that she lied but it sounds far fetched and unlikely to me as a medical doctor, I don't know if I can hold this social worker to that standard but certainly this social worker knew that she was so concerned about this child, well, the things that I said, that she wanted the child to go to an emergency room, she felt he needed it, the mother said no, I'm going tomorrow. The social worker was so concerned that she called the pediatrician's office on the following day and was informed that the child had no appointment. She heard from the mother that not only did the mother not take him to the emergency room but not to the doctor. She called the doctor, said the kids is shaking, she said he told her to keep an eye on him, take him to the emergency room if he gets worse, that's alarming.

Q. Is there any other instances besides that for which you believe that the mother was uncooperative?

MR. JOHNSON: Before he answers let me voice an objection to the form of the question. If you've got specific examples you want to ask him about, ask him but doing this in a narrative causes an improper record.

BY MR. HICKS:

Q. Can you as you sit here right now, can you give me any other examples in a way in which the mother was uncooperative?

MR. JOHNSON: Again, let me voice my objection, before this doctor answers let me voice an objection to the form of the question, it's now vague, uncooperative in what way or in what instance?

BY MR. HICKS:

Q. You, doctor, said that the social worker at Life Span failed to communicate to the social worker for the State of Michigan that the mother was uncooperative, I'm asking you what other instances of uncooperativeness --

A. Lack of cooperation.

Q. Whatever. That there is other than the emergency room situation and the follow-up for medical care after that?

A. That's the most glaring one that comes to mind.

Q. Any less glaring?

A. Not that I can think of now. If you'd like me to scour this record again and then bring to your attention every other instance?

Q. No. I assume you read everything before we started this deposition.

A. Please don't assume I've committed the entire record to memory.

Q. On March 11th of '03 should Jennifer Reno have contacted Protective Services at that time?

MR. JOHNSON: Before you answer let me voice an objection as to asked and answered, you've already been over that ground.

BY MR. HICKS:

Q. Jennifer Reno, one of the things she could have done, should she have done it, yes or no?

A. Again, there are a series of interventions she could have undertaken, that would have been the last resort.

Q. As of March 11 th of '03 knowing what you know from reviewing the records beginning from September of '02, and then all that occurred with Rufus and all the medical attention that apparently was required that he didn't receive immediately, the failure to thrive and everything else as of March 11th of 2003 should Jennifer Reno or Kristin Ryeson contacted Protective Services at that point?

MR. JOHNSON: Before you answer let me voice an objection to the form of the question, it's now definitely compound.

BY MR HICKS:

Q. Go ahead.

A. There's a number of things they could have done or a number of interventions they could have undertaken, calling Protective Services would have been the last resort or the most aggressive or assertive of those measures.

Q. March 18th of '03? Believe it or not March 18th of '03, at least I stopped saying December, I'm sure everybody is happy about that.

A. Now we're into March if the child had lived.

Q. March 18th of '03, anything in this report that indicates that at this point in time Kristin Ryeson should have contacted Protective Services?

MR. JOHNSON: Before he answers, let me voice an objection to the form of the question. You're taking this date out of context and asking the doctor to comment on this particular date out of its proper sequence and in the event that had already occurred --

MR. HICKS: All right, I'll rephrase.

BY MR. HICKS:

Q. Taking all of the events that have occurred from the time that Rufus came into Life Span for behavioral counseling beginning in September of '02, taking all of the events that have occurred up to this visit and through this visit of March 18 of '03 should Kristin Ryeson have contacted Protective Services?

MR. JOHNSON: Before the doctor answers, let me voice an objection again to the form of the question. The child didn't come in to receive counseling in December of '02, he started in September of '02.

MR. HICKS: I thought I said September.

BY MR. HICKS:

Q. But September of '02, from that point in time until March 18th of '03, including the information contained in the March 18th of '03 visit should Kristin Ryeson have contacted Protective Services at that point?

A. Let me answer that yes by saying that even on March 18th, 2003 it's still not too late to undertake any of the other measures that I suggested if those weren't deemed to be effective or if those couldn't be undertaken successfully, then Protective Services would have been one of the latter things that this social worker could have tried to protect this young boy.

