**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

HOWARD LINDEN, as Conservator for
the Estate of ELIZABETH MYERS,
ANGELA BRYANT, and TONIA LEE,          Case No. 5:16-cv-10803-JEL-SDD
as Personal Representative for the Estate
of DAWN MARIE SPICER,                  Hon. Judith E. Levy

      Plaintiffs,                       Mag. Judge Stephanie D. Davis

v.

4283791 CANADA INC., a foreign profit
corporation,       D/B/A     NATIONAL
CARGO  CARRIER  INC.,  and  ARIF
ALACAYIR, jointly and severally,


      Defendants.
_____/


**DEFENDANTS' MOTION IN LIMINE NO. 2
<u>TO EXCLUDE THE TESTIMONY OF DR. ROBERT EILERS</u>**

    Defendants 4283791 Canada, Inc. and Arif Alacayir respectfully move to

exclude the testimony of Dr. Eilers.  Dr. Eilers's testimony does not comply with

either Federal Rules of Evidence 402, 403, or 702, or the standards provided in

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).  Dr. Eilers

offers estimates of future medical expenses that are irrelevant and prejudicial

because they cannot be recovered from Defendants.  Beyond that, his opinions about

Ms. Myers's future care derive only from impermissible speculation and must be excluded.

Defendants rely on their attached memorandum in support.

As Local Rule 7.1(a) requires, Defendants conferred with Plaintiffs' counsel concerning this motion.  Plaintiffs responded that they did not concur.

Respectfully submitted,

BUSH SEYFERTH & PAIGE PLLC

By: /s/ Cheryl A. Bush
Cheryl A. Bush (P37031)
Michael R. Williams (P79827)
3001 W. Big Beaver Rd. Suite 600
Troy, MI 48084
(248) 822-7800
bush@bsplaw.com
williams@bsplaw.com

*Attorneys for 4283791 Canada, Inc.
and Arif Alacayir*

Dated: March 19, 2018

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

HOWARD LINDEN, as Conservator for
the Estate of ELIZABETH MYERS,
ANGELA BRYANT, and TONIA LEE,
as Personal Representative for the Estate
of DAWN MARIE SPICER,

       Plaintiffs,

v.

4283791 CANADA INC., a foreign profit
corporation, D/B/A NATIONAL
CARGO CARRIER INC., and ARIF
ALACAYIR, jointly and severally,

       Defendants.
_____/

Case No. 5:16-cv-10803-JEL-SDD

Hon. Judith E. Levy

Mag. Judge Stephanie D. Davis

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION IN LIMINE NO. 2
## <u>TO EXCLUDE THE TESTIMONY OF DR. ROBERT EILERS</u>

## <u>STATEMENT OF ISSUE PRESENTED</u>

Should the Court exclude the testimony of Dr. Robert Eilers, where he offers

irrelevant and prejudicial figures for medical expenses and builds his opinions on

Ms. Myers's future medical needs on speculation?

**Defendants answer:** "Yes."

**Plaintiffs answer:** "No."

## <u>CONTROLLING OR MOST APPROPRIATE AUTHORITIES</u>

Fed. R. Evid. 702

*Johnson v. Recca*,
     821 N.W.2d 520 (Mich. 2012)

*Pride v. BIC Corp.*,
     218 F.3d 566 (6th Cir. 2000)

*Tamraz v. Lincoln Elec. Co.*,
     620 F.3d 665 (6th Cir. 2010)

## I.   INTRODUCTION

"Life care planning" should not amount to fortune-telling in disguise.  Nor should it serve as a vehicle for a plaintiff to introduce irrelevant but breathtakingly high medical-expense figures to confuse the jury into entering a bigger award. Though neither proposition should be open to debate, Plaintiff's expert Dr. Robert Eilers offends both.  His testimony about future medical care needs and costs should be excluded as irrelevant and prejudicial, as future medical care costs are not recoverable in a third-party negligence action in Michigan.   And his more generalized prognostications about the future must go, too, as they do not rest on any reliable basis and are cumulative.  Quite simply, Dr. Eilers cannot explain how he reaches broad conclusions about *decades* of expected treatment for Ms. Myers based on some medical records review, an evaluation (which took place when Ms. Myers was less than a year old), and a follow-up appointment.

