# Exhibit 2

ROBERT EILERS, M.D.
1/16/2018

Page 7

1    they need to plan for in the future?  And his point is,

2    he goes, You know, I'm her grandfather.  I'm not going

3    to be around.  Her mom is deceased.  What do we need to

4    plan in terms of long term, what she requires?  Can you

5    give us some idea of that?

6         Q.   Okay.  And we have your CV.  But if you could,

7    Doctor, tell us generally what type of medicine you

8    practice and what your specialties are.

9         A.   It's physical medicine rehabilitation, is my

10   specialty, and I have done that 38 years or so.

11   Basically, what we deal with is the diagnosis,

12   treatment, and management of individuals with strokes,

13   spinal cord injury, head injury, progressive

14   neuromuscular diseases, like MS, ALS, people who have

15   had amputations, various body parts.  We deal with

16   orthotics, bracing and prosthetics.  We would also work

17   with sports medicine.  Musculoskeletal, nonsurgical

18   intervention.  And we do take care of hip, knee, and

19   other joints and spine surgeries, postoperatively.  We

20   manage them after that point forward.  Obviously, if

21   they need a repeat surgery to remove hardware, then that

22   would be done by a surgeon.

23            So we mainly do orthopedics, neurologic

24   management in a broad number of disorders.  And we're

25   focusing on long-term management, as opposed to

ROBERT EILERS, M.D.
1/16/2018

Page 8

1   immediate intervention.  So I have patients I follow.

2   Some I still have after 35 years or so.

3       Q.   And, if I heard you correctly, you don't do

4   any type of surgery, correct?

5       A.   We -- no.  I don't do OR type things.  We

6   debride wounds.  We do skin management, wound back,

7   those types of things.

8       Q.   Obviously, talking to you earlier, you are

9   still actively working in the clinical setting in

10  multiple locations, correct?

11      A.   Yes.

12      Q.   And where, just for the record, do you

13  practice?

14      A.   I practice here in Naples at Naples Community,

15  which is a couple blocks from here, and then up north,

16  their other hospital, which is North Collier Hospital.

17  And then I practice in Illinois at Lagrange Hospital and

18  Hinsdale Hospital.  They are merged hospitals.  They

19  have been bought out.

20      Q.   I understand.

21      A.   I can't even keep up with it.

22      Q.   And do you have any medical specialty?  I'm

23  sure you will have some training in all of these fields,

24  but I'm going to list some fields to see if you have any

25  specialized training.

ROBERT EILERS, M.D.
1/16/2018

Page 10

```
 1    long term.  I mean, that's something we do.  Anything in
 2    the area of traumatic brain injury really is clearly
 3    within our world.
 4         Q.   And I certainly didn't mean to say you didn't
 5    have --
 6         A.   No, no.  I --
 7         Q.   -- that expertise.
 8         A.   I understand.
 9         Q.   We've been provided -- have you read any of
10    the other -- been provided any of the other expert --
11    retained expert reports?
12         A.   No.  I don't have any real interest.
13         Q.   Okay.  And you were not actively involved in
14    the initial treatment or diagnosis following this
15    accident; is that correct?
16         A.   No.  I first saw her at 11 months of age, but
17    I didn't think it was 11.  I would -- yeah.
18         Q.   So you've provided a Notice of Physician's
19    Lien.
20              Are you only retained by Mr. Spicer or have
21    you become retained by Mr. Fieger's firm?
22         A.   I'm simply a physician treating and offering
23    opinions to the family.  I have not been paid nor
24    retained by anyone other than the family.
25         Q.   Perfect.  Thank you.
```

ROBERT EILERS, M.D.
1/16/2018

Page 12

1      Q.    Doctor, we put in front of you -- and I'll
2  mark this as Exhibit 2.  You have a copy there.
3      A.    Yes.
4            (Exhibit 2 marked for identification.)
5  BY MR. HARPER:
6      Q.    Is that your initial evaluation and -- I'm
7  going to use the word "life care plan", if that's okay.
8            Is that the initial evaluation, life care
9  plan, that you did based on an evaluation of October
10  15th, 2016?
11      A.    Yes, it is.
12      Q.    Okay.  And in terms of forming your opinions
13  that are found in the life care plan, can you tell me
14  what you did and what you reviewed to come to these
15  initial opinions?
16      A.    What I did is, I gave the grandfather just --
17  and you may not have it because I did send it to the
18  family.  These are things that I e-mailed to the family,
19  so I assume -- well, anyway that's how you would come to
20  them.
21            What I do is have them do a patient history
22  form, which is about a seven-page document, that they
23  would do, fill out.  And then I review it with them.  So
24  a lot of the dark writing is mine, the light writing is
25  his.  So this lets me go through methodically.  And then

