# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

TONIA LEE, as Personal Representative
of the Estate of DAWN SPICER, Deceased,

       Plaintiff,

v.

4283791 CANADA, INC., a Foreign
Profit Corporation, d/b/a NATIONAL
CARGO CARRIERS, INC., and
ARIF ALACAYIR, jointly and severally,

       Defendants.

  -AND-

HOWARD LINDEN, as Conservator for
The Estate of Elizabeth Myers, and
ANGELA BRYANT,

       Plaintiffs,

v

4283791 CANADA, INC., a Foreign
Profit Corporation, d/b/a NATIONAL
CARGO CARRIERS, INC., and
ARIF ALACAYIR, jointly and severally,
       Defendants.

Case No. 2:16-cv-11164-BAF-SDD
Honorable Judith E. Levy
Magistrate Stephanie D. Davis

Case No. 2:16-cv-10803-JEL-SDD
Honorable Judith E. Levy
Magistrate Stephanie D. Davis

---

GEOFFREY N. FIEGER (P30441)
CHRISTIAN P. COLLIS (P54790)
Fieger, Fieger, Kenney & Harrington, P.C.
Attorneys for Plaintiff
19390 West Ten Mile Road
Southfield, Michigan  48075
Telephone:  (248) 355-5555
Facsimile:  (248) 355-5148

LES C. BRAVERMAN (P37916)
THE BRAVERMAN GROUP
Attorney for Spicer
3509 Biddle Avenue
Wyandotte, MI  48192
(734) 283-7700
(734) 283-9760

CHERYL A. BUSH (P37031)
BUSH, SEYFERTH & PAIGE
PLLC
Attorneys for Defendants
3001 W. Big Beaver Road
Suite 600
Troy, MI 48084
Telephone: (248) 822-7800
bush@bsplaw.com

{00529184.DOCX}

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION IN LIMINE #2 TO EXCLUDE TESTIMONY OF DR. ROBERT EILERS

Plaintiffs, Howard Linden, as Personal Representative of the Estate of Elizabeth Myers, a Minor and Angela Bryant, by and through their attorneys, Fieger, Fieger, Kenney & Harrington, P.C., ask that this Honorable Court DENY Defendants' Motion in Limine No. 2, to exclude the testimony of Dr. Robert Eilers.

Dr. Eilers's testimony is relevant. Evidence about the treatment that Elizabeth Myers will need for the rest of her life, the medication she will have to take, and her rehabilitation ability and plan speaks directly to Elizabeth's claims for noneconomic damages. Plaintiffs understand that the actual costs for the medication and care will be paid by the No-Fault insurer. However, this payment does not include the emotional and mental toll that having to live with her debilities for the rest of her life will have. It is necessary for Plaintiffs to be able to present evidence of Elizabeth's future medical needs in order for the jury to be able to assess the mental and emotional costs these will have on Elizabeth. Dr. Eilers's testimony speaks directly to this issue, is relevant and admissible.

Dr. Eilers's testimony is also qualified to offer his opinions in this case under Fed. R. Civ. P. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*, 509 U.S. 579, 590 (1993).

Plaintiffs rely on the attached memorandum in support of their response.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court DENY Defendants' Motion in Limine to exclude testimony of Dr. Robert Eilers.

Respectfully submitted,

*Fieger, Fieger, Kenney &Harrington, P.C.*

By: /s/ *Christian P. Collis*
GEOFFREY N. FIEGER (P-30441 )
CHRISTIAN P. COLLIS (P54790)

Attorneys for Plaintiffs
19390 W. Ten Mile Road
Southfield, MI 48075
(248) 355-5555

Dated:  April 16, 2018

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

TONIA LEE, as Personal Representative
of the Estate of DAWN SPICER, Deceased,

        Plaintiff,

v.

4283791 CANADA, INC., a Foreign
Profit Corporation, d/b/a NATIONAL
CARGO CARRIERS, INC., and
ARIF ALACAYIR, jointly and severally,

        Defendants.

  -AND-

HOWARD LINDEN, as Conservator for
The Estate of Elizabeth Myers, and
ANGELA BRYANT,

        Plaintiffs,

v

4283791 CANADA, INC., a Foreign
Profit Corporation, d/b/a NATIONAL
CARGO CARRIERS, INC., and
ARIF ALACAYIR, jointly and severally,
        Defendants.

