# EXHIBIT 1

{00516324.DOCX}

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

TONIA LEE, as Personal Representative
of the Estate of DAWN SPICER, Deceased,

        Plaintiff,

v.

4283791 CANADA, INC., a Foreign
Profit Corporation, d/b/a NATIONAL
CARGO CARRIERS, INC., and
ARIF ALACAYIR, jointly and severally,

Defendants.

 -AND-

HOWARD LINDEN, as Conservator for
The Estate of Elizabeth Myers, and
ANGELA BRYANT,

Plaintiffs,
v

4283791 CANADA, INC., a Foreign
Profit Corporation, d/b/a NATIONAL
CARGO CARRIERS, INC., and
ARIF ALACAYIR, jointly and severally,

Defendants.

Case No. 2:16-cv-11164-BAF-SDD
Honorable Judith E. Levy
Magistrate Stephanie D. Davis

Case No. 2:16-cv-10803-JEL-SDD
Honorable Judith E. Levy
Magistrate Stephanie D. Davis

---

GEOFFREY N. FIEGER (P30441)
CHRISTIAN P. COLLIS (P54790)
Fieger, Fieger, Kenney & Harrington, P.C.
Attorneys for Plaintiff
19390 West Ten Mile Road
Southfield, Michigan 48075
Telephone: (248) 355-5555
Facsimile: (248) 355-5148

LES C. BRAVERMAN (P37916)
THE BRAVERMAN GROUP
Attorney for Spicer
3509 Biddle Avenue
Wyandotte, MI 48192
(734) 283-7700
(734) 283-9760

CHERYL A. BUSH (P37031)
BUSH, SEYFERTH & PAIGE PLLC
Attorneys for Defendants
3001 W. Big Beaver Road
Suite 600
Troy, MI 48084
Telephone: (248) 822-7800
bush@bsplaw.com

{00526020.DOCX}

## AFFIDAVIT OF ROBERT EILERS, M.D., FAAPM&R

I, Robert Eilers, M.D., FAAPM&R being first duly sworn, depose and state as follows:

1.      My name is Robert Edwin Eilers, M.D., and I am a medical doctor licensed to practice medicine in the States of Michigan, Illinois, Indiana, Kentucky, Wisconsin, Georgia and Florida. I have been licensed to practice medicine for almost 40 years.

2.      I am Board Certified in Physical Medicine and Rehabilitation since 1983 by The American Board of Physical Medicine and Rehabilitation which is part of The American Board of Medical Specialities. I am a clinical instructor in the Department of Physical Medicine and Rehabilitation at Northwestern University Medical School since 1982. I am a Credentialed Specialist in Physical Medicine for the Division of Specialized Care for Children in Springfield, IL. I have been selected as a Top Doctor in both Illinois and in Naples since 2001. I have hospital admitting privileges at Adventist Hinsdale Hospital, Adventist LaGrange Hospital in Illinois, Naples Community Hospital and North Collier Hospital in Naples, FL. I provide care to patients with strokes, spinal cord injuries, traumatic brain injuries, progressive neuromuscular diseases as ALS, multiple sclerosis, muscular dystrophies, burns, cerebral palsy, amputations, medically complex diseases, neuromuscular disorders and other medical conditions resulting in profound disabilities and impairments. I currently have two offices; one in Big Rock, IL and one in Naples, FL. Attached as **Exhibit A** is my curriculum vitae.

3.      Since 1980, I have been preparing Rehabilitation and Medical Care Management Plans for patients or Habilitation Plans. Some individuals refer to these generically as Life Care Plans or Care Plans. Developing these types of Rehabilitation and Medical Care Management

Plans or Habilitation Plans is a part of my daily practice and my expertise in Physical Medicine and Rehabilitation.   Per the American Academy of Physical Medicine and Rehabilitation, Physical Medicine and Rehabilitation (PM&R) physicians, also known as physiatrists, treat a wide variety of medical conditions affecting the brain, spinal cord, nerves, bones, joints, ligaments, muscles, and tendons. PM&R physicians are medical doctors who have completed training in the specialty of Physical Medicine and Rehabilitation (PM&R), and may be subspecialty certified in Brain Injury Medicine, Hospice and Palliative Medicine, Neuromuscular Medicine, Pain Medicine, Pediatric Rehabilitation Medicine, Spinal Cord Injury Medicine, and/or Sports Medicine. Specifically, PM&R physicians:

- Treat patients of all ages
- Focus treatment on function
- Have a broad medical expertise that allows them to treat disabling conditions throughout a person's lifetime
- Diagnose and treat pain as a result of an injury, illness, or disabling condition
- Determine and lead a treatment/prevention plan
- Lead a team of medical professionals, which may include physical therapists, occupational therapists, and physician extenders to optimize patient care
- Work with other physicians, which may include primary care physicians, neurologists, orthopedic surgeons, and many others.
- Treat the whole person, not just the problem area

4.     To get an understanding of the methodology in developing a Rehabilitation and Medical Care Management Plan for patients or Habilitation Plan or a Life Care Plan a good source is the American Academy of Life Care Planners.  Medical Planning is a part of a being a physiatrist.  Life Care Planning is a process of applying methodological analysis to formulate diagnostic conclusions and opinions regarding impairment and disability for the purpose of formulating care requirements for individuals with permanent or chronic medical conditions. Life Care Plans are comprehensive documents that objectively identify ill/injured individuals' residual medical conditions and ongoing care requirements, and they quantify the ongoing costs

{00526020.DOCX}

of supplying these individuals with requisite medically-related goods and services throughout specified durations of care. For a life care plan to credibly formulate and substantiate medical damages, it must accomplish The Clinical Objectives of Life Care Planning by answering The Basic Questions of Life Care Planning.

The Clinical Objectives of Life Care Planning include: 1) Diminish or eliminate physical and psychological pain and suffering, 2) Reach and maintain the highest level of function given an individual's unique circumstance, 3) Prevent complications to which an individual's unique physical/mental conditions predispose them, 4) Afford the individual the best possible quality of life in light of their condition.

To be considered transparent a Life Care Plan should include:

- A complete synopsis of the medical records
- A complete account of a personal interview and physical examination (in cases in which personal interviews/physical examinations are performed)
- Specific identification of all diagnostic conditions
- Specific identification of all consequent circumstances
- Specific identification of all future medical recommendations
- Identification of the physician specialist(s) who formulated each of the plan's medical opinions (diagnostic conclusions, consequent circumstances, and future medical recommendations)
- Specific presentation of all variables used to perform the plan's cost analysis, e.g. unit prices, frequencies, durations, etc.
- A complete vendor survey which identifies the specific sources from which unit price information was obtained

The Superstructure of a life care plan is what most people refer to as "the plan itself". It contains three primary, indispensable components:

1. Facts

2. Opinions

3. Conclusions

Any life care plan that does not evidence all of the primary components is fundamentally incomplete and/or incorrectly constructed. The objective findings are composed of: 1) a Medical Record Review, and 2) a Personal Interview & Examination. The Medical Record Review is a chronological synopsis of relevant medical treatment, medical procedures and diagnostic studies undergone by the subject. All treating and/or consulting physicians providing medical opinions in regards to a subject's condition or care should have thoroughly reviewed all medical records available at the time their opinions were rendered. If additional records have become available since the formulation of their opinions, the physician(s) should consider the impact of any newly available information and revise/update their opinions accordingly. The Personal Interview & Examination is an important part of the information gathering process, as significant objective findings are often discovered. It is important for an interview and examination to occur in order to properly assess a subject's existing conditions and needs at the time of a life care plan's production. In any case, in order for the information obtained from an interview and examination to be credible, it must be obtained/interpreted by a medical professional with requisite capacity. **Relative to all other medical specialties, physiatrists are particularly well suited to perform medical examinations for the types of cases which require life care plans, as physiatry is specifically geared towards the provision of holistic care and rehabilitation over time exactly what a properly constructed life care plan is designed to address.**

A Life Care Plan's Objective Findings should include:

- General Information about the Subject
- Specification of the cause of relevant Injury/Illness
- Listing of Diagnostic Studies, (X-rays, MRIs, laboratory studies, pulmonary function studies, etc.)
- Listing of Procedures (treatments, surgeries, etc.)
- Observational Documentation (operative reports describing structural lesions, etc.)
- Documented Opinions from Treating Physicians
- Subjective complaints obtained during the personal interview and examination which correlate with the objective findings in the medical records
- Complete review of the subject's biological symptoms and systems
- Account of health history, social history, medication history, etc.
- Statements regarding observations of symptom magnification, feigning or malingering on behalf of the subject (if any)

The opinions component of a life care plan addresses the first two Basic Questions of Life Care Planning:

1. What is the subject's condition?
2. What medically-related goods and services does the subject's condition require?

The subcomponents of a Life Care Plan's Opinions include:

- Diagnostic Conclusions
- Consequent Circumstances
- Future Medical Requirements

{00526020.DOCX}

For a life care plan to be considered fundamentally complete and/or correctly formulated, it must contain specifically identifiable diagnostic conclusions, consequent circumstances and future medical requirements. For the purpose of life care planning, a diagnostic condition can be defined as an impairment, which according to the American Medical Association's Guide to the Evaluation of Permanent Impairment, 6th Edition, is defined as: "a loss of use, or a derangement of any body part, organ system or organ function." Life care plans that do not specify relevant diagnostic conclusions are vulnerable to significant scrutiny and prospective invalidation as diagnostic conclusions are the basis for the existence of all consequent circumstances and future medical requirements. A life care plan's Consequent Circumstances identify the physical and/or mental circumstances which exist as a consequence of the impairments specified in a life care plan's diagnostic conclusions.

Consequent circumstances include two key components: Disability and Probable Duration of Care. According to the American Medical Association, "Disability is an alteration of an individual's capacity to meet personal, social, or occupational demands because of impairment." Disabilities which are relevant to a Life Care Plan are the physical and/or mental effects of a subject's impairments that are attributable to diagnostic conditions attributable to the relevant cause of injury/illness.

Formulation of a subject's disabilities requires a qualified physician to:

- Specify alterations in a subject's capacity to meet personal demands
- Specify alterations in a subject's capacity to meet social demands
- Specify alterations in a subject's capacity to meet occupational demands

Future Medical Requirements comprise the requisite medically-related goods and services a physician believes a subject will require, in light of their diagnostic conditions and consequent circumstances, to accomplish The Clinical Objectives of Life Care Planning.

Future medical requirements constitute the primary opinion-driven variables in a life care plan's cost analysis, and all future medical requirements, including their start dates, frequencies, and durations, must be supported by sound medical reasoning, and a reasonable degree of medical probability. The American Academy of Physician Life Care Planners categorizes future medical requirements according to the following structure:

- Physician Services
- Routine Diagnostics
- Medications
- Laboratory Studies
- Rehabilitation Services
- Equipment & Supplies
- Nursing & Attendant Care
- Environmental Modifications & Essential Services
- Acute Care Services

Future medical requirements constitute medical opinions regarding medical necessity, and must therefore be formulated by a qualified medical professional, i.e. a physician.

Physiatrists are experts in the medical and physical treatment of disabling illness and injury, and have long been recognized as uniquely qualified among medical specialists to provide the scientific and medical foundations essential to the development of life care plans. In order to be credibly substantiated, a life care plan's future medical requirements must be formulated within a

{00526020.DOCX}

proper methodological context.  Beyond their usefulness as case management tools for chronically/catastrophically ill/injured individuals, life care plans are professional medical valuations which quantify the cost of providing ill/injured individuals with requisite medically-related goods and services over specified durations of care.

     5.     Life care planners must depend on the opinions and orders of a physician. Thus a life care planner must ask the physician since they cannot order treatment, medication or therapy. Since I am a physician that can diagnose and treat patients such as Ms. Myers, I do not have to rely solely on other physicians. Many life care planners do not undergo the additional 8 years of post- graduate training required of a physician in Physical Medicine and Rehabilitation. Many life care planners have not initially provided Medical Rehabilitation Consultations to these patients immediately after onset of their disability nor have they admitted these patients to an Inpatient Rehabilitation Unit Accredited by the Commission on Accreditation of Rehabilitation Facilities, nor had to comply and meet specific standards required for care of such patients by governmental agencies. Many Life Care Planners have not spent 1 to 4 months ordering and directing the medical and rehabilitation care for these patients and directing a collaborative team of allied health professionals. The Physiatrist as the leader of this rehabilitation team must on a daily basis advise the patient and their family of the diagnosis and prognosis related to their disability. I am required to include the family in conferences, to order and justify the necessity of all durable medical equipment such as wheelchairs, walkers, ventilators, hospital beds, backup generators, ceiling lift systems, accessibility modifications, standers, security systems and alert systems, accessible vans and transportation, walkers, home therapy equipment, oxygen sensors, motorized wheelchairs, orthotics, prosthetics and bionic system equipment and complete the forms required to justify the medical necessity for their diagnosis and specify the duration for

which such equioment or modifications are required. I am also required to write orders for all medical treatment as the Physiatrist is the admitting physician on the rehabilitation unit and must order prescriptions, home modifications, home health care services such as Physical Therapy, Occupational Therapy, Psychology, Vocational, Recreational, Certified Nurses Aides, Registered Nurses, Licensed Practical Nurses, Respiratory Therapy, Dialysis, Infusion Services and complete the documents indicating medical necessity and duration of need when indicated.

6.      I was hired by the family of Ms. Myers to assist them in developing a Life Assistance and Medical Habilitation Management Plan for Home. I was not retained as an expert, but as a treater to assist in Ms. Myers care. In light of my involvement as a treating physician I have a duty to the patient and family to provide the guidance for them now and long into the future as the treating physiatrist. Even when this case is over, I will continue to assist and guide the family and their guardians and other probate court involvement in planning and developing Ms. Myers future habilitation. I have continued over my decades of practice to be called by families, trust companies and probate courts to assist in any plan modification and implementation. I have families from 25 years ago where I have been called to assist with modifications of a plan. My opinions were disclosed in my initial Evaluation of the patient on October 15, 2016 (**Exhibit B**), my Life Assistance and Medical Habilitation Management Plan for Home sent to the family on 12-9-2016 (**Exhibit C**), a follow-up assessment occurred in January 9, 2018 (**Exhibit D**), and my deposition occurred on January 16, 2018 (**Exhibit E**). I also provided the family with prescriptions for her care on October 15, 2016 and January 9, 2018 which is exhibit 4 from my deposition.

7.      In addition to my education and training as outlined in my CV, I possess a considerable amount of particularized knowledge and expertise regarding life assistance plans. I have

prepared hundreds of formalized plans within the past 38 years tens of thousands of plans for patients being treated and discharged from the hospitals. When I first began preparing life assistant plans, there were no corresponding Associations or certifications necessary in preparing these plans. Many of those patients, I continue to see as they have progress through life over the past 38 years. I have treated over 100,000 patients over the years. I have had to testify in hundreds of cases over the years and my testimony has never been stricken due to a Daubert issue or any other issue. It is my opinion that developing a Life Assistance and Medical Habilitation Plan is important for the care and treatment of a disabled patient, especially an infant like Ms. Myers and her family as it gives them a realistic understanding of her long term future needs and the family can prepare accordingly.

8.      The methodology utilized by me as set forth above in preparing the life assistance plan adheres to generally accepted practice of physiatrist and/or physical medicine and rehabilitation physician.   There is no novel science that was utilized in preparing the life assistance and medical habilitation plan. This is the day to day practice in physical medicine and rehabilitation.

9.      As part of the methodology, I met with Ms. Myers, her grandfather and her step-grandmother, who are her guardians.  I met the family on two occasions.   I will continue to see Ms. Myers at least once a year if not more to continue to assist and manage her care and provide counsel for her guardians.

10.      This affidavit is not in any way meant to change my opinions in my reports or in my deposition, but to clarify my expertise and the relevance of my potential testimony.

11.      A Life Assistance and Medical Habilitation Plan will continue to change as different medical needs arise.  It is meant to assist the family and the trier of facts (in this case) regarding the type of care and treatment she will expect to need as she progresses from infancy to adolescence to

adulthood. Although the cost of the medical treatment may not be admissible in a Michigan court, in my opinion it is important for the family and trier of facts to understand these costs regardless of whether a jury can assess the amount as an actual damage.

12. Defendants want to characterize Ms. Myers and this case as being "static". Any changes from month to month of an opinion or Ms. Myers condition, sparks an argument from the Defendants that my Plan is speculative. Although that notion may sound appropriate on paper, it is not based in reality. Ms. Myers will continue to grow and change as she ages. As she grows and changes, the physiatrist (me) will need to adapt her treatment accordingly. As of now given her condition and disability, the Plan as set forth with the changes discussed in the deposition are based on generally accepted principals of physiatry and/or physical medicine and rehabilitation. These are my opinions as a treating physiatrist who has a duty to convey the truth to this patient and her family.

13. All of my opinions are rendered to a reasonable degree of medical certainty and are true to the best of my knowledge, information and belief based upon my education, training and experience.

Robert Eilers, M.D.

Subscribed and sworn to before me this
14th day of April , 2018

Notary Public
Cook County, FL IL
My Commission Expires: 10/13/19

OFFICIAL SEAL
JAMES F GRUTSCH
Notary Public - State of Illinois
My Commission Expires Oct 13, 2019.

{00526020.DOCX}

# EXHIBIT A

{00453696.DOCX}

# ROBERT EDWIN EILERS, M.D.

## CURRICULUM VITAE

**OFFICE ADDRESS**

BLUFF CREEK
45W699 JETER ROAD
BIG ROCK, IL 60511

PHONE: (630) 556-9900
FAX: (630) 358-6987

NAPLES
11983 TAMIAMI TRAIL NORTH
SUITE 100D
NAPLES, FLORIDA 34110

PHONE (239)593-0918
FAX (630) 358-6987

**PERSONAL**

PLACE OF BIRTH:          NEW YORK, NEW YORK

CITIZENSHIP:              UNITED STATES
                          IRELAND

## EDUCATION

### RESIDENCY

Physical Medicine & Rehabilitation
Department of Physical Medicine and Rehabilitation
Northwestern University Feinberg School of Medicine
Rehabilitation Institute of Chicago
July 1979 – June 1982

Assistant Chief Resident
January 1981 – July 1981

Chief Resident
July 1981 – January 1982

### INTERNSHIP

Northwestern University Feinberg School of Medicine
McGraw Medical Center
Northwestern Memorial Hospital
Chicago, Illinois
1979 – 1980

### MEDICAL SCHOOL

University of Louisville
School of Medicine
Louisville, Kentucky
1975 – 1979

Degree Conferred: M.D.
Date: May 13, 1979

### LAW SCHOOL

University of Louisville
School of Law
Louisville, Kentucky
1976 – 1979

Degree Conferred: J.D.
Date: May 13, 1979

### UNDERGRADUATE

University of Louisville
College of Arts and Science
Louisville, Kentucky
1972 – 1975

Degree Conferred: B.A. – Biology High Honors
Date:   May 11, 1975

## HONORARY SOCIETIES

| | |
|---|---|
| Phi Kappa Phi | 1975 |
| Phi Kappa Phi | 1979 |
| Omicron Delta Kappa | 1975 |
| Alpha Epsilon Delta | 1973 |
| Woodcock Society | 1975 |

## HONORS AND AWARDS

Stanley Walker Grubbs Award               1975

Heller Fellowship
Department of Physical Medicine & Rehabilitation
Northwestern University Feinberg School of Medicine
1980 – 1981

Service Award
National Multiple Sclerosis Society
Chicago – Northern Illinois Chapter
May 6, 1985

Lawrence – Grever Award
University of Louisville
Outstanding Alumnus Award               1997

Chicago Magazine – Top Doctors          2001
Castle Connolly Medical Ltd.

Top Doctors-Chicago Metro Area          2001-present
Castle Connolly Medical Ltd.

Top Doctors for Region                  2013-present
Castle Connolly Medical Ltd.

Consumer Research Counsel of
America, America's Top Physicians       2004- present

US News & World Report Top Docs         2012-

Gulfshore Life - Top Doctors
Naples, Florida                         2016-present

Healthy Life – Top Doctors
Naples, Florida                         2016-present

Naples Illustrated-Top Doctors          2018

3

## PROFESSIONAL CERTIFICATION

### SPECIALTY BOARD CERTIFICATION

American Board of Physical Medicine & Rehabilitation

Certificate Number:    1997
Date:    May 26, 1983

### LICENSURE

National Board of Medical Examiners
DIPLOMATE – Certificate Number 217791 –    1980

Federated Licensure Examination    1979

Illinois Supreme Court    1980

Real Estate Managing Broker
Illinois No. 471.006022    2011
Florida No. BK3347661    2016

### STATE LICENSES

| | | |
|---|---|---|
| Illinois | July 1980 | No. 36-061196 |
| Indiana | July 1982 | No. 31805 |
| Kentucky | July 1980` | No. 20713 |
| Michigan | May 1982 | No. 044719 |
| Wisconsin | July 1982 | No. 24507 |
| Georgia | February 1997 | No. 043201 |
| Florida | July 2010 | No. ME 107796 |

### HOSPITAL AFFILIATONS

**Adventist Hinsdale Hospital**
120 North Oak Street
Hinsdale, Illinois 60521

Provisional
September 1982 – December 1983
Associate
December 1983 – December 1984
Active
December 1984 – Present

**Rehabilitation Institute of Chicago**
345 East Superior Street
Chicago, Illinois 60411

August 1982 – 2012

**Silver Cross Hospital**
1900 Silver Cross Blvd
New Lenox, IL 60451

Associate Staff
July 2011 - 2015

4

**St. James Hospital**
Chicago Heights, Illinois 60411

Consulting– Jan. 1983 – March 1983
Associate – March 1986 – Jan. 1990
Active – Jan. 1990 – December 1990
Consulting –Jan.1991– October 1993

**St. Joseph's Medical Hospital**
South Bend, Indiana

Associate-November1982–June1983
Visiting - June 1983 – January 1986

**Memorial Hospital of South Bend**
South Bend, Indiana

Associate -July 1982- February 1984
Visiting -February1984- March 1986

**Adventist LaGrange Hospital**
5101 South Willow Springs Road
LaGrange, Illinois 60525

Consulting
October 1984- 1998
February 2001 – Present

**Loyola University Medical Center**
2106 South First Ave.
Maywood, Illinois 60153

Consulting
May 1985 – November 1986
Active
November 1986 -- 1998

**Glendale Heights Community Hospital**
1501 Jill Court
Glendale Heights, Illinois

Consulting
February 1986 – September 1988

**Good Samaritan Hospital**
3815 Highland Avenue
Downers Grove, Illinois

Associate
March 1986 – January 1988
Active
January 1988 – January 1990
Courtesy / Consulting
February 1990 – 1998

**St. Joseph Medical Center**
Joliet, Illinois

Consulting
January 1986 – 1993

**Delnor Community Hospital**
300 Randall Road
Geneva, Illinois

Consulting
May 1994 – 1998

**St. Margaret's Hospital**
600 East First Street
Spring Valley, Illinois

Consulting
October 1996 – 1998

**NCH Healthcare System**

**Naples Community Hospital**
350 Seventh Street North
Naples, FL 34102

Associate Dept Neurology
December 2010 -2012
Active Dept Neurology
December 2012-

5

**North Collier Hospital**                          Associate Dept Neurology
11190 Healthpark Blvd.                               December 2010 –2012
Naples, FL 34110                                     Active Dept Neurology
                                                     December 2012-

## ACADEMIC APPOINTMENTS

**Northwestern University**
**Feinberg School of Medicine**                      Clinical Instructor
Department of Physical Medicine and
Rehabilitation                                       August 1982 – Present
Chicago, Illinois

**Loyola University**                                Clinical Assistant Professor
Stitch School of Medicine                            May 1985 – June 2002
Department of Orthopedics & Rehabilitation
Maywood, Illinois

## DIRECTORSHIPS

**Adventist Hinsdale Hospital**                      Medical Director
**Hinsdale, Illinois**                               Paulson Rehabilitation Network
                                                     September 1982 – 2010

**Adventist Hinsdale Hospital**                      Chairman
Hinsdale, Illinois                                   Rehabilitation Services
                                                     Patient Care Committee
                                                     1982 – 2012

**Lexington Health Care**
**Center of LaGrange**                               Medical Director
LaGrange, Illinois                                   Rehabilitation
                                                     July 2005 - 2010

**St. James Hospital and Medical Center**            Medical Director
Chicago Heights, Illinois                            Physical Medicine Unit
                                                     September 1983 – 1990

                                                     Department of Rehabilitation &
                                                     Occupational Medicine – 1990

**Michiana Rehabilitation Institute**               Medical Director
**Memorial Hospital of South Bend**                 Rehabilitation Services and Neuro-
                                                     Rehabilitation
                                                     July 1982 – January 1984

6

**Paulson Center for Rehabilitation Medicine**   Medical Director
April 1986 – 2010

**Paulson Rehab Network**   Medical Director
1989 – 2010

**Back to Work Center
Lansing, Illinois**   Medical Director
November 1986 – 1990

**Rehab America**   Medical Director
April 1988 – 1990

**Adventist Living Centers**   National Rehabilitation Medical Director
October 1987 – 1990

**Phase IV Transitional Living Center**   Medical Director
1986 – 1987

**Colonial Manor Convalescent Center
LaGrange, Illinois**   Medical Director
Coma Arousal Program
1984 – 1993

**Fairfax of Berwyn**   Medical Director Rehabilitation
Traumatic Brain Injury Unit
October 1993 – 2002

**Fairview of LaGrange**   Medical Director
Brain Trauma Unit
October 1993 – 1999
Medical Director of Rehabilitation
2007

**Chateau Village Nursing
& Rehabilitation Center
Willowbrook, Illinois**   Medical Director
Specialty Unit
January 1994 – 1999

**Medbridge Medical &
Physical Rehabilitation
Westmont, Illinois**   Medical Director
Physical Medicine & Rehabilitation
May 1994 – 1996

**Adventist LaGrange Hospital
LaGrange, Illinois**   Medical Director Rehabilitation
Services
Paulson Rehabilitation Network
2001 – 2010

<u>Skilled Nursing Facilities</u>

**Manor Care
Naperville, Illinois**   August 2010 –

7

**Hospital Committee Appointments**

**Adventist Hinsdale Hospital**
**Hinsdale, Illinois**

Chairman Rehabilitation Patient Care Committee
1982 – 2012

By Laws Committee, Medical Staff
1988 – 1989

Medical Services Evaluation Committee
1989 – 1994

Utilization Review Committee
1991 – 2001

Hinsdale Family Medicine Residency Program
1982- 2011

**St. James Hospital and Medical Center**
**Chicago Heights, Illinois**

Chairman Rehabilitation Services Committee
March 1986 – 1990
Tumor Committee 1989 – 1990

**Paulson Center for Rehabilitation Medicine**

Professional Review Committee
1986 – 2010

Utilization Review Committee
1991 – 2010

**Other Appointments**

**Division of Specialized Care for Children**
**Springfield, Illinois (Regional Office – Chicago)**
Credentialed Specialist
Physical Medicine & Rehabilitation
January 1991 –

**Illinois Head Injury Association**
**LaGrange, Illinois**
Member, Professional Advisory Committee
1984 – 1994

8

**National Head Injury, Association, Illinois Chapter**
Medical Resource List
1995 –2010

**Illinois Independent Living Center**
**LaGrange, Illinois**
Member, Finance Committee
1983 – 1985

**Rehab America**
Board of Directors
1987 – 1990
Executive Committee
1987 – 1990

**Illinois Society of Physical Medicine & Rehabilitation**

| | |
|---|---|
| By Laws Committee | 1983 – 1998 |
| Professional Relations Committee | 1988 – 1998 |
| Board Member | 1984 – 1990 |
| Vice President | 1987 |
| President | 1987 – 1989 |

**Chicago Society of Physical Medicine & Rehabilitation**
President
1987 – 1988

**Crescent Counties Foundation for Medical Care**
Member
1985 – 1996

**Northwestern University Feinberg School of Medicine**
Admissions Committee
Interview Committee
August 1999 – 2006

**Midwest Clinical Conference Committee**
Member
1980 – 1982, 1988

**Illinois State Medical Society**
Medical Legal Council
1981 – 1986

**American Back Society**
Pain Management, Arthritis and Osteoporosis Committee
1989 – 1996

9

**Burr Ridge Willowbrook Little League**
Board Member
1993 – 1998

**Illinois Green Industry Association**
Education Committee Member
1999 – 2007

**Illinois Landscape Contractor's Association**
Education Committee
2000

**Adventist Health Systems Midwest Region**
Medical Executive Committee
2000 - 2007

**University of Louisville**
Brandeis School of Law
Alumni Council
2008 – 2013

**ProAssurance Florida Regional Advisory Board**
Member
2013 –


## MEMBERSHIP IN PROFESSIONAL ORGANIZATIONS

| | |
|---|---|
| American Medical Association | 1978 |
| Illinois State Medical Society | 1980 |
| Florida Medical Society | 2010 |
| Chicago Medical Society | 1980 |
| American Congress of Physical Medicine & Rehabilitation | 1979 |
| Illinois Society of Physical Medicine & Rehabilitation | 1979 |
| Chicago Society of Physical Medicine & Rehabilitation | 1980 |
| American Association of Electrodiagnostic Medicine | 1982 |

10

| | |
|---|---|
| American Academy of Physical Medicine & Rehabilitation – Fellow | 1984 |
| Physiatric Association of Spine, Sports, & Occupational Medicine – Fellow (An Official Council of the American Academy) | 1995 |
| Association of Academic Physiatrist-Diplomate | 1985 |
| International Society of Physical Medicine and Rehabilitation | 2018 |
| International Association for the Study of Traumatic Brain Injury | 1987 – 1998 |
| Illinois Chapter National Spinal Cord Injury Association | 1988- 2012 |
| American Back Society | 1988 – 1998 |
| Illinois Green Industry Association | 1995 - 2011 |
| Illinois Landscape Contractor's Association | 2000 - 2008 |
| Florida Nursery, Growers & Landscape Association | 2002 – 2008 |

**LOCUM TENENS**

| | |
|---|---|
| **Three Rivers Healthcare** 701 South Health Parkway Three Rivers, Michigan 49093 Acting Medical Director Rehabilitation | July 15, 2010 - October 1, 2010 |
| **Blessing Hospital** Broadway & 11th Street Quincy, Illinois 62305 Acting Medical Director Rehabilitation | November 1, 2010 - March 1, 2011 |
| **Phoebe Putney Memorial Hospital** 417 West 3rd Avenue Albany, Georgia 31701 Acting Medical Director Rehabilitation | July 1, 2013- December 1, 2013 |

11

# EXHIBIT B

{00453696.DOCX}

# PHYSICAL MEDICINE AND REHABILITATION ASSOCIATES

PHYSICAL MEDICINE
& REHABILITATION
ELECTROMYOGRAPHY

PHONE (630) 556-9900
FACSIMILE (888) 328-2601



OFFICE ADDRESS:
BLUFF CREEK
45W699 JETER ROAD
BIG ROCK, ILLINOIS 60511

ROBERT E. EILERS, M.D., FAAPM&R
email: contact@pmrassociates.org

## EVALUATION

RE: MYERS, ELIZABETH
DOB: 11/01/2015

DATE OF EVALUATION: October 15, 2016

HISTORY: I had the opportunity to see Elizabeth with her grandfather, Robert Spicer, and his wife, Renee Spicer, and I also had the opportunity to briefly meet their son, Billy, at their residence located at 441 Cedar in Wyandotte, MI 48192.