Q. March 25th of '03, anything up to that point in time including what was learned at the March 25, '03 visit that would indicate that Kristin Ryeson should have contacted Protective Services on that day?

A. The medical record is absent any progress note or any progress charting that would address any of the concerns that were expressed about the mother's ability to cooperate and accept recommendations, the child or the child's shaking, only that there is some shaking present, the child's state of nutrition. And so I would say again that on this day it's still not too late to initiate some of the measures that I described and if those weren't deemed to be effective, if those didn't elicit cooperation from the mother then the other drastic measures, last resort measures of calling Protective Services or calling 911 would have been indicated.

Q. Other man calling Protective Services on March 25, '03, can you tell me as of this particular date taking everything into account from September of 2002 to what Miss Ryeson should or could have done on this day short of calling Protective Services, that would have at least you know fallen within your realm of suggestions, short of calling Protective Services what are the things?

A. My realm of suggestion, I'm not really sure what that means.

Q. Let me rephrase the question, bad question. Short of calling Protective Services --

A. Nothing personal.

Q. Short of calling Protective Services on March 25, '03 what else should she have done?

A. I think I discussed that in several of the other things I've discussed that on several of the other dates that we have discussed and encouraging the mother to more consciously follow up with the physician, obtaining information from the physician as to the status of the testing, the findings of the testing, encouraging a more detailed exploration of the satisfactoriness of the placement and the child's safety in the placement, all those things would be the kinds of things that the social worker could have done short of calling Protective Services.

Q. Okay.

A. In addition to the other things I mentioned on the other days that we discussed.

Q. Sure. Is it your opinion that prior to March 25 of '03 that Rufus should have been out of the foster home and into Protective Services?

A. I think that would depend on the findings of the investigation. I think the results strongly suggest it and putting it together retrospectively the results strongly suggest that had the investigation been undertaken that the degree of neglect and degree of abuse would have been revealed and the child's safety would have been preserved.

Q. Okay. And my last question --

MR. JOHNSON: Sure.

THE WITNESS: Sure.

BY MR. HICKS:

Q. My last question is you cannot tell me a specific time from September of 2002 to March 25, '03 by which Miss Ryeson should have picked up the phone or filled out a form and called Protective Services?

A. Oh, I can tell you.

Q. What day would that be?

A. It would be the day she tried all those other things and they didn't work.

Q. What day was that?

A. Well, she never tried all those other things so she never got to that point. Any day that she had tried all those things she would have seen if they would have been effective or not and if they hadn't then she would have called Protective Services but she never took the first steps.

Q. So she never got to the point where it would have been necessary to call Protective Services?

A. No. I think the necessity for intervention existed, the need for intervention of the level of calling Protective Services wasn't demonstrated because she never did any of the earlier interventions so it wasn't demonstrated and the only reason I am not able to tell you the day that Protective Services should have been called is because none of the other stuff was tried to determine whether it would have been effective or not. And if she had taken a more assertive approach with the foster mother, that may have protected this child and prevented his death and she didn't even do that.

Q. Are you telling me then there's nothing in this record --

A. I thought that was your last question.

Q. Are you telling me then there's nothing in this record without doing anything to follow-up on it that is the records that you've reviewed to this point, in particular the records from Life Span, you're telling me there's not enough information in there without Miss Ryeson to do the follow-up that you suggested that would have triggered her contacting Protective Services, she would have needed to do the additional investigation that you suggested as far as going into the family home and doing all those other things before she should have filed a complaint with Protective Services?

A. Well, that was a pretty long question.

Q. Did you understand it because I can rephrase it?

A. It was lengthy and circumstantial.

Q. Do you want me to rephrase it?

A. No, no, but I'm going to answer it. It's not the dirth of information in the record it's inactivity on the part of the social worker that makes it difficult for me to tell you the day that Protective Services involvement would have been necessary but not because there's not information in the records, it's just that she didn't do anything and Protective Services would only be indicated if the things that she did didn't work. Because she didn't do anything you can't tell when that day would have

occurred.