## II.   BACKGROUND

Dr. Eilers is a medical doctor and law school graduate who is board certified in physical medicine and rehabilitation.  *See* Ex. 1, Eilers CV.  As a specialist in physical medicine rehabilitation, he "mainly" claims to "do orthopedics [and] neurologic management in a broad number of disorders."  Ex. 2, Dep. of Robert Eilers, at 7:6-24.  He is not certified as a life care planner by the International Commission on Health Care Certifications.  Even so, he attempts to provide an

expansive life-care plan for Plaintiff Elizabeth Myers, *see* Ex. 3, Eielers Report, at 1, evidently after having seen her once when she was just under one year old, *see* Ex. 4, Evaluation, *see also* Ex. 2 at 12:8-11.

Dr. Eilers evaluated Ms. Myers in October 2016. She was "seen in a walker," and he did not see her use any words. Ex. 4 at 3. "[S]he could not long sit." *Id.* She could not use a sippy cup and had some trouble with food. *Id.* at 4. She had some impairment on her left side. *Id.* at 4-5. She was also "probably showing 3-6 months of delays with regards to language, motor function, and deficits consistent with her encephalomalicia." *Id.* at 5. At the same, Dr. Eilers concluded that "she is probably going to be able to ambulate for some distances" and was already "showing good motor gains." *Id.* "Overall, the family [was] doing well." *Id.*

In his report, Dr. Eilers takes this evaluation and develops a "budget" that purports to capture the "maximum out-of-pocket costs" for Ms. Myers's anticipated outpatient care over her entire lifetime. *See* Ex. 2 at 21:15-19, 28:14-17. In essence, Dr. Eilers's report serves as a catalog of potential procedures and needs (and their associated costs) that *may or may not* ever be incurred. For example:

- Although the report does not assess whether Ms. Myers will need medication for the rest of her life, Dr. Eilers projects that a lifetime of licensed practical nurse visits will be needed because an "LPN is required *if* administration of medications will be indicted." Ex. 3 at 5 (emphasis added).

2

- He outlines "future surgeries to consider" but does not suggest that other doctors have scheduled them or otherwise suggested that they will be necessary. *Id.* at 22; *see also* Ex. 2 at 8:3-5 ("Q. And, if I heard you correctly, you don't do any type of surgery, correct? A. We -- no."). Instead, he explains that surgeries "might" be needed because "sometimes" future developments require them. Ex. 2 at 51:23-52:23. Lines for surgery were just to "understand that this is an issue"; he was "passing the buck to the family" to say whether they are even necessary. *Id.* at 52:24-53:4.

- He lays out the need for "wheelchair equipment" and related home and vehicle modifications, Ex. 3 at 11-15, 18-21, even though Ms. Myers will "be able to ambulate more," Ex. 2 at 19:7-8. He recognized that items like home modifications would all depend on the family's choice of living situation, *id.* at 61:3-14, and as to vehicle modifications, "she doesn't absolutely need to have [them]," either, *id.* at 48:9-24. As for the wheelchair, during his deposition, Dr. Eilers was already admitting that "we may be able to back away from" some of those costs because of Ms. Myers's improvement. *Id.* at 46:6-22.

- He deems a certified nurse's assistant a necessity because he believes that Ms. Myers is "clearly going to be a potential assault victim," and she requires someone with "native intelligence" to take care of her. *Id.* at 34:13-35:7.

3

- He assumes that Ms. Myers will be hospitalized for six days each year, *see* Ex. 3 at 8, but then admits that she's "not necessarily going to check into to the hospital," Ex. 2 at 41:21-42:7.  He just imagines and expects that a series of medical accidents or issues will arise.  *Id.* at 41:21-43:8.

- He called for orthotics, *see* Ex. 3 at 20, but conceded during his deposition that "orthotics are a question mark right now," and he was in a "hold position" about whether Ms. Myers needed them, *see* Ex. 2 at 47:15-21.