ROBERT EILERS, M.D.
1/16/2018

Page 13

1    they had records from Detroit Children's, and I think,

2    Oakwood Hospital were the records he had at that time

3    for me to review.

4         Q.   Okay.   And then you were kind enough today --

5    it appears, on January 9th, 2018, you had some contact.

6    And I believe you said you actually went and met with

7    them again?

8         A.   Right.   I was there, and they were available,

9    so I wanted to talk to them.   And I think, too, since I

10   knew that we had a deposition, I wanted to talk to them

11   about the recommendations.   I talked to him verbally,

12   but I wanted to see where she was now, because, you

13   know, that year can make, you know, a big difference for

14   me, seeing where she was.   So that's what I did.

15        Q.   And, just so the record is clear, that was

16   January 9th, 2018?

17        A.   Yes.   And I did not do it just to do that.

18        Q.   No.   No.   I understand.

19        A.   In January, I would not, but I was up there

20   with some friends.

21        Q.   And we'll get into this report in more detail,

22   Doctor, but had you noticed at least some improvements

23   with her physical abilities and her ability to move

24   about?

25        A.   Yes, she did.   She's able to ambulate, you

BRICKELL KEY COURT REPORTING, LLC
305.407.9993

ROBERT EILERS, M.D.
1/16/2018

Page 19

1    cognitive -- or, you know, in terms of expressive

2    language and words, she's a good, you know, 14, 15

3    months.

4          Q.    Okay.  Do you see her gross motor strength and

5    functioning improving with the TOTS program, and things

6    like that?

7          A.    Here is what I see:  I see that she'll be able

8    to ambulate more.  She'll do it independently.  She

9    might use a device for balance from time to time.

10   Unlevel ground, gravel, grass, things like that will be

11   a problem for her.

12          She has difficulty correcting if she's

13   challenged.  Like on carpeting, if it's thicker, you can

14   see her decline from a hard surface -- or, like

15   linoleum.  And so that will always be an issue.  And her

16   gait will -- she will be able to walk more, as any child

17   will be able to do more.  I don't see her level of

18   refinement improving that much.  She is always going to

19   have limits.

20          Will she be able to do stairs?  With a

21   railing, things like that, she'll do -- she'll have -- I

22   think she has a lot of visual issues, and she is still

23   young to assess the extent of all of the occipital

24   damage, what she's able to see.

25          She has a lot of, like, spinning,

ROBERT EILERS, M.D.
1/16/2018

Page 21

1    Q.   And I'll talk some more about that future.

2  But I don't think anybody is going to disagree with

3  that.

4    A.   What I've explained to them is pretty much

5  what is in the plan.  You're always going to need

6  24-hour attendant care, CNA care.  The family can

7  administer the medications, but attendants can't do

8  that, so there has to be a retained, like, LPN to

9  administer seizure medications or anything else she

10  might need.

11    Q.   At some point?

12    A.   Well, if Mom and Dad or grandparents are gone

13  tomorrow --

14    Q.   No, I understand --

15    A.   -- my point is, they have to have a plan to

16  know or budget that, you're going to need -- you know,

17  we explain this to families who have no litigation:  If

18  you all die, do you have a plan in place, and have you

19  considered how to provide that?

20        I mean, that's a lot of what, unfortunately,

21  we do with families that have nothing to do with

22  litigation and trying to get life insurance, that type

23  of thing.

24    Q.   But in terms of, you know -- part of what,

25  unfortunately, what I have to do is figure out the

ROBERT EILERS, M.D.
1/16/2018

Page 28

1   I'm an RPT -- or I'm a licensed physical therapist.  I'm

2   going to do it free as long as they could, that's fine.