Case No. 2:16-cv-11164-BAF-SDD
Honorable Judith E. Levy
Magistrate Stephanie D. Davis

Case No. 2:16-cv-10803-JEL-SDD
Honorable Judith E. Levy
Magistrate Stephanie D. Davis

---

GEOFFREY N. FIEGER (P30441)
CHRISTIAN P. COLLIS (P54790)
Fieger, Fieger, Kenney & Harrington, P.C.
Attorneys for Plaintiff
19390 West Ten Mile Road
Southfield, Michigan  48075
Telephone:  (248) 355-5555
Facsimile:  (248) 355-5148

LES C. BRAVERMAN (P37916)
THE BRAVERMAN GROUP
Attorney for Spicer
3509 Biddle Avenue
Wyandotte, MI  48192
(734) 283-7700
(734) 283-9760

CHERYL A. BUSH (P37031)
BUSH, SEYFERTH & PAIGE
PLLC
Attorneys for Defendants
3001 W. Big Beaver Road
Suite 600
Troy, MI 48084
Telephone: (248) 822-7800
bush@bsplaw.com

{00529184.DOCX}

## MEMORANDUM IN SUPPORT

2

## <u>CONCISE COUNTERSTATEMENT OF THE ISSUES PRESENTED</u>

I.      Is Dr. Eilers's testimony relevant, reliable and admissible?


        Plaintiffs Answer:     "Yes."

        Defendants Answer:  "No."

## <u>CONTROLLING AND MOST APPROPRIATE AUTHORITY</u>

*Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 U.S. 579, 590 (1993)

Fed. R. Evid. 401

Fed. R. Evid. 402

Fed. R. Evid. 403

Fed. R. Evid. 702

## I.        Relevant Facts and Summary of Argument:

This is a tragic case involving a collision with a tractor-trailer being driven by Defendant Alacayir. Elizabeth Myers, an infant at the time of the collision, and Angela Bryant were occupants in a vehicle that broke down on I-75. Dawn Spicer, the driver, was able to safely navigate the vehicle to the shoulder of the road. In that area of I-75, the shoulder is tight, measuring five feet in length. A small portion of the vehicle (42 inches) protruded into the right southbound lane. Ms. Spicer engaged the hazard lights. She got out of the car and raised the hood. She returned to the car to await assistance. Defendant Alacayir was driving a tractor-trailer truck transporting goods to Texas. Mr. Alacayir was speeding and did not see the Spicer vehicle. He hit the vehicle at full speed, causing grievous injuries to Elizabeth and Dawn. Mr. Alacayir also killed Ms. Spicer, Elizabeth's mother, as a result of the collision.

Defendants have now filed a motion in limine to preclude Dr. Robert Eilers's testimony. Defendants' argument is two-fold.

Defendants first argue that Dr. Eilers's opinions are not based on reliable methodology and should be excluded as "junk science." This argument should be rejected. Dr. Eilers's opinions are based on his extensive experience and educational background, and are formed using reliable principles and methods.

Defendants next argue that Dr. Eilers's testimony—which will detail the long-term rehabilitation and care needs that Elizabeth will have as a consequence of the collision—is irrelevant to this case because the No-Fault insurer should be picking up the bill for these costs. But Defendants completely miss the point: Plaintiffs will offer Dr. Eilers's testimony to explain to the jury what long-term care and needs Elizabeth will have; not to ask for the costs of care, but to give the jury a fuller picture of the mental and emotional damages that the collision will cost Elizabeth. Dr. Eilers's testimony is critical to establishing Elizabeth's noneconomic damages,

and is therefore relevant. Fed. R. Evic. 402.

Defendants' motion must be denied.

## II.      The legal standard for assessing the threshold reliability of expert testimony under Fed. R. Evid. 702 and *Daubert*.

Fed. R. Evid. 702 provides that an expert may testify if he has specialized knowledge and is qualified based on "knowledge, skill, experience, training, or education" and his testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." There is no question that Dr. Eilers meets the qualifications and standards of Fed. R. Civ. P. 702.

Trial courts are charged with the function of acting as "gatekeepers" to ensure that all scientific testimony admitted is not only relevant, but reliable. See *Kumho Tire Co v Carmichael*, 526 U.S. 137 (1999); and *Daubert v Merrell Dow Pharmaceuticals, Inc*, 509 U.S. 579, 590 (1993). When considering a motion to preclude expert testimony, Fed. R. Civ. P. 702 provides that a trial judge must first determine, pursuant to Fed. R. Civ. P. 104(a), "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist a trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. Specifically, Fed. R. Evid. 702 governs the admissibility of expert testimony. That rule provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and
>>
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert,* the United States Supreme Court abandoned the well-established "general

acceptance" threshold for scientific testing originally set forth in *Frye v. United States*, 293 F.