Elizabeth was born on 11/01/2015. She is the daughter of Robert's daughter, Dawn, and she is currently 11-months of age. Unfortunately, on 11/28/2015, Dawn, who was operating their vehicle, pulled off the side of the interstate, and her vehicle was tragically rear-ended by a tractor trailer, resulting in Dawn's death at the scene of the accident. The accident resulted in the rear of the car being pressed forward, the car seat apparently being dislodged from its base and forced into the front seats. Elizabeth sustained a traumatic brain injury, multiple skull fractures, and has now recently required a VP shunt and shows significant encephalomalacia. The impact was apparently at a high rate of speed. Elizabeth's Glasgow Coma Scale was 10 at the emergency room and eventually revised upwards in subsequent days to 12.

She was taken initially to Oakwood Hospital after she was extracted from the vehicle and then transferred to Children's Hospital of Michigan where she was diagnosed with multiple skull fractures. She had bilateral intraparenchymal hemorrhages. She had left frontoparietal subdural hematomas, bilateral scalp hematomas, and multiple bilateral skull fractures. She had acute blood loss anemia secondary to hemorrhaging.

She had an EEG done on 12/04/2015 which showed her to have delta and theta waves, sharp waves bilaterally suggestive of seizures, with more involvement in the right hemisphere than the left. A CT scan was carried out showing a right parietal occipital skull fracture, minimally displaced, bilateral temporal bone fractures, occipital fracture right frontal, left parietal occipital intraparenchymal hemorrhages, and left frontoparietal subdural hematoma. She was seen by pediatric neurosurgery. She had a craniotomy done for decompression and had an intraventricular monitor placed during her time at Children's.

1

When she was admitted to Oakwood Hospital she was noted to be crying. She remained at the hospital and then was discharged to the home setting.

Subsequently she had a cranioplasty done on 02/11/2016, and a CT showed absorption of the bone flap in the right temporoparietal area and was noted to have encephalomalacia of the right parietal subcortical white matter. She was showing some herniation through the cranioplasty site, 03/23/2016, and they needed removal of the cranioplasty done. Subsequently she had surgery done in June of 2016 and had a VP shunt done on 07/03/2016. Records were available for the Children's Hospital and Oakwood Hospital.

She also apparently had a number of rib fractures which were initially treated.

TREATING PHYSICIANS:  Presently they follow with Dr. Steven Ham at Children's Hospital in Michigan in pediatric neurosurgery and Dr. Arlene Rozzelle at Children's Hospital in Michigan who is Chief of Plastic and Reconstructive Surgery. The primary care physician is Dr. Dinesh Nayak in Southgate MI.

FAMILY MEDICAL HISTORY: Otherwise unremarkable.

SURGICAL HISTORY: She had placement of the VP shunt, right hemisphere and in the right neck area, 07/03/2016. She had the cranioplasty again, 06/27/2016. She had had the bone replacement on 02/11/2016. She had removal of part of the skull to relieve her swelling, or the cranioplasty done, 11/29/2015.

INJURY HISTORY: None.

ALLERGIES: None.

CURRENT MEDICATIONS: Keppra 0.4 mL b.i.d. for control of her seizures, although it appears she may be having some breakthrough.

OTHER SYMPTOMS: She does show nystagmus when lying supine, particularly with attempting to focus. She does have altered concentration. She has some absence periods. She has poor motor coordination and almost a motor apraxia. She has difficulty with motor planning in the left upper extremity compared to the right. It appears that she may have some visual perceptual problems using the left upper extremity and placing it over or by objects. The patient has been showing some steppage gait when supported, which is demonstrated during her physical exam. She is able to tolerate liquids and use a bottle. She is starting to use some sippy cups. She is not showing any coughing or aspiration. She did not require a feeding tube except through nasogastric means early on.

DIAGNOSTIC TESTING: She has had 3-D CT scans of the skull showing the deformities. She has had MRIs and EEGs carried out.

PAST MEDICAL HISTORY: Otherwise she has been in excellent health.

ACTIVITIES OF DAILY LIVING: She certainly is dependent, as anticipated for her age at 11

months. She is doing some finger food. She tends to pick them up with the left and will try and transfer them to the right, but has more difficulty getting the right to the mouth at times. She is not able to crawl. She cannot sit up independently. She can sit in a walker but does not scoot. She does not push forward or back. When I move the walker, she does lift her legs to prevent them from dragging on the floor. She does play with toys, particularly noisy cause and effect toys on her walker. She tends to show more dominance to the right. Items in her left visual field are less attractive to her, and she does show some changes of object permanence, not pursuing items taken out of her visual field.

THERAPY: She is not receiving therapy at this time.

EDUCATION: She has of course not begun school.

SOCIAL HISTORY: She lives with her grandfather, as well as her step grandmother in their home. She does have an aunt, Dawn's sister, Heather, who is 32. Billy is Renee's son and he is 19. Heather, who is Renee's daughter, has cerebral palsy and she is 25. Elizabeth's brother, Devin, is 12 and lives with his father.

They currently live in a home which the family owns. They have stairs. Elizabeth obviously lives with her family. The family provides her care. She sleeps in a crib. They do not have an adapted home. No adapted wheelchair. No adapted devices. There is a ramp at the home in the front, and they do have an adapted van that they can use. Currently she uses about 6 diapers a day. She is not aware of her incontinence. She does not get upset or cry or whine. No one smokes or drinks. The home is immaculate, well cared for.

Currently she is 28 inches tall, 17 pounds.

PHYSICAL EXAMINATION: Elizabeth is initially seen in a walker. She is pleasant. She smiles. She does coo. She does not use any words. They have heard her say "dada," but she has not demonstrated any other verbal output at this time. She tends to neglect to the left. She will quickly track and look to the right. I was able to get her on the floor and she could roll, particularly to the left. She will continuously roll to the left. She is not showing a significant asymmetrical tonic neck reflex. She does not roll to the right. Generally she shows good head control in the walker. She showed good head control and would try and bring her head up from the floor, but she could not long sit. When I seated her on the floor upright, she was able to maintain her head control, but not trunk control and immediately fell backwards. She was supported. She does not drop to the floor injuring herself, but she does not have adequate trunk support to remain in an upright position. She did like the television and music. She would smile, but did not become fussy when it was ended. Toys taken from her did not cause her to become fussy. It appears that her visual field is diminished to the left. She did not respond to a sudden visual threat by blinking. Items placed in her left visual field while she was focusing to the right did not draw her attention. Items placed in the right and left visual field with frontal confrontation eventually obtained a response. It appears that she has vision to the left, but she tends to neglect some of the stimuli and may suppress that. She did show nystagmus when she was recumbent on the floor. She tends to show some perseveration on toys specifically, and particularly certain games they note she will repeat. She does show some difficulty with her motor control and planning. More of a motor apraxia of the left upper extremity. When she was attempting a purposeful task, she had more

3

difficulty than automatic responses. She has difficulty with transfer of food to her hands, but she was able to do it. She was eating some small baby cookies at this time. She cannot really use a sippy cup; that was tried. She does use a bottle. She is incontinent of bowel and bladder. When toys were taken out of her visual field, she did not cry or pursue them. She smiled when they reappeared in her visual field but did not pursue them when taken out of her visual fields. She tends to use her left arm more, although she does show bimanual activity, but it is more difficult with bimanual and it appears that she initiates activities with the left, although she does use the right. She seems to have more motor planning and placement problems with the left upper extremity than the right. She did appear to have some brief periods of absence where she was not fully responsive, staring into space. No motor seizure activity was noted. She was able to protrude her tongue. She could keep liquids within her mouth without showing significant drooling, and she was able to swallow without coughing. She is sleeping through the night. They note that at times she seems to wake up crying with nightmares. They note she has longer naps. She tires, such as today after the exam and a great deal of activity, she became far more exhausted and was becoming more lethargic, probably related to depletion of neurotransmitters. Her head is asymmetric. She has some flattening of the posterior cranium. It is difficult to gauge her head size. At this point in time, she does have the shunt over the right coursing to the neck and to the right abdominal region. It does not show any obstruction. She does not show any distension. The shunt appears to be functioning well for her. She appears on tracking to have full extraocular movements, but she tends to move her head to track objects. It was more difficult to test extraocular movement. She does show eye movement, but tends to be more dominant moving her head to look at items straight on. Hearing is intact. She is able to respond and localize to noxious auditory stimulus, both right and left. She did localize pressure. She tended to laugh and giggle, but she did localize where the stimuli was coming. She responded to pinprick in each of the extremities by localizing slight pointed pressure. She is able to grab objects with her fingers. She is able to hold toys and to shake them, both in the right and the left hand. She does like lighted, responsive, noisy toys, as would be expected in her walker, but she does tend to perseverate one toy even when other toys are put into her visual field.

IMPRESSION
1. Profound traumatic brain injury resulting in permanent neuromuscular deficits.
2. Multiple skull fractures, including right parietal occipital skull fracture, minimally displaced, bilateral temporal bone fractures.
3. The patient sustained occipital right frontal, left parietal, and occipital region intraparenchymal hemorrhages.
4. Left frontoparietal subdural hematoma.
5. Seizure activity with abnormal EEG.
6. Hydrocephalus.
7. Status post ventriculoperitoneal shunt.
8. Status post decompressive craniotomy for edema and placement of intracranial pressure monitor.
9. Status post cranioplasty, February of 2016.
10. Encephalomalacia demonstrated on followup CT in the right parietal subcortical white matter.
11. Cranioplasty in June 2016.
12. VP shunt placed on the right, 07/03/2016.

4

13. The patient shows evidence of neglect to the left side with associated cognitive deficits and delays. She is probably showing 3-6 months of delays with regards to language, motor function, and deficits consistent with her encephalomalacia.

14. Probable left motor apraxia or impairment relative to visual perceptual deficits involving the right parietal lobe.

DISCUSSION: I had a long discussion with Robert, as well as with Renee. They understand Elizabeth is showing delays. She certainly is requiring continuous care, although they feel that she is pleasant and a delight, and they are happy to provide care. Their concern is what her long-term outlook would be. I have explained that certainly I believe that Elizabeth is going to have significant deficits. She will probably be ambulatory but with abnormal gait. I anticipate in light of the extent of her brain damage and involvement, she is probably going to require 24-hour-a-day attendant care, and she might be able to understand her medications. If not, she would need to have an LPN to administer her medications in the future. They should anticipate planning that she will have an essentially normal life expectancy with proper medical care.

She should be involved with intensive physical, occupational and speech therapy to begin addressing her deficits. The family plays with her. They get down on the floor to roll with her and encourage her mobility. I think further therapy would be of benefit to help her at this point in time, and certainly the family is committed to doing everything possible. They have numerous toys and activities for her to pursue, and clearly they are committed to her care. They understand that she probable will be able to transfer to a regular car, she might need a wheelchair for longer distance ambulation depending on her progress, and that she may continue to have incontinence for extended period of time. They do understand that she does have seizures. Those will probably be persistent over her lifetime; however, that might change.

I did provide prescriptions for PT, OT and speech to start working with cause and effect, language, and neurodevelopmental evolution. She is starting to try and push up when she is on her belly, but she is unable to pull and crawl herself. She is able to roll over. Certainly, the family's goal is to have her as functional as possible. At this point in time, there is not a lot of adaptive equipment that would be indicated, and certainly they can pursue her therapies.

Certainly Elizabeth had profound brain involvement, and those deficits should continue to unfold. She is likely to show more significant decline than her peers as she moves into further school settings. I would anticipate that she will require special education and will be a special needs child. She certainly would benefit with stimulation care and support, but I do not see Elizabeth living independently. She is always going to require 24-hour-a-day supervision. I would anticipate that she is probably going to be able to ambulate for some distances. She is showing good motor gains, but I believe that her cognitive intellectual deficits and visual perceptual skills will probably be significantly impaired.

This is a family who sustained a significant loss with Robert losing his daughter, and it is difficult to accept the deficits that his granddaughter demonstrates but he is hoping to do as much as possible.

Overall, the family is doing well. They are supportive, and I will be glad to provide them

5

further information so they can plan for their granddaughter more effectively over the long-term.

Certainly she is going to benefit with her own home that would be adapted for her safety and based upon her functional needs.

I will be glad to answer any further questions that they may have, I answered all of their questions that they did have, and we spent about 2 hours evaluating and discussing these issues.

Robert E. Eilers, M.D.

REE:dm

6

# EXHIBIT C

*LIFE ASSISTANCE, HABILITATION AND MEDICAL*
*MANAGEMENT PLAN FOR HOME*

**PATIENT:**       **ELIZABETH MYERS**

**BIRTHDATE:**    **NOVEMBER 1, 2015**

**ADDRESS:**       **441 CEDAR**
                          **WYANDOTTE, MICHIGAN 48192**

**REQUESTED BY: ROBERT SPICER**

**AUTHORED BY:  ROBERT E. EILERS, M.D., FAAPM&R**

## *TABLE OF CONTENTS*

| | |
|---|---|
| PERSONAL CARE | Page 3 |
| MEDICAL AND ALLIED HEALTHCARE, DIAGNOSTIC SERVICES AND HOSPITAL CARE | Page 6 |
| THERAPY CARE | Page 9 |
| HOUSING MODIFICATIONS FOR SAFETY | Page 11 |
| ICE MELT SYSTEM | Page 15 |
| ASSISTIVE TECHNOLOGY | Page 16 |
| ADAPTIVE RECREATION | Page 17 |
| WHEELCHAIR EQUIPMENT | Page 18 |
| ORTHOTICS | Page 20 |
| VEHICLE MODIFICATIONS | Page 21 |
| FUTURE SURGERIES TO CONSIDER | Page 22 |
| PERSONAL CARE SUPPLIES | Page 23 |
| BOWEL, BLADDER & HYGIENE SUPPLIES | Page 24 |
| EQUIPMENT FOR MANAGEMENT AT HOME | Page 25 |
| SUMMARY OF NON RECURRING COSTS | Page 27 |
| SUMMARY OF COST PER YEAR FIGURES | Page 28 |

2

## *PERSONAL CARE*

Elizabeth presents with significant neurological issues as a result of her severe traumatic brain injury caused by the semi vs auto impact. She survived although her mother died at the scene. Elizabeth sustained multiple neurological injuries with a Glasgow Coma Scale of 10/15. She had bilateral intraparenchymal hemorrages, left frontal parietal subdural hematoma, bilateral scalp hematomas, displaced right parietal occipital skull fracture, bilateral temporal bone fractures, right frontal bone fracture and left parietal occipital intraparenchymal hemorrhage. The profound trauma caused severe elevations in intracranial pressure and an intraventricular pressure monitor was placed and a craniotomy was performed to reduce pressure caused by her brain swelling.

She required a subsequent cranioplasty on February 11, 2016 but the bone was resorbing and the cranioplasty was removed on March 23, 2016. An additional cranioplasty was completed on June 27, 2016. She also developed hydrocephalus as a result of her severe traumatic brain injuries and a ventriculoperitoneal shunt was placed to reduce pressure on July 3, 2016.

Her intracranial injuries have resulted in motor delays, left hemiparesis, left neglect, poor fine and gross motor skills and language deficits. Elizabeth shows perceptual deficits consistent with her parietal lobe involvement. She has also developed seizures due to her extensive brain injuries requiring the use of Keppra to manage her seizures.

Elizabeth has also sustained a left hemiparesis due to the damage to the motor cortex of the right hemisphere.

Her bimanual dexterity is impaired and she demonstrates motor planning and visual motor deficits with activity attempts.

She has notable motor delays and impaired motor coordination deficits in both gross and fine motor skills. These impact her level of function on a daily basis.

Elizabeth requires, and will continue to need, assistance with many daily activities and tasks. She will require a life assistant to help her due to her noted impairments both cognitive and motoric.


The life assistant will provide integrative support for Elizabeth with such activities as:

Daily hygiene
Perineal hygiene
Toileting assistance
Setting up toothpaste, soap and shampoo
Assistance with transfers and mobility
Dressing assistance with zippers, buttons, snaps, eyelets and items of clothing
Assist with makeup, jewelry clasps and hooks in the future
Meal preparation and table set up
Removing adhesive stickers from fruit, foods and items
Opening bottles, medicine containers and shrink wrap packaging
Measuring doses for any medicines prior to administration
Locating hotel rooms if traveling
Assistance and supervision in public restrooms
Assistance in restaurants and public places
Dispose of expired foods by checking expiration dates
Opening bubble packaging for over the counter medications
Assist with keys or keypads
Assist with writing or typing
Assisting with shoes, ties and fasteners
Setting up meals at the table, cutting food, preparing food, applying condiments,
opening packages
Changing batteries in devices
Assist with doing laundry, changing bed linens
Light housekeeping daily and heavier cleaning as needed
Washing dishes, loading and unloading the dishwasher
Collecting trash
Clearing and protecting the garbage disposal
Measuring soap for dishwasher and washing machine
Assist taking out garbage and recyclables to curb
Grocery and supply shopping
Loading and carrying groceries
Packing luggage for travel when needed
Assistance crossing streets
Changing light bulbs
Climbing ladders
Reaching shelves
Seasonal decorating
Sewing when needed
Ironing or steaming clothing
Driving to appointments and activities
Providing security and safety for her anytime in public
Changing filters in refrigerator, dryer and furnace
Assistance with writing notes

4

Assistance with bill payment, finances, organizing documents and correspondence
Activating the security system
Moving furniture or other items

Certified Nursing Assistant

(3) 8 Hour Shifts Per Day $ 22.00/Hour        $ 528.00/Day    $ 192,852.00/Year

Holidays are charged at time and one half. Nights and weekends may be charged at a higher rate but not at present. Leap year calculations are included.

Holidays at time and one half                                   $    1,848.00/Year

Total Cost per Year:                                      **$ 194,700.00**

LPN is required if administration of medications will be indicated. The CNA cannot administer medications. The costs for an LPN position to administer medications can be per visit or per shift. Family members can administer medications if present.

*LPN Visits are $75.00 Each Visit*

Since 2 visits per day would be required for her seizure medications the additional cost per day is $150.00

Total Cost Per Year for LPN:                             **$ 54,787.50**

TOTAL PERSONAL CARE COSTS PER YEAR:                      **$ 249,487.50**

Interim Health Care, Detroit, Novi, Canton Michigan

5

## MEDICAL AND ALLIED HEALTHCARE, DIAGNOSTIC SERVICES AND HOSPITAL CARE

### Medical and Allied Healthcare

| | COST | YEARLY |
|---|---|---|
| Endocrinology Follow Up 1/Year | $ 175.00 | $ 175.00 |
| Neurology Follow Up 4/Year | $ 185.00 | $ 740.00 |
| Ophthalmology Follow Up 1/Year | $ 165.00 | $ 165.00 |
| Neuro-ophthalmology Follow Up 1/Year | $ 180.00 | $ 180.00 |
| Orthopedic Follow Up 3/Year | $ 175.00 | $ 525.00 |
| Pediatric/Medical Follow Up 4/Year | $ 155.00 | $ 620.00 |
| Rehabilitation Follow Up 4/Year | $ 180.00 | $ 720.00 |
| Dental Hygiene 4/Year | $ 155.00 | $ 620.00 |
| Psychiatry Follow Up 3/Year | $ 275.00 | $ 825.00 |
| Neurosurgery Follow Up 2/Year | $ 210.00 | $ 210.00 |
| Plastic Surgery Follow Up 1/Year | $ 195.00 | $ 195.00 |

### Laboratory Services

| | | COST | YEARLY |
|---|---|---|---|
| Chemistry Panel | 1/Year | $ 266.50 | $ 266.50 |
| Vitamin D Level | 1/Year | $ 221.00 | $ 221.00 |

6

| | | | |
|---|---|---|---|
| Growth Hormone | 1/Year | $ 103.00 | $   103.00 |
| Keppra Level | 4/Year | $ 273.00 | $ 1,638.00 |

## *Diagnostic Services*

| | | | |
|---|---|---|---|
| EEG 1/Year | | $ 358.00 | $   358.00 |
| Hip X-rays 1/6 Years Until Age 18 | | $ 358.00 | $     59.66 |
| MRI Brain 1/6 Years | | $1,929.00 | $   321.50 |
| Spinal Tap 1/10 Years | | $2,850.00 | $   285.00 |
| Bone Scan 1/12 Years | | $1,520.00 | $   126.66 |
| Scoliosis Survey 1/3 Years Until Age 18 | | $ 368.00 | $   122.60 |
| MRI Hips 1/12 Years | | $1,575.00@ | $   262.50 |
| Polysomnography 1/15 Years | | $2,625.00 | $   175.00 |
| Cardiac Perfusion Imaging 1/40 Years | | $2,846.00 | $     71.15 |
| Bone Density Scan 1/5 Years | | $ 513.00 | $   102.60 |
| Positive Emission Tomography Brain 1/12 Years | | $3,850.00 | $   320.83 |
| MRI Knees 1/16 Years | | $1,802.00@ | $   225.25 |
| 3D CT of Skull 1/15 Years | | $2,775.00 | $   185.00 |
| 24 Hour EEG with Video 1/12 Years | | $2,800.00 | $   233.33 |

7

## Hospital Care*

| | | | |
|---|---|---|---|
| Hospital Admission History & Physical 3/Year | $ 265.00 | $ | 795.00 |
| Hospital Stay 6 Days | $ 4,293.00 | $ | 25,758.00 |
| Medical Follow Up 3 Days | $ 215.00 | $ | 645.00 |

*Surgery, procedures and consultation not included
 Emergency Room fees not included

Total Cost per Year until age 18:                    $ 37,250.58

Total Cost per Year thereafter:                      $ 37,068.32

costhelper.com
Beckershospitalreview.com
International Federation of Health Plans
Newchoicehealth.com
Bostonscientific.com
LabCorp.com
Codemap.com

8

## *THERAPY CARE*

|  | PER VISIT | YEARLY |
|---|---|---|
| **Physical Therapy** | | |
| 5 Times/week to age 10 | $ 201.00 | $ 52,260.00 |
| 3 Times/week to age 18 | $ 201.00 | $ 31,356.00 |
| 2 Times/week for life | $ 201.00 | $ 20,904.00 |
| **Occupational Therapy** | | |
| 5 Times/week until age 8, then | $ 201.00 | $ 52,260.00 |
| 3 Times/week until age 18, then | $ 201.00 | $ 31,356.00 |
| 1 Time/month for life | $ 201.00 | $ 10,452.00 |
| **Speech Therapy** | | |
| 5 Times/week until age 10, then | $ 201.00 | $ 52,260.00 |
| 3 Times/week until age 18, then | $ 201.00 | $ 31,356.00 |
| 2 Times/week until age 26, then | $ 201.00 | $ 20,904.00 |
| 12 Times/year for life | $ 201.00 | $ 2,412.00 |
| **Psychological Counseling, Behavioral Modification Therapy Cognitive Therapy** | | |
| 1 Visit per week to Age 16, then | $ 185.00 | $ 9,620.00 |

9

|  | | |
|---|---|---|
| 2 Visits per month to age 21, then | $ 185.00 | $ 4,440.00 |
| 1 Visit per month for life | $ 185.00 | $ 2,220.00 |

**Rehab Case Manager**

| 1 hour/month | $ 155.00 | $ 1,860.00 |

**Neuropsychology Evaluation**

| 1 every 3 years to Age 26, then | $2,400.00 | $    800.00 |
| 1 every 10 years for life | $2,400.00 | $    240.00 |

**Total Cost per Year:**

| Until age 8, then | **$ 169,060.00** |
|---|---|
| Until age 10, then | **$ 148,156.00** |
| Until age 16, then | **$ 106,348.00** |
| Until age 18, then | **$ 101,168.00** |
| Until age 21, then | **$  59,360.00** |
| Until age 26, then | **$  57,140.00** |
| Each Year Thereafter: | **$  38,088.00** |

Affinity Home Agency, South Lyon, Michigan
Therapists.psychologytoday.com

## *HOUSING MODIFICATIONS FOR SAFETY*

✓ GENERAL CONSIDERATIONS

Elizabeth's home should be designed to provide safe housing. It should preferably be a single level residence due to her motoric impairments. Stairs should be avoided
Floors should be safe with padded low pile carpet where possible
Securing the house from unplanned egress is important for safety

✓ INTERIOR AREAS

o HALLWAYS

Should be 72 inches wide to allow adequate room for attendants, scooters and wheelchairs
Lights to be movement activated in hallways, Lutron lighted pathway controls
Door casing with smooth rounded edges
Drywall corners to be rounded
Handrails in hallways to be lighted with LED rope in lower recess

o DOORWAYS

Doors must be fire resistant solid core doors UL 30 minute rating
Pocket doors are to be utilized where feasible for safety
Smooth rounded casing and edges
Accessible hardware on all doors

o LIGHTING

Lutron pathway control and whole house lighting systems are preferred with security system integration
Emergency pathway lighting for emergency exit access

11

o FIRE

Alarm system with smoke detectors in each room
Carbon Monoxide sensors
Whole house fire sprinkler installation wet system
Positive ventilation system for smoke for exit route, HVAC shut off system
provided by Honeywell
Emergency pathway lighting with battery back-up
All rooms and bedrooms to have direct exits to exterior for first
responder access
Response plan should be on file with assigned Fire Station
Knox Box to be installed

o BEDROOM AREA

Room to have direct exit to outside for easy evacuation
Bedroom is to connect directly to bathroom area
Plan for future wheelchair access
Double joists for future track lift system in later years

o UTILITIES

Security system with police, fire, ambulance with wireless remote
monitoring and security cameras with central and local monitoring
Induction range for kitchen safety

o GARAGE AREAS

Remote control door opener (Chamberlain) with battery backup
Central floor drain to accept runoff to triple drain before discharge
All garage walls adjacent to interior to be cement block and ceilings fire
rated
Garage to be fitted with fire sprinklers
No center pole to allow second bay access for accessible van
Pneumatic compressor to inflate tires and clean wheelchairs/scooters
Hot and Cold spigots for equipment cleaning

12

o BATHROOM

6 x 6 foot roll-in shower
Infinity floor drain 6 foot wide to 2 inch sewer drain
Sure Dry Shower drying system with timer for mildew control
Grab bars in shower for safety
Plywood ¾ inch wall backing for grab bars
Point of supply hot water heaters with remote temperature control settings
Grohe or other pressure balanced temperature controlled ¾ inch valves
Grohe or other diverter valves, ¾ inch for hand held shower and shower heads
Valves and supplies at shower access outside for safety
Tumbled stone 4 inch floor tiles with slope to infinity drain at shower
All shower floor tiles to be mud set ½ inch below bathroom floor with wide grout lines
Durock cement board or Kerdi-Board to be used for walls
Shower floor and tray walls to have sealed vinyl membrane by Kerdi
Fanteck timed exhaust system at toilet and shower and sink, 6 inch ducts
SunTouch floor heating system for floor drying with timer
All outlets to be 20 AMP GFI
Storage corner for shower chair
Louvered doors for ventilation

o OUTDOOR AREAS

There should be a yard fully fenced and secured.

**Total direct job costs**         **$ 409,910.00**

**Labor**    **$ 208,280.00**

**Material**   **$ 192,636.00**

**Equipment $   8,994.00**

13

**Total indirect job costs**     $ 47,510.00

      **Insurance**   $ 15,823.00

      **Clean-up**    $ 3,156.00

      **Permits and Utilities**

            $ 11,191.00

      **Plans and Specs**

            $ 20,496.00

**Total Contractor Markup**    $ 57,387.00

**TOTAL COSTS**        $ 517,963.00

*Based on Zip Code 48192, Wyandotte, Michigan in December 2016.