Q. But that day is out there somewhere?

A. Well, it may be, maybe some of the other stuff would have worked and it would have never been necessary if she had taken a stronger line and if she had taken some measures less than Protective Services. Maybe she should have called 911 when she thought the kid should be seen in the emergency room instead of letting the mother take him home and say that she would take him to the pediatrician the next day and then didn't, maybe she should have called 911 and the child would have been alive. I think it's more likely than not the child would be alive. And the next morning when she saw that the mother did not take the child to the pediatrician, if she called 911 or she called the mother and said either you're going to take him to the doctor or I'm going to call 911, that might have been enough, Protective Services may not have needed to be called if it could be resolved, if those other issues weren't successful then a Protective Services referral would be indicated.

Q. You'think if she would have called 911 on that February office visit where he had the bump on his head that Rufus would be alive today?

A. Yes.

Q. What would have occurred as a result of calling 911 to get him immediate medical attention that would have resulted in Rufus being alive today, what would have occurred?

A. A doctor would have looked at him, would have determined his condition, would have made comments on the state of his nutrition and the state of his health, a more clear channel of the gravity of the situation would have been provided to the child's pediatrician so that the child's pediatrician would have been aware of the risks, would have been aware of the mother's lack of cooperation, the emergency room doctor would have been aware of the mother's lack of cooperation and emergency room doctors, the threshold for initiating a suspected child abuse and neglect intervention or investigation would have been a bit lower than this social worker's was apparently.

Q. So if Rufus would have been seen in the emergency room before the day before his death by virtue --

A. Not the day before the day, but at the time the need was entertained.

Q. Do you know if he was seen within the emergency room within a week or two of that February '03?

A. I don't know if it was within a week or two but I know it wasn't that day and I know that the emergency room, whenever they did see him, was not aware of the fact that the mother was uncooperative with recommendations that the child receive emergent medical care and misleading in her assurances to the social worker that she would seek medical care on the following day which she did not.

MR. HICKS: I don't have any other questions.

## EXAMINATION BY MR. CORBET:

Q. Doctor, did Rufus at nay point in time have tremors?

A. It was only described as shaking, I don't recall a doctor describing it as a tremor.

Q. Ill settle for shakes. What do you think the cause of the shakiness was?

A. Malnutrition, dehydration.

Q. Well, how long was he malnourished or dehydrated?

A. You mean on what day did he become malnourished?

Q. No. For how long was he malnourished and dehydrated? I don't know if mis is acceptable as an answer, for the record the doctor is reviewing the medical records that he has in front of him. For the record he's still reviewing.

A. Thank you, Mr. Corbet. Why don't you just put a time in and then we can state the time that I answer?

Q. That's not a bad idea actually.

A. Why don't you do that?

Q. The court reporter can indicate it's 8:28.

A. Given that he was below the 25 percentile in body weight at the time of his death and his measurement of 95 centimeters or 37 inches, we're at the 5th percentile so he must have been malnourished for months.

Q. For how long, how many months?

A. Oh, several. And given that it's an insidious process, it would be difficult to pinpoint it but that it must have been several months, I would say more than three or four.

Q. Well, if he was having shakiness when he was only two months old, what would be the cause of that, would it still be malnourished and dehydrated?

A. It might be a question of dehydration, it might be a question of being malnourished, hypoglycemia. The difference for shakiness in a newborn would be somewhat different than shaking in a three or four month old.

Q. Let's go to six months because six months isn't a newborn, is it?

A. No, six months isn't a newborn, Mr. Corbet.

Q. If the patient was not malnourished and dehydrated at six months of age and still shaky, what would be the possible cause?

A. Hypoglycemic or neurologic disorder, might be seizure, might be the effects of medication.

Q. What is hypoglycemia?

A. Low blood sugar.

Q. Did this patient have any rashes that you saw in the records?

A. They talk about scars and stigmata of abuse, let me review the records again to see if they mention the term rash. Do you want to note the time that I start reviewing the records?

Q. If the court reporter doesn't mind.

(Time noted at 8:30 p.m.)

THE WITNESS: There was a hyperpigmented spot on the interior neck, hypeipigmentation that's associated with scarring on the left anterior and lateral chest so that wouldn't be a rash, there's no mention of a rash.