After imagining out every potential need, Dr. Eilers provides line-by-line costs for each of the medical treatments, procedures, pieces of equipment, and modifications that he concludes will be necessary.  *See* Ex. 3.  He apparently obtained the figures that he uses from various sites on the internet.  *See, e.g., id.* at 19 (citing "1800wheelchair.com" and "spinlife.com," among others, as his sources for wheelchair figures).  He does not describe any independent efforts to verify that the figures were accurate.  His estimates led him to find $657,463 in non-recurring costs and *at least* $366,127.19 in recurring costs each year.  *Id.* at 27-29.  He does not discount his figures for present value or adjust for inflation.

Dr. Eilers conducted an "outpatient recheck" almost a year later, in January 2018.  *See* Ex. 5, Outpatient Recheck.  Dr. Eliers decided to do the check because "[he] was there, and [Ms. Myers's grandparents] were available," and he also "knew that we had a deposition."  Ex. 2 at 13:4-14.  He noted that, although she continued

4

to show deficits, Ms. Myers had also "shown improvement," including "bihemispheric improvement." Ex. 5 at 1. She was able to roll, stand, get up from the ground, and walk. *Id.* at 1. She could point and follow some directions. *Id.* at 2. She had a sippy cup (though, like many children, she didn't like it), and she was able to do finger foods. *Id.* Her potential seizure disorder "appear[ed] to be stable." *Id.* Though she lagged in communication, she could do "long sitting and short sitting." *Id.* at 3. In short, she had had experienced many changes since the first evaluation. Despite that growth, Dr. Eilers professed no plans to change his initial opinions about her future needs. *Id.* at 70:13-24.

## III.   ANALYSIS

Under *Daubert*, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *In re Bayer Healthcare & Merial Ltd. Flea Control Prod. Mktg. & Sales Practices Litig.*, 752 F.3d 1065, 1078 (6th Cir. 2014). Federal Rule of Evidence 702 gives the trial court the relevant standards performing that gatekeeping function:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

*Dabuert* and the cases that follow it in turn list factors for the Court to consider in applying Rule 702, such as "whether the theory or technique enjoys general acceptance in a relevant scientific community." *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006). Other "[r]ed flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012). In the end, none of these standards are exclusive; the test is flexible, and reliability is the touchstone. *See EEOC v. Kaplan Higher Educ. Corp.*, 748 F.3d 749, 752 (6th Cir. 2014). Plaintiffs bear the burden of establishing that their experts meet these standards. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

For several reasons, Dr. Eilers's proposed testimony does not satisfy Rule 702 or the principles espoused in *Daubert*.

## A.   Dr. Eilers's Opinions Concerning Future Medical Costs are Irrelevant and Prejudicial.

"[S]cientific testimony must 'fit' the facts of the case, that is, there must be a connection between the scientific research or test result being offered and the disputed factual issues in the case in which the expert will testify."[1] *Pride v. BIC*

---

[1] Internal quotation marks, citations, footnotes, emphasis, and alterations are omitted throughout, unless otherwise noted.

*Corp.*, 218 F.3d 566, 578 (6th Cir. 2000).  At its most basic level, that requires that expert testimony be relevant.  *See In re Dow Corning Corp.*, 237 B.R. 364, 367 (Bankr. E.D. Mich. 1999) ("Expert testimony will be relevant if the expert's reasoning or methodology properly can be applied to the facts in issue.").  So, for example, if the expert testimony goes to facts that simply aren't elements of the legal claims to be made, then that testimony is irrelevant and inadmissible.  *See, e.g., Rutherlan Enterprises, Inc. v. Zettler Hardware,* 700 F. App'x 398, 405 (6th Cir. 2017) (explaining that expert testimony was about quality of product was irrelevant in breach of contract case, where dispute actually centered around whether the defendants could be held liable under alter ego theory for any breach); *accord Rondigo, L.L.C. v. Casco Twp.,* 537 F. Supp. 2d 891, 892 (E.D. Mich. 2008).