3       Q.   Okay.  Your recommendations are the numbers of

4   treatments, and the costs are what they are, whether

5   they're free, whether they're $200 a visit, it just

6   depends on where she's getting them?

7       A.   These are -- these are home costs.  The

8   hospital would be almost twice these prices.  So it

9   depends on where they would go.  I do it through the

10  home because it's actually cheaper.  So they would be

11  set up at home.  So it would be -- what they can do is

12  coordinate between the IEP and what they would

13  supplement at home if they need to.

14      Q.   Okay.  So these are the maximum out-of-pocket

15  costs that you see at this time?

16      A.   If they do outpatient, yes.  I mean, these

17  will keep moving up.

18      Q.   Right.  Understood.  But as we sit here today,

19  if the school -- or, there's no additional, you know,

20  free hours per week, these are the numbers you're

21  looking at.  And if there are some, the school provides

22  half of it, and those costs would go in half?

23      A.   Right.  And it depends on the school

24  districts.

25      Q.   Sure.

ROBERT EILERS, M.D.
1/16/2018

Page 34

1    In their community right now, interim health is doing

2    22.  They're now at 24.  It's gone up.  This is going --

3    because now you have an aging population who is

4    demanding more services.  It's just either the LPNs --

5    some are 65 an hour, if you staff them.

6              So there is going to be some variability, but

7    these are pretty much what you're going to do,

8    basically.  And it's hard for them to get people in the

9    agencies.  They can't really cut their costs too much,

10   and to staff her, you need five, six, seven people to

11   staff.  So they get a higher retaining -- or if somebody

12   is sick, they have to send somebody else.

13             So that's why the agencies are a lot better.

14   Plus, they screen, make sure, they're -- I mean, they do

15   what's, basically, due diligence.  And a young girl like

16   this, you know, you're going to want to staff her with

17   women.  Not to say men are going to assault her or

18   anything else, but, you know, she's clearly going to be

19   a potential assault victim.  I'm not saying someone is

20   going to do that, or anything else, but that's just the

21   reality.

22        Q.   So if I understand you correctly, the need for

23   a certified nursing assistant degree is based on her

24   potential for seizures and things of that nature?

25        A.   Her seizures.  Her medical complexity, her

ROBERT EILERS, M.D.
1/16/2018

Page 35

1    lack of language.  She's -- if you had, say, a

2    78-year-old person who has some physical limitations but

3    they're cognitively intact, they can take their meds.

4    They can tell the person what to do.  In this case, we

5    have to have somebody who has enough native intelligence

6    to assess the patient at some level, determine what they

7    need or they don't need.

8            So you need a little better skill set than

9    maybe somebody who completed a year of high school, who

10   isn't very well educated, who doesn't -- it's not

11   that -- you can't use somebody who you have to direct

12   all the time.  They have to have some problem-solving

13   skills, and that gets you to at least a high school --

14   hopefully, a high school graduate.  Or if they have more

15   training or education, that's wonderful, but, you know,

16   even if you were to hire a nanny, you're going to pay at

17   least this money, if not more, for most nannies.

18           So for a good person who is articulate, can

19   problem-solve, think, you know, this person has to do

20   everything for them.  They really have to be their

21   parent.

22       Q.   And that's basically what Robert and Rene are

23   providing, as the grandparents, currently?

24       A.   Absolutely.

25       Q.   Would potentially an au pair, or something

ROBERT EILERS, M.D.
1/16/2018

Page 41

1   is, and they think, you know, What is that?  And then

2   they guess, and then we end up in trouble.

3       Q.   Right.  Go to Page 7 of your report, Doctor.

4   The diagnostic services that are listed, are those just

5   based on your 38 years of what you would expect her to

6   need or is there specific records that have recommended

7   these things?

8       A.   No, no.  This would be based on my experience,

9   the issues she has, the hydrocephalus.  She's going to

10  have some issues with falls.  There are some risks of

11  infection.  She, obviously, still may need a revision of

12  the cranioplasty, things like that.  She does have --

13  she is sleeping through the night now.  At times, she

14  has some disruption.

15           For cardiac testing, we've got to look at

16  that.  The reason is, she can't walk well enough to do

17  cardiac testing.  So, like, when she's 40 or so, we may

18  end up having to do it differently.  There may be

19  different technology then, too, so -- but these are

20  things that they need to understand.