1013 (DC Cir 1923)[1], and specifically defined the trial court's special role as a "gatekeeper" with

regard to expert opinion testimony and evidence, writing:

> The trial judge must ensure that any and all scientific testimony or evidence
> admitted is not only relevant, <u>but reliable</u>.  [*Daubert*, 509 US at 589 (emphasis
> added).]

The Court further established the following non-exclusive, four-part test to be used in

determining whether the proposed expert testimony or evidence is reliable:

(1)    Can the underlying scientific theory or technique be tested;

(2)    Has the theory or technique been subjected to peer review and publication;

(3)    Is there a known or potential rate of error for the particular scientific
       technique; and

(4)    Whether the underlying scientific technique has achieved a particular
       degree of acceptance within the relevant scientific community. [*Id*. at 592-
       594.]

In some cases, "the relevant reliability concerns may focus upon personal knowledge or

experience. . . .There are many different kinds of experts, and different kinds of expertise."

*Kumho*, 526 U.S. at 149.

When the principles outlined above are applied to Dr. Eilers's proposed opinions, Dr.

Eilers's opinions are based on his qualification and the application of reliable methodology. Dr.

Eilers's opinions are not "junk science" and should not be precluded.

### III.    Dr. Eilers is qualified as an expert by knowledge, skill,   experience, training, and education to opine on what long     term medical rehabilitation and care Elizabeth   Myers will     require as a result of the collision.

Dr. Robert Eilers is a medical doctor, and has been practicing his craft for almost 40

years. (**Exhibit 1**, Affidavit of Dr. Eilers, ¶1) Dr. Eilers has been Board Certified in Physical

---

[1]    According to the Supreme Court, the *Frye* test had been supplanted by adoption of the
Federal Rules of Evidence, particularly Fed. R. Evid. 702.  *Daubert*, *supra,* 509 US at 586-589.

Medicine and Rehabilitation since 1983 by The American Board of Physical Medicine and Rehabilitation, which is part of The American Board of Medical Specialties. He has been a clinical instructor in the Department of Physical Medicine and Rehabilitation at Northwestern University Medical School since 1982.  He is also a Credentialed Specialist in Physical Medicine for the Division of Specialized Care for Children in Springfield, IL. (Id. at ¶2)

As a part of his practice, Dr. Eilers has been preparing Rehabilitation and Medical Care Management Plans for patients or Habilitation Plans. Some individuals refer to these generically as Life Care Plans or Care Plans.  As explained in Dr. Eilers's affidavit ¶3: Developing these types of Rehabilitation and Medical Care Management Plans or Habilitation Plans is a part of his daily practice and his expertise in Physical Medicine and Rehabilitation. Per the American Academy of Physical Medicine and Rehabilitation, Physical Medicine and Rehabilitation (PM&R) physicians, also known as physiatrists, treat a wide variety of medical conditions affecting the brain, spinal cord, nerves, bones, joints, ligaments, muscles, and tendons. PM&R physicians are medical doctors who have completed training in the specialty of Physical Medicine and Rehabilitation (PM&R), and may be subspecialty certified in Brain Injury Medicine, Hospice and Palliative Medicine, Neuromuscular Medicine, Pain Medicine, Pediatric Rehabilitation Medicine, Spinal Cord Injury Medicine, and/or Sports Medicine. Specifically, PM&R physicians:

- Treat patients of all ages
- Focus treatment on function
- Have a broad medical expertise that allows them to treat disabling conditions throughout a person's lifetime
- Diagnose and treat pain as a result of an injury, illness, or disabling condition
- Determine and lead a treatment/prevention plan
- Lead a team of medical professionals, which may include physical therapists, occupational therapists, and physician extenders to optimize patient care
- Work with other physicians, which may include primary care physicians, neurologists, orthopedic surgeons, and many others.
- Treat the whole person, not just the problem area

Dr. Eilers is eminently qualified to opine on Elizabeth's long-term rehabilitation and care needs.

### IV.    Dr. Eilers's methodology for evaluating Elizabeth Myers and developing a Life Care Plan was based on sound principles  and  methods, and meets threshold reliability inquiry under Fed. R. Evid. 702 and *Daubert*. His opinions are not "speculative."