Building-cost.net
US Fire Administration

14

## *ICE MELT SYSTEMS*

Since Elizabeth still plans to remain in the Wyandotte area with significant snow and ice accumulation annually, she should install a snow melt system for the driveway and walkways in the accessible one level home. Either a Viessmann or Buderus boiler is required and runs of Pex plastic tubing are connected to the mesh in a concrete driveway. The hydronic system using a water and glycol mixture is best to utilize with the proper controls which sense temperature and moisture on the driveway surface. Assuming 1200 square feet of walkways and driveways the cost is $13.50 to $21.50 per square foot for a total cost of $16,200.00 to $25,800.00 for new construction. Average cost of $21,000.00 with 20 year life.  Additionally, annual utility costs can run $450.00 to $750.00 per season.

| | |
|---|---|
| Total Annual Cost Ice Melt System | $ 1,050.00 |
| Total Utility Costs per Year | $   650.00 |
| **TOTAL COST PER YEAR** | $ 1,700.00 |

Buderus.com
Viessmann.com
Paversearch.com
Reha.com

15

## *ASSISTIVE TECHNOLOGY*

IPAD PRO with WIFI 128GB                     $ 42.91/month

IPHONE  7 Plus 32GB                          $ 36.24/month

Phone/Data 2GB $35.00 per Month              $ 35.00/month


                      Cost per Year          $ 1,374.00/Year


IPAD and IPHONE can run Lingraphica applications for communication and applications can be downloaded for free at apple store apps

GPS location services can be added for wander protection such as Amber Alert GPS Smart Locator for $145.00 Purchase and $15.00/month monitoring fee.

Amberalert.com
Verizon.com
Aphasia.com

16

## *ADAPTIVE RECREATION*

Recreational Therapist

2 Hours/Month                    $140.00/Hour                    $ 3,360.00

Coordination of extensive adaptive recreational activities can be done by a Certified Recreational Therapist. Additional costs will be incurred for specialized equipment, buddy training and certification as well as for special travel and accommodations. The therapist can also assist with integrated activities for birthday and other events to create an inclusive environment for sharing these positive experiences with other disabled peers and unimpaired peers who participate.

Below are web sites to be explored for extensive adaptive opportunities.

divepirates.org
ChallengeAlaska.org
Unlimitedskiing.com
Outdoorbuddies.org
Wildernessinquiry.org
Tranquiladventures.com
Wildernessonwheels.org
Tellurideadaptivesports.org
Specialolympics.org
Fhnbinc.org
Hsascuba.com
Nwpainc.org
Sailtoprevail.org
Footloosesailing.org
Juddgoldmansailing.org
Palaestra.com
Nscd.org
Disabledsportsusa.org
Adaptiveadventures.org

17

## WHEELCHAIR EQUIPMENT

### Until age 8

Pediatric Manual Wheelchair

> Manufacturer: Freedom Designs Dual Tilt Wheelchair NXT
> Generation Next

> Additions: Trunk supports, head supports, lower body supports, butterfly harness system, dynamic footrests, custom inserts and anti-tippers.

| | |
|---|---|
| Total Initial Purchase Cost: | $ 12,568.00 |
| Annual Service Cost | $ 1,256.80 |
| Replacement Every Three Years | |
| Total Cost per Year to Age 8 | $ 4,608.26 |

Pediatric Transport Wheelchair

> Manufacturer: Karman Ergonomic MVP Reclining Transport

| | |
|---|---|
| Total Initial Purchase Cost: | $ 1,699.00 |
| Annual Service Cost | $ 175.00 |
| Replacement Every Three Years | |
| Total Cost per Year to Age 8 | $ 741.33 |

### TOTAL COST PER YEAR TO AGE 8          $ 5,349.59

18

**After Age 8**

Manual Wheelchair

    Light Weight Wheelchair

    Manual Wheelchair: Quickie Zippie/2 Light

    Initial Purchase Cost           $ 1,595.00

    Annual Service and Repairs     $   159.50

    Replacement Every 8 Years

    Cost per Year:               **$  358.87**

Motorized Power Chairs

    Pride Go-Chair or Equivalent

    Initial Purchase Cost           $ 1,449.00

    Annual Service and Repairs     $   144.90

    Replacement Every 6 Years

    Cost per Year                **$  386.40**

    Service loaner costs not included

    Mobility Equipment Total per Year after Age 8    **$ 745.27**

Ilevel.rehab
Freedomdesigns.com
1800wheelchair.com
Spinlife.com

19

## ORTHOTICS

|  | COST | YEARLY |
|---|---|---|
| Plastic molded AFO (Replacement Every Year) | $1,335.00@ | $ 1,335.00 |

Total Cost per Year:          **$ 1,335.00**

Hanger Clinic: Orthotics & Prosthetic Solutions, Detroit, Michigan

20

## *VEHICLE MODIFICATIONS*

A minivan, which has been modified for Elizabeth's needs, will be the best mode of transportation. This will allow for transport of the wheelchair for her regular use. The following are recommendations:

2016 Chrysler Town & Country or similar V6, 3.6L 6 speed automatic.

- Includes Braun Conversion Entervan model, Full cut 14" lowered floor, Power sliding passenger door, Power kneel system, Power ramp slotted, Wheelchair securement straps and Power windows and door locks. Quiet Drive. Fire extinguisher in van.

3 Year 36,000 mile Basic Warranty

Lifetime Power Train Warranty

5 Year 100,000 mile roadside assistance

Total Initial Purchase Cost:          **$ 59,790.00**

Replacement Every 5 Years

Total Cost per Year:                       **$ 11,958.00**

Does not include cost for loaner rentals during service and repairs, handicapped license plates, insurance or operating costs.

Mcmobilitysystems.com
Cars.com

21

## _FUTURE SURGERIES TO CONSIDER_

Elizabeth will require surgeries over her lifetime as a result of her traumatic injuries.

As a result of her significant head trauma she has developed hydrocephalus and will require VP Shunt revisions. She will need multiple revisions and at least 3 are probably going to be required.

Cost of VP Shunt          $46,500.00 @   Total  $ 139,500.00

Elizabeth may also require Scoliosis surgery and hip derotational surgeries and tendon releases in her youth but the actual need is not certain yet.

Elizabeth will probably require plastic surgery and cranioplasty revisions. The frequency and extent are not known at this time.

Elizabeth will probably require joint replacements over her lifetime due to her probable abnormal gait. Hip and knee replacement surgeries are likely.

**TOTAL FUTURE SURGERIES**          **$ 139,500.00**

Pearldiver.com                    Costhelper.com
Newchoicehealth.com               Healthcarebluebook.com

## PERSONAL CARE SUPPLIES

|  | Cost | Yearly |
|---|---|---|
| Pocket Dresser 2/Year | $ 39.95 | $ 79.90 |
| Knork 6/Year | $ 5.95 | $ 35.70 |
| Zipper Rings 12/Year | $ 8.95 | $107.40 |
| Reacher 2/Year | $ 20.00 | $ 40.00 |
| Built Up Utensils 4 sets/Year<br>Fork, Spoon, Soup Spoon | $ 21.00@ | $ 252.00 |
| Anti skid placemats 1 dozen/Year | $ 360.00 | $360.00 |
| Non skid cereal bowl 4/Year | $ 17.50 | $ 70.00 |
| Button hook 4/Year | $ 8.00 | $ 32.00 |
| Shower Buddy Shower Chair 1/6 Years | $ 1,611.00 | $268.50 |
| Ablewear knife rocker 3/Year | $ 5.85 | $ 17.55 |
| Philips Sonicare 1/2 Years | $ 189.99 | $ 94.99 |
| Philips Sonicare Brush Tips | $ 39.00/6 | $ 39.00 |

TOTAL COST PER YEAR                    **$1,397.04**

activemotionhealth.com
dynamic-living.com
colonialmedical.com
independentliving.com
disabled-world.com

23

## BOWEL, BLADDER & HYGIENE SUPPLIES*

|  | Cost | Yearly |
|---|---|---|
| Chux UnderPads (23" x 36") 4/Day | 150/$ 52.08 | $ 1,013.82 |
| Diapers 6/Day | 48/$43.99 | $ 2,007.04 |
| Non Sterile Gloves 18/Day | 100/$ 9.24 | $    607.06 |
| Desitin Zinc Oxide 3/Year | 16oz/$13.48 | $      40.44 |
| Ready Flush Medline 24/Day | 540/$69.99 | $ 1,135.39 |
| Saalfeld Biohazard Bags 6/Day | 500/$124.01 | $    543.16 |
| Unimed Biohazard Bags 1/Day | 50/$41.00 | $    299.30 |
| Sandi Hands Wipes Tub 135/Week | 135/$5.95 | $    309.40 |
| Eye Protection 3/Day Alair | $14.40/12 | $ 1,314.00 |
| Gowns 6/Day | $72.32/100 | $ 1,583.80 |
| Masks 6/Day | $4.00/50 | $    175.20 |

Total Cost per Year:                          **$  9,028.61**

*Supplies may change if Elizabeth can improve toileting
as she ages, or fewer diapers and supplies may be used.

HealthyKin.com
Uline.com
Qualitymedicalsupplies.com
Walmart.com
Medsupplyco.com
Walgreens.com

24

## EQUIPMENT FOR MANAGEMENT AT HOME

| | | |
|---|---|---|
| Physical Therapy Table w/Mat (4'x7') | $ 409.80 | 7 Years |
| Physical Therapy Wall Mat (4'x8') | $ 220.30 | 5 Years |
| Physical Therapy Stool (w/wheels) | $ 122.95 | 7 Years |
| V4 ceiling track lift system* (Bedroom-Bath-Therapy) | $14,680.00* | 12 Years |
| Motor Replacement | $ 4,250.00 | 10 Years |
| Slings for lift | $ 198.00 | 2 Years |
| Hospital Bed Hill Rom | $ 5,599.00 | 12 Years |
| Tilt in Space Shower Chair | $ 2,295.00 | 5 Years |
| Prone Stander Rifton | $ 1,895.00 | 5 Years |
| Aretech Zero G System* | $142,000.00 | 40 Years |
| Aretech Annual Service and Repairs | $ 3,000.00 | |
| Kohler Generator 30KW NG | $ 10,394.00 | 20 Years |
| Tumble Forms, Blocks, Wedges & Cylinders | $ 343.68 | 1 Year |

| | | |
|---|---|---|
| 40 Year property | Cost per Year | $ 3,550.00 |
| 20 Year property | Cost per Year | $ 519.70 |
| 12 Year property | Cost per Year | $ 1,689.91 |
| 10 Year property | Cost per Year | $ 425.00 |
| 7 Year property | Cost per Year | $ 76.10 |
| 5 Year property | Cost per Year | $ 882.06 |

25

| 2 | Year property | Cost per Year | $ | 99.00 |
| 1 | Year property | Cost per Year | $ | 343.68 |
| 1 | Year service | Cost per Year | $ | 3,000.00 |

Total Cost per Year:                          **$10,585.45**

*Cost listed above does not include installation

Aretech.com
Spinlife.com
Rifton.com
Bhm-medical.com
HillRom.com

26

## SUMMARY OF NON RECURRING COSTS

HOUSING MODIFICATIONS                         $ 517,963.00

FUTURE SURGERIES                              $ 139,500.00

27

## _SUMMARY OF COST PER YEAR FIGURES_

PERSONAL CARE                                              $249,487.50

MEDICAL AND ALLIED HEALTHCARE, DIAGNOSTIC
SERVICES AND HOSPITAL CARE

    Cost per Year until age 18:                  $ 37,250.58

    Cost per Year thereafter:                    $ 37,068.32

THERAPY CARE

    Total Cost Per Each Year:

    Until age 8, then                            $169,060.00

    Until age 10, then                           $148,156.00

    Until age 16, then                           $106,348.00

    Until age 18, then                           $101,168.00

    Until age 21, then                           $ 59,360.00

    Until age 26, then                           $ 57,140.00

    Each Year Thereafter:                        $ 38,088.00

ICE MELT SYSTEM                                           $   1,700.00

ASSISTIVE TECHNOLOGY                                      $   1,374.00

ADAPTIVE RECREATION                                       $   3,360.00

28

WHEELCHAIR EQUIPMENT

  EACH YEAR TO AGE 8          $   5,349.59

  EACH YEAR THEREAFTER       $    745.27

ORTHOTICS              $   1,335.00

VEHICLE MODIFICATIONS        $   11,958.00

PERSONAL CARE SUPPLIES       $   1,397.04

BOWEL, BLADDER & HYGIENE SUPPLIES    $   9,028.61

EQUIPMENT FOR MANAGEMENT AT HOME   $   10,585.45

29

# EXHIBIT D

# PHYSICAL MEDICINE AND REHABILITATION ASSOCIATES

PHYSICAL MEDICINE
& REHABILITATION
ELECTROMYOGRAPHY

PHONE (630) 556-9900
FACSIMILE (888) 328-2601

OFFICE ADDRESS:
BLUFF CREEK
45W699 JETER ROAD
BIG ROCK, ILLINOIS 60511

ROBERT E. EILERS, M.D., FAAPM&R
email: contact@pmrassociates.org

## OUTPATIENT RECHECK

RE: MYERS, ELIZABETH

DATE: January 9, 2018

I had the opportunity to see Elizabeth, and to talk with Robert and meet with Renee.

At this point in time, had a follow-up and the opportunity to review my recommendations for Elizabeth, and to review the Life Assistance, Rehabilitation and Medical Management Plan for Home, which was provided about a year ago to the family.

Elizabeth, at this time, has shown improvement. The areas in which I would have anticipated that she would have motor gains have occurred. She does continue to be incontinent of bowel and bladder, but she is still showing deficits consistent with her left hemiparesis, left neglect. She still has deficits in fine and gross motor skills, but she has begun to show more interaction obviously since she is a bit older. She had had a significant left hemiparesis.

She has had bihemispheric involvement and continues to have profound expressive and receptive language deficits, with her expressive language being the most impaired. Currently she is able to say very few words functionally. She basically babbles. She could say, "mama," "dada," and she sometimes says "bubba" for bottle, and on leaving she does raise her hand, fist and open it, and was able to say "bah," approximating bye bye.

At the present time, she is able to roll. She is able to stand. She is able to get up from the ground and stand without an assistive device. She is able to ambulate. She shows some mild pronation during ambulation, and at this point in time she might benefit with SMOs, but probably not AFOs at this juncture. She is able to walk. She does show more of a waddling gait, heel and foot to foot. She does not quite roll over her toes at this time, but she is not toe walking. She is able to maintain balance. After walking frequently, she tires and then she literally will plop to the floor. When she uses an iPad to watch cartoons, she is content. She does show some self-stimulation with forward and back rocking. When she is standing, she does tend to like to turn towards the right side. It appears she might be compensating for visual changes. She tends to use her right hand slightly more than her left based upon her examination at this time.

1

She is able to follow directions, pointing to body parts. She was able to correctly point to her ears, her nose, her mouth and her teeth. She confused her tongue and her neck. When asked to touch her knee, she pointed to her tummy, but she was able to identify probably 80% of her body parts correctly. She could identify primary colors: red, yellow, blue, and green, and she was able to pick those. She could not say the words, but when asked to pick out the blue toy she was able to do so. She did follow directions for "Throw this in the trash." She likes to put things in the trash, but she was not able to follow other specific commands to carry out tasks.

She does have a fascination with her iPad. I did start using my iPhone with a Lingraphica application for ADLs. She was able to touch the phone and repeatedly press it to get the same response. She showed a good interaction with the symbolic and auditory statements coupled with the pictures, and I did provide them with a prescription for a Lingraphica app download for an iPhone or iPad, which I think she would be willing to use. She likes Sesame Street for TV and Splash and Bubbles, but she particularly likes to watch it on what she calls her iPad.

They still feed her with a high chair. She is able to do finger foods. She eats basically the table food. She prefers to avoid sinewy or difficult to chew meats. Softer consistencies are better for her and she will use those. She does not like to drink out of a cup. She cannot hold it steadily. She has a sippy cup, but she likes the more plastic sippy cups which are softer and have two handles, which she is able to hold.

You can hold her in your lap, but she did have some anxiety with me as a stranger and then became slightly more comfortable. We particularly bonded with the use of the iPhone and symbols.

Her expressive language is still profoundly impaired. Receptive skills are fair but still impaired. She could not use yes or no. She was not able to accurately provide those answers. For instance, when I wanted to see if she would ask, "Do you want the cell phone again?" She could not say yes or no. She does explore drawers and cabinets in the kitchen. They are all childproof. She does not try for the refrigerator at this point, but she was able to say "bubba" which indicated the bottle, which is the sippy cup, so that is her interpretation at this time but she has still not mastered saying cup.

She is on Keppra, which has been increased to 0.6 mL b.i.d. since it was questionable if she was having some additional seizures, and that appears to be stable. There have been no grand mal seizures. Her shunt is functioning. There have been no revisions carried out. She has not had any episodes of nausea, vomiting or change in status.

She does have some mild nystagmus on doing visual examination. It is difficult to fully assess her visual fields. It appears that she may have some neglect to her left side when testing her, but it is difficult to get a complete set of complete control. It appears that she may be compensating more with turning her head to take things into the visual fields. She is following with an ophthalmologist due to some esotropia on the left, but that seems to be showing some improvement and more visual field assessment can be carried out.

She is working with a Tots Program, and they are doing PT and speech at home and working with the family. She will be moving on to early intervention at school in the near future.

She is able to do long sitting and short sitting. She does not W sit. She basically is showing skills for ambulation more consistent with an 18-month old. She does have fairly significant delay, but is showing improvement.

They do have an induction range due to the risk of her putting her hands on a hot stove.

They are using MiraLAX, one half teaspoon to a teaspoon daily, because she sometimes gets constipated.

She does like to stand and then turn in circles, particularly going to the right with her head turned significantly to the right. She usually does not go to the left. She shows a tendency to bring her arm up, slightly more decorticate appeared on the left. Although she did at other times show the right. She does seem to like to pursue self-soothing activities.

Since my initial evaluation, her language really has not shown much, if any, improvement. She still tends to show visual neglect. It is difficult to fully assess her visual fields and further assessment will clearly be required. I am not sure if her turning the head to the right improves her visual function, and that will need to be further assessed as time goes forward.

She is still lagging well behind her peers, and her ability to acquire expressive and receptive language is still profoundly impaired.

She does continue to have nystagmus, as she did in the initial evaluation. She does still show some persistent motor apraxias in her upper extremities, but she is showing some improvement in terms of motor function and coordination. She has improved using a sippy cup from before. She of course is still incontinent and is diapered. She did not show any drooling. She was not showing an inability to handle secretions or swallowing. There were no problems in that regard.

IMPRESSION
1. Profound traumatic brain injury.
2. Status post multiple skull fractures.
3. Visual field impairment, certainly with multiple traumas to visual fields in the occipital, parietal, and temporal lobes with intraparenchymal hemorrhages.
4. Seizure activity, persistent.
5. Hydrocephalus, stable.
6. Profound deficits in expressive and receptive language deficits with expressive language more impaired than receptive language skills.
7. Persistent neglect.

RECOMMENDATIONS: I had a long discussion with the family and would recommend that they continue the plan as outlined for her previously. We did review those, the implications, and the specific needs. At this point in time, she may be able to move away from an Aerotech G system. She may have toileting accomplished by at least her teens or by maybe age 10.

3

I think that she will show some overall improvement, but is going to continue to require close one-on-one supervision and care.

We discussed the plan at some length. There are some areas where there could be some modifications. I have discussed those with the family and provided them with prescriptions for the Lingraphica app and 24-hour attendant care.

I did provide them with some recommendations to deal with her anxiety. She does not do well with overstimulation. She does best with a very calm, predictive, structured environment, which would be anticipated with her traumatic brain injury. I helped Renee understand that many of the interventions that are applied, are most appropriate for Elizabeth, and I think that she has good insight into her specific needs.

Certainly, she is going to require a highly structured, calm environment. That would be to her benefit, and I think that they certainly provide that in her current living environment.

I would anticipate that she of course will be needing shunt revisions in the future, and the concern with regards to her language is quite profound and will impact her level of functional independence.

Since she is still taking the seizure medications, she will need to be staffed with LPNs for part of the day or to have them come in to provide her those medications, which was discussed previously.

Fortunately, she has shown gains with ambulation, which were anticipated but now confirmed. Her language delays are unfortunately far more profound than expected, and her visual and language skills will be profoundly impaired and require continuous supervision and care.

Certainly, as I explained, her survival will be long-term. I do not see any reason that she would have a reduction in a life expectancy, and certainly she will be able to continue with long-term support though within the home setting and an appropriately adapted home. She certainly is not going to be able to do climbing, and many tasks will be limited due to her visual impairments and her communication impairments.


Robert E. Eilers, M.D.

REE:dm


4

# EXHIBIT E

Page 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


C.A. No: 5:16-CV-10803-JEL-SDD


HOWARD LINDEN, as Conservator
for the ESTATE of Elizabeth Myers,
and ANGELA BRYANT,


        Plaintiff(s),

v.


4283791 CANADA, INC., a Foreign
Profit Corporation d/b/a NATIONAL
CARGO CARRIERS, INC.,  and
ARIF ALACAYIR, jointly and severally,


        Defendant(s).
_____/



DEPOSITION OF
ROBERT EILERS, M.D.

DATE TAKEN:      January 16, 2018
TIME:            10:00 a.m. - 11:59 a.m.
PLACE:           780 5th Avenue South
                 Naples, Florida


Stenographically Reported By:

Elizabeth M. Brooks, RPR, FPR

Registered Professional Reporter


BRICKELL KEY COURT REPORTING, LLC
305.407.9993

ROBERT EILERS, M.D.
1/16/2018

Page 2

1   On behalf of the Plaintiffs:    (VIA TELEPHONE)

2

3        CHRISTIAN P. COLLIS, ESQ.
         Fieger, Fieger, Kenney & Harrington, P.C.
4        19390 West Ten Mile Road
         Southfield, MI  48075
5        nc.collis@fiegerlaw.com

6

7

8   On behalf of the Defendants:

9        RYAN C. HARPER, ESQ.
         Neuens Mitchell Bonds
10       2021 S. Lewis Avenue
         Suite 660
11       Tulsa, OK  74104
         rharper@neuensmitchell.com

12

13

14

15               * * * * * * * *

16

17

18

19

20

21

22

23

24

25

ROBERT EILERS, M.D.
1/16/2018

Page 3

1                    INDEX OF PROCEEDINGS

2    WITNESS                                    PAGE

3    DEPOSITION OF ROBERT E. EILERS, M.D.

4    Direct Examination by Ms. Harper            4
     Cross Examination by Mr. Collis            72
5
     Certificate of Oath                        74
6    Certificate of Reporter                    75

7

8                    * * * * * * *

9                    EXHIBITS

10   DESCRIPTION                                PAGE

11   Exhibit 1    Curriculum Vitae              5

12   Exhibit 2    Evaluation and Life Assistance  12
                  Plan
13
     Exhibit 3    E-mail dated 1/15/18 and       14
14                attachment

15   Exhibit 4    Prescriptions and Outpatient   15
                  Recheck
16

17

18                   * * * * * * * *

19

20

21

22

23

24

25

Page 4

1          Deposition taken before Elizabeth M. Brooks,

2     Registered Professional Reporter, Notary Public, in and

3     for the State of Florida at Large, in the above cause.

4                    * * * * * * * *

5          THE COURT REPORTER:  Do you solemnly swear or

6          affirm that the testimony you are about to give

7          will be the truth, the whole truth and nothing but

8          the truth?

9          THE WITNESS:  I do.

10                  ROBERT E. EILERS, M.D.,

11    having been first duly sworn or affirmed, was examined

12    and testified as follows:

13                    DIRECT EXAMINATION

14    BY MR. HARPER:

15         Q.   Sir, could you please state your full legal

16    name for the record.

17         A.   Robert Edwin Eilers.

18         Q.   And you are a medical doctor, correct?

19         A.   Correct.

20         Q.   All right.  Dr. Eilers, my name is Ryan

21    Harper.  We met briefly, and have spoken in the presence

22    of Mr. Collis prior to this deposition.

23         You understand that I am an attorney

24    representing the driver of the semi and the truck

25    company that was involved in this accident?

ROBERT EILERS, M.D.
1/16/2018

Page 5

1      A.    Okay.

2      Q.    And I'm here today to get your opinions and

3   testimony regarding your physical -- let me say the

4   correct -- the Life Assistance Habilitation and Medical

5   Management Plan for Elizabeth Myers.

6      A.    Correct.

7      Q.    Okay.  And, Doctor, you've provided us a copy

8   of your CV here today.  I'm assuming this is current and

9   up to date?

10     A.    It is, yes.

11     Q.    And do you have a list of depositions or trial

12  testimony included in this?

13     A.    No, I don't.

14     Q.    Do you have the ability to get one to

15  Mr. Collis?

16     A.    I think -- I think there is a case list.  I

17  think that -- yeah.  It's a couple pages.

18     Q.    If you could get that to Mr. Collis so we have

19  it.  I'm not that concerned about it.

20     A.    Not a problem.

21     Q.    In terms of --

22         MR. HARPER:  Let me mark this as Exhibit 1.

23         (Exhibit 1 marked for identification.)

24  BY MR. HARPER:

25     Q.    In terms of serving as an expert witness, is

Page 6

 1    that something you do on a regular basis for legal

 2    cases?

 3        A.    Most of the time I end up getting involved as

 4    a treating physician, is principally how that occurs.

 5    And so in some cases, usually not that many, I would be

 6    a retained expert, but generally I really prefer to deal

 7    with the family directly and not deal with lawyers.

 8            If the family wants to know something, I'll be

 9    glad to answer that for them.

10        Q.    In this case, you were retained by Mr. Collis'

11    law firm, the Fieger Law Firm in Detroit?

12        A.    I was not, actually.  It was through Robert

13    Spicer, the grandfather.

14        Q.    Okay.

15        A.    And he contacted me.  Obviously, they are

16    involved, and I've known them in the past, but it was

17    Dad -- sorry -- grandfather who contacted me.

18        Q.    And do you know them through dealings with

19    their other child, who is not involved in this case?

20        A.    No, not -- I didn't take care of her directly,

21    no.

22        Q.    Okay.  And what did Mr. Spicer ask you to do

23    in relation to his granddaughter, Elizabeth Myers?

24        A.    What he was trying to determine, at her young

25    age, what -- what would they need to do now?  What do

ROBERT EILERS, M.D.
1/16/2018

Page 7

1    they need to plan for in the future?  And his point is,

2    he goes, You know, I'm her grandfather.  I'm not going

3    to be around.  Her mom is deceased.  What do we need to

4    plan in terms of long term, what she requires?  Can you

5    give us some idea of that?

6        Q.   Okay.  And we have your CV.  But if you could,

7    Doctor, tell us generally what type of medicine you

8    practice and what your specialties are.

9        A.   It's physical medicine rehabilitation, is my

10   specialty, and I have done that 38 years or so.

11   Basically, what we deal with is the diagnosis,

12   treatment, and management of individuals with strokes,

13   spinal cord injury, head injury, progressive

14   neuromuscular diseases, like MS, ALS, people who have

15   had amputations, various body parts.  We deal with

16   orthotics, bracing and prosthetics.  We would also work

17   with sports medicine.  Musculoskeletal, nonsurgical

18   intervention.  And we do take care of hip, knee, and

19   other joints and spine surgeries, postoperatively.  We

20   manage them after that point forward.  Obviously, if

21   they need a repeat surgery to remove hardware, then that

22   would be done by a surgeon.

23        So we mainly do orthopedics, neurologic

24   management in a broad number of disorders.  And we're

25   focusing on long-term management, as opposed to

ROBERT EILERS, M.D.
1/16/2018

Page 8

1    immediate intervention.  So I have patients I follow.

2    Some I still have after 35 years or so.

3         Q.    And, if I heard you correctly, you don't do

4    any type of surgery, correct?

5         A.    We -- no.  I don't do OR type things.  We

6    debride wounds.  We do skin management, wound back,

7    those types of things.

8         Q.    Obviously, talking to you earlier, you are

9    still actively working in the clinical setting in

10   multiple locations, correct?

11        A.    Yes.

12        Q.    And where, just for the record, do you

13   practice?

14        A.    I practice here in Naples at Naples Community,

15   which is a couple blocks from here, and then up north,

16   their other hospital, which is North Collier Hospital.

17   And then I practice in Illinois at Lagrange Hospital and

18   Hinsdale Hospital.  They are merged hospitals.  They

19   have been bought out.

20        Q.    I understand.

21        A.    I can't even keep up with it.

22        Q.    And do you have any medical specialty?  I'm

23   sure you will have some training in all of these fields,

24   but I'm going to list some fields to see if you have any

25   specialized training.

Page 9

1              Neurology?

2         A.    We overlap tremendously with neurology.  For

3    instance, they would manage medications for Parkinson's.

4    They would manage -- seizures, we'll manage the

5    medications, but if they are refractory, then we

6    certainly have them involved with neurology.  So there

7    is a lot of overlap in head injury, stroke.  Some of the

8    spinal cord syrinxes.

9              But I'm not a neurologist, as such, so I'm not

10   going to deal with the esoteric, neurologic diseases or

11   a lot of familial tremors, but -- so there is -- there

12   is -- a lot of our training is neurology, and then a lot

13   of it is orthopedics, but the nonsurgical.  We don't do

14   a lot of the more involved neurologic diagnoses.  We

15   would be involved with mainly traumatic, progressive

16   disabilities, those that affect function, mobility,

17   cognition.  Those types of things.

18        Q.    And, based on that answer, I'm assuming your

19   testimony in this case will be limited to the long-term,

20   ongoing needs of Elizabeth Myers as opposed to the

21   medical diagnosis of traumatic brain injury, things of

22   that nature?