BY MR. CORBET:

Q. I'm talking about at any point in time did he have a rash?

A. I don't recall seeing any documentation.

Q. Can rashes cause scars on patients?

A. That's a pretty general question.

Q. It is?

A. Can a rash cause a scar.

Q. Are you familiar with eczema causing scars on patients?

A. Which question do you want me to answer, Mr. Corbet?

Q. How about the second one?

A. I wouldn't say that eczema causes scars but it can cause pruritis and the excoriations that occurs with eczema might cause some.

Q. What kind of --

A. In the African Americans, like hyperpigmentation.

Q. What areas of the body do you see eczema on?

A. Limbs, sometimes on trunks, mostly on the limbs.

Q. Folds of skin?

A. Well, I guess in a small child where there can be macerations within the skin folds if hygiene is poor.

Q. Did you see any documentation that this child was picking at any of his skin at any point in time?

A. Yes. They talked about him, the foster parents gave a history of him picking and digging at his skin.

Q. What do I you think that was due to?

A. Well, there's some suggestion that the child had eczema or dry skin although the post mortem examination didn't describe that. It might, may be compulsive behavior or ticks, reactions to medication.

Q. Did he have developmental delays?

A. I think there was some, I thought dial there was in one particular record, I couldn't find it, I think there was some mention of the issue of developmental delay, no specific degree as to what functions were latent in this little boy.

Q. Can cocaine babies - strike that. Young children at the age of three, four and five, can they have neurological problems as a result of exposure to cocaine and alcohol in utero?

A. Well, that's a pretty general question. Based on my familiarity with the literature there's some behavioral problems that are attributed to children who have perinatal exposure to stimulants or cocaine, to my understanding, to my best assessment and recollection of the literature. There is some indication that alcohol use and its attended nutritional compromise can cause certain difficulties in children. Those children tend to be of lower intellect, they may be delayed in some mental functions and they may have certain stigmata, that is characteristic facial appearance, the distance between the campus of the eyes that

suggest the developmental issues.

Q. Can new onset diabetes cause weight loss in a young patient?

A Well, that's a pretty general question and young patients who have insulin deficiency diabetes or so-called insulin dependent diabetes, sometimes called juvenile diabetes, weight loss is possible.

Q. And actually weight loss is common in those patients, right?

A And eating a lot, drinking a lot, voiding a lot in this status is a common presentation.

Q. And weight loss, correct?

A. Well, in the status it is not necessarily weight loss, but failure to gain weight

Q. So you would disagree if the literature indicates that the weight loss is common, one of the common complaints in new onset diabetes?

A. Failure to gain weight, failure to keep up with demand more commonly accompanied by increase in height without a concurrent increase in weight but some of the vague literature might describe it as weight loss or in some of the literature might be described that way when it's not addressed scientifically or specifically.

Q. So you don't think new onset juvenile diabetes is commonly associated with weight loss? I'm not talking about failure to gain weight, I'm talking about weight loss?

A. I think it's sometimes described that way but look, you're just arguing with me

Q. I just want you to answer.

A. I'm doing my best to answer it, Mr. Corbet.

Q. Well, then you answer I don't know Mr. Corbet.

A. I'd only do that if I didn't know the answer.

Q. Okay. Do you know if weight loss is a common finding with new onset juvenile diabetes?

MR. JOHNSON: Before he answers let me voice an objection as to asked and answered. He's already given you bis answer, his understanding of the medical literature. He's even agreed with you that in some of the literature they may describe weight loss but it's his understanding that the primary, the primary consequence is failure to gain weight or failure to keep up with other children that are otherwise considered to be diabetically normal things, keeping up with growth of height. But if you're talking about young children, that would be more common if you're talking adolescence in children where a period of growth is stable and growth doesn't take place then weight loss might be more appropriately described but it's a complex issue.

Q. Did Rufus have any signs or symptoms that were inconsistent with deficits due to in utero exposure to cocaine and/or alcohol?

MR. JOHNSON: Before he answers let me voice an objection to the form of the question. You're calling for a negative here as opposed to the positive, you're asking him did he have any signs or symptoms that were inconsistent, you mean such as being able to breathe, being able to void, being able to defecate?