In addition, the ordinary requirements of Rules 401 and 403 apply to expert testimony, too.  *See United States v. Geiger*, 303 F. App'x 327, 329 (6th Cir. 2008) ("Like all evidence, the admissibility of expert testimony is also subject to a determination of relevancy under Rule 401 and balancing of probative value against likely prejudice under Rule 403.").  "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.  Meanwhile, Federal Rule of Evidence 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of … unfair

prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

Ms. Myers's future medical expenses are not relevant in this case. Her third-party negligence claims fall under Michigan's No-Fault Act because they arise from a motor-vehicle collision that occurred on a public road. See MCL 500.3101, *et seq.* Indeed, Ms. Myers' conservator has acknowledged as much by filing suit against Ms. Myers's no-fault insurer in a separate action. *See Linden v. State Farm Auto. Ins. Co.*, No. 16-015107-NI (Wayne Cnty. Cir. Ct. 2016). Michigan's No-Fault Act bars any third-party claims for medical expenses and other allowable first-party benefits, and instead requires drivers like a plaintiff to look to his or her own insurance carrier for payment of such expenses (as Ms. Myers has done). *See* Mich. Comp. Laws § 500.3135(3)(a)-(e); *see also Johnson v. Recca*, 821 N.W.2d 520, 535 (Mich. 2012) (finding that first-party personal protection insurance ("PIP") benefits under Mich. Comp. Laws § 500.3107 are not recoverable in a third-party tort action under Mich. Comp. Laws § 500.3135(3)). Accordingly, this case does not involve a claim for PIP benefits or for payment of Ms. Myers' medical bills.[2] As a result, any evidence of the amount of Ms. Myers' medical expenses is irrelevant to the

---

[2] In fact, *future* medical expenses aren't recoverable at all in no-fault-related cases, as the No-Fault Act provides that such medical expenses are payable when the "reasonable charges [are] incurred," Mich. Comp. Laws § 500.3107, and those benefits "accrue not when the injury occurs but as the allowable expenses … [are] incurred," *id.* § 500.3110(4).

8

issues in this case (as they're not material to a disputed issue), and they should be excluded.

If Plaintiffs believe that the costs of future medical care are somehow relevant in some other sense, then they are mistaken.  For instance, no court in this circuit looks to have held that such expenses may be used as a proxy for the severity of the plaintiff's injury.  And why would they?  Ms. Myers's injuries and future needs could be discussed directly through her treatment providers and medical records; they need not be distorted through the lens of money.

Even if the amount of Ms. Myers's medical expenses were somehow relevant to her claims for third-party damages, that evidence would remain more be prejudicial than probative.  If evidence of the amount of alleged medical expenses is presented to the jury, the jury could give it undue weight, as it could mistakenly believe that it is required to compensate Plaintiff for those expenses.  "Rule 403 requires that evidence be excluded, even if relevant, if the jury will place undue weight on that evidence[.]"  *Grant v. Johnson Elec. N. Am., Inc.*, No. CV 16-11690, 2018 WL 1061698, at *2 (E.D. Mich. Feb. 27, 2018);  *see also, e.g., Goldman v. Healthcare Mgmt. Sys., Inc.*, 628 F. Supp. 2d 748, 756 (W.D. Mich. 2008) (holding that evidence was properly excluded under Rule 403 where it was likely to confuse the jury on a damages issue that was irrelevant to plaintiff's theory of liability).  The introduction of this evidence would have no probative value to any issue in this case,

and it would only cause the jury confusion regarding the damages it can properly award. *Cf. Cooley v. Rains*, No. CIV.A. 00-3494-KHV, 2003 WL 827499, at *1 (D. Kan. Mar. 3, 2003) ("Plaintiff has not claimed medical expenses and therefore any evidence of medical expenses is irrelevant and inadmissible.").

For all these reasons, the medical expense estimates that Dr. Eilers offered must be excluded.

## B. Dr. Eilers's discussions of Ms. Myers's future medical needs are cumulative and duplicative.

Expert testimony must also add something new. For instance, "[a]cting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology. Mere narration thus fails to fulfill *Daubert*'s most basic requirements." *Tchatat v. City of N.Y.*, 315 F.R.D. 441, 444 (S.D.N.Y. 2016). A jury can read medical records for themselves. *See In re Dow Corning*, 541 B.R. at 650. Not only does cumulative summary evidence from an expert fall short of "expertise," but it also creates hearsay problems. *See United States v. Rios*, 830 F.3d 403, 418 (6th Cir. 2016) ("If an expert simply parrots another individual's out-of-court statement, rather than conveying an independent judgment that only incidentally discloses the statement to assist the jury in evaluating the expert's opinion, then the expert is, in effect, disclosing that out-of-court statement for its substantive truth."). And "[a] district court is "free to exclude any expert testimony, including testimony of an announced expert, if the