21      Q.   And then on Page 8, under "hospital care,"

22  you've listed yearly hospital stays of six days.  And

23  I'm trying to determine what that might be for.

24      A.   These could be budgeted.  She's not

25  necessarily going to check in to the hospital, but let's

Page 42

1   say that she has an absence episode, there is a concern

2   it's a seizure.  Let's say it is.  They go, you know,

3   This is a little different.  Let's go to the ER and

4   check it out, which if they call a neurologist or if

5   they call me, I'm going to say, You need to go and check

6   this out.  They'd do an EEG, might do an MRI.  And that

7   may happen a few times a year.

8           Let's say she's walking now, she falls and

9   hits her head.  They're going to take her to the ER

10  because, you know, she's at much greater risk than other

11  children for a bleed or complications.  So these are

12  going to be events that will occur because she's less

13  stable when she's, like, 70.  It's more likely she's

14  going to fall, fracture her hip, you know, get a Colles'

15  fracture.  There are going to be a lot of interfaces

16  with hospitals and emergency rooms, things like that,

17  that will come.

18          Let's say her VP shunt -- say she gets a shunt

19  infection.  She could be in three or four weeks on the

20  antibiotics.  And I'm not saying it's going to happen,

21  but this is what they need to really think about, and

22  say she gets chest pain.  Could be the flu.  She's, you

23  know, grabbing her chest; she can't talk to us.  So now

24  we've got to do a million-dollar workup to determine, Is

25  there a problem or not?

ROBERT EILERS, M.D.
1/16/2018

Page 43

1       It may be, Oh, she has a little bit of an

2   upper respiratory infection.  But we can't ask her those

3   questions.  That's the problem.  So she gets a higher

4   level of medical intensity because she can't help us.

5       Q.   So just so I'm clear, that's not based on any

6   specific need that we know of, but the likelihood of

7   what she may have, based on her current condition?

8       A.   Correct.  And she might go five years and not

9   have it, and then end up in the hospital for 30 days

10  because of other issues that would relate.  So this is a

11  budget that they need to outline.

12      Q.   I just wanted to make sure there was not a --

13      A.   There is not a current condition that she

14  needs to check in, say, to have certain testing done.

15  You know, VP shunt will have issues, and that will be

16  revised.  And there's going to be some overlap in both

17  of those areas.  Say she starts vomiting, we're going to

18  get her to the hospital to determine if she's going to

19  have an obstructed shunt, those types of things.

20      Q.   So just so I'm clear, those are prospective,

21  potential issues, but not a guaranteed, She's going to

22  need these many days a year, based on her condition?

23      A.   Right.  She probably will, but I can't tell

24  you 100,000 percent this is going to be required.

25      Q.   Yes, sir.  Thank you.

ROBERT EILERS, M.D.
1/16/2018

Page 46

1    years.  The earlier years right now.  The manual

2    wheelchair, she's still going to need -- for some of the

3    positioning and getting certain distances, she may not

4    use it as much, so we may replace it, you know, every

5    four or five years.

6              You know, we're kind of -- she will need a

7    wheelchair for long distances.  So, like, the pediatric

8    transport chair would remain the same.  So that's, like,

9    741 a year.  So the -- the freedom design chair we can

10   basically -- may be able to back away from at this

11   point, since she's got more control.

12             So it's kind of a family choice, but I think

13   you could get away from the costs on -- it would be

14   about 4,600.  I would still say you would stay with the

15   741, the transport chair, which kind of is really a

16   transport chair.  It doesn't necessarily need to

17   recline, but whatever we put in is going to be about

18   that 740.

19             So, at this point, it would be about 740 a

20   year.  And then she'll either use a powered wheelchair

21   and/or she'll need a manual wheelchair.  So we're

22   probably looking at, you know, 700 a year.

23        Q.   So that 750 range is --

24        A.   There is -- you know, and it may be that she's

25   going to -- we have to see, with her vision, if she can

ROBERT EILERS, M.D.
1/16/2018

Page 47

1    operate a different type of electric chair, but I don't

2    want her just using it.  That's only -- if you go to the

3    state fair, she's going to -- say she went to a ballgame

4    with her grandparents or someone.  Those long distances,

5    she's going to need that.  That's what I'm looking at,

6    at this point.