Dr. Eilers's opinions are based on reliable methodology. Dr. Eilers explains his

methodology in his Affidavit, ¶4:

> The methodology in developing a Rehabilitation and Medical Care Management Plan for patients or Habilitation Plan or a Life Care Plan a good source is the American Academy of Life Care Planners.  Medical Planning is a part of a being a physiatrist.  Life Care Planning is a process of applying methodological analysis to formulate diagnostic conclusions and opinions regarding impairment and disability for the purpose of formulating care requirements for individuals with permanent or chronic medical conditions.  Life Care Plans are comprehensive documents that objectively identify ill/injured individuals' residual medical conditions and ongoing care requirements, and they quantify the ongoing costs of supplying these individuals with requisite medically-related goods and services throughout specified durations of care. For a life care plan to credibly formulate and substantiate medical damages, it must accomplish The Clinical Objectives of Life Care Planning by answering The Basic Questions of Life Care Planning.
>
> The Clinical Objectives of Life Care Planning include: 1) Diminish or eliminate physical and psychological pain and suffering, 2) Reach and maintain the highest level of function given an individual's unique circumstance, 3) Prevent complications to which an individual's unique physical/mental conditions predispose them, 4) Afford the individual the best possible quality of life in light of their condition.
>
> To be considered transparent a Life Care Plan should include:
> - A complete synopsis of the medical records
> - A complete account of a personal interview and physical examination (in cases in which personal interviews/physical examinations are performed)
> - Specific identification of all diagnostic conditions
> - Specific identification of all consequent circumstances
> - Specific identification of all future medical recommendations
> - Identification of the physician specialist(s) who formulated each of the plan's medical opinions (diagnostic conclusions, consequent circumstances, and future medical recommendations)
> - Specific presentation of all variables used to perform the plan's cost analysis, e.g. unit prices, frequencies, durations, etc.

- A complete vendor survey which identifies the specific sources from which unit price information was obtained

   The Superstructure of a life care plan is what most people refer to as "the plan itself". It contains three primary, indispensable components:

1. Facts

2. Opinions

3. Conclusions

Any life care plan that does not evidence all of the primary components is fundamentally incomplete and/or incorrectly constructed. The objective findings are composed of: 1) a Medical Record Review, and 2) a Personal Interview & Examination. The Medical Record Review is a chronological synopsis of relevant medical treatment, medical procedures and diagnostic studies undergone by the subject. All treating and/or consulting physicians providing medical opinions in regards to a subject's condition or care should have thoroughly reviewed all medical records available at the time their opinions were rendered. If additional records have become available since the formulation of their opinions, the physician(s) should consider the impact of any newly available information and revise/update their opinions accordingly. The Personal Interview & Examination is an important part of the information gathering process, as significant objective findings are often discovered. It is important for an interview and examination to occur in order to properly assess a subject's existing conditions and needs at the time of a life care plan's production. In any case, in order for the information obtained from an interview and examination to be credible, it must be obtained/interpreted by a medical professional with requisite capacity. **Relative to all other medical specialties, physiatrists are particularly well suited to perform medical examinations for the types of cases which require life care plans, as physiatry is specifically geared towards the provision of holistic care and rehabilitation over time exactly what a properly constructed life care plan is designed to address.**

   A Life Care Plan's Objective Findings should include:

- General Information about the Subject

- Specification of the cause of relevant Injury/Illness

- Listing of Diagnostic Studies, (X-rays, MRIs, laboratory studies, pulmonary function studies, etc.)

- Listing of Procedures (treatments, surgeries, etc.)

- Observational Documentation (operative reports describing structural lesions, etc.)

- Documented Opinions from Treating Physicians

- Subjective complaints obtained during the personal interview and examination which correlate with the objective findings in the medical records

- Complete review of the subject's biological symptoms and systems

- Account of health history, social history, medication history, etc.

- Statements regarding observations of symptom magnification, feigning or malingering on behalf of the subject (if any)

The opinions component of a life care plan addresses the first two Basic Questions of Life Care Planning:

1. What is the subject's condition?

2. What medically-related goods and services does the subject's condition require?

The subcomponents of a Life Care Plan's Opinions include:

- Diagnostic Conclusions

- Consequent Circumstances

- Future Medical Requirements

For a life care plan to be considered fundamentally complete and/or correctly formulated, it must contain specifically identifiable diagnostic conclusions, consequent circumstances and future medical requirements.  For the purpose of life care planning, a diagnostic condition can be defined as an impairment, which according to the American Medical Association's Guide to the Evaluation of Permanent Impairment, 6th Edition, is defined as: "a loss of use, or a derangement of any body part, organ system or organ function."   Life care plans that do not specify relevant diagnostic conclusions are vulnerable to significant scrutiny and prospective invalidation as diagnostic conclusions are the basis for the existence of all consequent circumstances and future medical requirements.  A life care plan's Consequent Circumstances identify the physical and/or mental circumstances which exist as a consequence of the impairments specified in a life care plan's diagnostic conclusions.