23        A.    You could have a first-year med student make

24   those diagnoses in this matter.  So yes.  I mean, we

25   diagnose those conditions, manage those and manage those

ROBERT EILERS, M.D.
1/16/2018

Page 10

1    long term.  I mean, that's something we do.  Anything in

2    the area of traumatic brain injury really is clearly

3    within our world.

4         Q.    And I certainly didn't mean to say you didn't

5    have --

6         A.    No, no.  I --

7         Q.    -- that expertise.

8         A.    I understand.

9         Q.    We've been provided -- have you read any of

10   the other -- been provided any of the other expert --

11   retained expert reports?

12        A.    No.  I don't have any real interest.

13        Q.    Okay.  And you were not actively involved in

14   the initial treatment or diagnosis following this

15   accident; is that correct?

16        A.    No.  I first saw her at 11 months of age, but

17   I didn't think it was 11.  I would -- yeah.

18        Q.    So you've provided a Notice of Physician's

19   Lien.

20             Are you only retained by Mr. Spicer or have

21   you become retained by Mr. Fieger's firm?

22        A.    I'm simply a physician treating and offering

23   opinions to the family.  I have not been paid nor

24   retained by anyone other than the family.

25        Q.    Perfect.  Thank you.

ROBERT EILERS, M.D.
1/16/2018

Page 11

1          When you are a retained expert, if a lawyer

2     calls you or you get involved that way, do you have any

3     way to tell me the percentage of plaintiff versus

4     defense cases?

5          A.     You know, it probably -- we do some people who

6     have work injuries, and that's probably 65 injured,

7     maybe 35 that are, you know, insurance carriers,

8     disability evaluations, and things like this, auto

9     crashes, or, you know, get involved with medical

10    negligence products type things.  I would guess most of

11    it is plaintiff. I would guess, 80, 90 percent.  I

12    don't have a specific percentage.

13          Mainly, either patients -- I really don't know

14    in terms of really being retained as a retained expert.

15    I couldn't really give you that, but, on the total

16    picture, that would be my guess.

17          Q.    It sounds like most of your involvement you've

18    either treated somebody or been asked by someone to

19    provide an opinion as opposed to insurance companies

20    calling you and asking you to do plans?

21          A.    Right.  That's not -- I'll get called, where

22    somebody will have a question, What do you think of this

23    plan?  Is it fair, reasonable?  And I'll give them my

24    opinion, you know, that type of thing.  But usually they

25    just want to know what my thoughts are.

ROBERT EILERS, M.D.
1/16/2018

Page 12

1      Q.    Doctor, we put in front of you -- and I'll

2  mark this as Exhibit 2.  You have a copy there.

3      A.    Yes.

4            (Exhibit 2 marked for identification.)

5  BY MR. HARPER:

6      Q.    Is that your initial evaluation and -- I'm

7  going to use the word "life care plan", if that's okay.

8            Is that the initial evaluation, life care

9  plan, that you did based on an evaluation of October

10  15th, 2016?

11      A.    Yes, it is.

12      Q.    Okay.  And in terms of forming your opinions

13  that are found in the life care plan, can you tell me

14  what you did and what you reviewed to come to these

15  initial opinions?

16      A.    What I did is, I gave the grandfather just --

17  and you may not have it because I did send it to the

18  family.  These are things that I e-mailed to the family,

19  so I assume -- well, anyway that's how you would come to

20  them.

21            What I do is have them do a patient history

22  form, which is about a seven-page document, that they

23  would do, fill out.  And then I review it with them.  So

24  a lot of the dark writing is mine, the light writing is

25  his.  So this lets me go through methodically.  And then

ROBERT EILERS, M.D.
1/16/2018

Page 13

1  they had records from Detroit Children's, and I think,

2  Oakwood Hospital were the records he had at that time

3  for me to review.

4      Q.   Okay.  And then you were kind enough today --

5  it appears, on January 9th, 2018, you had some contact.

6  And I believe you said you actually went and met with

7  them again?

8      A.   Right.  I was there, and they were available,

9  so I wanted to talk to them.  And I think, too, since I

10  knew that we had a deposition, I wanted to talk to them

11  about the recommendations.  I talked to him verbally,

12  but I wanted to see where she was now, because, you

13  know, that year can make, you know, a big difference for

14  me, seeing where she was.  So that's what I did.

15      Q.   And, just so the record is clear, that was

16  January 9th, 2018?

17      A.   Yes.  And I did not do it just to do that.

18      Q.   No.  No.  I understand.

19      A.   In January, I would not, but I was up there

20  with some friends.

21      Q.   And we'll get into this report in more detail,

22  Doctor, but had you noticed at least some improvements

23  with her physical abilities and her ability to move

24  about?

25      A.   Yes, she did.  She's able to ambulate, you

ROBERT EILERS, M.D.
1/16/2018

Page 14

1    know, transfer, get up and down.  She had some limits,

2    but yes, she has improved.

3        Q.    There is an e-mail on the front of this from

4    Sharon at PM&R Associates, which I assume is --

5        A.    My secretary.

6        Q.    -- your secretary to keithkeithspi@yahoo, and

7    then the updated report, Outpatient Recheck of January

8    9th, 2018, is attached to that.  And I'm going to mark

9    that as Exhibit 3.

10            (Exhibit 3 marked for identification.)

11            THE WITNESS:  That's fine.

12   BY MR. HARPER:

13       Q.    And then it looks like you also brought a

14   couple of scripts -- for lack of a better word.

15       A.    That was from that visit.  I don't know if you

16   need any from the initial visit or --

17       Q.    Well, not yet.

18       A.    Okay.

19       Q.    But there are two pages from January 9th,

20   2018.  Can you just -- I come from a family of doctors,

21   but still can't read or pronounce medical terms very

22   well.  So if you can just read those, I'll mark those as

23   Exhibit 4, Doctor.

24       A.    These were for Elizabeth Myers, and noted her

25   diagnosis, expressive-receptive language deficits,

Page 15

1    status post TBI and skull fractures.  It was 1/9/18, and

2    I wrote for them to use Lingraphica, which is through

3    Aphasia.com, and then communication apps for iPad and

4    iPhone.

5         She was able to use it when I was there.  She

6    started -- it actually makes the statements, so she can

7    touch a picture and it would say, I'm hungry, I'm

8    thirsty; something they could download onto the iPhone

9    now, for her to use as an augmented communication device

10   to help her, well, see how she --

11        And the other is the same diagnoses, same

12   date, and it was for 24-hour attendant care and LPN

13   visits for medication administration if the family

14   wasn't present.  Those were two things I gave them so

15   they could do that.

16        (Exhibit 4 marked for identification.)

17   BY MR. HARPER:

18   Q.   And have you read any of the deposition

19   transcripts in this case?

20   A.   I have not.

21   Q.   And I believe earlier you said you haven't

22   seen any of the other expert reports or used them as

23   part of your opinions?

24   A.   No.  I just gave opinions to the family.

25   Q.   Do you believe there is anything else you need

Page 16

1   to review or see to form your opinions in this case?

2        A.    No.  And I saw her.  And, I mean, they had

3   some of the records from the TOTS program.  Some of the

4   early intervention that Rene, the grandmother, had

5   there.  So no, actually -- and she filled me in on the

6   medical issues, which I think I summarized in the

7   follow-up note.

8        Q.    And have you been able to review any of the

9   TOTS records for Elizabeth Myers?

10       A.    Yes.

11       Q.    And what, if anything, did you find

12  significant in those?

13       A.    I think the major significant findings were

14  the fact her language is still profoundly impaired.

15  It's not delayed, it's impaired.  She is still using

16  maybe two or three words, and she clearly can't express

17  herself.  She can point.

18            Mobility wise, she's able to walk.  She was

19  doing some toe walking.  She's not showing as much of

20  that when I saw her.  She can get up from sitting.  She

21  can do long sitting.  So her axial balance mobility is

22  improved.  She is still unstable walking, and that will

23  be the case long term.  So unlevel surfaces will be a

24  problem -- steps -- but she's able to walk, which I

25  thought initially.  So it kind of confirmed what I would

Page 17

1  expect to see.

2          She's made gains in terms of her awareness.

3  She can follow more directions.  Body parts, she could

4  probably point correctly to 70 percent, which is very

5  good for her.  I mean, that's -- so she's showing an

6  evolution.

7          She does very well in a highly structured

8  environment, which Rene is providing.  She keeps things

9  very structured.  As more people are coming in and out

10  and, you know -- it was like the aide for the other

11  child.  You know, more stimulation, she doesn't do as

12  well, but if things are highly structured and organized,

13  she does best, and that's classic for a head injury.

14          And she's still incontinent of bowel and

15  bladder, which is expected.  I think she'll make

16  progress with her toileting, and I talked with Rene

17  about that.  She was increased on her seizure meds.  Her

18  Keppra was increased to 0.6 because she was having some

19  breakthrough seizures.  That's helped a little bit.  And

20  that's going to always be adjusted.

21          Her shunt is still in place.  The tubing, she

22  didn't seem to have any leaks or cysts or fistulas that

23  were occurring.

24          So those were the major areas.  The fact that,

25  obviously, she has visual impairments.  She had a lot of

ROBERT EILERS, M.D.
1/16/2018

Page 18

1   diffuse brain damage.  So she has a mixture of findings.

2          She still has increased tone.  She still has

3   spasticity.  It's not at the point that she needs to be

4   on anti-spasticity medication.  She might need some

5   Botox going forward, but right now, mainly she needs

6   constant supervision.

7          And she's not aware -- you know, safety,

8   obviously, for a two-year-old, she'll explore things,

9   open drawers.  So she has gross motor skills.  Fine

10   motor skills are still profoundly impaired.  She can't

11   drink out of a cup.  She has to use a sippy cup, which

12   she wasn't doing before, but she could do now.  She

13   wasn't gagging on liquids or anything like that.  So her

14   swallowing is okay.  Pretty much what I would expect to

15   see at this point, which is what I wanted to see with

16   her.

17      Q.   In terms of those gross motor functions, what

18   type of delay, if any, in terms of months or years, is

19   she ahead or behind?  I'm assuming she's behind, but, I

20   mean, how far behind is she in the gross motor

21   development?

22      A.   She's a good -- let's see.  She's now --

23      Q.   26 months.

24      A.   Yeah, I think that's right.  She's a good --

25   you know, she is a year behind, at least.  And

ROBERT EILERS, M.D.
1/16/2018

Page 19

1   cognitive -- or, you know, in terms of expressive

2   language and words, she's a good, you know, 14, 15

3   months.

4       Q.   Okay.  Do you see her gross motor strength and

5   functioning improving with the TOTS program, and things

6   like that?

7       A.   Here is what I see:  I see that she'll be able

8   to ambulate more.  She'll do it independently.  She

9   might use a device for balance from time to time.

10  Unlevel ground, gravel, grass, things like that will be

11  a problem for her.

12           She has difficulty correcting if she's

13  challenged.  Like on carpeting, if it's thicker, you can

14  see her decline from a hard surface -- or, like

15  linoleum.  And so that will always be an issue.  And her

16  gait will -- she will be able to walk more, as any child

17  will be able to do more.  I don't see her level of

18  refinement improving that much.  She is always going to

19  have limits.

20           Will she be able to do stairs?  With a

21  railing, things like that, she'll do -- she'll have -- I

22  think she has a lot of visual issues, and she is still

23  young to assess the extent of all of the occipital

24  damage, what she's able to see.

25           She has a lot of, like, spinning,

Page 20

1    self-stimulation behaviors, which a lot of it appears as

2    though it has to do with her vision.  It might be

3    labyrinthine or inner ear because she -- it tends to

4    help her seem to be more stable.  So she has a lot of

5    compensatory mechanisms that we don't understand, but

6    they are self-soothing for her, which is not unusual in

7    head injuries.

8            So she clearly has shown improvement, but most

9    children at this point are going to be aware that their

10   diaper is dirty or wet.  She's not.  I would anticipate

11   that either with toileting, behavioral changes, she'll

12   be able to maybe get out of the diapers, maybe by seven,

13   eight, nine, somewhere in there.  That's the type of

14   progress I would expect she would show.

15           In terms of being self-sufficient, I mean,

16   she's not --

17       Q.   Right.

18       A.   She's always going to live with somebody.

19       Q.   I -- I think, from what my experts -- I don't

20   think there is any debate at this point, barring a

21   massive breakthrough or change -- and we can all hope

22   and pray for that -- but where we are now, I don't think

23   anybody disputes the need of some type of attendant care

24   long term.

25       A.   Right.

ROBERT EILERS, M.D.
1/16/2018

Page 21

1        Q.    And I'll talk some more about that future.
2   But I don't think anybody is going to disagree with
3   that.

4        A.    What I've explained to them is pretty much
5   what is in the plan.  You're always going to need
6   24-hour attendant care, CNA care.  The family can
7   administer the medications, but attendants can't do
8   that, so there has to be a retained, like, LPN to
9   administer seizure medications or anything else she
10  might need.

11       Q.    At some point?

12       A.    Well, if Mom and Dad or grandparents are gone
13  tomorrow --

14       Q.    No, I understand --

15       A.    -- my point is, they have to have a plan to
16  know or budget that, you're going to need -- you know,
17  we explain this to families who have no litigation:  If
18  you all die, do you have a plan in place, and have you
19  considered how to provide that?

20            I mean, that's a lot of what, unfortunately,
21  we do with families that have nothing to do with
22  litigation and trying to get life insurance, that type
23  of thing.

24       Q.    But in terms of, you know -- part of what,
25  unfortunately, what I have to do is figure out the

ROBERT EILERS, M.D.
1/16/2018

Page 22

1  costs.

2      A.    No, no.   I --

3      Q.    As long as she is -- if I understand you, as

4  long as she's living with family, the LPN wouldn't be

5  necessary?

6      A.    As long as a family member, who is competent,

7  is there to provide the medication, yes, that's fine.   I

8  mean, it's -- if the family is not there, they need to

9  know, they need to decide when it is they would provide

10  that, or, if they go on vacation or if they take a

11  break, they need to have -- what they need to know is,

12  if they are not there, they need to plan to have an LPN.

13  Or, it could be an RN, but it has to be a licensed nurse

14  to administer medications in most states.

15      Q.    Would, at some point if she was able to move

16  into a group home-type setting, do they provide those

17  services, someone who can administer medication?

18      A.    It depends.   Group homes come and go.   They

19  are kind of like restaurants.   They last a few years.

20  They disappear because of the financial problems.   Most

21  of them are through family support or it's charitably

22  based.   But if they are there, then they would have to

23  have an LPN.   So, yes, again, they would have to staff

24  it for an LPN.

25      Q.    Okay.   Currently, through the TOTS program or,

BRICKELL KEY COURT REPORTING, LLC
305.407.9993

ROBERT EILERS, M.D.
1/16/2018

Page 23

1   you know, the early intervention services, she's

2   receiving physical therapy, occupational therapy and

3   speech therapy; is that correct?

4        A.   Yes.  And it's mainly that Mom, or basically,

5   Rene, the grandmother, has to carry through on what they

6   are recommending.  They are providing a lot of

7   one-on-one therapies.  I mean, that's just not the way

8   the program is set up.  But she does need to have PT/OT

9   and speech.  And I gave them a prescription for that on

10  the first visit, but then they've got to cover that on

11  their own.

12       Q.   Right.  But if I understand correctly, the

13  TOTS program is at least providing some supervision and

14  occasional visits monitoring to help them with that.

15       A.   They will give them input about things to do

16  and not to do.  Rene is pretty good, and at least

17  experienced in trying to help with that.  They are going

18  to need to get -- in other words, Rene can't be a PT/OT

19  or speech licensed specialist, but she can carry over at

20  home, and then they will be starting a school program,

21  and then she can go and start getting more continuous

22  therapy.

23            So what she needs is PT/OT and speech, either

24  through school or the family funding it, or whatever

25  sources they have.  Like, if school provides five times

ROBERT EILERS, M.D.
1/16/2018

Page 24

1    a week PT, they don't need to go buy an additional five

2    times a week.  If school provides one, and they could

3    benefit with five, they should supplement the four, and

4    early on.  Like, really, the TOTS program is an early-on

5    intervention program.

6            So the earlier you can do this, the better, at

7    least you maximize learning and recovery, you know, if

8    she has any visual limits, or extinguishing visual

9    therapy may be involved more now, those types of things.

10   So when I tell the family, You need these things, it's a

11   totality.

12           So if school provides X, the difference to

13   achieve five times a week, let's say, they would

14   supplement.  The school is going to provide what's

15   needed for her educability.

16       Q.   Right.

17       A.   They will not provide what's needed just

18   purely for therapeutic gauges or maintenance.

19       Q.   And that will be determined -- at least

20   generally determined through an IEP and a

21   multidisciplinary setting with the consent of the

22   custodial guardians or parents, correct?

23       A.   Right.  They would be there.  If they aren't

24   comfortable with the decision, they can appeal that.  We

25   get involved in the appeals.  To ask for more, usually

Page 25

1  it's pretty hard.  You know, the school will determine

2  what they feel is appropriate for her education.

3      Q.   Right.  And I have the unique benefit in this

4  one area of -- that my wife is a school psychologist,

5  psychiatrist, master's-plus, all of that good stuff.

6      A.   She knows the good and bad.

7      Q.   I'm one of the few people familiar, and her

8  specialty is autism and Asperger's.  She's dealt with

9  the high-level issues.  But you answered that question.

10  I would expect her to start school.  I don't know if

11  they have prekindergarten in Michigan or not.  In

12  Oklahoma, we would be able to put them in a

13  prekindergarten program.

14      A.   She's starting around three in early

15  intervention.  That depends on the district.  But, yes,

16  it can start at three.

17      Q.   So that helps in terms of your report, what

18  you've recommended -- five days of speech, five days of

19  PT, five days of OT, through age 18, I believe.

20      A.   Yeah, I think I have to look.

21      Q.   But if the school provides any or all of those

22  at some level, those costs wouldn't be incurred for the

23  days the school is actually providing those services, if

24  I understood you correctly?

25      A.   If the school is providing them, then, they do

ROBERT EILERS, M.D.
1/16/2018

Page 26

1   not need to duplicate it.  That's pretty much covered

2   with taxes and taxpayer contributions.  So, you know,

3   usually, the schools don't call it back.  I'm not an

4   expert in that, whether they can or would, but

5   basically, as long as the schools -- what I stress is,

6   you don't need to duplicate services.

7         So if I said she needed therapy five times a

8   week, and if school is providing that five hours, they

9   don't need to go buy another five.  If the school does

10   two and a half, then they would supplement.

11      Q.   Right.  The patient ID report, Doctor, I think

12   is probably what I'm referring to.

13      A.   Yes.

14      Q.   So I'll jump around a little bit because I

15   think, you know, some of the issues that I was concerned

16   about -- on this page, under "occupational therapy, I

17   just wanted to ask if on -- one time a month for life, I

18   believe, that 10,452 number is wrong.  I just wanted to

19   see if you agree that's probably 2,412?

20      A.   You're absolutely correct.

21      Q.   Okay.  That wasn't a major point, but I kept

22   looking at the numbers, trying to figure it out.

23      A.   That's why I'm a doctor.

24      Q.   On Page 9 of your life care plan, you've got

25   therapy care listed, and you've got physical therapy,

Page 27

1   occupational therapy, speech therapy as the initial

2   three.  I know there's another one underneath that.

3   Where you have PT, OT, and speech, you know, five times

4   a week until a certain age, then three times a week and

5   two times a week; is that accurate?

6        A.    Correct.

7        Q.    And anything that is provided through the

8   school system, whether it's one or a combination of all

9   of these things, would alleviate the need for outside

10  assistance on each of those categories?

11       A.    It can reduce their costs if they provide it.

12  So if I said -- and just so I'm clear, if I say five

13  times a week for PT, let's say the school, until age

14  ten, provides five times a week or five hours a week of

15  PT, they don't need to go buy another five hours.

16       Q.    Right.

17       A.    If the school provided zero, then they would

18  need to go and buy five hours.

19       Q.    And if the school did three, we would be

20  looking at twice a week.  So that yearly total is

21  assuming there are no provisions from the school or

22  government entity related to her?

23       A.    This is what she needs.  How that's put

24  together, how they arrange it will be up to them.  If

25  they had a neighbor that said, I'm going to come in, and

ROBERT EILERS, M.D.
1/16/2018

Page 28

1    I'm an RPT -- or I'm a licensed physical therapist.  I'm

2    going to do it free as long as they could, that's fine.

3        Q.   Okay.  Your recommendations are the numbers of

4    treatments, and the costs are what they are, whether

5    they're free, whether they're $200 a visit, it just

6    depends on where she's getting them?

7        A.   These are -- these are home costs.  The

8    hospital would be almost twice these prices.  So it

9    depends on where they would go.  I do it through the

10   home because it's actually cheaper.  So they would be

11   set up at home.  So it would be -- what they can do is

12   coordinate between the IEP and what they would

13   supplement at home if they need to.

14       Q.   Okay.  So these are the maximum out-of-pocket

15   costs that you see at this time?

16       A.   If they do outpatient, yes.  I mean, these

17   will keep moving up.

18       Q.   Right.  Understood.  But as we sit here today,

19   if the school -- or, there's no additional, you know,

20   free hours per week, these are the numbers you're

21   looking at.  And if there are some, the school provides

22   half of it, and those costs would go in half?

23       A.   Right.  And it depends on the school

24   districts.

25       Q.   Sure.

ROBERT EILERS, M.D.
1/16/2018

Page 29

 1      A.    In all fairness, you'll find a lot of school
 2   districts provide a lot less.  It's just, if you're a
 3   very wealthy community, and you're obviously paying a
 4   ton of property tax, you'd get a lot more.  If you're in
 5   a less affluent area, the school is less.  I mean, it's
 6   just reality.  Depends on where they live.
 7          So they may want to consider, you know,
 8   locating into a higher-end school district to get a
 9   better supplement.  It's not that the therapies are
10   different.  The therapists are good in both, but you
11   need to -- you kind of get what you pay for in the
12   school districts.
13      Q.    Sure.  In terms of the attendant care, the
14   24-hour-a-day attendant care --
15      A.    Yeah, let me just --
16      Q.    Yeah.
17      A.    -- one thing.  And I believe they're planning
18   on public schools.  If the family does private schools
19   or religious schools, then they do not provide the IEP
20   support, so they would pay out of pocket in that
21   situation.  So I can't answer whether they have an
22   interest in a private school or not.  But they need to
23   keep that in mind, which is also why I explained these
24   are the costs.  If they choose -- say they wanted to go
25   to a religious school, then they have to usually provide

Page 30

1    that on their own.

2        Q.    But, generally speaking, because obviously we

3    can't speak for the family and what their decisions

4    might be.

5        A.    Right.  I can't tell --

6        Q.    Generally speaking, going to a private school

7    would be a choice a family would make to leave a public

8    school, and if that was a choice they made, they would

9    do that knowing they might lose some of the services

10   public schools can provide, fair?

11       A.    Right.  They would have to pay for them, or

12   they can go to inclusive schools.  If the grandparents

13   are older, they may choose to go to an all-inclusive

14   school.  And those tuitions can be 50 to 100,000 or

15   whatever.  They may -- some include therapy, some do

16   not.  So there are all sorts of blends.

17            So if they do a public school we talked about,

18   yes.  If they do a private school or make other choices

19   or, you know, whatever their choice would be, then they

20   have to make sure they budget.  And I didn't discuss

21   that specific issue with them, you know, because I -- I

22   don't know what their thoughts are, and that's why I

23   include it this way.

24            So if they deal with the public schools, they

25   will have some savings, potentially.  If they go

Page 31

1    private, it will be the same.

2        Q.    Okay.  In terms of the attendant care, kind of

3    under that same line, going -- at public schools, if the

4    IEP provides for a paraprofessional, does that -- would

5    that person qualify as an attendant care person?

6        A.    Usually, in the school, they would provide a

7    full-time aide or, you know, usually she is going to

8    have either one-on-one or two or three to one as an

9    aide, taking her to the bathroom, doing all of the

10   things that we've talked about, helping her eat her

11   lunch, set it up, carry her tray, things like that.

12   Then the aide would be assigned to her.

13        So she might have two children.  She might get

14   her in there and get the tray and bring the other --

15   help them with their food, cutting things up.  She's

16   doing pretty well with eating, but then making sure she

17   has a specific sippy cup, changing her diaper or

18   toileting her.  There will be an aide provided by the

19   school.

20        Q.    Enduring, kind of, the same thing.  We've

21   talked about 24-hour-a-day care, whatever the cost may

22   be -- I'll argue costs with you later, but I mean,

23   whatever that cost is, if she's in school, those costs

24   would be -- they wouldn't have the hourly costs.

25        A.    Any of the -- you know, if they provide eight

Page 32

1    hours a day of coverage, including the bus, et cetera,

2    and somebody -- and it depends on whether she would need

3    a supervised attendant on the bus.  If she has seizures,

4    she has any breakthrough, then you've got to -- then the

5    school may assign an attendant.  Or the families -- a

6    lot of families choose to take them to and from school

7    for that reason.

8         Those are issues that, you know, we would have

9    to drill down to later.  But the school would provide an

10   attendant for her at home, so you don't need to hire an

11   attendant to sit at her home, waiting for her to come.

12   They would need to provide anything on weekends, school

13   holidays, vacations, you know, parent conference days,

14   whatever the days she would be at home.  They would

15   provide all of that.

16        Q.   So kind of like we talked about with PT and

17   OT, whatever is provided through the school would just

18   reduce the amount of coverage required in terms of

19   potential out-of-pocket cost?

20        A.   Right.  That's fine.

21        Q.   Okay.  How long -- am I right, public schools

22   generally provide services to age 19?  Is that --

23        A.   It absolutely will get to 19.  There are

24   certain conditions and it's variable in districts.  They

25   might go a little bit longer, but absolutely to, like,

ROBERT EILERS, M.D.
1/16/2018

Page 33

1   19, until graduation, which is 18, 19, generally.

2        Q.    If we go to Page 5, Doctor, of your life care

3   plan, kind of what we were speaking of earlier.  You've

4   listed the need for a certified nursing assistant, and

5   that's the three, eight-hour shits per day, at $22 an

6   hour.

7        My question is -- I've heard testimony given

8   that the person -- the attendant care person just needs

9   to be an unskilled person providing supervision and

10  assistance with activities of daily living.

11       A.    Well, they are going to have to do it all.

12  They obviously have to do the feeding.  They need to

13  understand issues, so it's somebody who has got to at

14  least have a high school, you know, graduate.  Somebody

15  who can do vital signs, because if she has seizures,

16  they need to know about positioning her.  So there has

17  to be a certain basic skill set, which would be the

18  certified nurses certification.  I mean, it's not

19  impossible to get, but that way, you know they have a

20  certain basic skill set.

21       Q.    Okay.  And is the $22 an hour that you've

22  cited here a standard number or --

23       A.    That's pretty much the bottom now.  I mean, if

24  they -- for instance, if they moved to even here, it

25  would be, like, 26.  So it depends on where they live.

Page 34

1    In their community right now, interim health is doing

2    22.  They're now at 24.  It's gone up.  This is going --

3    because now you have an aging population who is

4    demanding more services.  It's just either the LPNs --

5    some are 65 an hour, if you staff them.

6         So there is going to be some variability, but

7    these are pretty much what you're going to do,

8    basically.  And it's hard for them to get people in the

9    agencies.  They can't really cut their costs too much,

10   and to staff her, you need five, six, seven people to

11   staff.  So they get a higher retaining -- or if somebody

12   is sick, they have to send somebody else.

13        So that's why the agencies are a lot better.

14   Plus, they screen, make sure, they're -- I mean, they do

15   what's, basically, due diligence.  And a young girl like

16   this, you know, you're going to want to staff her with

17   women.  Not to say men are going to assault her or

18   anything else, but, you know, she's clearly going to be

19   a potential assault victim.  I'm not saying someone is

20   going to do that, or anything else, but that's just the

21   reality.

22        Q.   So if I understand you correctly, the need for

23   a certified nursing assistant degree is based on her

24   potential for seizures and things of that nature?

25        A.   Her seizures.  Her medical complexity, her

ROBERT EILERS, M.D.
1/16/2018

Page 35

1   lack of language.  She's -- if you had, say, a

2   78-year-old person who has some physical limitations but

3   they're cognitively intact, they can take their meds.

4   They can tell the person what to do.  In this case, we

5   have to have somebody who has enough native intelligence

6   to assess the patient at some level, determine what they

7   need or they don't need.

8            So you need a little better skill set than

9   maybe somebody who completed a year of high school, who

10  isn't very well educated, who doesn't -- it's not

11  that -- you can't use somebody who you have to direct

12  all the time.  They have to have some problem-solving

13  skills, and that gets you to at least a high school --

14  hopefully, a high school graduate.  Or if they have more

15  training or education, that's wonderful, but, you know,

16  even if you were to hire a nanny, you're going to pay at

17  least this money, if not more, for most nannies.

18           So for a good person who is articulate, can

19  problem-solve, think, you know, this person has to do

20  everything for them.  They really have to be their

21  parent.

22       Q.    And that's basically what Robert and Rene are

23  providing, as the grandparents, currently?

24       A.    Absolutely.

25       Q.    Would potentially an au pair, or something

BRICKELL KEY COURT REPORTING, LLC
305.407.9993

Page 36

1    like that, be an option that lived with the family?

2         A.    Well, if they had the skill, but an au pair is

3    not going to fly.  It's hard to get these people.  And

4    most, they might -- they might not want to do it.  What

5    you want is continuous staffing of a similar person.  An

6    au pair is just going to be a transient, you know, brief

7    period for, you know, experiential.