THE WITNESS: Mr. Corbet, to best answer your question I'll have to premise my answer by stating that the kind of difficulties that occur in children born after in utero exposure to cocaine are quite nonspecific, irritability, hyperactivity, behavioral problems that occur in many conditions, in many instances. This child certainly manifested some of those

behaviors. In terms of fetal alcohol syndrome, I'm not sure I read anything that described any objective signs that were specific to or characteristic of having the moniker of fetal alcohol syndrome but he did have some developmental delays and behavioral problems and they're seen in such a wide range of disturbances so I would say that lacks specificity but if you asked, had to ask it in that awkward backward manner, did he have any signs that were inconsistent with the disorder? The vague symptoms of behavioral problems, picking, those are the kinds of things that are described in many disturbances, in utero alcohol and in utero cocaine exposure would be just two of them.

BY MR. CORBET:

Q. Due to that objection, let me rephrase the question.

A. Do I have to answer it again?

Q. Yes. The failure to thrive, the behavior problems, the developmental delays, the tremors, encopresis, are those things that can be seen with in utero exposure to cocaine and/or alcohol?

MR. JOHNSON: Before he answers let me voice an objection to the form of the question and lack of foundation. You've not established that this child actually had a failure to thrive or that he actually had any of the conditions, whether it's cocaine baby or fetal alcohol syndrome at the time of his birth or that he certainly was experiencing those at the time he went into foster care in April of '02.

BY MR. CORBET:

Q. I'll take an answer, doctor.

A. I'm sorry, Bonnie, can you read it back?

(Record repeated as requested)

THE WITNESS: My answer would be that these. symptoms and descriptions that you give are very nonspecific symptoms. They're so nonspecific that they can be seen in any number of conditions. In utero exposure to cocaine is so vaguely described that that would be possible. In utero exposure to alcohol is more specifically described and is only invoked as a reason for the kind of behaviors that you described in me presence of other stigmatas of fetal alcohol syndrome such as body habitus.

BY MR. CORBET:

Q. Assuming he was - are you done? Assuming he was having increased encopresis with bis first set of foster parents, what do you think the cause of that was?

A. Encopresis is often behavioral and is a response to abuse, neglect or frustration of the child. It's considered to be expressions of overwhelming frustration.

Q. In Rufus'case what do you think the cause of his encopresis was that he was having with his first set of foster parents?

A. I don't think he was reacting to the fact that he was traumatized.

Q. What was the trauma that he had with respect to his first foster parents?

A. I think that he had, he had been alleged that he had a history of abuse with his birth mother and often abused children who are traumatized and neglected at the time and not properly cared for become enuretic and encopretic.

Q. The behavior problems that were noted in the records of his first foster home, what do you think the cause of that was?

A. Well, when you say the cause, I don't know that it's any different than what I just stated.

Q. I wasn't talking about encopresis now, I'm talking about behavior problems?

A. Same answer.

Q. The developmental delays that were noted in the records of his first foster parents, what do you think the cause of that was?

MR. JOHNSON: Before he answers let me voice an objection, lack of foundation. You have not identified for this witness what those developmental delays were during the time he was with the first foster parents and absent that it then calls for speculation.

THE WITNESS: And my recollection of my answer the last time the issue of developmental delay was raised was I recalled some reference to the issue of developmental delay but I don't recall any specific notation of the functions or the milestones that were not reached in a timely manner and developmental delays can occur because of neglect, lack of socialization, malnutrition, developmental disability or abuse.

BY MR. CORBET:

Q. Have you seen the autopsy photographs?

A. I thought I had but the copy of the autopsy that 181 have, I don't believe has the photographs so I don't recall whether they were shown to me at some point but I don't have them here.

Q. Are you qualified to review autopsy photographs of this patient and determine which marks on his body are from abuse and which ones are from accidental trauma, playing with his siblings or from eczema?

A. Accidental, you mean, if you're asking me can I look at the marks on his body and determine the intent of the person that inflicted them, whether they were in the course of an accidental interaction with a sibling or intentionally inflicted by his father or foster father as described in the records, just by looking at the pictures? Perhaps not. But looking at the autopsy report it seemed that the number of lesions and the aging of the lesions I think I'm qualified to reach a reasonable inference that there was an ongoing process of abuse.