10

testimony is cumulative or redundant under Fed. R. Evid. 403." *Bowman v. Corr. Corp. of Am.*, 350 F.3d 537, 547 (6th Cir. 2003).  An expert should not take the stand if "nothing suggests that the expert would have added to these interpretations a new angle or argument, as opposed to the refrain 'me too.'" *In re Air Crash Disaster*, 86 F.3d 498, 527 (6th Cir. 1996)

Once the evidence of medical costs is properly stripped from Dr. Eilers's opinion, Plaintiffs are left with nothing but a duplicative, cumulative recitation of some of the medical records in the case.  True, Dr. Eilers discusses things like medical equipment needs, home modifications, and vehicle modifications.  But none of that goes to a disputed issue in the case, so it's properly put aside.  For purposes of the pain-and-suffering damages that could arise in *this* action, only the treatments and prognosis of Ms. Myers herself matter.   The treating physicians that have worked with Ms. Myers and diagnosed her conditions are the ones who can say how she will advance and what care she will need.  *Cf. Hale v. Gannon*, No. 1:11-CV-277-WTL-DKL, 2012 WL 3866864, at *5 (S.D. Ind. Sept. 5, 2012) (explaining that "underlying treatments" must be proven by "independent admissible evidence").  Dr. Eilers, who has seen Ms. Myers twice, does not purport to be making independent diagnoses and treatment recommendations.  Rather, he is just synthesizing the work of others.  The jury "is equally capable of constructing" the summary that he provides. *In re Rezulin Prod. Liab. Litig.,* 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004).

11

**C.   Dr. Eilers's "conclusions" are speculative or otherwise unhelpful to the jury, as they are not supported by reliable methods or data.**

"[C]ourts have a duty to inspect the reasoning of qualified scientific experts in determining whether a case should go to a jury, including whether an expert's sources support his conclusions." *Rodriguez v. Stryker Corp.*, 680 F.3d 568, 572 (6th Cir. 2012). Put differently, "trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data provides adequate support to mark the expert's testimony as reliable." *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 15 (1st Cir. 2011). And in any case involving expert testimony, "a court may conclude that there is simply too great an analytical gap between the data and the opinion offered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Where data is wanting, the expert also cannot patch the problem with speculation. "[N]o matter how good experts' credentials may be, they are not permitted to speculate." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010); *see also Valentine v. Jones Lang LaSalle Americas, Inc.,* No. 13-CV-10888, 2014 WL 4906726, at *3 (E.D. Mich. Sept. 30, 2014) (Levy, J.) (excluding expert under Federal Rule of Evidence 702 who engaged in undue speculation).

It's especially important that expert testimony concerning *future* damages not veer into the realm of speculation. "[T]o establish damages for future medical expenses, plaintiff must establish with reasonable certainty that the injury sustained will require medical treatment in the future." *Rupersburg v. Etkin Skanska Const.*

*Co. of Mich.*, No. 262388, 2006 WL 3458177, at *4 (Mich. Ct. App. Nov. 30, 2006); *see also Larson v. Johns-Manville Sales Corp.,* 399 N.W.2d 1, 8 (Mich. 1986) ("In Michigan, in order to recover damages on the basis of future consequences, it is necessary for a plaintiff to demonstrate with "reasonable certainty" that the future consequences will occur.").  "Damages based on speculation or conjecture are not recoverable." *Rupersburg*, 2006 WL 3458177, at *4; *see also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 339 (1971) ("[I]t is hornbook law … that even if injury and a cause of action have accrued as of certain date, future damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable.").