7        Q.   And how about the AFO, the orthotics?

8        A.   I think that -- I talked with Rene about that.

9    I'm comfortable that she should hold on the AFOs right

10   now.  She's not doing a lot of toe walking.  She's not

11   quite heel-toe.  She might be able to use -- I talked to

12   her about supra malleolar orthotics, which is kind of

13   like a shoe insert.  But I think she's probably not

14   going to want to wear them.

15            So, you know, orthotics are a question mark

16   right now.  She doesn't have to have them.  I told her,

17   I think you may want to wait on doing them.  I had a

18   long discussion with her about that.  You know, I think

19   they were going to meet with the orthotist to also see

20   if it would be worthwhile to have his input.  I'm in a

21   hold position right now on the AFOs.

22            MR. HARPER:  Okay.  Well, Doctor, can we take

23        a break, maybe 10 or 15 minutes, as we have to call

24        the Judge and -- I have a hearing that was

25        scheduled for 11:00.  And I apologize to you and

ROBERT EILERS, M.D.
1/16/2018

Page 48

1          the court reporter for that.  That's -- federal

2          judges make that call.  We don't argue with them.

3          Thank you.

4               THE WITNESS:  Sure.

5               MR. HARPER:  Off the record.

6          (A recess was taken.)

7               MR. HARPER:  Back on.

8     BY MR. HARPER:

9          Q.   Doctor, if you'll go to Page 21 of your life

10    care plan, it's the vehicle modification page.  We had

11    kind of an informal, off-the-record discussion before

12    this, kind of about what the needs are.  Obviously, she

13    is too young to have her own car, and most likely won't

14    drive, but I don't believe, based on her ability to

15    ambulate now, that the -- this type of transport vehicle

16    is required; is that accurate?

17         A.   Just to answer that, she doesn't absolutely

18    need to have this.  She could transfer in and out of a

19    conventional vehicle, generally.  She's not going to

20    drive, so she wouldn't operate this.  The point would be

21    that, if she's going to need to use a scooter or an

22    electric device for long distances, then this would come

23    into play.  But she's not going to need to use it for

24    everything.

25               So you may actually get -- you know, this, I'm

ROBERT EILERS, M.D.
1/16/2018

Page 51

1   attendant will have to have some way to get her around;

2   is that accurate?

3        A.   She's going to need some type of vehicle that

4   would accommodate some of her disability.  I think that

5   they would be better -- I mean, they're going to have to

6   go to a minimum of, like, an SUV, if they do have to use

7   wheelchairs or other devices to lift her in the back.

8             The problem is with the lifting, the equipment

9   gets wet and dirty.  You know, the reality is, for the

10  cost, you might be able to go to a little less.  You can

11  get longer use out of the van.  She would benefit using

12  an accessible van, but she doesn't absolutely have to

13  get it to get from point A to point B.

14       Q.   Thank you.  That's great.

15       A.   That's the best answer I can give you.

16       Q.   On the next page, future surgeries, you have

17  future surgeries to consider, and you have the cost of

18  the VP shunt, and up to three revisions.  Is that --

19       A.   Over her lifetime.

20       Q.   Over her lifetime, okay.  And is the shunt

21  something, Doctor, that will be removed permanently at

22  some point?

23       A.   She has a VP shunt, and you might be able

24  to -- it's going to be an ultimate neurosurgical

25  question, whether if they remove it, they get enough

ROBERT EILERS, M.D.
1/16/2018

Page 52

1    closure.  Sometimes, if it retracts and closes off and

2    you don't have a problem with fluid, you might be able

3    to.  With intraparenchymal hemorrhages and all the

4    trauma that she had, it's probable she's going to

5    continue with the shunt, whatever the ultimate

6    neurosurgical decision is.  But very rarely have I seen

7    patients, if they do have an intraventricular or

8    ventricular parenchymal shunt, it's rare that they

9    function well without it.  Possible, but in all

10   probability, it will be extended, replaced.

11            So, as she grows and that tubing moves up, or

12   let's say she has appendicitis -- she gets a little

13   infection, she's got to be given antibiotics, we may

14   have to have them remove the shunt.  Those are the

15   issues.