Consequent circumstances include two key components: Disability and Probable Duration of Care.  According to the American Medical Association, "Disability is an alteration of an individual's capacity to meet personal, social, or occupational demands because of impairment."

Disabilities which are relevant to a Life Care Plan are the physical and/or mental effects of a subject's impairments that are attributable to diagnostic conditions attributable to the relevant cause of injury/illness.

Formulation of a subject's disabilities requires a qualified physician to:

- Specify alterations in a subject's capacity to meet personal demands

- Specify alterations in a subject's capacity to meet social demands

- Specify alterations in a subject's capacity to meet occupational demands

Future Medical Requirements comprise the requisite medically-related goods and services a physician believes a subject will require, in light of their diagnostic conditions and consequent circumstances, to accomplish The Clinical Objectives of Life Care Planning.

Future medical requirements constitute the primary opinion-driven variables in a life care plan's cost analysis, and all future medical requirements, including their start dates, frequencies, and durations, must be supported by sound medical reasoning, and a reasonable degree of medical probability.  The American Academy

of Physician Life Care Planners categorizes future medical requirements according to the following structure:

- Physician Services
- Routine Diagnostics
- Medications
- Laboratory Studies
- Rehabilitation Services
- Equipment & Supplies
- Nursing & Attendant Care
- Environmental Modifications & Essential Services
- Acute Care Services

Future medical requirements constitute medical opinions regarding medical necessity, and must therefore be formulated by a qualified medical professional, i.e. a physician.

Physiatrists are experts in the medical and physical treatment of disabling illness and injury, and have long been recognized as uniquely qualified among medical specialists to provide the scientific and medical foundations essential to the development of life care plans. In order to be credibly substantiated, a life care plan's future medical requirements must be formulated within a proper methodological context.

According to Dr. Eilers, this methodology in preparing the life assistance plan adheres to generally accepted practice of physiatrist and/or physical medicine and rehabilitation physician. There is no novel science that was utilized in preparing the life assistance and medical habilitation plan. This is the day to day practice in physical medicine and rehabilitation. (Id. at ¶8)

Dr. Eilers utilized this methodology to formulate his Life Care Plan and opinions for Elizabeth. He evaluated Elizabeth, interviewed her caretakers, and reviewed relevant medical records, and made his own medical assessments within the scope of his expertise. Every opinion and conclusion is properly based on a foundation of appropriate medical evaluations, medical records, and clinical practice guidelines. There is nothing in Dr. Eilers's report, evaluation or conclusions that is speculative. Dr. Eilers reliably applied the methodology to reach his conclusions about Elizabeth's future rehabilitation needs.

Dr. Eilers is not a retained expert in this case—he is a treating physician. He developed the Life Care Plan for Elizabeth after being retained by her grandfather. (Id. at ¶6) Dr. Eilers is honest in recognizing that Elizabeth's development is not static, that she will continue to grow and change, and her needs may change accordingly. (Id. at ¶12) Recognizing that Elizabeth's needs may change as she grows older does not make Dr. Eilers's opinions speculative.

### V.     Dr. Eilers's testimony is relevant because it will allow the jury to properly assess Elizabeth Myer's future noneconomic damages.

In addition to questioning the reliability of Dr. Eilers's opinions, Defendants also argue that his testimony is not relevant to this case. Their argument is absurd.

Elizabeth Myers has suffered grievous, catastrophic injuries as a result of the collision. She has experienced significant pain and suffering, emotional distress, and other noneconomic damages. She **_will continue_** to experience significant pain and suffering, emotional distress, and other noneconomic damages as a consequence of the collision. Dr. Eilers's testimony is critical to establishing Elizabeth's future noneconomic damages.

While insurance may cover the economic cost of future medical needs, it does not cover the emotional and mental cost of having undergo the procedures, or the cost of bearing developmental deficiencies for the rest of her life. Elizabeth is entitled to recover the full scope of these damages from Defendants. Dr. Eilers's testimony will assist the jury in assessing these damages, and the testimony is therefore relevant.