8              And most of them you don't know, and they

9    don't know what they're getting into.  There are lots of

10   problems.  I've seen that not work out because they go,

11   I didn't sign on to take care of a kid with

12   disabilities.  I want -- and in all fairness, it depends

13   on how it's done.  In life, they're going to get what

14   they pay for, and that's -- can you find people cheaper?

15   Can you go online and pick them up?  Yes.  Do they have

16   problems in their background?

17             Oftentimes, there are issues -- there are

18   certain psychological issues.  You really kind of want

19   to screen these people.  I'm not saying an agency is

20   going to be perfect, but you've got some interesting

21   people who want to get into doing this sort of care.

22   And you've got to really screen them out.

23             It's not to say that, you know, there are just

24   lots of issues that you run into.  In 38 years, I've

25   just never ceased to be amazed at what comes up.

ROBERT EILERS, M.D.
1/16/2018

Page 37

1      Q.   Okay.   And we've discussed the LPN.   As long

2  as she's with family, the LPN visits are not necessary;

3  is that correct?

4      A.   At this point, if there is a family --

5  immediate family member, her guardian, they administer

6  the medications, but not outside of that.   So it would

7  have to be a licensed provider, and that's based on her

8  meds now.   I don't know if she's going to be on more.

9          And just as an aside, if, let's say, she ends

10  up on four, five, or six medications, you may staff an

11  eight-hour shift of LPNs.   It would be cheaper than

12  having somebody come in, say, eight times a day.   So

13  there is a point at which you could staff the LPNs full

14  time.   And that cost could be 35 to 40 an hour, you may

15  be able to get.

16          So let's assume that she needs a number of

17  medications, for whatever reason, you know, she has

18  shunt issues, she -- as she goes forward, maybe she has

19  additional seizure meds or, you know, behavioral issues

20  come up in her adolescence, which can occur in people

21  with head injuries.   There's a lot that may be coming.

22  Let's say she needs eight hours of medications, roughly.

23  Then you would shift over.   Instead of 22 an hour, you

24  would add, maybe, 10 or 13 an hour.   So you might add 80

25  to $90 per day, and if you look at that, it's not

Page 38

1  insignificant, but it kind of -- it somewhat ends up in

2  a similar range.

3      Q.   So you're saying, instead of a CNA, you would

4  switch up to the LPN?

5      A.   Right.  For one shift, assuming most of the

6  meds you can get in within that eight-hour period.

7      Q.   Right.

8      A.   Then that could be done.

9      Q.   But as we know her condition today, the only

10  medication she is taking is the Keppra, correct?

11      A.   That's correct.

12      Q.   And as long as she is with her grandparents

13  and they are, obviously, alive and, you know, capable,

14  they are able to provide the -- or administer the

15  medication, and there is not a need for an LPN until

16  that changes?

17      A.   Right.  And I would explain this to them.

18  It's really -- what I've done is to provide them the

19  information.  Then they have to make the decision.  If

20  they say, We feel we'll live to be 200, and we're going

21  to provide 16 hours a day, that's a decision they have

22  to make.  It's like if I tell you, you need your tooth

23  pulled, and you go, Absolutely no way, I'd go find

24  "signed here," that you said you're not going to have it

25  pulled, go on your way, you may come back and say,

Page 39

1   Please get me a dentist to take it out.  Or, you might

2   say, I did well or, I died from sepsis.

3          So you make that decision and the family has

4   to really make those ultimate decisions.

5       Q.   But as we sit here today, she's living with

6   the family and the medication is being administered by

7   the family and, to date, there has not been any outside

8   costs for this care?

9       A.   I'm not absolutely certain.  I'm not aware of

10  any outside agency that is coming in, as far as I know,

11  but I just don't want to say.  You know, there is

12  always -- you know, if I say "absolutely not," they may

13  have had to hire somebody for two weeks.

14      Q.   No, and I'm -- I'm with you.

15      A.   I understand.  I just --

16      Q.   I appreciate that.

17          To your knowledge, they're not regularly using

18  an outside agency to assist in her care at this point?

19      A.   That's correct.

20      Q.   Can the family consent to someone else

21  providing medication, or is that --

22      A.   Not really, because then you would put that

23  person as a -- you know, it's sort of like, I consent to

24  you being my doctor.  So you do it.  The State is going

25  to say, Uh-uh, you're practicing without a license.  It

Page 40

1   just -- you know, obviously, that's not going to happen.

2   Now, could they consent to their neighbor, the LPN, to

3   do it?  Sure.

4          If the neighbor is an LPN or RN, she can do

5   it.  If the neighbor is Mrs. Jones, who teaches school,

6   she can't do it because, then, if something goes wrong,

7   she's the one who gets brought up on charges for

8   administering medication without a license or -- when

9   something goes wrong, they're in trouble.

10          If nothing goes wrong, it's okay.  Then when

11   something happens and the child dies because they

12   couldn't calculate, then that's where the trouble

13   starts.

14     Q.    Right.  It's not the administering the

15   medication.  It's like you just said, if there is a

16   problem, they can't fix it or, if they did something

17   wrong --

18     A.    I've seen people put eardrops in people's eyes

19   and blind them.  I mean, it just -- it's -- you know,

20   that's why I say, there is always something new.  But,

21   yes.  The issue is do they know what they're doing.

22   And, you know, there are certain medications or ways,

23   measurements, amounts, conversions, milligrams.  That's

24   where the trouble comes in.

25          You know, they may not even know what an ML

Page 41

1   is, and they think, you know, What is that?  And then

2   they guess, and then we end up in trouble.

3        Q.    Right.  Go to Page 7 of your report, Doctor.

4   The diagnostic services that are listed, are those just

5   based on your 38 years of what you would expect her to

6   need or is there specific records that have recommended

7   these things?

8        A.    No, no.  This would be based on my experience,

9   the issues she has, the hydrocephalus.  She's going to

10  have some issues with falls.  There are some risks of

11  infection.  She, obviously, still may need a revision of

12  the cranioplasty, things like that.  She does have --

13  she is sleeping through the night now.  At times, she

14  has some disruption.

15            For cardiac testing, we've got to look at

16  that.  The reason is, she can't walk well enough to do

17  cardiac testing.  So, like, when she's 40 or so, we may

18  end up having to do it differently.  There may be

19  different technology then, too, so -- but these are

20  things that they need to understand.

21       Q.    And then on Page 8, under "hospital care,"

22  you've listed yearly hospital stays of six days.  And

23  I'm trying to determine what that might be for.

24       A.    These could be budgeted.  She's not

25  necessarily going to check in to the hospital, but let's

ROBERT EILERS, M.D.
1/16/2018

Page 42

1    say that she has an absence episode, there is a concern
2    it's a seizure.  Let's say it is.  They go, you know,
3    This is a little different.  Let's go to the ER and
4    check it out, which if they call a neurologist or if
5    they call me, I'm going to say, You need to go and check
6    this out.  They'd do an EEG, might do an MRI.  And that
7    may happen a few times a year.
8              Let's say she's walking now, she falls and
9    hits her head.  They're going to take her to the ER
10   because, you know, she's at much greater risk than other
11   children for a bleed or complications.  So these are
12   going to be events that will occur because she's less
13   stable when she's, like, 70.  It's more likely she's
14   going to fall, fracture her hip, you know, get a Colles'
15   fracture.  There are going to be a lot of interfaces
16   with hospitals and emergency rooms, things like that,
17   that will come.
18             Let's say her VP shunt -- say she gets a shunt
19   infection.  She could be in three or four weeks on the
20   antibiotics.  And I'm not saying it's going to happen,
21   but this is what they need to really think about, and
22   say she gets chest pain.  Could be the flu.  She's, you
23   know, grabbing her chest; she can't talk to us.  So now
24   we've got to do a million-dollar workup to determine, Is
25   there a problem or not?

Page 43

1          It may be, Oh, she has a little bit of an

2    upper respiratory infection.  But we can't ask her those

3    questions.  That's the problem.  So she gets a higher

4    level of medical intensity because she can't help us.

5          Q.   So just so I'm clear, that's not based on any

6    specific need that we know of, but the likelihood of

7    what she may have, based on her current condition?

8          A.   Correct.  And she might go five years and not

9    have it, and then end up in the hospital for 30 days

10   because of other issues that would relate.  So this is a

11   budget that they need to outline.

12         Q.   I just wanted to make sure there was not a --

13         A.   There is not a current condition that she

14   needs to check in, say, to have certain testing done.

15   You know, VP shunt will have issues, and that will be

16   revised.  And there's going to be some overlap in both

17   of those areas.  Say she starts vomiting, we're going to

18   get her to the hospital to determine if she's going to

19   have an obstructed shunt, those types of things.

20         Q.   So just so I'm clear, those are prospective,

21   potential issues, but not a guaranteed, She's going to

22   need these many days a year, based on her condition?

23         A.   Right.  She probably will, but I can't tell

24   you 100,000 percent this is going to be required.

25         Q.   Yes, sir.  Thank you.

Page 44

1        If you go to Page 10, that's the total cost

2   per year summary of the therapy care.  Is that --

3        A.   Correct.  And you just make the one adjustment

4   on that.

5        Q.   Right.  Sure.  In essence.  And that's not --

6   but those numbers obviously are based on what they

7   actually have to potentially pay for out of pocket?

8        A.   Correct.

9        Q.   And that's -- so that number would actually

10  be -- with a grade-school system IP, that number could

11  be zero for the PT/OT and speech -- most likely not, I

12  understand, but --

13       A.   Anything is possible.  I mean, that would be

14  up to the school or them.  I mean, we already talked

15  about all that.

16       Q.   So those are -- just so I'm clear, these

17  numbers under "Total costs per year" are -- knowing that

18  there is inflation and all that, but, as we sit here

19  today, these are your top-dollar amounts, as we sit here

20  today, if they have to pay for everything?

21       A.   Right, somebody has got to pay.  This is what

22  it comes down to.  I mean, that's what it would cost.

23  So whether they are, the school is, you know, taxpayer,

24  somebody is going to have to cover it.

25       Q.   I'm going to jump over to the house stuff

ROBERT EILERS, M.D.
1/16/2018

Page 45

1    because we're going to have to take a break in a second

2    for a call and we'll have to come back to that.  I'm

3    trying to -- all right.  If you can go to the wheelchair

4    items, Doctor, on Pages 18 and 19, it looks like?

5        A.    Gotcha.

6        Q.    We've discussed, at this point, she has become

7    ambulatory.  And you've put qualifications on grass, you

8    know, different types of surfaces may be difficult for

9    her.  Given her ability to ambulate, would any of these

10   prospective wheelchair costs change or be different?

11       A.    Let me kind of give you this in a backward

12   way.

13       Q.    Great.

14       A.    If you look at Page 19, she's always going to

15   need a manual chair for longer distances.  So, let's say

16   she can walk a quarter mile and do reasonably well, but

17   let's say she has to go to the airport or a hospital or

18   a long-distance type thing.  You're going to use the

19   manual wheelchair, and the motorized chair has a

20   scooter.  You can have an attendant actually operate

21   that.  It just makes it easier for grandparents or

22   older, that they can control it.  It's a very simple

23   system.

24              Those are two things that will, you know, be a

25   long-term need, and maybe more, if she's -- in later

ROBERT EILERS, M.D.
1/16/2018

Page 46

1    years.  The earlier years right now.  The manual

2    wheelchair, she's still going to need -- for some of the

3    positioning and getting certain distances, she may not

4    use it as much, so we may replace it, you know, every

5    four or five years.

6            You know, we're kind of -- she will need a

7    wheelchair for long distances.  So, like, the pediatric

8    transport chair would remain the same.  So that's, like,

9    741 a year.  So the -- the freedom design chair we can

10   basically -- may be able to back away from at this

11   point, since she's got more control.

12           So it's kind of a family choice, but I think

13   you could get away from the costs on -- it would be

14   about 4,600.  I would still say you would stay with the

15   741, the transport chair, which kind of is really a

16   transport chair.  It doesn't necessarily need to

17   recline, but whatever we put in is going to be about

18   that 740.

19           So, at this point, it would be about 740 a

20   year.  And then she'll either use a powered wheelchair

21   and/or she'll need a manual wheelchair.  So we're

22   probably looking at, you know, 700 a year.

23       Q.   So that 750 range is --

24       A.   There is -- you know, and it may be that she's

25   going to -- we have to see, with her vision, if she can

Page 47

1  operate a different type of electric chair, but I don't

2  want her just using it.  That's only -- if you go to the

3  state fair, she's going to -- say she went to a ballgame

4  with her grandparents or someone.  Those long distances,

5  she's going to need that.  That's what I'm looking at,

6  at this point.

7       Q.    And how about the AFO, the orthotics?

8       A.    I think that -- I talked with Rene about that.

9  I'm comfortable that she should hold on the AFOs right

10 now.  She's not doing a lot of toe walking.  She's not

11 quite heel-toe.  She might be able to use -- I talked to

12 her about supra malleolar orthotics, which is kind of

13 like a shoe insert.  But I think she's probably not

14 going to want to wear them.

15       So, you know, orthotics are a question mark

16 right now.  She doesn't have to have them.  I told her,

17 I think you may want to wait on doing them.  I had a

18 long discussion with her about that.  You know, I think

19 they were going to meet with the orthotist to also see

20 if it would be worthwhile to have his input.  I'm in a

21 hold position right now on the AFOs.

22       MR. HARPER:   Okay.  Well, Doctor, can we take

23 a break, maybe 10 or 15 minutes, as we have to call

24 the Judge and -- I have a hearing that was

25 scheduled for 11:00.  And I apologize to you and

Page 48

1          the court reporter for that.  That's -- federal

2          judges make that call.  We don't argue with them.

3          Thank you.

4                 THE WITNESS:  Sure.

5                 MR. HARPER:  Off the record.

6                 (A recess was taken.)

7                 MR. HARPER:  Back on.

8     BY MR. HARPER:

9          Q.    Doctor, if you'll go to Page 21 of your life

10    care plan, it's the vehicle modification page.  We had

11    kind of an informal, off-the-record discussion before

12    this, kind of about what the needs are.  Obviously, she

13    is too young to have her own car, and most likely won't

14    drive, but I don't believe, based on her ability to

15    ambulate now, that the -- this type of transport vehicle

16    is required; is that accurate?

17         A.    Just to answer that, she doesn't absolutely

18    need to have this.  She could transfer in and out of a

19    conventional vehicle, generally.  She's not going to

20    drive, so she wouldn't operate this.  The point would be

21    that, if she's going to need to use a scooter or an

22    electric device for long distances, then this would come

23    into play.  But she's not going to need to use it for

24    everything.

25                So you may actually get -- you know, this, I'm

ROBERT EILERS, M.D.
1/16/2018

Page 49

1    figuring every five years.  You might get up to eight or

2    more.  You know, that's a decision the family will have

3    to make, and it's still not absolutely clear.  It's

4    appropriate if she uses a scooter, which I think she'll

5    be able to do.  It's not like she's walking into things

6    or she can't see, but at two, with some of the visual

7    issues, I just can't say absolutely.

8            So here is what I would tell the family, which

9    is what I'll tell you.  You could put her in a regular

10   car and transport her, put the wheelchair in the trunk.

11   A lot of times you may want to consider going with this

12   so you can just roll her in and lock her down.  She can

13   transfer inside, or if you use the scooter, it's more

14   practical.

15           Now, you might be able to say, Okay, we're

16   willing, because she's not -- critical in Michigan, if

17   it breaks down in the winter, she could get into another

18   vehicle.  So we have safety factors, so you could extend

19   this out to maybe six, seven, eight years.  So there

20   will be some costs.  Let's say, you know, 5,000 for some

21   type of vehicle option, or would she have gotten a

22   car -- you know, I mean, you guys can probably figure

23   that out.  But that's the reason.

24           So, yes, I would tell them they don't

25   absolutely need for her to get from point A to point B;

ROBERT EILERS, M.D.
1/16/2018

Page 50

1    however, you may need it if she uses an electric

2    wheelchair because they're far too heavy to put in

3    trunks.  It's just a problem; her grandparents are going

4    to be older.

5         Q.   And, currently -- unrelated to Elizabeth's

6    injuries -- they have another child.  Do they have an

7    adapted vehicle or not?  I can't remember.

8         A.   They do, and Rene was not certain how that

9    could or couldn't be used.  She wasn't sure.  And as

10   I've told her, you don't -- they could be open to using

11   it; she's just not sure -- I don't know enough about --

12   I don't get into the other, you know, that's --

13        Q.   Right.  Absolutely.

14        A.   -- you know -- but yes.  And it may be that

15   they would have some ability to use that intermittently.

16   Bottom line is, if they go to an electric scooter or an

17   attendant-operated -- so say she's weighing 120, 130

18   pounds, and Rene is lighter.  They're just not as

19   strong.  And a lot of times, in Michigan, with the snow

20   and ice, actually, the electric chair is better than

21   manual because you're pushing them -- just use an

22   operator control, or she can use a joystick.  So that's

23   a discussion the family will have to have.

24        Q.   And to be fair, once she's older or at a time

25   when the grandparents are not with us anymore, the

Page 51

1   attendant will have to have some way to get her around;

2   is that accurate?

3        A.   She's going to need some type of vehicle that

4   would accommodate some of her disability.  I think that

5   they would be better -- I mean, they're going to have to

6   go to a minimum of, like, an SUV, if they do have to use

7   wheelchairs or other devices to lift her in the back.

8             The problem is with the lifting, the equipment

9   gets wet and dirty.  You know, the reality is, for the

10  cost, you might be able to go to a little less.  You can

11  get longer use out of the van.  She would benefit using

12  an accessible van, but she doesn't absolutely have to

13  get it to get from point A to point B.

14        Q.   Thank you.  That's great.

15        A.   That's the best answer I can give you.

16        Q.   On the next page, future surgeries, you have

17  future surgeries to consider, and you have the cost of

18  the VP shunt, and up to three revisions.  Is that --

19        A.   Over her lifetime.

20        Q.   Over her lifetime, okay.  And is the shunt

21  something, Doctor, that will be removed permanently at

22  some point?

23        A.   She has a VP shunt, and you might be able

24  to -- it's going to be an ultimate neurosurgical

25  question, whether if they remove it, they get enough

Page 52

1    closure.  Sometimes, if it retracts and closes off and

2    you don't have a problem with fluid, you might be able

3    to.  With intraparenchymal hemorrhages and all the

4    trauma that she had, it's probable she's going to

5    continue with the shunt, whatever the ultimate

6    neurosurgical decision is.  But very rarely have I seen

7    patients, if they do have an intraventricular or

8    ventricular parenchymal shunt, it's rare that they

9    function well without it.  Possible, but in all

10   probability, it will be extended, replaced.

11           So, as she grows and that tubing moves up, or

12   let's say she has appendicitis -- she gets a little

13   infection, she's got to be given antibiotics, we may

14   have to have them remove the shunt.  Those are the

15   issues.

16        Q.   Okay.

17        A.   This is not a shunt, from the records that I

18   looked at, that you're going to readily remove.  But if

19   neurosurgery says, we're absolutely comfortable in

20   removing it, no problems -- I can't speak for

21   neurosurgery, but, generally, it doesn't work out when

22   they take it out.  And she might go with two or three.

23   She might need five or six.  It just --

24        Q.   This is just an estimate based on, again, 40

25   years of doing this and seeing how those changes occur?

ROBERT EILERS, M.D.
1/16/2018

Page 53

1          A.    Just understand that this is an issue, and

2     ultimately, they make the decision in the budget.  I'm

3     passing the buck to the family to say, At the end of the

4     day, you have to make the decisions.

5          Q.    Complete ignorance on my part.  I mean, is a

6     shunt -- theoretically, could it be in place without any

7     revisions, or is just the growth aspect going to cause

8     at least the need for one new one?

9          A.    At least one, yes.

10         Q.    On Page 24, just briefly, Doctor, you have the

11    bowel, bladder, and hygiene supplies.  Will these go

12    away completely, assuming she becomes toilet trained or

13    not?

14         A.    I would say that all of this goes away at, I

15    would expect, somewhere around age seven to ten.  I do

16    believe that she will be able to be toileted or toilet

17    trained.  She might need to have a diaper a day, just

18    as -- a Pull-Up for protection, or if you're traveling,

19    those types of things.  But generally I don't see that

20    she cannot be toileted.  I can't say she'll get full

21    bowel and bladder control, but you can toilet her in the

22    morning.

23              There will be some times, maybe, if she had

24    diarrhea, that it might be more of an issue.  If she

25    needs to go, it will be then.  So if she has an

Page 54

1    attendant toilet her maybe every two or three hours,

2    kind of set up a pattern.  So a lot of this can go away.

3    Maybe -- maybe you would have, you know, $1,000 worth of

4    diapers, or you know --

5        Q.   You would expect these costs, through age,

6    like you said, seven to ten, and maybe 1,000, 1,500

7    bucks?

8        A.   Then she'd have 300 or so diapers a year or

9    something.  You know, that -- you know, that would put

10   you, you know, I think it would be, like, under $1,000.

11       Q.   Okay.  Now, Page 25, equipment for management

12   at home, I'm not necessarily concerned with the first --

13       A.   Gotcha.

14       Q.   -- three.  I want to talk about the big ones

15   because I think they deal with, you know, her ability to

16   ambulate, which I may be completely wrong about.

17            So the need for a ceiling track?

18       A.   The track system, based upon her transfers,

19   what she's doing, could be eliminated, unless she has

20   decline later.  And that's -- you know, the motor

21   replacement could go.

22       Q.   Okay.

23       A.   And the slings for the lift.  I'm going to

24   make a note so -- you know, they asked me about it, and

25   I can explain that.  The Hill-Rom hospital bed she could

Page 55

1   do without now because she is transferring. She's able

2   to use a crib. The shower chair, they'll need maybe a

3   little different model, more for safety because she's

4   not as stable. The prone stander, she could probably do

5   without, and the ZeroG system she could do without at

6   this point -- and the repairs.

7      Q.   Okay.

8      A.   The generator is a personal choice. Again,

9   you know.

10      Q.   My question about the generator, is, are you

11   talking about for the house, or is that for these

12   products?

13      A.   That's for the home.

14      Q.   Okay. Like I say, we can nitpick stuff. I

15   think the home makes more sense if you're needing to

16   make sure she's got safety issues.

17      A.   Yeah, it's just that she may not be able to go

18   somewhere. She likes it very predictable, structured,

19   so if she has to, quote, "evacuate," it's a big problem.

20      Q.   That was my question about it, is to run what.

21   And the home makes sense. I just want to make sure that

22   wasn't just related to the items we crossed off.

23      A.   Each of those can go. And the reason for the

24   therapy equipment at home is she can do the therapy at

25   home, which cuts the cost.

Page 56

1      Q.    Sure.

2            And then if we go back, Doctor -- I kind of

3      skipped over Page 11, the housing modifications for

4      safety?

5      A.    Okay.

6      Q.    And my first question, really, is, on Page 13,

7      you've got labor and material costs of 409,000.

8      A.    Right.

9      Q.    Is there a breakdown of that, or is that

10     just --

11     A.    It's actually broken down -- well, each of

12     these -- so if you go to building-costs.net, it's

13     basically an insurance and contractor estimating site

14     that will give you the information.

15     Q.    I'm sorry.  Building.com -- dot net?

16     A.    On Page 14, building-costs.net.

17     Q.    Thank you.

18     A.    And if you go into their -- it will ask you

19     the state, it will ask you the ZIP code.  And this would

20     be about a -- you know, 2,200-square-foot property that

21     they would need.

22     Q.    So is this a building from scratch?

23     A.    This --

24     Q.    Okay.

25     A.    Let me give you a view of it.

1          I mean, they have a nice home at this point,

2    but, you know, it's still a two-story.  They need to be

3    on one level.  And this is just for Elizabeth.  So, in

4    the long term, you know, they have a ramp for their

5    other daughter; however, for Elizabeth, let's assume

6    that, you know, we're just talking about Elizabeth --

7    they need to do a home that's going to be on one level.

8          The hallways really need to be out of that,

9    you know, 5-, 6-foot range, mainly because you need 5

10   feet to turn the wheelchair.  She's not in a wheelchair,

11   but, say, at age 60 -- she's going to improve in her

12   20s, and then she's going to start to decline after her

13   thirties, again, with mobility.  So there are going to

14   be periods later she will need the wheelchair more, that

15   van more.  That's where it's an issue.

16         For the home, this is something she would stay

17   in.  Doesn't include a lot.  It would be new

18   construction.  It's going to provide, in her room, that

19   she has direct exits outside, assuming that, say, in her

20   60s or 70s, she's not as mobile because she has an

21   abnormal gait, things like that.  You'd push the bed

22   straight out.

23         There are just things that you want to plan

24   for, standing or rolling shower, that the attendant can

25   help her, where she's safe, you know, she's not going to

1    fall and get a subdural -- we don't want those things

2    happening, et cetera.

3          Q.    Right.

4          A.    So this considers all of the issues.  There

5    may be a few thousand to come out because we don't have

6    to put in the track systems, but the double-up joists,

7    and all, are not huge.

8          Q.    Let me ask this:  This is -- again -- and I

9    appreciate and understand you saying these are family --

10   you know, most -- more -- the more concerning part of

11   your report is once the grandparents are gone, and who

12   is going to look after and care for her.  So these costs

13   would be related to a new house on a lot, just for her

14   and her attendant people --

15         A.    Right.

16         Q.    -- to live in?

17         A.    And they may choose -- like, the home they

18   have now doesn't have wide enough hallways.  I mean,

19   they did a ramp, they did some things, but it really

20   doesn't -- right now she's tiny.  You can just kind of

21   move her around.

22         Q.    For example -- and that answers my question.

23   But just so I'm clear for the record and all of that,

24   the number you have, the $500,000 contemplates a new

25   house plus whatever a lot might cost?

ROBERT EILERS, M.D.
1/16/2018

Page 59

1        A.    And here's -- yes and -- of course, if --
2   let's say the average home that somebody would have in
3   the area, say it was -- the average American home is,
4   like, about 200-some thousand dollars.
5        Q.    Right.
6        A.    For about that size.
7        Q.    Uh-huh.
8        A.    So she has an additional cost of 300,000.  So,
9   you know, she might have bought a $200,000 home.  Or, if
10  the parents or grandparents were -- I don't know whether
11  they own the home or rent or whatever, but say they went
12  from that home to another home, there may be some monies
13  that would be offsets.
14        So the best thing -- doing remodels eats up
15  about a third of your budget because of all of the
16  demolition and all of the -- and then you get a house
17  that you've got to bring up to code because now you've
18  made a 40-percent change, and they say "OOPS," then you
19  have to cover the ramps now.  Like, in Michigan, you're
20  going to have to cover all of the ramps and everything
21  else, which makes sense; it's a good idea.
22        So what you want to do is, it's a lot cheaper
23  to build it from scratch than to try and remodel.
24        Q.    And that number doesn't -- I'm not saying --
25  but that doesn't -- I was more concerned this was a

ROBERT EILERS, M.D.
1/16/2018

Page 60

1   remodel of the house they were in type costs and that's

2   why --

3        A.   No.

4        Q.   -- why -- the questions I had dealt with that.

5        A.   In the house they are in, it's a decent home,

6   no problem, but just looking at it, you're going to

7   spend so much to do these changes, and if they

8   accommodate, you know, her.  And it just doesn't work.

9   And I deal with this a lot of times.  And we work with

10  families where they've done it.  And then, to get them

11  home and get them in, they would go, Okay, and realize,

12  Gee, this isn't working.  Okay, Here's what you've got

13  to do new.

14        And this is a good way to get numbers.  It's

15  never perfect until you draw the plans to do the specs,

16  and you get certain jurisdictions that are a lot more --

17  it just -- but it gives them a pretty solid idea.  It's

18  the most objective source I could look for.  So, for

19  doors and windows, you'd go to luxury instead of

20  standard:  Best standard roof, best standard exterior.

21  We generally do block because of tornadoes and the type

22  of buildings we have to do for penetration protection,

23  because a lot of them couldn't get to the basement; she

24  could.  So I think in terms of storms, we have a little

25  bit of leeway, but a lot of times, because they may be

Page 61

1    wheelchair dependent, you keep that on there.  So those

2    are the types of things that, you know, I look at.

3         Q.    Is this a scenario for this family -- given

4    their other members of the house, I mean, it might be

5    beneficial even to look at moving everybody, building a

6    new home -- selling their house and moving everybody?

7         A.    If they choose to do that, that's fine, and

8    they can apportion whatever they do with the other --

9    you know, child's situation.  But if they do that, then,

10   yes, they can certainly do that, however that's

11   structured so Elizabeth has hers.  Whatever.  I mean,

12   that's more your-all's world.  But, yes, they could

13   choose to do that and allocate resources.  And they may

14   be able to find some cost savings.

15        Q.    Ice melt system?

16        A.    Just Michigan.

17        Q.    And not really my question.  I think it makes

18   perfect sense.  If they have a garage entrance to the

19   home, would that take away the need?

20             I understand outside walking and all of that,

21   but if they had an entrance and exit from inside a

22   covered garage, to the house, would that take that out?

23        A.    No.  Let's assume -- what happens is, because

24   you have attendants and caregivers coming, deliveries,

25   supplies, you have business invitees.  That's one of the

Page 62

1    big -- and, you know, you're going to heat the garage

2    anyway, so to go out, you know, that extra space is not

3    huge.  And now they are so affordable, it's cheaper --

4    it's kind of -- and it's safer.