Q. Do you plan to do that in this case?

A. If I'm asked.

MR. CORBET: I would reserve the right to come back and complete the deposition should Dr. Shiener do that function just for the record.

THE WITNESS: At your expense or at your client's expense.

BY MR. CORBET:

Q. Well, as you said that will be up to the judge, right?

A. Warfield Moore.

Q. We're here hopefully the one and only time today.

A. All Fm saying if you want to come back and reserve your right to come back, it's at your expense.

Q. I do and I did reserve my right and it will be up to the Judge as to whether it's at my expense.

A. I guess we'll see then.

Q. We will. Now, you are a licensed physician, correct?

A. I am. Physician and surgeon I believe is what my license states.

Q. Have you operated on anybody lately?

A. Not lately. I pierced my daughter's ears.

Q. What's wrong with your daughter's ears?

A. I said I pierced them.

Q. Oh, I thought you said you fixed them?

A. What's wrong with your ears?

Q. Between February of 2002 and February of 2003, was there a specialty to which you devoted the majority of your professional time?

A. There was.

Q. What was that?

A. Psychiatry.

Q. And you're Board Certified?

A. Lam.

Q. Are you grandfathered in or do you have to keep taking the test every ten years?

A. Those are my only two I'm grandfathered in for, my subspecialty I have to take my recertification for addiction and forensics.

Q. What portion of your time is spent doing geriatrics versus other types of psychiatry?

A. There's a lot of overlap, I do consultations, most of that is geriatric.

Q. If (fie Judge was here and he said try to ball park it for these guys, what portion is geriatric, what portion is not?

A. I would say it would be hard for me to do that.

Q. So you can't do that, you can't deny it's 90 percent of your practice?

A. I didn't say it was 90 percent.

Q. I didn't ask you. I said can you deny it's 90 percent of your practice?

A. I don't know that I have to deny anything.

Q. It's asking a question.

A. I don't know that I'm required to deny anything.

Q. One way for me to get the answer?

A. Well, I'm not sure what your question is. Why don't you just come out and ask it.

Q. I just did. Could you deny 90 percent of your practice is geriatric psychiatry?

A. I don't know that I have to deny anything. If Judge Moore wants me to deny that, I'll discuss it.

Q. I'll take that as an I don't know.

A. Mr. Corbet, but I can't deny that because I don't know.

MR. JOHNSON: Objection, let me voice an objection to the form of the question, it's now argumentative, you're arguing with the witness.

BY MR. CORBET:

Q. No, I'm not I'm trying to explain my question, try to help him answer.

MR. JOHNSON: Still an argumentative explanation.

BY MR. CORBET:

Q. Are you on staff anywhere?

A. What does that mean on staff anywhere, on staff of what?

Q. Any hospitals?

A. Yes.

Q. Is there another staff?

A. You can be on staff at a nursing home, you can be on staff in an office, you can be on staff at a clinic, I don't know what you mean.

Q. Tell me where you're on staff at.

A. That's too vague. I don't know what you mean, if you're talking about hospitals, you can tell me.

Q. Nursing homes, anything like that?

A. It's too vague, I don't know what you mean. If you want hospitals.

Q. Let's go nursing homes, what nursing homes are you on staff at?

A. I've been credentialed to do consults at West Bloomfield Nursing Home, I've done consults at Lahser Hills Nursing Home, Dorvan and I think there's one more, maybe Danto.

Q. And any senior citizen homes, anything like that?

A. I don't know that they have a credentialing procedure, I've never been required to credential myself at a senior citizen home. I might make a house call on a person that's in a senior citizen home.

Q. Have you spent any significant time in the last year treating patients in nursing homes?

A. If a patient of mine gets admitted to a nursing home or rehab facility, I'll ask for courtesy privileges and I'll attend them while they're there. And I don't want to give the Finder of Fact in this matter the impression that nursing homes are confined to geriatric residents, there's some pediatric cases that go to nursing homes, there's some young adults and adults who wouldn't be considered to be geriatric confined in those facilities.