Courts have stressed that these principles apply with full force in the life-care context.  "Medical items requested in life care plans should be based on medically substantiated needs, not on some abstract wish list or on speculation by the life care planner." *Parr v. Sec'y of Dep't of Health & Human Servs.*, No. 90-1324V, 1993 WL 151860, at *3 n.7 (Fed. Cl. Apr. 26, 1993).  So, if the planner doesn't have a doctor defining the future needs, and if doesn't otherwise have experience treating similar conditions, his decisions can be dismissed as speculative.  *See, e.g., Israel v. Spring Indus., Inc.*, No. 98CV5106ENVRML, 2006 WL 3196956, at *7 (E.D.N.Y. Nov. 3, 2006); *Donaldson v. Ryder Truck Rental & Leasing*, 189 Misc. 2d 750, 754, (N.Y. Sup. Ct. 2001); *see also* International Association of Rehabilitation

Professionals, *International Academy of Life Care Planners: Standards of Practice* § IV.4 (2009) ("Recommendations are to have medical, rehabilitation, psychological and case management foundations with appropriate medical specialist and treatment team collaboration when possible, with support from medical recommendations, clinical practice guidelines, research, and other current literature.").

Applying these principles here, it becomes apparent that Dr. Eilers's plan is too speculative and unreliable to warrant admission under *Daubert*.   Dr. Eilers concedes that he has included things in his "plan" or "budget" that may not be warranted.   These include hospitalizations, surgeries, wheelchair needs, orthotics, and more.  In other contexts, he budgets merely for risks or potentials.  But because he does not "formulate a quantitative measure to a reasonable medical certainty of excess … risk, it was left to speculation as to possible consequences of the [accident] on the future health of [Ms. Myers]."  *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1205 (6th Cir. 1988).  He attempts to project *decades* of care and costs for someone who is presently a largely non-verbal infant.  He then expressly "pass[es] the buck to the family" on critical care decisions.  Ex. 2 at 52:24-53:4.  Though he is speculating as to the need for these treatments and services now, he appears to concede that these needs could significantly change.  Even so, he declined to adjust his plan after he observed marked improvements between his first evaluation and his deposition-spurred "recheck."

Dr. Eilers does not suggest any way to validate that his life care plan is accurate. Although he appears to have been doing this work for some time, neither his report nor his deposition testimony provides any statistics or analysis that would provide insight into the past accuracy of his previous life care plans.  And he does not suggest that his approach and methodology has been approved by others (including any other life care planner), as he is apparently not coordinating or communicating with others on the case.  *See, e.g.,* Ex. 2 at 10:9-12 (Dr. Eilers explaining that he doesn't "have any real interest" in review other expert reports in the case).  Thus, nothing suggests that Ms. Myers's actual medical providers would approve the plan if they were asked to review it.  Instead, Dr. Eilers made a unilateral, subjective assessment.  He does not even refer to published studies or literature in projecting future medical needs.

In the end, very little suggests that this plan will ever amount to anything. Though Dr. Eilers has spoken to Ms. Myers's grandparents, the great many of her treatment decisions will ultimately be made by the physicians that see her day-to-day. Outside of this litigation, Dr. Eilers's life care plan has no practical value in the medical community.  This report is meant to guide this case, and courts "have been suspicious of methodologies created for the purpose of litigation."  *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 408 (6th Cir. 2006).

An expert "may be a distinguished doctor, … but the courtroom is not the place for scientific guesswork, even of the inspired sort." *Avendt v. Covidien Inc.*, 262 F. Supp. 3d 493, 518 (E.D. Mich. 2017).  Dr. Eilers's guesswork should be excluded.

## IV.   CONCLUSION

Dr. Eilers's life-care-planning testimony should not be heard by a jury.  It either speaks to irrelevant issues, such as future medical expenses, or parrots findings that can be better recounted first-hand from those actually treating Ms. Myers.  On top of that, his conclusions are speculative.  Under Federal Rules of Evidence 401, 403, and 702, this testimony should be excluded.

Respectfully submitted,

BUSH SEYFERTH & PAIGE PLLC

By:  /s/ Cheryl A. Bush
Cheryl A. Bush (P37031)
Michael R. Williams (P79827)
3001 W. Big Beaver Rd. Suite 600
Troy, MI 48084
(248) 822-7800
bush@bsplaw.com
williams@bsplaw.com

*Attorneys for 4283791 Canada, Inc.*
*and Arif Alacayir*

Dated: March 19, 2018

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 19, 2018, I electronically filed the foregoing document with the Clerk of the Court using the ECF System, which will send notification to the ECF counsel of record.


By:    /s/ Michael R. Williams
        Michael R. Williams (P79827)
        williams@bsplaw.com