16       Q.   Okay.

17       A.   This is not a shunt, from the records that I

18   looked at, that you're going to readily remove.  But if

19   neurosurgery says, we're absolutely comfortable in

20   removing it, no problems -- I can't speak for

21   neurosurgery, but, generally, it doesn't work out when

22   they take it out.  And she might go with two or three.

23   She might need five or six.  It just --

24       Q.   This is just an estimate based on, again, 40

25   years of doing this and seeing how those changes occur?

Page 53

1      A.   Just understand that this is an issue, and

2   ultimately, they make the decision in the budget.  I'm

3   passing the buck to the family to say, At the end of the

4   day, you have to make the decisions.

5      Q.   Complete ignorance on my part.  I mean, is a

6   shunt -- theoretically, could it be in place without any

7   revisions, or is just the growth aspect going to cause

8   at least the need for one new one?

9      A.   At least one, yes.

10     Q.   On Page 24, just briefly, Doctor, you have the

11  bowel, bladder, and hygiene supplies.  Will these go

12  away completely, assuming she becomes toilet trained or

13  not?

14     A.   I would say that all of this goes away at, I

15  would expect, somewhere around age seven to ten.  I do

16  believe that she will be able to be toileted or toilet

17  trained.  She might need to have a diaper a day, just

18  as -- a Pull-Up for protection, or if you're traveling,

19  those types of things.  But generally I don't see that

20  she cannot be toileted.  I can't say she'll get full

21  bowel and bladder control, but you can toilet her in the

22  morning.

23          There will be some times, maybe, if she had

24  diarrhea, that it might be more of an issue.  If she

25  needs to go, it will be then.  So if she has an

ROBERT EILERS, M.D.
1/16/2018

Page 61

1    wheelchair dependent, you keep that on there.  So those

2    are the types of things that, you know, I look at.

3         Q.   Is this a scenario for this family -- given

4    their other members of the house, I mean, it might be

5    beneficial even to look at moving everybody, building a

6    new home -- selling their house and moving everybody?

7         A.   If they choose to do that, that's fine, and

8    they can apportion whatever they do with the other --

9    you know, child's situation.  But if they do that, then,

10   yes, they can certainly do that, however that's

11   structured so Elizabeth has hers.  Whatever.  I mean,

12   that's more your-all's world.  But, yes, they could

13   choose to do that and allocate resources.  And they may

14   be able to find some cost savings.

15        Q.   Ice melt system?

16        A.   Just Michigan.

17        Q.   And not really my question.  I think it makes

18   perfect sense.  If they have a garage entrance to the

19   home, would that take away the need?

20             I understand outside walking and all of that,

21   but if they had an entrance and exit from inside a

22   covered garage, to the house, would that take that out?

23        A.   No.  Let's assume -- what happens is, because

24   you have attendants and caregivers coming, deliveries,

25   supplies, you have business invitees.  That's one of the

ROBERT EILERS, M.D.
1/16/2018

Page 70

```
 1        A.   She can see and visualize.  We'd do like a
 2   widescreen TV for her, and you can Skype, or basically
 3   do that.  So there is a lot available to her.  It
 4   doesn't mean she can't go to a national park.  And there
 5   are programs I think I listed for them --
 6        Q.   Yes, sir.
 7        A.   -- that they can look into.  And some will
 8   accept, or some won't, but there are some resources to
 9   start with.  If she wanted to go hiking or go to the
10   mountains, they will modify it for her level of
11   functioning and, basically, they have guides, plus their
12   attendant, the buddy systems that they can do.
13        Q.   And, Doctor, is -- I know we mentioned this
14   earlier.  Do you have any plans to alter your opinions?
15   At this time, I understand you try to follow her on a
16   yearly basis, but between now and July, would you have
17   any reason to think any of these opinions are going to
18   change, based on what you currently show?
19        A.   I don't anticipate that.  My biggest concern,
20   from the first meeting to now is, I just wanted to -- I
21   really wanted to see where she was.  Pretty much kind of
22   what I expected, but, you know, that helped me to
23   reaffirm what I'm thinking and what I explained.  We've
24   covered the changes, and that's probably going to be it.
25        Q.   And so, kind of to recap, the developmental
```