District courts may rule on motions in limine pursuant to their authority to manage trials, even though such rulings are not explicitly authorized by the Federal Rules of Evidence. *Luce v. United States*, 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). District judges have broad discretion in ruling on motions in limine. *United States v. Certain Land Situated in the City of Detroit,* 547 F.Supp. 680, 681 (E.D.Mich.1982).   Evidence should be excluded in limine only when evidence is clearly inadmissible on all potential grounds. *Cf. Luce v. United States*,

469 U.S. at 41 n. 4. "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Bouchard v. Am. Home Products Corp.*, 213 F. Supp. 2d 802, 810 (ND Ohio 2002).

As pointed out in *Sperberg v. Goodyear Tire & Rubber Co*., 519 F.2d 708, 712 (6th Cir. 1975), cert. denied, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 303: "Orders in limine which exclude broad categories of evidence should rarely be employed. A better practice is to deal with questions of admissibility of evidence when they arise." "Denial of a motion in limine does not necessarily mean that all evidence contemplated by the motion will be admitted at trial. Denial merely means that without the context of trial, the court is unable to determine whether the evidence in question should be excluded." *Indiana Ins Co v. Gen Elec. Co*., 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004). In the present case, there is no reason to preclude in limine any of the evidence referenced by the defendant.

Rule 401 of the Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." The standard set forth in Rule 401 is a liberal one. *Churchwell v. Bluegrass Marine, Inc*., 444 F.3d 898, 905 (6th Cir.2006). Rule 402 states that "all relevant evidence is admissible, except as otherwise provided ..." and that "evidence which is not relevant is not admissible."

Rule 403 states that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Trial courts have broad discretion in determining whether to admit evidence based on considerations of relevance, materiality and prejudice. *United States v.*

*Jackson–Randolph*, 282 F.3d 369, 376 (6th Cir.2002). "'Unfair prejudice' means the undue tendency to suggest a decision based on improper considerations; it does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence." *Doe v. Claiborne Cty., Tenn. By & Through Claiborne Cty. Bd. of Educ.*, 103 F.3d 495, 515 (6th Cir. 1996), citing *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir.1993).

Here, Dr. Eilers's testimony is relevant because it will help a jury assess Elizabeth Myers's noneconomic damages. Plaintiffs are not asking for the cost-value of the services that Elizabeth will need in the future. Rather, Elizabeth will seek the value of the future pain and suffering, mental and emotional damages that she will suffer as a result of having to live with the debilitating injuries she suffered as a result of the collision. Dr. Eilers's testimony speaks to this issue of damages in dispute, and is therefore relevant and admissible.

Defendants' cry of undue prejudice is unavailing. The jury can easily be instructed that Elizabeth is not seeking the dollar value of the future medical services and rehabilitation care, and that the testimony is only being presented to give the jury a basis to assess Elizabeth's future noneconomic damages. There is no undue prejudice here.

Dr. Eilers's testimony is not cumulative, contrary to Defendants' statements. Dr. Eilers relied on Elizabeth's medical history in part in forming his opinions in this case. He recited the relevant history in his report and assessment to educate the reader about how he formed his opinions. As the Court is aware, Fed. R. Evid. 702 requires that an expert's testimony be based on sufficient facts and data specific to the case. Dr. Eilers, by relying on Elizabeth's records, is making an informed analysis. This fact supports the admissibility of his testimony; it does not make the testimony duplicative.

## V.      Conclusion

Dr. Eilers's testimony is relevant to Elizabeth's claimed noneconomic damages, and is admissible. His opinions are based on his extensive expertise, his thorough review of Elizabeth's medical records, evaluation of Elizabeth, and interview with her caretakers. Dr. Eilers reliably applied his expertise to the facts of this case and formed his opinions regarding Elizabeth's future medical needs and rehabilitation care. Dr. Eilers's opinions are reliable and admissible.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court DENY Defendants Motion in Limine to exclude testimony of Dr. Eilers.

Respectfully submitted,
***Fieger, Fieger, Kenney &Harrington, P.C.***

By:  /s/ *Christian P. Collis*
GEOFFREY N. FIEGER (P-30441 )
CHRISTIAN P. COLLIS (P54790)
Attorneys for Plaintiffs
19390 W. Ten Mile Road
Southfield, MI 48075
(248) 355-5555

Dated:  April 16, 2018

## **PROOF OF SERVICE**

I hereby certify that on April 16, 2018, the above document was served upon all counsel of record via electronic mail through the District Court efiling system.  I declare under the penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief.

*/s/ Rebecca L. Stanley*
Rebecca L. Stanley