5         Q.    All right.  Doctor, I think that's -- any

6    other opinions you think I missed on this?  I'm going to

7    kind of read through this, recheck -- you brought up.  I

8    just have a couple of quick questions, but if there was

9    anything else dealing with the life care plan that you

10   felt needed to be discussed or I failed to discuss with

11   you, or if you have any opinions you want to make sure

12   are on the record, I'm happy to do that; otherwise, let

13   me kind of peruse through this.  I didn't want to mark

14   on it, since we're going to put it on the record.  So

15   let me find my things here.

16             You mention in the first report and in this

17   report of January 9th, about the nystagmus.  Is that a

18   diagnosis or something you noticed?  And I know a little

19   bit about it because I have some situational vertigo, so

20   I just didn't know what the nystagmus was.  I'm

21   assuming -- you described the circular motions as part

22   of it, but --

23        A.    She likes to spin a little bit, move around.

24   And you can tell -- it's almost as though her visual

25   field, she's trying to accommodate.  If you test her

Page 63

1   vision a little more after that, she gets some position.

2   In certain places, if you sit down and test her, it

3   doesn't show up.  It's intermittent, so it may be more

4   activity related, it can be -- but, you know, she did

5   show that.

6        So, it's not as though, sitting there looking

7   at her, she has pronounced nystagmus.  It appears to be

8   with some of her activities, or if she's tracking an

9   object, we have been doing it a while, then she starts

10  to show that.

11       Q.   And you mentioned the iPad, and she's able --

12  sounds like she's able to hit a "I'm hungry," or that

13  type -- well, let me ask, is she able to do that, or is

14  that what this program will provide her the ability to

15  do?

16       A.   She could push various options, not

17  purposefully for me, but it was clear that she could

18  have the cause/effect, that if she pushes it and

19  expressed the words -- and she understands things better

20  than she can express.  So she could push it.  And as the

21  pictures -- if you then get pictures that meet her

22  needs.

23       And there's a whole Lingraphica system that

24  they can buy for 7,500, for a computer, but these are

25  little lamps that can work on an iPad -- and see if

Page 64

1    she's consistently doing it.  Then she could set up her
2    own programming in that system that's maybe 7,500, lasts
3    about four years, but you have to upgrade it.  So she
4    could press and say "I want the bathroom, I'm hungry,"
5    versus -- you know.  So it would allow her a means to
6    have some control.

7         Now, that's going to be dependent upon her
8    visual abilities and learning and cause/effect and
9    switches, but I think she will make progress in that
10   area, clearly.

11        Q.    You mentioned in this supplemental report that
12   if you, say, "Throw something in the trash" -- and you
13   just mentioned that -- she seems to have understanding
14   of commands, she just can't communicate, at this point,
15   back to you?

16        A.    Her receptive skills are far superior to her
17   expressive language.  She has three, four, five words.
18   She will point, and then she gets frustrated and melts
19   down because she knows what she wants to tell you, but
20   because of the damage, she has -- her expressive
21   language center is impaired.  But she could visually
22   look and understand, like, "I want coffee," or "I want"
23   -- that's what I would like to do with that.  So her
24   level of frustration is diminished.

25        Say something she asks for five times a year,

Page 65

1    if it's on there, she could press it as the picture.

2    She understands the cause and effect.  I don't know, and

3    I couldn't assess it, just being there, if she will

4    consistently do it, but I believe that she can, and

5    therefore, could have a lot more control in her

6    environment, which would help her be less frustrated.

7         Q.    And the receptive skills would probably be

8    beneficial for her attendant care people, I mean, she

9    will be able to understand them even if she's unable to

10   communicate effectively?

11        A.    On basic things.  I mean, simple, like, You're

12   not going to be able to talk to her for an hour, but

13   clearly, "bathroom."  And you can use a communication

14   board or computer now, touching it "I want bathroom,

15   drink, food, hungry, go outside," and keep building on

16   those pictures and vocabulary.  So it will help the

17   attendant and make her feel that she has control.

18        Q.    And, Doctor, we mentioned this, and I just

19   want you to clarify; don't want anybody to think you're

20   using the word "neglect" incorrectly.  As it relates to

21   this family, under your impressions on Page 3 of your

22   supplemental report, you used the term "persistent

23   neglect," and I know that was not meant to be she's

24   neglected, but I would like you to put that on the

25   record, so it's not used negatively against you.

ROBERT EILERS, M.D.
1/16/2018

Page 66

1      A.    I appreciate that.  The persistent neglect is,

2    she tends to neglect to one side of her body, moving,

3    and she -- visually, her field, she responded, but at

4    other times, when she's focusing on a task, she doesn't

5    respond to items moving into that visual field.  So she

6    had that neglect of vision before, and it appears she

7    has some visual neglect.  It doesn't mean her visual

8    field is completely gone, but she tends to extinguish

9    that when she's pursuing other tasks.

10          So, yes, it's not that anyone is neglecting

11   her or persisting in neglect.  See, you all are the word

12   lawyers.

13      Q.    And it looks like in that report and

14   consistent with the other doctors we have spoken with,

15   based on the injuries now, you don't expect her life

16   expectancy to be significantly altered?

17      A.    I really don't see a reduction unless she had

18   major complications.  And there's always a risk with

19   shunts or things, but with proper care and due

20   diligence, really -- no, she doesn't have any other

21   medical conditions at this point that -- what I tell the

22   family is, based upon this, look at the average life

23   expectancy because that includes people who jump off

24   cliffs, kill themselves, children born young, and the

25   person lives to 104.  So the best range is to target

Page 67

1    that average life expectancy.

2              And she might have a little reduction here,

3    but on the other hand, she's not smoking, drinking, she

4    doesn't drive a car.  I mean, you know, we see all of

5    these things that's already had an impact on her, but

6    you know -- there's -- so that's why I recommend they

7    just look at the average life expectancy, which, I

8    think, is going to be, like, 80 to 84, whatever it is by

9    the government schedule.

10        Q.   We had heard through her treating doctors,

11   testimony he thought her abilities would be similar to a

12   child with cerebral palsy.

13             Do you agree, disagree?

14        A.   Oh, absolutely.  I mean, that would have been,

15   probably, the diagnosis given years ago.  Cerebral palsy

16   simply means paralysis of the cerebrum, or the brain.

17   So, yes, she has -- if she had had this, and it was

18   only, say, something that occurred at birth; she had all

19   of these fractures, we would consider her cerebral

20   palsy.  Yes, he's absolutely right.

21        Q.   Do you have an opinion as to what -- I mean,

22   obviously, barring significant medical breakthrough

23   changes -- but do you have an opinion as to what her

24   verbal communication skills will be, you know, at their

25   best, like, you know, what level?

Page 68

1      A.    You know, she's probably not going to really

2   even achieve first grade.  It will be -- it's going to

3   be very basic yes-no, pointing, simple words, phrases.

4   You know, it will be one- and two-component commands.

5   That's probably where she's going to be.

6      Q.    I think Dr. Gabriel, if I remember right, said

7   she might be able to read or understand vocabulary

8   reading up to a first- or second-grade level.  So you're

9   kind of in the same ball- --

10      A.    Yeah, I mean --

11      Q.    A little lower, little higher?

12      A.    Yes.

13      Q.    But that's --

14      A.    It will be basic.  I mean, she might, then,

15   identify numbers, pictures, apples.  She might be able

16   to trace or recognize her name spelled out.  It's going

17   to be -- yes, I will agree.

18      Q.    And, Doctor, if -- I know you gave your

19   opinion testimony on the typical group homes, but if

20   there was a group setting when she's older, a home that

21   is going to last for 30 years -- I mean, if that were

22   available to her, would that be a good option for her

23   at -- you know, after she's 18, 19, 20?

24      A.    You know, I -- I personally don't find the

25   group homes work out that well.  You get into conflicts

ROBERT EILERS, M.D.
1/16/2018

Page 69

1    and fights.  There are a lot -- there are some cases

2    where, if a family feels they want to pay, there are

3    certain kids who will do better with socialization, but

4    they have better language skills or they're more

5    self-sufficient.

6              Group homes for her pose some problems in

7    terms of sexual behavior, issues of she can't

8    communicate.  That's a decision the family will have to

9    make.  I just -- I have not had tremendous success with

10   group settings.  They come, they go, families think they

11   will be there forever, and then they aren't.

12             It's a family decision, but I think they have

13   to move very cautiously with that and decide do they

14   want -- where she's at home with that full care.  There

15   are some day programs she might be able to go to that

16   she can go with her attendant to where they can do some

17   field trips or Special Olympics.  But I find that the

18   home setting ultimately ends up -- they can have friends

19   over, they can have interfaces.  It gives them control;

20   whereas, in group settings, there are lots of issues

21   that come up.

22        Q.   And certainly I would assume, with technology

23   improving and changing as it does every day, that the

24   socialization aspect will be easier, Facetime, using a

25   computer to see people, this type and the other?

ROBERT EILERS, M.D.
1/16/2018

Page 70

1    A.    She can see and visualize.  We'd do like a

2    widescreen TV for her, and you can Skype, or basically

3    do that.  So there is a lot available to her.  It

4    doesn't mean she can't go to a national park.  And there

5    are programs I think I listed for them --

6        Q.    Yes, sir.

7        A.    -- that they can look into.  And some will

8    accept, or some won't, but there are some resources to

9    start with.  If she wanted to go hiking or go to the

10   mountains, they will modify it for her level of

11   functioning and, basically, they have guides, plus their

12   attendant, the buddy systems that they can do.

13       Q.    And, Doctor, is -- I know we mentioned this

14   earlier.  Do you have any plans to alter your opinions?

15   At this time, I understand you try to follow her on a

16   yearly basis, but between now and July, would you have

17   any reason to think any of these opinions are going to

18   change, based on what you currently show?

19       A.    I don't anticipate that.  My biggest concern,

20   from the first meeting to now is, I just wanted to -- I

21   really wanted to see where she was.  Pretty much kind of

22   what I expected, but, you know, that helped me to

23   reaffirm what I'm thinking and what I explained.  We've

24   covered the changes, and that's probably going to be it.

25       Q.    And so, kind of to recap, the developmental

ROBERT EILERS, M.D.
1/16/2018

Page 71

1   needs or expectations at this time would be:

2   Kindergarten, first, second grade, language and reading

3   skills.  And then, you know, she'll be able to ambulate,

4   although guarded, on uneven or grassy-type surfaces.

5   And you would expect, based on her development now, that

6   she's toilet trained or, you know, at least toilet

7   functional by the age of ten, maybe as early as the age

8   of seven?

9       A.   Correct.  Seven to ten.  I mean, won't be

10  perfect, but it will be far more functional.  We cannot

11  have her depending on diapers all the time, and things

12  like that.

13      Q.   She'll never be a driver?

14      A.   No.

15      Q.   And she will always need some type of

16  supervision for assisted daily living, whether that's

17  outside care or school care or otherwise.  Somebody is

18  going to need to be with her 24 hours a day?

19      A.   She'll always need parental assistance,

20  whether that's an attendant or a family member, but

21  obviously, adult family member that she would need.

22      Q.   Any other opinions that you have, Doctor, that

23  I have failed to elicit from you?

24      A.   No.  I think they are all in the

25  recommendations I made to the family, and my notes.  I

BRICKELL KEY COURT REPORTING, LLC
305.407.9993

ROBERT EILERS, M.D.
1/16/2018

Page 72

 1    think we've covered what I discussed with them.

 2              MR. HARPER:  And I didn't put the physician

 3        lien as an exhibit.  I'll give that to you, Chris.

 4              THE WITNESS:  I gave him one.

 5              MR. HARPER:  Okay.  I'll keep this one for

 6        myself.

 7              THE WITNESS:  I need to keep one for the file.

 8              MR. HARPER:  Oh, I'm sorry.

 9              Chris, can you send me one of those?

10              MR. COLLIS:  Yes.  Or we can make a --

11              MR. HARPER:  No, no.  That's fine.

12              I'm assuming Chris probably doesn't have any

13        questions.

14              MR. COLLIS:  I just have the one.

15              MR. HARPER:  Oh, all right.

16              Doctor, thank you for your time.

17              I'll pass the witness.

18                      CROSS EXAMINATION

19    BY MR. COLLIS:

20        Q.    Doctor, it would appear that the family

21    members -- the grandfather and grandmother, are going to

22    be providing the attendant care a majority of the time,

23    at least for the foreseeable future.

24              What would be a reasonable value of those

25    services, I guess, in an attendant care setting, where

ROBERT EILERS, M.D.
1/16/2018

Page 73

1  it would be per hour, for individuals in the State of

2  Michigan?

3       A.   The agency, I think we had them at 22, if I

4  remember correctly, 22 an hour.  The agency would

5  probably pay them, you know, 15, could be 15 to 18; 15

6  to 16 an hour would probably be what the agency would

7  pay them together to get somebody who is capable or

8  competent.  That would be at a minimum.

9            MR. COLLIS:  Thank you, Doctor.

10           MR. HARPER:  I have no further questions,

11       Doctor.  I think, in Michigan, you've got a right

12       to read and sign your deposition or waive that

13       right.

14           Do you -- just I need to say it on the record.

15           THE WITNESS:  I really don't want -- I don't

16       have insomnia, so I'll waive it.

17           MR. HARPER:  All right.

18           Off the record.

19           (Deposition concluded at 11:59 a.m.)

20

21

22

23

24

25

ROBERT EILERS, M.D.
1/16/2018

Page 74

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA    )

4    COUNTY OF COLLIER   )

5

6

7         I, Elizabeth M. Brooks, RPR, FPR, Notary

8    Public, State of Florida, do hereby certify that, ROBERT

9    E. EILERS, M.D., personally appeared before me on the

10   16th day of January, 2018, and was duly sworn.

11

12        Signed this 26th day of January, 2018.

13

14

15                    /s/ Elizabeth M. Brooks

16                    _____
                      Elizabeth M. Brooks, RPR, FPR
                      Notary Public
17                    State of Florida
                      My Commission No. GG 077785
18                    Expires:  June 27, 2021

19

20

21

22

23

24

25

Page 75

1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA

3    COUNTY OF COLLIER

4           I, Elizabeth M. Brooks, Registered

5    Professional Reporter, Florida Professional Reporter, do

6    hereby certify that I was authorized to and did

7    stenographically report the deposition of ROBERT E.

8    EILERS, M.D.; that a review of the transcript was not

9    requested, and that the foregoing transcript is a true

10   record of my stenographic notes.

11          I FURTHER CERTIFY that I am not a relative,

12   employee or attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorney or counsel connected with the action, nor am I

15   financially interested in the action.

16          DATED this 26th day of January, 2018, at

17   Naples, Collier County, Florida.

18

19                    /s/ Elizabeth M. Brooks

20                    _____
                      Elizabeth M. Brooks
                      Registered Professional Reporter
21                    Florida Professional Reporter

22

23

24

25

ROBERT EILERS, M.D.
1/16/2018

Page 76

**A**

**a.m** 1:20,20 73:19
**abilities** 13:23 64:8
  67:11
**ability** 5:14 13:23
  45:9 48:14 50:15
  54:15 63:14
**able** 13:25 15:5
  16:8,18,24 19:7
  19:16,17,20,24
  20:12 22:15 25:12
  37:15 38:14 46:10
  47:11 49:5,15
  51:10,23 52:2
  53:16 55:1,17
  61:14 63:11,12,13
  65:9,12 68:7,15
  69:15 71:3
**abnormal** 57:21
**absence** 42:1
**absolutely** 26:20
  32:23,25 35:24
  38:23 39:9,12
  48:17 49:3,7,25
  50:13 51:12 52:19
  67:14,20
**accept** 70:8
**accessible** 51:12
**accident** 4:25 10:15
**accommodate** 51:4
  60:8 62:25
**accurate** 27:5
  48:16 51:2
**achieve** 24:13 68:2
**action** 75:14,15
**actively** 8:9 10:13
**activities** 33:10
  63:8
**activity** 63:4
**adapted** 50:7
**add** 37:24,24
**additional** 24:1
  28:19 37:19 59:8
**adjusted** 17:20

**adjustment** 44:3
**administer** 21:7,9
  22:14,17 37:5
  38:14
**administered** 39:6
**administering** 40:8
  40:14
**administration**
  15:13
**adolescence** 37:20
**adult** 71:21
**affect** 9:16
**affirm** 4:6
**affirmed** 4:11
**affluent** 29:5
**affordable** 62:3
**AFO** 47:7
**AFOs** 47:9,21
**age** 6:25 10:16
  25:19 27:4,13
  32:22 53:15 54:5
  57:11 71:7,7
**agencies** 34:9,13
**agency** 36:19 39:10
  39:18 73:3,4,6
**aging** 34:3
**ago** 67:15
**agree** 26:19 67:13
  68:17
**ahead** 18:19
**aide** 17:10 31:7,9
  31:12,18
**airport** 45:17
**ALACAYIR** 1:13
**alive** 38:13
**all-inclusive** 30:13
**alleviate** 27:9
**allocate** 61:13
**allow** 64:5
**ALS** 7:14
**alter** 70:14
**altered** 66:16
**amazed** 36:25
**ambulate** 13:25

19:8 45:9 48:15
  54:16 71:3
**ambulatory** 45:7
**American** 59:3
**amount** 32:18
**amounts** 40:23
  44:19
**amputations** 7:15
**and/or** 46:21
**ANGELA** 1:7
**answer** 6:9 9:18
  29:21 48:17 51:15
**answered** 25:9
**answers** 58:22
**anti-spasticity** 18:4
**antibiotics** 42:20
  52:13
**anticipate** 20:10
  70:19
**anybody** 20:23
  21:2 65:19
**anymore** 50:25
**anyway** 12:19 62:2
**Aphasia.com** 15:3
**apologize** 47:25
**appeal** 24:24
**appeals** 24:25
**appear** 72:20
**appeared** 74:9
**appears** 13:5 20:1
  63:7 66:6
**appendicitis** 52:12
**apples** 68:15
**apportion** 61:8
**appreciate** 39:16
  58:9 66:1
**appropriate** 25:2
  49:4
**apps** 15:3
**area** 10:2 25:4 29:5
  59:3 64:10
**areas** 17:24 43:17
**argue** 31:22 48:2
**ARIF** 1:13

**arrange** 27:24
**articulate** 35:18
**aside** 37:9
**asked** 11:18 54:24
**asking** 11:20
**asks** 64:25
**aspect** 53:7 69:24
**Asperger's** 25:8
**assault** 34:17,19
**assess** 19:23 35:6
  65:3
**assign** 32:5
**assigned** 31:12
**assist** 39:18
**assistance** 3:12 5:4
  27:10 33:10 71:19
**assistant** 33:4
  34:23
**assisted** 71:16
**Associates** 14:4
**assume** 12:19 14:4
  37:16 57:5 61:23
  69:22
**assuming** 5:8 9:18
  18:19 27:21 38:5
  53:12 57:19 62:21
  72:12
**attached** 14:8
**attachment** 3:14
**attendant** 15:12
  20:23 21:6 29:13
  29:14 31:2,5 32:3
  32:5,10,11 33:8
  45:20 51:1 54:1
  57:24 58:14 65:8
  65:17 69:16 70:12
  71:20 72:22,25
**attendant-operat...**
  50:17
**attendants** 21:7
  61:24
**attorney** 4:23 75:12
  75:14
**au** 35:25 36:2,6

**augmented** 15:9
**authorized** 75:6
**autism** 25:8
**auto** 11:8
**available** 13:8
  68:22 70:3
**Avenue** 1:20 2:10
**average** 59:2,3
  66:22 67:1,7
**aware** 18:7 20:9
  39:9
**awareness** 17:2
**axial** 16:21

**B**

**B** 49:25 51:13
**back** 8:6 26:3 38:25
  45:2 46:10 48:7
  51:7 56:2 64:15
**background** 36:16
**backward** 45:11
**bad** 25:6
**balance** 16:21 19:9
**ball-** 68:9
**ballgame** 47:3
**barring** 20:20
  67:22
**based** 9:18 12:9
  22:22 34:23 37:7
  41:5,8 43:5,7,22
  44:6 48:14 52:24
  54:18 66:15,22
  70:18 71:5
**basement** 60:23
**basic** 33:17,20
  65:11 68:3,14
**basically** 7:11 23:4
  26:5 34:8,15
  35:22 46:10 56:13
  70:2,11
**basis** 6:1 70:16
**bathroom** 31:9
  64:4 65:13,14
**bed** 54:25 57:21

ROBERT EILERS, M.D.
1/16/2018

Page 77

behalf 2:1,8
behavior 69:7
behavioral 20:11
  37:19
behaviors 20:1
believe 13:6 15:21
  15:25 25:19 26:18
  29:17 48:14 53:16
  65:4
beneficial 61:5 65:8
benefit 24:3 25:3
  51:11
best 17:13 51:15
  59:14 60:20,20
  66:25 67:25
better 14:14 24:6
  29:9 34:13 35:8
  50:20 51:5 63:19
  69:3,4
big 13:13 54:14
  55:19 62:1
biggest 70:19
birth 67:18
bit 17:19 26:14
  32:25 43:1 60:25
  62:19,23
bladder 17:15
  53:11,21
bleed 42:11
blends 30:16
blind 40:19
block 60:21
blocks 8:15
board 65:14
body 7:15 17:3
  66:2
Bonds 2:9
born 66:24
Botox 18:5
bottom 33:23 50:16
bought 8:19 59:9
bowel 17:14 53:11
  53:21
bracing 7:16

brain 9:21 10:2
  18:1 67:16
break 22:11 45:1
  47:23
breakdown 56:9
breaks 49:17
breakthrough
  17:19 20:21 32:4
  67:22
brief 36:6
briefly 4:21 53:10
bring 31:14 59:17
broad 7:24
broken 56:11
Brooks 1:24 4:1
  74:7,15,16 75:4
  75:19,20
brought 14:13 40:7
  62:7
BRYANT 1:7
buck 53:3
bucks 54:7
buddy 70:12
budget 21:16 30:20
  43:11 53:2 59:15
budgeted 41:24
build 59:23
building 56:22 61:5
  65:15
building-costs.net
  56:12,16
Building.com
  56:15
buildings 60:22
bus 32:1,3
business 61:25
buy 24:1 26:9
  27:15,18 63:24

**C**

C 2:9
C.A 1:4
calculate 40:12
call 26:3 42:4,5

45:2 47:23 48:2
called 11:21
calling 11:20
calls 11:2
CANADA 1:11
capable 38:13 73:7
car 48:13 49:10,22
  67:4
cardiac 41:15,17
care 6:20 7:18 12:7
  12:8,13 15:12
  20:23 21:6,6
  26:24,25 29:13,14
  31:2,5,21 33:2,8
  36:11,21 39:8,18
  41:21 44:2 48:10
  58:12 62:9 65:8
  66:19 69:14 71:17
  71:17 72:22,25
caregivers 61:24
CARGO 1:12
carpeting 19:13
carriers 1:12 11:7
carry 23:5,19 31:11
case 5:16 6:10,19
  9:19 15:19 16:1
  16:23 35:4
cases 6:2,5 11:4
  69:1
categories 27:10
cause 4:3 53:7 65:2
cause/effect 63:18
  64:8
cautiously 69:13
ceased 36:25
ceiling 54:17
center 64:21
cerebral 67:12,15
  67:19
cerebrum 67:16
certain 27:4 32:24
  33:17,20 36:18
  39:9 40:22 43:14
  46:3 50:8 60:16

63:2 69:3
certainly 9:6 10:4
  61:10 69:22
Certificate 3:5,6
  74:1 75:1
certification 33:18
certified 33:4,18
  34:23
certify 74:8 75:6,11
cetera 32:1 58:2
chair 45:15,19 46:8
  46:9,15,16 47:1
  50:20 55:2
challenged 19:13
change 20:21 45:10
  59:18 70:18
changes 20:11
  38:16 52:25 60:7
  67:23 70:24
changing 31:17
  69:23
charges 40:7
charitably 22:21
cheaper 28:10
  36:14 37:11 59:22
  62:3
check 41:25 42:4,5
  43:14
chest 42:22,23
child 6:19 17:11
  19:16 40:11 50:6
  67:12
child's 61:9
children 20:9 31:13
  42:11 66:24
Children's 13:1
choice 30:7,8,19
  46:12 55:8
choices 30:18
choose 29:24 30:13
  32:6 58:17 61:7
  61:13
Chris 72:3,9,12
CHRISTIAN 2:3

circular 62:21
cited 33:22
clarify 65:19
classic 17:13
clear 13:15 27:12
  43:5,20 44:16
  49:3 58:23 63:17
clearly 10:2 16:16
  20:8 34:18 64:10
  65:13
cliffs 66:24
clinical 8:9
closes 52:1
closure 52:1
CNA 21:6 38:3
code 56:19 59:17
coffee 64:22
cognition 9:17
cognitive 19:1
cognitively 35:3
Colles' 42:14
Collier 8:16 74:4
  75:3,17
Collis 2:3 3:4 4:22
  5:15,18 72:10,14
  72:19 73:9
Collis' 6:10
combination 27:8
come 12:14,19
  14:20 21:18 27:25
  32:11 37:12,20
  38:25 42:17 45:2
  48:22 58:5 69:10
  69:21
comes 36:25 40:24
  44:22
comfortable 24:24
  47:9 52:19
coming 17:9 37:21
  39:10 61:24
commands 64:14
  68:4
Commission 74:17
communicate

64:14 65:10 69:8
**communication**
15:3,9 65:13
67:24
**community** 8:14
29:3 34:1
**companies** 11:19
**company** 4:25
**compensatory** 20:5
**competent** 22:6
73:8
**Complete** 53:5
**completed** 35:9
**completely** 53:12
54:16 66:8
**complexity** 34:25
**complications**
42:11 66:18
**computer** 63:24
65:14 69:25
**concern** 42:1 70:19
**concerned** 5:19
26:15 54:12 59:25
**concerning** 58:10
**concluded** 73:19
**condition** 38:9 43:7
43:13,22
**conditions** 9:25
32:24 66:21
**conference** 32:13
**confirmed** 16:25
**conflicts** 68:25
**connected** 75:14
**consent** 24:21
39:20,23 40:2
**Conservator** 1:6
**consider** 29:7 49:11
51:17 67:19
**considered** 21:19
**considers** 58:4
**consistent** 66:14
**consistently** 64:1
65:4
**constant** 18:6

**construction** 57:18
**contact** 13:5
**contacted** 6:15,17
**contemplates** 58:24
**continue** 52:5
**continuous** 23:21
36:5
**contractor** 56:13
**contributions** 26:2
**control** 45:22 46:11
50:22 53:21 64:6
65:5,17 69:19
**conventional** 48:19
**conversions** 40:23
**coordinate** 28:12
**copy** 5:7 12:2
**cord** 7:13 9:8
**Corporation** 1:12
**correct** 4:18,19 5:4
5:6 8:4,10 10:15
23:3 24:22 26:20
27:6 37:3 38:10
38:11 39:19 43:8
44:3,8 71:9
**correcting** 19:12
**correctly** 8:3 17:4
23:12 25:24 34:22
73:4
**cost** 31:21,23 32:19
37:14 44:1,22
51:10,17 55:25
58:25 59:8 61:14
**costs** 22:1 25:22
27:11 28:4,7,15
28:22 29:24 31:22
31:23,24 34:9
39:8 44:17 45:10
46:13 49:20 54:5
56:7 58:12 60:1
**counsel** 75:12,14
**County** 74:4 75:3
75:17
**couple** 5:17 8:15
14:14 62:8

**course** 59:1
**court** 1:1 4:5 48:1
**cover** 23:10 44:24
59:19,20
**coverage** 32:1,18
**covered** 26:1 61:22
70:24 72:1
**cranioplasty** 41:12
**crashes** 11:9
**crib** 55:2
**critical** 49:16
**Cross** 3:4 72:18
**crossed** 55:22
**cup** 18:11,11 31:17
**current** 5:8 43:7,13
**currently** 22:25
35:23 50:5 70:18
**Curriculum** 3:11
**custodial** 24:22
**cut** 34:9
**cuts** 55:25
**cutting** 31:15
**CV** 5:8 7:6
**cysts** 17:22

**D**

**d/b/a** 1:12
**Dad** 6:17 21:12
**daily** 33:10 71:16
**damage** 18:1 19:24
64:20
**dark** 12:24
**date** 1:19 5:9 15:12
39:7
**dated** 3:13 75:16
**daughter** 57:5
**day** 32:1 33:5 37:12
37:25 38:21 53:4
53:17 69:15,23
71:18 74:10,12
75:16
**days** 25:18,18,19
25:23 32:13,14
41:22 43:9,22

**deal** 6:6,7 7:11,15
9:10 30:24 54:15
60:9
**dealing** 62:9
**dealings** 6:18
**dealt** 25:8 60:4
**debate** 20:20
**debride** 8:6
**deceased** 7:3
**decent** 60:5
**decide** 22:9 69:13
**decision** 24:24
38:19,21 39:3
49:2 52:6 53:2
69:8,12
**decisions** 30:3 39:4
53:4
**decline** 19:14 54:20
57:12
**Defendant(s)** 1:15
**Defendants** 2:8
**defense** 11:4
**deficits** 14:25
**degree** 34:23
**delay** 18:18
**delayed** 16:15
**deliveries** 61:24
**demanding** 34:4
**demolition** 59:16
**dentist** 39:1
**dependent** 61:1
64:7
**depending** 71:11
**depends** 22:18
25:15 28:6,9,23
29:6 32:2 33:25
36:12
**deposition** 1:18 3:3
4:1,22 13:10
15:18 73:12,19
75:7
**depositions** 5:11
**described** 62:21
**DESCRIPTION**