Q. What percentage of your practice would you consider to be pediatrics?

A. I'm a psychiatrist, I don't practice pediatrics at all.

Q. How about in psychiatry that you treat pediatric patients?

A. You mean children, is that what you're saying?

Q. Yes, children, pediatrics?

A. I see some kids.

Q. What percentage?

A. I've never calculated.

Q. So you can't deny it's less than I percent?

A. I can deny it's 99 percent, I'm not in a position to deny anything.

Q. I'll accept that as an answer. What hospitals are you on staff at?

A. Sinai-Grace Hospital in Detroit, part of the Detroit Medical Center and I have privileges out at DMC facilities and William Beaumont Hospital in Royal Oak.

Q. About how often do you get over to William Beaumont?

A. Lately pretty often.

Q. Is that once a day, once a week?

A. Last couple weeks it's been a couple times a week, sometimes on a daily basis. Again, my primary work is done at Sinai-Grace in Detroit. I maintain privileges at Beaumont in the event that one of my patients is admitted there. It just happened that over the last couple of weeks I've had a series of patients who have been under my regular care that have been admitted to the general hospital for other reasons, I've attended to them.

Q. You said you're Board Certified in geriatric psychiatry by the American Board of Psychiatry and Neurology?

A. Yes.

Q. When was me last time you took that board?

A. I took it in 2006, I took it originally in 1996.

Q. Do you have to actually sit for a test?

A. Yep.

Q. Do you have to produce the documentation of how many geriatric patients you took care of or anything like that?

A. No.

Q. Bit verbal or written or just written?

MR. JOHNSON: Before he answers let me voice an objection. Verbal by definition means it deals with words, oral and written, so your question can not and does not make sense.

BY MR. CORBET:

Q. Is it two tests, is it one oral?

MR. JOHNSON: No. Is one oral and one written, not is one verbal and one written just because verbal is both oral and in writing so by definition the written is a verbal test.

BY MR. CORBET:

Q. Everybody else in the room knew what I meant

A. Well, it's given on a computer but it's a four hour written exam, at least four hours is allotted for the exam.

Q. You have to do it from your desk, the computer?

A. No, I have to go to a testing center.

Q. How often do you get over to Sinai-Grace to take care of patients?

A. Every day except when I'm on vacation.

Q. That list of cases you've done in the past, legal cases?

A. What list is that?

Q. The Rule 26 list?

A. You mean that I prepare when I'm asked to do so.

Q. When is the last time you prepared one?

A. I don't remember.

Q. Was it ten years ago?

A. Probably more recent than that.

Q. Did you destroy it after you completed it?

A. No. I wrote it down and turned it in.

**Adriana LEE, as Personal Representative of the Estate of..., 2007 WL 7687480...**

Q. Who did you turn it in to?

A. The person who asked me for it.

Q. Who was it?

A. The last federal case I did, I don't remember.

Q. You did it on your computer?

A. No, typed it out.

Q. On a regular typewriter?

A. Yes.

Q. In here?

A. No, next door.

Q. How come you didn't use your computer?

A. Because I don't keep a record.

Q. You purposely don't keep a record?

A. Not purposely, I find no reason to do that.

MR. CORBET: That's all the questions I have.

EXAMINATION BY MS. ENGELHARDT:

Q. I promise I'll be brief. With respect to everything you've testified to today have you given us any and all opinions which you've formed to date?

A. I have tried to.

MS. ENGELHARDT: That's all.

THE COURT REPORTER: Could you place your orders on the record, please?

MR. HICKS: Of course I want a copy, original and mini.

MR. CORBET: Ditto. Full size and mini.

MS. ENGELHARDT: Ditto. Full size and mini.

MR. JOHNSON: I would like a full size, a mini four pages, not six, and an E-trans.

DEPOSITION EXHIBIT 1

WAS MARKED BY THE REPORTER

FOR IDENTIFICATION

**Adriana LEE, as Personal Representative of the Estate of..., 2007 WL 7687480...**

(The deposition was concluded at 8:57 p.m.)

**End of Document**                                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.