3:10
**design** 46:9
**detail** 13:21
**determine** 6:24
25:1 35:6 41:23
42:24 43:18
**determined** 24:19
24:20
**Detroit** 6:11 13:1
**development** 18:21
71:5
**developmental**
70:25
**device** 15:9 19:9
48:22
**devices** 51:7
**diagnose** 9:25
**diagnoses** 9:14,24
15:11
**diagnosis** 7:11 9:21
10:14 14:25 62:18
67:15
**diagnostic** 41:4
**diaper** 20:10 31:17
53:17
**diapers** 20:12 54:4
54:8 71:11
**diarrhea** 53:24
**die** 21:18
**died** 39:2
**dies** 40:11
**difference** 13:13
24:12
**different** 29:10
41:19 42:3 45:8
45:10 47:1 55:3
**differently** 41:18
**difficult** 45:8
**difficulty** 19:12
**diffuse** 18:1
**diligence** 34:15
66:20
**diminished** 64:24
**direct** 3:4 4:13

ROBERT EILERS, M.D.
1/16/2018

Page 79

directions 17:3
directly 6:7,20
dirty 20:10 51:9
disabilities 9:16
    36:12
disability 11:8 51:4
disagree 21:2 67:13
disappear 22:20
discuss 30:20 62:10
discussed 37:1 45:6
    62:10 72:1
discussion 47:18
    48:11 50:23
diseases 7:14 9:10
disorders 7:24
disputes 20:23
disruption 41:14
distances 45:15
    46:3,7 47:4 48:22
district 1:1,1 25:15
    29:8
districts 28:24 29:2
    29:12 32:24
DIVISION 1:2
doctor 4:18 5:7 7:7
    12:1 13:22 14:23
    26:11,23 33:2
    39:24 41:3 45:4
    47:22 48:9 51:21
    53:10 56:2 62:5
    65:18 68:18 70:13
    71:22 72:16,20
    73:9,11
doctors 14:20
    66:14 67:10
document 12:22
doing 16:19 18:12
    31:9,16 34:1
    36:21 40:21 47:10
    47:17 52:25 54:19
    59:14 63:9 64:1
dollars 59:4
doors 60:19
dot 56:15

double-up 58:6
download 15:8
Dr 4:20 68:6
draw 60:15
drawers 18:9
drill 32:9
drink 18:11 65:15
drinking 67:3
drive 48:14,20 67:4
driver 4:24 71:13
due 34:15 66:19
duly 4:11 74:10
duplicate 26:1,6

**E**

E 3:3 4:10 74:9
    75:7
e-mail 3:13 14:3
e-mailed 12:18
ear 20:3
eardrops 40:18
earlier 8:8 15:21
    24:6 33:3 46:1
    70:14
early 16:4 23:1
    24:4 25:14 71:7
early-on 24:4
easier 45:21 69:24
EASTERN 1:1
eat 31:10
eating 31:16
eats 59:14
educability 24:15
educated 35:10
education 25:2
    35:15
Edwin 4:17
EEG 42:6
effect 65:2
effectively 65:10
eight 20:13 31:25
    37:12,22 49:1,19
eight-hour 33:5
    37:11 38:6

Eilers 1:18 3:3 4:10
    4:17,20 74:9 75:8
either 11:13,18
    20:11 23:23 31:8
    34:4 46:20
electric 47:1 48:22
    50:1,16,20
elicit 71:23
eliminated 54:19
Elizabeth 1:6,24
    4:1 5:5 6:23 9:20
    14:24 16:9 57:3,5
    57:6 61:11 74:7
    74:15,16 75:4,19
    75:20
Elizabeth's 50:5
emergency 42:16
employee 75:12,13
ends 37:9 38:1
    69:18
Enduring 31:20
entity 27:22
entrance 61:18,21
environment 17:8
    65:6
episode 42:1
equipment 51:8
    54:11 55:24
ER 42:3,9
esoteric 9:10
ESQ 2:3,9
essence 44:5
ESTATE 1:6
estimate 52:24
estimating 56:13
et 32:1 58:2
evacuate 55:19
evaluation 3:12
    12:6,8,9
evaluations 11:8
events 42:12
everybody 61:5,6
evolution 17:6
Examination 3:4,4

4:13 72:18
examined 4:11
example 58:22
exhibit 3:11,12,13
    3:15 5:22,23 12:2
    12:4 14:9,10,23
    15:16 72:3
EXHIBITS 3:9
exit 61:21
exits 57:19
expect 17:1 18:14
    20:14 25:10 41:5
    53:15 54:5 66:15
    71:5
expectancy 66:16
    66:23 67:1,7
expectations 71:1
expected 17:15
    70:22
experience 41:8
experienced 23:17
experiential 36:7
expert 5:25 6:6
    10:10,11 11:1,14
    15:22 26:4
expertise 10:7
experts 20:19
Expires 74:18
explain 21:17 38:17
    54:25
explained 21:4
    29:23 70:23
explore 18:8
express 16:16
    63:20
expressed 63:19
expressive 19:1
    64:17,20
expressive-recept...
    14:25
extend 49:18
extended 52:10
extent 19:23
exterior 60:20

extinguish 66:8
extinguishing 24:8
extra 62:2
eyes 40:18

**F**

Facetime 69:24
fact 16:14 17:24
factors 49:18
failed 62:10 71:23
fair 11:23 30:10
    47:3 50:24
fairness 29:1 36:12
fall 42:14 58:1
falls 41:10 42:8
familial 9:11
familiar 25:7
families 21:17,21
    32:5,6 60:10
    69:10
family 6:7,8 10:23
    10:24 12:18,18
    14:20 15:13,24
    21:6 22:4,6,8,21
    23:24 24:10 29:18
    30:3,7 36:1 37:2,4
    37:5 39:3,6,7,20
    46:12 49:2,8
    50:23 53:3 58:9
    61:3 65:21 66:22
    69:2,8,12 71:20
    71:21,25 72:20
far 18:20 39:10
    50:2 64:16 71:10
federal 48:1
feeding 33:12
feel 25:2 38:20
    65:17
feels 69:2
feet 57:10
felt 62:10
Fieger 2:3,3 6:11
Fieger's 10:21
field 62:25 66:3,5,8

69:17
**fields** 8:23,24
**fights** 69:1
**figure** 21:25 26:22
    49:22
**figuring** 49:1
**file** 72:7
**fill** 12:23
**filled** 16:5
**financial** 22:20
**financially** 75:15
**find** 16:11 29:1
    36:14 38:23 61:14
    62:15 68:24 69:17
**findings** 16:13 18:1
**fine** 14:11 18:9
    22:7 28:2 32:20
    61:7 72:11
**firm** 6:11,11 10:21
**first** 4:11 10:16
    23:10 54:12 56:6
    62:16 68:2 70:20
    71:2
**first-** 68:8
**first-year** 9:23
**fistulas** 17:22
**five** 23:25 24:1,3,13
    25:18,18,19 26:7
    26:8,9 27:3,12,14
    27:14,15,18 34:10
    37:10 43:8 46:5
    49:1 52:23 64:17
    64:25
**fix** 40:16
**Florida** 1:21 4:3
    74:3,8,17 75:2,5
    75:17,21
**flu** 42:22
**fluid** 52:2
**fly** 36:3
**focusing** 7:25 66:4
**follow** 8:1 17:3
    70:15
**follow-up** 16:7

**following** 10:14
**follows** 4:12
**food** 31:15 65:15
**foregoing** 75:9
**Foreign** 1:11
**foreseeable** 72:23
**forever** 69:11
**form** 12:22 16:1
**forming** 12:12
**forward** 7:20 18:5
    37:18
**found** 12:13
**four** 24:3 37:10
    42:19 46:5 64:3
    64:17
**FPR** 1:24 74:7,16
**fracture** 42:14,15
**fractures** 15:1
    67:19
**free** 28:2,5,20
**freedom** 46:9
**friends** 13:20 69:18
**front** 12:1 14:3
**frustrated** 64:18
    65:6
**frustration** 64:24
**full** 4:15 37:13
    53:20 69:14
**full-time** 31:7
**function** 9:16 52:9
**functional** 71:7,10
**functioning** 19:5
    70:11
**functions** 18:17
**funding** 23:24
**further** 73:10 75:11
**future** 7:1 21:1
    51:16,17 72:23

---

**G**

**Gabriel** 68:6
**gagging** 18:13
**gains** 17:2
**gait** 19:16 57:21

**garage** 61:18,22
    62:1
**gauges** 24:18
**Gee** 60:12
**generally** 6:6 7:7
    24:20 30:2,6
    32:22 33:1 48:19
    52:21 53:19 60:21
**generator** 55:8,10
**getting** 6:3 23:21
    28:6 36:9 46:3
**GG** 74:17
**girl** 34:15
**give** 4:6 7:5 11:15
    11:23 23:15 45:11
    51:15 56:14,25
    72:3
**given** 33:7 45:9
    52:13 61:3 67:15
**gives** 60:17 69:19
**glad** 6:9
**go** 12:25 22:10,18
    23:21 24:1 26:9
    27:15,18 28:9,22
    29:24 30:12,13,25
    32:25 33:2 36:10
    36:15 38:23,23,25
    41:3 42:2,3,5 43:8
    44:1 45:3,17 47:2
    48:9 50:16 51:6
    51:10 52:22 53:11
    53:25 54:2,21
    55:17,23 56:2,12
    56:18 60:11,19
    62:2 65:15 69:10
    69:15,16 70:4,9,9
**goes** 7:2 37:18 40:6
    40:9,10 53:14
**going** 7:2 8:24 9:10
    12:7 14:8 17:20
    18:5 19:18 20:9
    20:18 21:2,5,16
    23:17 24:14 27:25
    28:2 30:6 31:3,7

33:11 34:2,6,7,16
    34:17,18,20 35:16
    36:3,6,13,20 37:8
    38:20,24 39:24
    40:1 41:9,25 42:5
    42:9,12,14,15,20
    43:16,17,18,21,24
    44:24,25 45:1,14
    45:18 46:2,17,25
    47:3,5,14,19
    48:19,21,23 49:11
    50:3 51:3,5,24
    52:4,18 53:7
    54:23 57:7,11,12
    57:13,18,25 58:12
    59:20 60:6 62:1,6
    62:14 64:7 65:12
    67:8 68:1,2,5,16
    68:21 70:17,24
    71:18 72:21
**good** 17:5 18:22,24
    19:2 23:16 25:5,6
    29:10 35:18 59:21
    60:14 68:22
**Gotcha** 45:5 54:13
**gotten** 49:21
**government** 27:22
    67:9
**grabbing** 42:23
**grade** 68:2 71:2
**grade-school** 44:10
**graduate** 33:14
    35:14
**graduation** 33:1
**granddaughter**
    6:23
**grandfather** 6:13
    6:17 7:2 12:16
    72:21
**grandmother** 16:4
    23:5 72:21
**grandparents**
    21:12 30:12 35:23
    38:12 45:21 47:4

50:3,25 58:11
    59:10
**grass** 19:10 45:7
**grassy-type** 71:4
**gravel** 19:10
**great** 45:13 51:14
**greater** 42:10
**gross** 18:9,17,20
    19:4
**ground** 19:10
**group** 22:16,18
    68:19,20,25 69:6
    69:10,20
**grows** 52:11
**growth** 53:7
**guaranteed** 43:21
**guarded** 71:4
**guardian** 37:5
**guardians** 24:22
**guess** 11:10,11,16
    41:2 72:25
**guides** 70:11
**guys** 49:22

---

**H**

**Habilitation** 5:4
**half** 26:10 28:22,22
**hallways** 57:8
    58:18
**hand** 67:3
**happen** 40:1 42:7
    42:20
**happening** 58:2
**happens** 40:11
    61:23
**happy** 62:12
**hard** 19:14 25:1
    34:8 36:3
**hardware** 7:21
**Harper** 2:9 3:4
    4:14,21 5:22,24
    12:5 14:12 15:17
    47:22 48:5,7,8
    72:2,5,8,11,15

73:10,17
**Harrington** 2:3
**head** 7:13 9:7 17:13
    20:7 37:21 42:9
**health** 34:1
**heard** 8:3 33:7
    67:10
**hearing** 47:24
**heat** 62:1
**heavy** 50:2
**heel-toe** 47:11
**help** 15:10 20:4
    23:14,17 31:15
    43:4 57:25 65:6
    65:16
**helped** 17:19 70:22
**helping** 31:10
**helps** 25:17
**hemorrhages** 52:3
**high** 33:14 35:9,13
    35:14
**high-level** 25:9
**higher** 34:11 43:3
    68:11
**higher-end** 29:8
**highly** 17:7,12
**hiking** 70:9
**Hill-Rom** 54:25
**Hinsdale** 8:18
**hip** 7:18 42:14
**hire** 32:10 35:16
    39:13
**history** 12:21
**hit** 63:12
**hits** 42:9
**hold** 47:9,21
**holidays** 32:13
**home** 23:20 28:7,10
    28:11,13 32:10,11
    32:14 54:12 55:13
    55:15,21,24,25
    57:1,7,16 58:17
    59:2,3,9,11,12,12
    60:5,11 61:6,19

68:20 69:14,18
**home-type** 22:16
**homes** 22:18 68:19
    68:25 69:6
**hope** 20:21
**hopefully** 35:14
**hospital** 8:16,16,17
    8:18 13:2 28:8
    41:21,22,25 43:9
    43:18 45:17 54:25
**hospitals** 8:18
    42:16
**hour** 33:6,21 34:5
    37:14,23,24 65:12
    73:1,4,6
**hourly** 31:24
**hours** 26:8 27:14
    27:15,18 28:20
    32:1 37:22 38:21
    54:1 71:18
**house** 44:25 55:11
    58:13,25 59:16
    60:1,5 61:4,6,22
**housing** 56:3
**HOWARD** 1:6
**huge** 58:7 62:3
**hungry** 15:7 63:12
    64:4 65:15
**hydrocephalus**
    41:9
**hygiene** 53:11

**I**

**ice** 50:20 61:15
**ID** 26:11
**idea** 7:5 59:21
    60:17
**identification** 5:23
    12:4 14:10 15:16
**identify** 68:15
**IEP** 24:20 28:12
    29:19 31:4
**ignorance** 53:5
**Illinois** 8:17

**immediate** 8:1 37:5
**impact** 67:5
**impaired** 16:14,15
    18:10 64:21
**impairments** 17:25
**impossible** 33:19
**impressions** 65:21
**improve** 57:11
**improved** 14:2
    16:22
**improvement** 20:8
**improvements**
    13:22
**improving** 19:5,18
    69:23
**include** 30:15,23
    57:17
**included** 5:12
**includes** 66:23
**including** 32:1
**inclusive** 30:12
**incontinent** 17:14
**incorrectly** 65:20
**increased** 17:17,18
    18:2
**incurred** 25:22
**independently** 19:8
**INDEX** 3:1
**individuals** 7:12
    73:1
**infection** 41:11
    42:19 43:2 52:13
**inflation** 44:18
**informal** 48:11
**information** 38:19
    56:14
**initial** 10:14 12:6,8
    12:15 14:16 27:1
**initially** 16:25
**injured** 11:6
**injuries** 11:6 20:7
    37:21 50:6 66:15
**injury** 7:13,13 9:7
    9:21 10:2 17:13

**inner** 20:3
**input** 23:15 47:20
**insert** 47:13
**inside** 49:13 61:21
**insignificant** 38:1
**insomnia** 73:16
**instance** 9:3 33:24
**insurance** 11:7,19
    21:22 56:13
**intact** 35:3
**intelligence** 35:5
**intensity** 43:4
**interest** 10:12
    29:22
**interested** 75:15
**interesting** 36:20
**interfaces** 42:15
    69:19
**interim** 34:1
**intermittent** 63:3
**intermittently**
    50:15
**intervention** 7:18
    8:1 16:4 23:1
    24:5 25:15
**intraparenchymal**
    52:3
**intraventricular**
    52:7
**invitees** 61:25
**involved** 4:25 6:3
    6:16,19 9:6,14,15
    10:13 11:2,9 24:9
    24:25
**involvement** 11:17
**IP** 44:10
**iPad** 15:3 63:11,25
**iPhone** 15:4,8
**issue** 19:15 30:21
    40:21 53:1,24
    57:15
**issues** 16:6 19:22
    25:9 26:15 32:8
    33:13 36:17,18,24

37:18,19 41:9,10
    43:10,15,21 49:7
    52:15 55:16 58:4
    69:7,20
**items** 45:4 55:22
    66:5

**J**

**January** 1:19 13:5
    13:16,19 14:7,19
    62:17 74:10,12
    75:16
**jointly** 1:13
**joints** 7:19
**joists** 58:6
**Jones** 40:5
**joystick** 50:22
**Judge** 47:24
**judges** 48:2
**July** 70:16
**jump** 26:14 44:25
    66:23
**June** 74:18
**jurisdictions** 60:16

**K**

**keep** 8:21 28:17
    29:23 61:1 65:15
    72:5,7
**keeps** 17:8
**keithkeithspi@y...**
    14:6
**Kenney** 2:3
**Keppra** 17:18
    38:10
**kept** 26:21
**kid** 36:11
**kids** 69:3
**kill** 66:24
**kind** 13:4 16:25
    22:19 29:11 31:2
    31:20 32:16 33:3
    36:18 38:1 45:11
    46:6,12,15 47:12

ROBERT EILERS, M.D.
1/16/2018

48:11,12 54:2
56:2 58:20 62:4,7
62:13 68:9 70:21
70:25
Kindergarten 71:2
knee 7:18
knew 13:10
know 6:8,18 7:2
11:5,7,9,13,24,25
13:13,13 14:1,15
17:10,11 18:7,25
19:1,2 21:16,16
21:24 22:9,11
23:1 24:7 25:1,10
26:2,15 27:2,3
28:19 29:7 30:19
30:21,22 31:7,25
32:8,13 33:14,16
33:19 34:16,18
35:15,19 36:6,7,8
36:9,23 37:8,17
37:19 38:9,13
39:10,11,12,23
40:1,19,21,22,25
40:25 41:1 42:2
42:10,14,23 43:6
43:15 44:23 45:8
45:24 46:4,6,22
46:24 47:15,18
48:25 49:2,20,22
50:11,12,14 51:9
54:3,4,9,9,10,15
54:20,24 55:9
56:20 57:2,4,6,9
57:25 58:10 59:9
59:10 60:8 61:2,9
62:1,2,18,20 63:4
64:5 65:2,23 67:4
67:6,24,25 68:1,4
68:18,23,24 70:13
70:22 71:3,6 73:5
knowing 30:9
44:17
knowledge 39:17

known 6:16
knows 25:6 64:19

**L**

labor 56:7
labyrinthine 20:3
lack 14:14 35:1
Lagrange 8:17
lamps 63:25
language 14:25
16:14 19:2 35:1
64:17,21 69:4
71:2
Large 4:3
lasts 64:2
law 6:11,11
lawyer 11:1
lawyers 6:7 66:12
leaks 17:22
learning 24:7 64:8
leave 30:7
leeway 60:25
legal 4:15 6:1
let's 18:22 24:13
27:13 37:9,16,22
41:25 42:2,3,8,18
45:15,17 49:20
52:12 57:5 59:2
61:23
level 19:17 25:22
35:6 43:4 57:3,7
64:24 67:25 68:8
70:10
Lewis 2:10
license 39:25 40:8
licensed 22:13
23:19 28:1 37:7
lien 10:19 72:3
life 3:12 5:4 12:7,8
12:13 21:22 26:17
26:24 33:2 36:13
48:9 62:9 66:15
66:22 67:1,7
lifetime 51:19,20

lift 51:7 54:23
lifting 51:8
light 12:24
lighter 50:18
likelihood 43:6
likes 55:18 62:23
limitations 35:2
limited 9:19
limits 14:1 19:19
24:8
LINDEN 1:6
line 31:3 50:16
Lingraphica 15:2
63:23
linoleum 19:15
liquids 18:13
list 5:11,16 8:24
listed 26:25 33:4
41:4,22 70:5
litigation 21:17,22
little 17:19 26:14
32:25 35:8 42:3
43:1 51:10 52:12
55:3 60:24 62:18
62:23 63:1,25
67:2 68:11,11
live 20:18 29:6
33:25 38:20 58:16
lived 36:1
lives 66:25
living 22:4 33:10
39:5 71:16
locating 29:8
locations 8:10
lock 49:12
long 7:4 10:1 16:21
16:23 20:24 22:3
22:4,6 26:5 28:2
32:21 37:1 38:12
46:7 47:4,18
48:22 57:4
long-distance
45:18
long-term 7:25

9:19 45:25
longer 32:25 45:15
51:11
look 25:20 37:25
41:15 45:14 58:12
60:18 61:2,5
64:22 66:22 67:7
70:7
looked 52:18
looking 26:22
27:20 28:21 46:22
47:5 60:6 63:6
looks 14:13 45:4
66:13
lose 30:9
lot 9:7,11,12,12,14
12:24 17:25 19:22
19:25 20:1,4
21:20 23:6 29:1,2
29:4 32:6 34:13
37:21 42:15 47:10
49:11 50:19 54:2
57:17 58:13,25
59:22 60:9,16,23
60:25 65:5 69:1
70:3
lots 36:9,24 69:20
lower 68:11
LPN 15:12 21:8
22:4,12,23,24
37:1,2 38:4,15
40:2,4
LPNs 34:4 37:11
37:13
lunch 31:11
luxury 60:19

**M**

M 1:24 4:1 74:7,15
74:16 75:4,19,20
M.D 1:18 3:3 4:10
74:9 75:8
maintenance 24:18
major 16:13 17:24

26:21 66:18
majority 72:22
making 31:16
malleolar 47:12
manage 7:20 9:3,4
9:4,25,25
management 5:5
7:12,24,25 8:6
54:11
manual 45:15,19
46:1,21 50:21
mark 5:22 12:2
14:8,22 47:15
62:13
marked 5:23 12:4
14:10 15:16
massive 20:21
master's-plus 25:5
material 56:7
matter 9:24
maximize 24:7
maximum 28:14
mean 9:24 10:1,4
16:2 17:5 18:20
20:15 21:20 22:8
23:7 28:16 29:5
31:22 33:18,23
34:14 40:19 44:13
44:14,22 49:22
51:5 53:5 57:1
58:18 61:4,11
65:8,11 66:7 67:4
67:14,21 68:10,14
68:21 70:4 71:9
means 64:5 67:16
meant 65:23
measurements
40:23
mechanisms 20:5
med 9:23
medical 4:18 5:4
8:22 9:21 11:9
14:21 16:6 34:25
43:4 66:21 67:22

**medication** 15:13
18:4 22:7,17
38:10,15 39:6,21
40:8,15
**medications** 9:3,5
21:7,9 22:14 37:6
37:10,17,22 40:22
**medicine** 7:7,9,17
**meds** 17:17 35:3
37:8,19 38:6
**meet** 47:19 63:21
**meeting** 70:20
**melt** 61:15
**melts** 64:18
**member** 22:6 37:5
71:20,21
**members** 61:4
72:21
**men** 34:17
**mention** 62:16
**mentioned** 63:11
64:11,13 65:18
70:13
**merged** 8:18
**met** 4:21 13:6
**methodically** 12:25
**MI** 2:4
**Michigan** 1:1 25:11
49:16 50:19 59:19
61:16 73:2,11
**mile** 2:4 45:16
**milligrams** 40:23
**million-dollar**
42:24
**mind** 29:23
**mine** 12:24
**minimum** 51:6
73:8
**minutes** 47:23
**missed** 62:6
**Mitchell** 2:9
**mixture** 18:1
**ML** 40:25
**mobile** 57:20

**mobility** 9:16 16:18
16:21 57:13
**model** 55:3
**modification** 48:10
**modifications** 56:3
**modify** 70:10
**mom** 7:3 21:12
23:4
**money** 35:17
**monies** 59:12
**monitoring** 23:14
**month** 26:17
**months** 10:16
18:18,23 19:3
**morning** 53:22
**motions** 62:21
**motor** 18:9,10,17
18:20 19:4 54:20
**motorized** 45:19
**mountains** 70:10
**move** 13:23 22:15
58:21 62:23 69:13
**moved** 33:24
**moves** 52:11
**moving** 28:17 61:5
61:6 66:2,5
**MRI** 42:6
**multidisciplinary**
24:21
**multiple** 8:10
**Musculoskeletal**
7:17
**Myers** 1:6 5:5 6:23
9:20 14:24 16:9

**N**

**name** 4:16,20 68:16
**nannies** 35:17
**nanny** 35:16
**Naples** 1:21 8:14
8:14 75:17
**national** 1:12 70:4
**native** 35:5
**nature** 9:22 34:24

**nc.collis@fiegerl...**
2:5
**necessarily** 41:25
46:16 54:12
**necessary** 22:5 37:2
**need** 6:25 7:1,3,21
14:16 15:25 18:4
20:23 21:5,10,16
22:8,9,11,11,12
23:8,18 24:1,10
26:1,6,9 27:9,15
27:18 28:13 29:11
29:22 32:2,10,12
33:4,12,16 34:10
34:22 35:7,7,8
38:15,22 41:6,11
41:20 42:5,21
43:6,11,22 45:15
45:25 46:2,6,16
46:21 47:5 48:18
48:21,23 49:25
50:1 51:3 52:23
53:8,17 54:17
55:2 56:21 57:2,7
57:8,9,14 61:19
71:15,18,19,21
72:7 73:14
**needed** 24:15,17
26:7 62:10
**needing** 55:15
**needs** 9:20 18:3,5
23:23 27:23 33:8
37:16,22 43:14
48:12 53:25 63:22
71:1
**negatively** 65:25
**neglect** 65:20,23
66:1,2,6,7,11
**neglected** 65:24
**neglecting** 66:10
**negligence** 11:10
**neighbor** 27:25
40:2,4,5
**net** 56:15

**Neuens** 2:9
**neurologic** 7:23
9:10,14
**neurologist** 9:9
42:4
**neurology** 9:1,2,6
9:12
**neuromuscular**
7:14
**neurosurgery**
52:19,21
**neurosurgical**
51:24 52:6
**never** 36:25 60:15
71:13
**new** 40:20 53:8
57:17 58:13,24
60:13 61:6
**nice** 57:1
**night** 41:13
**nine** 20:13
**nitpick** 55:14
**nonsurgical** 7:17
9:13
**north** 8:15,16
**Notary** 4:2 74:7,16
**note** 16:7 54:24
**noted** 14:24
**notes** 71:25 75:10
**Notice** 10:18
**noticed** 13:22 62:18
**number** 7:24 26:18
33:22 37:16 44:9
44:10 58:24 59:24
**numbers** 26:22
28:3,20 44:6,17
60:14 68:15
**nurse** 22:13
**nurses** 33:18
**nursing** 33:4 34:23
**nystagmus** 62:17
62:20 63:7

**O**

**Oakwood** 13:2
**Oath** 3:5 74:1
**object** 63:9
**objective** 60:18
**obstructed** 43:19
**obviously** 6:15 7:20
8:8 17:25 18:8
29:3 30:2 33:12
38:13 40:1 41:11
44:6 48:12 67:22
71:21
**occasional** 23:14
**occipital** 19:23
**occupational** 23:2
26:16 27:1
**occur** 37:20 42:12
52:25
**occurred** 67:18
**occurring** 17:23
**occurs** 6:4
**October** 12:9
**off-the-record**
48:11
**offering** 10:22
**offsets** 59:13
**Oftentimes** 36:17
**Oh** 43:1 67:14 72:8
72:15
**OK** 2:11
**okay** 5:1,7 6:14,22
7:6 10:13 12:7,12
13:4 14:18 18:14
19:4 22:25 26:21
28:3,14 31:2
32:21 33:21 37:1
40:10 47:22 49:15
51:20 52:16 54:11
54:22 55:7,14
56:5,24 60:11,12
72:5
**Oklahoma** 25:12
**older** 30:13 45:22
50:4,24 68:20
**Olympics** 69:17

ROBERT EILERS, M.D.
1/16/2018

Page 84

once 50:24 58:11
one- 68:4
one-on-one 23:7
  31:8
ones 54:14
ongoing 9:20
online 36:15
OOPS 59:18
open 18:9 50:10
operate 45:20 47:1
  48:20
operator 50:22
opinion 11:19,24
  67:21,23 68:19
opinions 5:2 10:23
  12:12,15 15:23,24
  16:1 62:6,11
  70:14,17 71:22
opposed 7:25 9:20
  11:19
option 36:1 49:21
  68:22
options 63:16
organized 17:12
orthopedics 7:23
  9:13
orthotics 7:16 47:7
  47:12,15
orthotist 47:19
OT 25:19 27:3
  32:17
out-of-pocket
  28:14 32:19
outline 43:11
outpatient 3:15
  14:7 28:16
outside 27:9 37:6
  39:7,10,18 57:19
  61:20 65:15 71:17
overlap 9:2,7 43:16

**P**

P 2:3
P.C 2:3

page 3:2,10 26:16
  26:24 33:2 41:3
  41:21 44:1 45:14
  48:9,10 51:16
  53:10 54:11 56:3
  56:6,16 65:21
pages 5:17 14:19
  45:4
paid 10:23
pain 42:22
pair 35:25 36:2,6
palsy 67:12,15,20
paralysis 67:16
paraprofessional
  31:4
parenchymal 52:8
parent 32:13 35:21
parental 71:19
parents 24:22
  59:10
park 70:4
Parkinson's 9:3
part 15:23 21:24
  53:5 58:10 62:21
parties 75:12
parties' 75:13
parts 7:15 17:3
pass 72:17
passing 53:3
patient 12:21 26:11
  35:6
patients 8:1 11:13
  52:7
pattern 54:2
pay 29:11,20 30:11
  35:16 36:14 44:7
  44:20,21 69:2
  73:5,7
paying 29:3
pediatric 46:7
penetration 60:22
people 7:14 11:5
  17:9 25:7 34:8,10
  36:3,14,19,21

37:20 40:18 58:14
  65:8 66:23 69:25
people's 40:18
percent 11:11 17:4
  43:24
percentage 11:3,12
perfect 10:25 36:20
  60:15 61:18 71:10
period 36:7 38:6
periods 57:14
permanently 51:21
persistent 65:22
  66:1
persisting 66:11
person 31:5,5 33:8
  33:8,9 35:2,4,18
  35:19 36:5 39:23
  66:25
personal 55:8
personally 68:24
  74:9
peruse 62:13
phrases 68:3
physical 5:3 7:9
  13:23 23:2 26:25
  28:1 35:2
physician 6:4 10:22
  72:2
Physician's 10:18
pick 36:15
picture 11:16 15:7
  65:1
pictures 63:21,21
  65:16 68:15
place 1:20 17:21
  21:18 53:6
places 63:2
plaintiff 11:3,11
Plaintiff(s) 1:9
Plaintiffs 2:1
plan 3:12 5:5 7:1,4
  11:23 12:7,9,13
  21:5,15,18 22:12
  26:24 33:3 48:10

57:23 62:9
planning 29:17
plans 11:20 60:15
  70:14
play 48:23
please 4:15 39:1
plus 34:14 58:25
  70:11
PM&R 14:4
pocket 29:20 44:7
point 7:1,20 16:17
  17:4 18:3,15 20:9
  20:20 21:11,15
  22:15 26:21 37:4
  37:13 39:18 45:6
  46:11,19 47:6
  48:20 49:25,25
  51:13,13,22 55:6
  57:1 64:14,18
  66:21
pointing 68:3
population 34:3
pose 69:6
position 47:21 63:1
positioning 33:16
  46:3
possible 44:13 52:9
post 15:1
postoperatively
  7:19
potential 32:19
  34:19,24 43:21
potentially 30:25
  35:25 44:7
pounds 50:18
powered 46:20
practical 49:14
practice 7:8 8:13
  8:14,17
practicing 39:25
pray 20:22
predictable 55:18
prefer 6:6
prekindergarten

25:11,13
prescription 23:9
Prescriptions 3:15
presence 4:21
present 15:14
press 64:4 65:1
pretty 18:14 21:4
  23:16 25:1 26:1
  31:16 33:23 34:7
  60:17 70:21
prices 28:8
principally 6:4
prior 4:22
private 29:18,22
  30:6,18 31:1
probability 52:10
probable 52:4
probably 11:5,6
  17:4 26:12,19
  43:23 46:22 47:13
  49:22 55:4 65:7
  67:15 68:1,5
  70:24 72:12 73:5
  73:6
problem 5:20 16:24
  19:11 40:16 42:25
  43:3 50:3 51:8
  52:2 55:19 60:6
problem-solve
  35:19
problem-solving
  35:12
problems 22:20
  36:10,16 52:20
  69:6
PROCEEDINGS
  3:1
products 11:10
  55:12
Professional 1:25
  4:2 75:5,5,20,21
Profit 1:12
profoundly 16:14
  18:10

ROBERT EILERS, M.D.
1/16/2018

**program** 16:3 19:5 22:25 23:8,13,20 24:4,5 25:13 63:14
**programming** 64:2
**programs** 69:15 70:5
**progress** 17:16 20:14 64:9
**progressive** 7:13 9:15
**prone** 55:4
**pronounce** 14:21
**pronounced** 63:7
**proper** 66:19
**property** 29:4 56:20
**prospective** 43:20 45:10
**prosthetics** 7:16
**protection** 53:18 60:22
**provide** 11:19 21:19 22:7,9,16 24:14,17 27:11 29:2,19,25 30:10 31:6,25 32:9,12 32:15,22 38:14,18 38:21 57:18 63:14
**provided** 5:7 10:9 10:10,18 27:7,17 31:18 32:17
**provider** 37:7
**provides** 23:25 24:2,12 25:21 27:14 28:21 31:4
**providing** 17:8 23:6,13 25:23,25 26:8 33:9 35:23 39:21 72:22
**provisions** 27:21
**psychiatrist** 25:5
**psychological** 36:18

**psychologist** 25:4
**PT** 24:1 25:19 27:3 27:13,15 32:16
**PT/OT** 23:8,18,23 44:11
**public** 4:2 29:18 30:7,10,17,24 31:3 32:21 74:8 74:16
**Pull-Up** 53:18
**pulled** 38:23,25
**purely** 24:18
**purposefully** 63:17
**pursuing** 66:9
**push** 57:21 63:16 63:20
**pushes** 63:18
**pushing** 50:21
**put** 12:1 25:12 27:23 39:22 40:18 45:7 46:17 49:9 49:10 50:2 54:9 58:6 62:14 65:24 72:2

**Q**

**qualifications** 45:7
**qualify** 31:5
**quarter** 45:16
**question** 11:22 25:9 33:7 47:15 51:25 55:10,20 56:6 58:22 61:17
**questions** 43:3 60:4 62:8 72:13 73:10
**quick** 62:8
**quite** 47:11
**quote** 55:19

**R**

**railing** 19:21
**ramp** 57:4 58:19
**ramps** 59:19,20
**range** 38:2 46:23

57:9 66:25
**rare** 52:8
**rarely** 52:6
**read** 10:9 14:21,22 15:18 62:7 68:7 73:12
**readily** 52:18
**reading** 68:8 71:2
**reaffirm** 70:23
**real** 10:12
**reality** 29:6 34:21 51:9
**realize** 60:11
**really** 6:6 10:2 11:13,14,15 24:4 34:9 35:20 36:18 36:22 38:18 39:4 39:22 42:21 46:15 56:6 57:8 58:19 61:17 66:17,20 68:1 70:21 73:15
**reason** 32:7 37:17 41:16 49:23 55:23 70:17
**reasonable** 11:23 72:24
**reasonably** 45:16
**recap** 70:25
**receiving** 23:2
**receptive** 64:16 65:7
**recess** 48:6
**recheck** 3:15 14:7 62:7
**recline** 46:17
**recognize** 68:16
**recommend** 67:6
**recommendations** 13:11 28:3 71:25
**recommended** 25:18 41:6
**recommending** 23:6
**record** 4:16 8:12

13:15 48:5 58:23 62:12,14 65:25 73:14,18 75:10
**records** 13:1,2 16:3 16:9 41:6 52:17
**recovery** 24:7
**reduce** 27:11 32:18
**reduction** 66:17 67:2
**referring** 26:12
**refinement** 19:18
**refractory** 9:5
**regarding** 5:3
**Registered** 1:25 4:2 75:4,20
**regular** 6:1 49:9
**regularly** 39:17
**rehabilitation** 7:9
**relate** 43:10
**related** 27:22 55:22 58:13 63:4
**relates** 65:20
**relation** 6:23
**relative** 75:11,13
**religious** 29:19,25
**remain** 46:8
**remember** 50:7 68:6 73:4
**remodel** 59:23 60:1
**remodels** 59:14
**remove** 7:21 51:25 52:14,18
**removed** 51:21
**removing** 52:20
**Rene** 16:4 17:8,16 23:5,16,18 35:22 47:8 50:8,18
**rent** 59:11
**repairs** 55:6
**repeat** 7:21
**replace** 46:4
**replaced** 52:10
**replacement** 54:21
**report** 13:21 14:7

25:17 26:11 41:3 58:11 62:16,17 64:11 65:22 66:13 75:7
**Reported** 1:23
**reporter** 1:25 3:6 4:2,5 48:1 75:1,5 75:5,20,21
**reports** 10:11 15:22
**representing** 4:24
**requested** 75:9
**required** 32:18 43:24 48:16
**requires** 7:4
**resources** 61:13 70:8
**respiratory** 43:2
**respond** 66:5
**responded** 66:3
**restaurants** 22:19
**retained** 6:6,10 10:11,20,21,24 11:1,14,14 21:8
**retaining** 34:11
**retracts** 52:1
**review** 12:23 13:3 16:1,8 75:8
**reviewed** 12:14
**revised** 43:16
**revision** 41:11
**revisions** 51:18 53:7
**rharper@neuens...** 2:11
**right** 4:20 11:21 13:8 18:5,24 20:17,25 23:12 24:16,23 25:3 26:11 27:16 28:18 28:23 30:5,11 32:20,21 34:1 38:5,7,17 40:14 41:3 43:23 44:5 44:21 45:3 46:1

47:9,16,21 50:13
56:8 58:3,15,20
59:5 62:5 67:20
68:6 72:15 73:11
73:13,17
risk 42:10 66:18
risks 41:10
RN 22:13 40:4
Road 2:4
Robert 1:18 3:3
4:10,17 6:12
35:22 74:8 75:7
roll 49:12
rolling 57:24
roof 60:20
room 57:18
rooms 42:16
roughly 37:22
RPR 1:24 74:7,16
RPT 28:1
run 36:24 55:20
Ryan 2:9 4:20

**S**

S 2:10
s/ 74:15 75:19
safe 57:25
safer 62:4
safety 18:7 49:18
55:3,16 56:4
savings 30:25 61:14
saw 10:16 16:2,20
saying 34:19 36:19
38:3 42:20 58:9
59:24
says 52:19
scenario 61:3
schedule 67:9
scheduled 47:25
school 23:20,24,25
24:2,12,14 25:1,4
25:10,21,23,25
26:8,9 27:8,13,17
27:19,21 28:19,21

28:23 29:1,5,8,12
29:22,25 30:6,8
30:14,17,18 31:6
31:19,23 32:5,6,9
32:12,17 33:14
35:9,13,14 40:5
44:14,23 71:17
schools 26:3,5
29:18,18,19 30:10
30:12,24 31:3
32:21
scooter 45:20 48:21
49:4,13 50:16
scratch 56:22 59:23
screen 34:14 36:19
36:22
scripts 14:14
second 45:1 71:2
second-grade 68:8
secretary 14:5,6
see 8:24 13:12
15:10 16:1 17:1
18:15,15,22 19:4
19:7,7,14,17,24
26:19 28:15 46:25
47:19 49:6 53:19
63:25 66:11,17
67:4 69:25 70:1
70:21
seeing 13:14 52:25
seen 15:22 36:10
40:18 52:6
seizure 17:17 21:9
37:19 42:2
seizures 9:4 17:19
32:3 33:15 34:24
34:25
self-soothing 20:6
self-stimulation
20:1
self-sufficient
20:15 69:5
selling 61:6
semi 4:24

send 12:17 34:12
72:9
sense 55:15,21
59:21 61:18
sepsis 39:2
services 22:17 23:1
25:23 26:6 30:9
32:22 34:4 41:4
72:25
serving 5:25
set 23:8 28:11
31:11 33:17,20
35:8 54:2 64:1
setting 8:9 22:16
24:21 68:20 69:18
72:25
settings 69:10,20
seven 20:12 34:10
49:19 53:15 54:6
71:8,9
seven-page 12:22
severally 1:13
sexual 69:7
Sharon 14:4
she'd 54:8
she'll 17:15 18:8
19:7,8,21,21
20:11 46:20,21
49:4 53:20 71:3
71:13,19
shift 37:11,23 38:5
shits 33:5
shoe 47:13
show 20:14 63:3,5
63:10 70:18
shower 55:2 57:24
showing 16:19 17:5
shown 20:8
shunt 17:21 37:18
42:18,18 43:15,19
51:18,20,23 52:5
52:8,14,17 53:6
shunts 66:19
sick 34:12

side 66:2
sign 36:11 73:12
signed 38:24 74:12
significant 16:12
16:13 67:22
significantly 66:16
signs 33:15
similar 36:5 38:2
67:11
simple 45:22 65:11
68:3
simply 10:22 67:16
sippy 18:11 31:17
sir 4:15 43:25 70:6
sit 28:18 32:11 39:5
44:18,19 63:2
site 56:13
sitting 16:20,21
63:6
situation 29:21
61:9
situational 62:19
six 34:10 37:10
41:22 49:19 52:23
size 59:6
skill 33:17,20 35:8
36:2
skills 18:9,10 35:13
64:16 65:7 67:24
69:4 71:3
skin 8:6
skipped 56:3
skull 15:1
Skype 70:2
sleeping 41:13
slings 54:23
smoking 67:3
snow 50:19
socialization 69:3
69:24
solemnly 4:5
solid 60:17
somebody 11:18,22
20:18 32:2 33:13

33:14 34:11,12
35:5,9,11 37:12
39:13 44:21,24
59:2 71:17 73:7
somewhat 38:1
sorry 6:17 56:15
72:8
sort 36:21 39:23
sorts 30:16
sounds 11:17 63:12
source 60:18
sources 23:25
South 1:20
SOUTHERN 1:2
Southfield 2:4
space 62:2
spasticity 18:3
speak 30:3 52:20
speaking 30:2,6
33:3
Special 69:17
specialist 23:19
specialized 8:25
specialties 7:8
specialty 7:10 8:22
25:8
specific 11:12
30:21 31:17 41:6
43:6
specs 60:15
speech 23:3,9,19,23
25:18 27:1,3
44:11
spelled 68:16
spend 60:7
Spicer 6:13,22
10:20
spin 62:23
spinal 7:13 9:8
spine 7:19
spinning 19:25
spoken 4:21 66:14
sports 7:17
stable 20:4 42:13

55:4
staff 22:23 34:5,10
    34:11,16 37:10,13
staffing 36:5
stairs 19:20
standard 33:22
    60:20,20,20
stander 55:4
standing 57:24
start 23:21 25:10
    25:16 57:12 70:9
started 15:6
starting 23:20
    25:14
starts 40:13 43:17
    63:9
state 4:3,15 39:24
    47:3 56:19 73:1
    74:3,8,17 75:2
statements 15:6
states 1:1 22:14
status 15:1
stay 46:14 57:16
stays 41:22
stenographic 75:10
stenographically
    1:23 75:7
steps 16:24
stimulation 17:11
storms 60:24
straight 57:22
strength 19:4
stress 26:5
stroke 9:7
strokes 7:12
strong 50:19
structured 17:7,9
    17:12 55:18 61:11
student 9:23
stuff 25:5 44:25
    55:14
subdural 58:1
success 69:9
Suite 2:10

summarized 16:6
summary 44:2
superior 64:16
supervised 32:3
supervision 18:6
    23:13 33:9 71:16
supplement 24:3
    24:14 26:10 28:13
    29:9
supplemental
    64:11 65:22
supplies 53:11
    61:25
support 22:21
    29:20
supra 47:12
sure 8:23 28:25
    29:13 30:20 31:16
    34:14 40:3 43:12
    44:5 48:4 50:9,11
    55:16,21 56:1
    62:11
surface 19:14
surfaces 16:23 45:8
    71:4
surgeon 7:22
surgeries 7:19
    51:16,17
surgery 7:21 8:4
SUV 51:6
swallowing 18:14
swear 4:5
switch 38:4
switches 64:9
sworn 4:11 74:10
syrinxes 9:8
system 27:8 44:10
    45:23 54:18 55:5
    61:15 63:23 64:2
systems 58:6 70:12

——————— T ———————
take 6:20 7:18
    22:10 32:6 35:3

36:11 39:1 42:9
    45:1 47:22 52:22
    61:19,22
taken 1:19 4:1 48:6
talk 13:9,10 21:1
    42:23 54:14 65:12
talked 13:11 17:16
    30:17 31:10,21
    32:16 44:14 47:8
    47:11
talking 8:8 55:11
    57:6
target 66:25
task 66:4
tasks 66:9
tax 29:4
taxes 26:2
taxpayer 26:2
    44:23
TBI 15:1
teaches 40:5
technology 41:19
    69:22
TELEPHONE 2:1
tell 7:7 11:3 12:13
    24:10 30:5 35:4
    38:22 43:23 49:8
    49:9,24 62:24
    64:19 66:21
ten 2:4 27:14 53:15
    54:6 71:7,9
tends 20:3 66:2,8
term 7:4 10:1 16:23
    20:24 57:4 65:22
terms 5:21,25 7:4
    11:14 12:12 14:21
    17:2 18:17,18
    19:1 20:15 21:24
    25:17 29:13 31:2
    32:18 60:24 69:7
test 62:25 63:2
testified 4:12
testimony 4:6 5:3
    5:12 9:19 33:7

67:11 68:19
testing 41:15,17
    43:14
thank 10:25 43:25
    48:3 51:14 56:17
    72:16 73:9
theoretically 53:6
therapeutic 24:18
therapies 23:7 29:9
therapist 28:1
therapists 29:10
therapy 23:2,2,3,22
    24:9 26:7,16,25
    26:25 27:1,1
    30:15 44:2 55:24
    55:24
They'd 42:6
thicker 19:13
thing 11:24 21:23
    29:17 31:20 45:18
    59:14
things 8:5,7 9:17,21
    11:8,10 12:18
    15:14 17:8,12
    18:8 19:5,10,21
    23:15 24:9,10
    27:9 31:10,11,15
    34:24 41:7,12,20
    42:16 43:19 45:24
    49:5 53:19 57:21
    57:23 58:1,19
    61:2 62:15 63:19
    65:11 66:19 67:5
    71:11
think 5:16,16,17
    10:17 11:22 13:1
    13:9 16:6,13
    17:15 18:24 19:22
    20:19,20,22 21:2
    25:20 26:11,15
    35:19 41:1 42:21
    46:12 47:8,13,17
    47:18 49:4 51:4
    54:10,15 55:15

60:24 61:17 62:5
    62:6 64:9 65:19
    67:8 68:6 69:10
    69:12 70:5,17
    71:24 72:1 73:3
    73:11
thinking 70:23
third 59:15
thirsty 15:8
thirties 57:13
thought 16:25
    67:11
thoughts 11:25
    30:22
thousand 58:5 59:4
three 16:16 25:14
    25:16 27:2,4,19
    31:8 33:5 42:19
    51:18 52:22 54:1
    54:14 64:17
Throw 64:12
time 1:20 6:3 13:2
    19:9,9 26:17
    28:15 35:12 37:14
    50:24 70:15 71:1
    71:11 72:16,22
times 23:25 24:2,13
    26:7 27:3,4,5,13
    27:14 37:12 41:13
    42:7 49:11 50:19
    53:23 60:9,25
    64:25 66:4
tiny 58:20
today 5:2,8 13:4
    28:18 38:9 39:5
    44:19,20
toe 16:19 47:10
toilet 53:12,16,21
    54:1 71:6,6
toileted 53:16,20
toileting 17:16
    20:11 31:18
told 47:16 50:10
tomorrow 21:13

ROBERT EILERS, M.D.
1/16/2018

Page 88

| | | | | |
|---|---|---|---|---|
| ton 29:4 | trips 69:17 | 69:18 | vacation 22:10 | 61:20 |
| tone 18:2 | trouble 40:9,12,24 | unable 65:9 | vacations 32:13 | want 11:25 29:7 |
| tooth 38:22 | 41:2 | underneath 27:2 | value 72:24 | 34:16 36:4,5,12 |
| top-dollar 44:19 | truck 4:24 | understand 4:23 | van 51:11,12 57:15 | 36:18,21 39:11 |
| tornadoes 60:21 | true 75:9 | 8:20 10:8 13:18 | variability 34:6 | 47:2,14,17 49:11 |
| total 11:15 27:20 | trunk 49:10 | 20:5 21:14 22:3 | variable 32:24 | 54:14 55:21 57:23 |
| 44:1,17 | trunks 50:3 | 23:12 33:13 34:22 | various 7:15 63:16 | 58:1 59:22 62:11 |
| totality 24:11 | truth 4:7,7,8 | 39:15 41:20 44:12 | vehicle 48:10,15,19 | 62:13 64:4,22,22 |
| TOTS 16:3,9 19:5 | try 59:23 70:15 | 53:1 58:9 61:20 | 49:18,21 50:7 | 65:14,19,19 69:2 |
| 22:25 23:13 24:4 | trying 6:24 21:22 | 64:22 65:9 68:7 | 51:3 | 69:14 73:15 |
| touch 15:7 | 23:17 26:22 41:23 | 70:15 | ventricular 52:8 | wanted 13:9,10,12 |
| touching 65:14 | 45:3 62:25 | understanding | verbal 67:24 | 18:15 26:17,18 |
| trace 68:16 | tubing 17:21 52:11 | 64:13 | verbally 13:11 | 29:24 43:12 70:9 |
| track 54:17,18 58:6 | tuitions 30:14 | understands 63:19 | versus 11:3 64:5 | 70:20,21 |
| tracking 63:8 | Tulsa 2:11 | 65:2 | vertigo 62:19 | wants 6:8 64:19 |
| trained 53:12,17 | turn 57:10 | understood 25:24 | victim 34:19 | wasn't 15:14 18:12 |
| 71:6 | TV 70:2 | 28:18 | view 56:25 | 18:13 26:21 50:9 |
| training 8:23,25 | twice 27:20 28:8 | uneven 71:4 | vision 20:2 46:25 | 55:22 |
| 9:12 35:15 | two 14:19 15:14 | unfortunately | 63:1 66:6 | way 11:2,3 23:7 |
| transcript 75:8,9 | 16:16 26:10 27:5 | 21:20,25 | visit 14:15,16 23:10 | 30:23 33:19 38:23 |
| transcripts 15:19 | 31:8,13 39:13 | unique 25:3 | 28:5 | 38:25 45:12 51:1 |
| transfer 14:1 48:18 | 45:24 49:6 52:22 | UNITED 1:1 | visits 15:13 23:14 | 60:14 |
| 49:13 | 54:1 | unlevel 16:23 19:10 | 37:2 | ways 40:22 |
| transferring 55:1 | two-component | unrelated 50:5 | visual 17:25 19:22 | we'll 9:4 13:21 |
| transfers 54:18 | 68:4 | unskilled 33:9 | 24:8,8 49:6 62:24 | 38:20 45:2 |
| transient 36:6 | two-story 57:2 | unstable 16:22 | 64:8 66:5,7,7 | we're 7:24 38:20 |
| transport 46:8,15 | two-year-old 18:8 | unusual 20:6 | visualize 70:1 | 43:17 45:1 46:6 |
| 46:16 48:15 49:10 | type 7:7 8:4,5 11:10 | updated 14:7 | visually 64:21 66:3 | 46:21 49:15 52:19 |
| trash 64:12 | 11:24 18:18 20:13 | upgrade 64:3 | Vitae 3:11 | 57:6 62:14 |
| trauma 52:4 | 20:23 21:22 45:18 | upper 43:2 | vital 33:15 | we've 10:9 31:10 |
| traumatic 9:15,21 | 47:1 48:15 49:21 | use 12:7 15:2,5,9 | vocabulary 65:16 | 31:20 37:1 41:15 |
| 10:2 | 51:3 60:1,21 | 18:11 19:9 35:11 | 68:7 | 42:24 45:6 70:23 |
| traveling 53:18 | 63:13 69:25 71:15 | 45:18 46:4,20 | vomiting 43:17 | 72:1 |
| tray 31:11,14 | types 8:7 9:17 24:9 | 47:11 48:21,23 | VP 42:18 43:15 | wealthy 29:3 |
| treated 11:18 | 43:19 45:8 53:19 | 49:13 50:15,21,22 | 51:18,23 | wear 47:14 |
| treating 6:4 10:22 | 61:2 | 51:6,11 55:2 | | week 24:1,2,13 |
| 67:10 | typical 68:19 | 65:13 | **W** | 26:8 27:4,4,5,13 |
| treatment 7:12 | | uses 49:4 50:1 | wait 47:17 | 27:14,14,20 28:20 |
| 10:14 | **U** | usually 6:5 11:24 | waiting 32:11 | weekends 32:12 |
| treatments 28:4 | Uh-huh 59:7 | 24:25 26:3 29:25 | waive 73:12,16 | weeks 39:13 42:19 |
| tremendous 69:9 | Uh-uh 39:25 | 31:6,7 | walk 16:18,24 | weighing 50:17 |
| tremendously 9:2 | ultimate 39:4 51:24 | | 19:16 41:16 45:16 | went 13:6 47:3 |
| tremors 9:11 | 52:5 | **V** | walking 16:19,22 | 59:11 |
| trial 5:11 | ultimately 53:2 | v 1:10 | 42:8 47:10 49:5 | West 2:4 |

BRICKELL KEY COURT REPORTING, LLC
305.407.9993

ROBERT EILERS, M.D.
1/16/2018

Page 89

| | | | | |
|---|---|---|---|---|
| **wet** 20:10 51:9 | **yeah** 5:17 10:17 | **13** 37:24 56:6 | **30** 43:9 68:21 | **75** 3:6 |
| **wheelchair** 45:3,10 | 18:24 25:20 29:15 | **130** 50:17 | **300** 54:8 | **750** 46:23 |
| 45:19 46:2,7,20 | 29:16 55:17 68:10 | **14** 3:13 19:2 56:16 | **300,000** 59:8 | **78-year-old** 35:2 |
| 46:21 49:10 50:2 | **year** 13:13 18:25 | **15** 3:15 19:2 47:23 | **35** 8:2 11:7 37:14 | **780** 1:20 |
| 57:10,10,14 61:7 | 35:9 42:7 43:22 | 73:5,5,5 | **38** 7:10 36:24 41:5 | |
| **wheelchairs** 51:7 | 44:2,17 46:9,20 | **15th** 12:10 | | **8** |
| **wide** 58:18 | 46:22 54:8 64:25 | **16** 1:19 38:21 73:6 | **4** | **8** 41:21 |
| **widescreen** 70:2 | **yearly** 27:20 41:22 | **16th** 74:10 | **4** 3:4,15 14:23 | **80** 11:11 37:24 67:8 |
| **wife** 25:4 | 70:16 | **18** 25:19 33:1 45:4 | 15:16 | **84** 67:8 |
| **willing** 49:16 | **years** 7:10 8:2 | 68:23 73:5 | **4,600** 46:14 | |
| **windows** 60:19 | 18:18 22:19 36:24 | **19** 32:22,23 33:1,1 | **40** 37:14 41:17 | **9** |
| **winter** 49:17 | 41:5 43:8 46:1,1,5 | 45:4,14 68:23 | 52:24 | **9** 26:24 |
| **wise** 16:18 | 49:1,19 52:25 | **19390** 2:4 | **40-percent** 59:18 | **90** 11:11 37:25 |
| **witness** 3:2 4:9 | 64:3 67:15 68:21 | | **409,000** 56:7 | **9th** 13:5,16 14:8,19 |
| 5:25 14:11 48:4 | **yes-no** 68:3 | **2** | **4283791** 1:11 | 62:17 |
| 72:4,7,17 73:15 | **young** 6:24 19:23 | **2** 3:12 12:2,4 | **48075** 2:4 | |
| **women** 34:17 | 34:15 48:13 66:24 | **2,200-square-foot** | | |
| **wonderful** 35:15 | **your-all's** 61:12 | 56:20 | **5** | |
| **word** 12:7 14:14 | | **2,412** 26:19 | **5** 3:11 33:2 57:9 | |
| 65:20 66:11 | **Z** | **20** 68:23 | **5-** 57:9 | |
| **words** 16:16 19:2 | **zero** 27:17 44:11 | **200** 28:5 38:20 | **5,000** 49:20 | |
| 23:18 63:19 64:17 | **ZeroG** 55:5 | **200-some** 59:4 | **5:16-CV-10803-J...** | |
| 68:3 | **ZIP** 56:19 | **200,000** 59:9 | 1:4 | |
| **work** 7:16 11:6 | | **2016** 12:10 | **50** 30:14 | |
| 36:10 52:21 60:8 | **0** | **2018** 1:19 13:5,16 | **500,000** 58:24 | |
| 60:9 63:25 68:25 | **0.6** 17:18 | 14:8,20 74:10,12 | **5th** 1:20 | |
| **working** 8:9 60:12 | **077785** 74:17 | 75:16 | | |
| **workup** 42:24 | | **2021** 2:10 74:18 | **6** | |
| **world** 10:3 61:12 | **1** | **20s** 57:12 | **6-foot** 57:9 | |
| **worth** 54:3 | **1** 3:11 5:22,23 | **21** 48:9 | **60** 57:11 | |
| **worthwhile** 47:20 | **1,000** 54:3,6,10 | **22** 33:5,21 34:2 | **60s** 57:20 | |
| **wouldn't** 22:4 | **1,500** 54:6 | 37:23 73:3,4 | **65** 11:6 34:5 | |
| 25:22 31:24 48:20 | **1/15/18** 3:13 | **24** 34:2 53:10 71:18 | **660** 2:10 | |
| **wound** 8:6 | **1/9/18** 15:1 | **24-hour** 15:12 21:6 | | |
| **wounds** 8:6 | **10** 37:24 44:1 47:23 | **24-hour-a-day** | **7** | |
| **writing** 12:24,24 | **10,452** 26:18 | 29:14 31:21 | **7** 41:3 | |
| **wrong** 26:18 40:6,9 | **10:00** 1:20 | **25** 54:11 | **7,500** 63:24 64:2 | |
| 40:10,17 54:16 | **100,000** 30:14 | **26** 18:23 33:25 | **70** 17:4 42:13 | |
| **wrote** 15:2 | 43:24 | **26th** 74:12 75:16 | **700** 46:22 | |
| | **104** 66:25 | **27** 74:18 | **70s** 57:20 | |
| **X** | **11** 10:16,17 56:3 | | **72** 3:4 | |
| **X** 24:12 | **11:00** 47:25 | **3** | **74** 3:5 | |
| | **11:59** 1:20 73:19 | **3** 3:13 14:9,10 | **740** 46:18,19 | |
| **Y** | **12** 3:12 | 65:21 | **741** 46:9,15 | |
| | **120** 50:17 | | **74104** 2:11 | |